UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MICHAEL JAMES WELLS,

Plaintiff,

v.

8:25-CV-1403
(AJB/ML)

MASSENA POLICE DEP'T; CONNOR TRUAX, Massena Police Detective; and GARY PASQUA, St. Lawrence County District Attorney,

Defendants.

---

APPEARANCES: OF COUNSEL:

MICHAEL JAMES WELLS
Plaintiff, *Pro Se*
Eastern New York Correctional Facility
Box 338
Napanoch, New York 12458

MIROSLAV LOVRIC, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

The Clerk has sent a *pro se* Complaint in the above captioned action together with an amended application to proceed *in forma pauperis* and inmate authorization form filed by Michael James Wells ("Plaintiff") to this Court for review. For the reasons discussed below, I (1) grant Plaintiff's amended *in forma pauperis* application, and (2) recommend that Plaintiff's Complaint be accepted in part for filing and dismissed in part.

## I. INTRODUCTION

Construed as liberally[1] as possible, the Complaint[2] alleges that Plaintiff's civil rights pursuant to 42 U.S.C. § 1983 were violated by defendants Massena Police Department, Connor Truax of the Massena Police Department, and Gary Pasqua the St. Lawrence County District Attorney (collectively "Defendants"). (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on March 11, 2024, Defendants Massena Police Department and Truax wrongfully arrested and slandered Plaintiff by placing him under arrest for first-degree Robbery, fourth-degree criminal possession of a weapon, petit larceny, and fourth-degree criminal mischief. (Dkt. No. 1 at 3.) Plaintiff alleges that Defendant Truax "attempt[ed] to speak to Plaintiff . . . without an attorney" present and sought to have Plaintiff work as a "snitch" or police "informant." (*Id*. at 4.) Plaintiff alleges that he repeatedly told Defendant Truax that he wanted his attorney. (*Id*.) The Complaint alleges that Defendant Truax told Plaintiff that if he did not cooperate, Defendant Truax would purposefully "trump up" false accusations. (*Id*.) Plaintiff alleges that he declined to work as a "snitch" and thereafter, Defendants "illegally searched Plaintiff in strip frisk." (*Id*. at 4-5.)

The Complaint alleges that Defendant Pasqua "attempted to indict by way of Grand Jury of St. Lawrence County in the last 6th month" for a crime that Plaintiff did not commit. (Dkt.

---

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 The Complaint was initially filed by Plaintiff and "on behalf of Britney Jane Zanker." (Dkt. No. 1 at 1.) On May 7, 2026, United States District Judge Anthony J. Brindisi dismissed Ms. Zanker from the action without prejudice. (Dkt. No. 21.) As a result, the review herein is solely as to the allegations contained in the Complaint that relate to Plaintiff.

No. 1 at 6.) Plaintiff alleges that the grand jury returned a "no bill" on the robbery charge and all charges against him were dropped. (*Id*. at 8.)

Notwithstanding the dismissal of the criminal charges, Plaintiff alleges that a parole violation was filed because of the false criminal charges and he was sentenced to 12 months incarceration based on the violation of the parole. (Dkt. No. 1 at 6-7.) The Complaint alleges that if Plaintiff had not been falsely accused of the robbery, he would not have received a 12-month sentence for the violation of parole. (*Id*. at 7.)

The Complaint alleges that on June 8, 2025, Defendants again falsely arrested Plaintiff for charges that he did not commit. (Dkt. No. 1 at 8.)

Based on these factual allegations, the Complaint asserts the following six claims: (1) a claim of false arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim of unlawful search and seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (3) a claim of malicious prosecution pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (4) a claim of abuse of process pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (5) a claim that Plaintiff's right to counsel pursuant to the Sixth Amendment and 42 U.S.C § 1983 was violated; and (6) a claim of defamation pursuant to New York common law. (*See generally* Dkt. No. 1.) As relief, the Complaint seeks: $50,000,000 in compensatory damages, $50,000,000 in punitive damages, injunctive relief "to order Defendants to cease and desist all illegal prosecution," and such further relief as the court deems just. (Dkt. No. 1 at 10.)

## II. PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-

CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[3] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 18 at 2), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. (Dkt. No. 19.)

Accordingly, Plaintiff's amended application to proceed with this action IFP is granted. (Dkt. No. 18.)

## III. LEGAL STANDARD GOVERNING REVIEW OF THE COMPLAINTS

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

---

[3] Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced. However, Plaintiff has become a prolific filer since commencing this action. Plaintiff is cautioned that proceeding IFP is a privilege, not an unqualified right, and the continued filing of frivolous lawsuits may result in the denial of a request to proceed IFP in an action and/or a recommendation to the Chief Judge that a filing injunction be issued against Plaintiff.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

**IV. ANALYSIS**

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that the pleadings be accepted in part for filing and dismissed in part.

**A. Claims Pursuant to 42 U.S.C. § 1983**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990).

"Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983.

**1. Claims Against Defendant Pasqua**

"Prosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'" *Joyner v. Cnty. of Cayuga*, 20-CV-0060, 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (D'Agostino, J.) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)). Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, 11-CV-0316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, 00-CV-3626, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).

Plaintiff's pleadings appear to allege that Defendant Pasqua as District Attorney should have dismissed the criminal charges against Plaintiff. (*See generally* Dkt. No. 1.) Based on

these allegations, Defendant Pasqua is entitled to prosecutorial immunity for the actions he took in his role as prosecutor. *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (citation and internal quotation marks omitted) (collecting cases) ("It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursing a criminal prosecution is immune from a civil suit for damages under § 1983.").

As a result, I recommend that claims against Defendant Pasqua in his individual capacity be dismissed because the claims seek monetary relief against a defendant who is immune from such relief pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii), 1915A(b)(2).

With respect to Plaintiff's claims against Defendant Pasqua in his official capacity—as the St. Lawrence County District Attorney—those claims are subject to dismissal pursuant to the Eleventh Amendment. *See D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New York*, 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment.").

The undersigned notes that prosecutors are not immune from suits seeking certain injunctive and declaratory relief. *Abdul-Matiyn v. District Attorney's Office Bronx Cnty*., 21-CV-11074, 2022 WL 523458, at *3 (S.D.N.Y. Feb. 22, 2022).

To the extent that the Complaint asks the Court to declare that Defendant Pasqua's past actions were wrong, that does not amount to a real and immediate threat of injury necessary to make out a case or controversy. *Morales v. City of New York*, 59 F. Supp. 3d 573, 581 (S.D.N.Y. 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)) ("ask[ing] the Court only

to recognize a past wrong . . . in the context of declaratory relief, does not in itself 'amount to that real and immediate threat of injury necessary to make out a case or controversy.").

To the extent that Plaintiff, in seeking injunctive relief, asks the Court to intervene in his pending state-court criminal proceeding, I recommend that the Court dismiss those claims as barred pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). In the Second Circuit, "*Younger* abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Kelly v. Wells Fargo Bank Nat'l Ass'n Securitized Asset Backed Receivable Mortgage Pass Through Certificate - Wells Fargo 101*, 19-CV-1366, 2020 WL 772685, *3 (N.D.N.Y. Feb. 18, 2020) (D'Agostino, J.) (citing *Spargo v. New York State Com'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003)).

Based on the allegations contained in the Complaint all three *Younger* abstention elements are present. First, there is an ongoing state criminal proceeding against Plaintiff. (Dkt. No. 1 at ¶¶ 34-36.) Second, "[t]here is no question that [an] ongoing prosecution implicates important state interests." *Davis v. Lansing*, 851 F.2d 72, 76 (2d Cir. 1988). Third, should Plaintiff be convicted, he may raise his constitutional claims on direct appeal or through collateral review of his conviction in state court. *See Tyson v. Clifford*, 18-CV-1600, 2018 WL 6727538, at *4 (D. Conn. Dec. 21, 2018) (plaintiff is "not precluded from challenging any subsequent conviction or sentence on appeal to the Connecticut Appellate and Supreme Courts, filing a habeas petition in the Connecticut Superior Court, and following that, a habeas petition in federal court"); *Robinson v. Sposato*, 11-CV-0191, 2012 WL 1965631, at *3 (E.D.N.Y. May 29, 2012) (direct appeal or collateral review provide "ample opportunity for review of petitioner's constitutional claim in state court"); *Miller v. County of Nassau*, 467 F. Supp. 2d

308, 317 (E.D.N.Y. 2006) (plaintiff can raise arguments on appeal once state court judgment enters).

However, even when a case has met all three of *Younger*'s prongs, "federal relief is obtainable[,] . . . where [ ] there is a showing of bad faith or harassment in bringing the or conducting the state proceeding." *Wandyful Stadium, Inc. v. Town of Hempstead*, 959 F. Supp. 585, 591 (E.D.N.Y. 1997) (citing *Younger*, 401 U.S. at 50). "[F]or such a showing to be made, generally 'the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome.'" *Homere v. Incorporated Vill. of Hempstead*, 322 F. Supp. 3d 353, 368 (E.D.N.Y. 2018) (quoting *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994)) (citation omitted); *see also Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975) (noting that bad faith under *Younger* "generally means a prosecution has been brought without a reasonable expectation of obtaining a valid conviction"). Furthermore, "[a] pattern of harassment both before and after institution of the state prosecution would be probative of the animus that attended the decision to prosecute." *Colonial First Properties, LLC v. Henrico Cnty. Virginia*, 166 F. Supp. 2d 1070, 1087 n.12 (E.D. Va. 2001).

Here, Plaintiff alleges that "Defendants are only p[u]rsuing false accusations [of his arrest on June 8, 2025,] because Plaintiff received a 'No Bill' on the Robbery charge last year and all charges . . . were dropped completely." (Dkt. No. 1 at ¶ 35.) However, these "allegations [of bad faith and harassment] are too conclusory and barebones to serve as the factual predicate for a plausible finding of bad faith." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 355-56 (E.D.N.Y. 2016); *see Pervu v. City of Oneonta*, 19-CV-0861, 2020 WL 1643392, at *7 (N.D.N.Y. Apr. 2, 2020) (D'Agostino, J.) (finding that the plaintiff's allegations that the defendants submitted misleading photographs to establish code violations in state court and the

plaintiff's allegation that the state court judgment was jurisdictionally defective, were too conclusory to plausibly suggest bad faith for purposes of *Younger* abstention).

Further, Plaintiff seeks an order that "Defendants cease and desist all illegal prosecution and to treat Plaintiff[] according to the Constitution of the State and Federal justice system." (Dkt. No. 1 at ¶ 38C.) A plaintiff seeking prospective injunctive relief "must plead more than conclusory, general requests that the defendants be enjoined from selective enforcement of laws against Plaintiffs." *Hamza v. Kotsidis*, 25-CV-0968, 25-CV-1429, 25-CV-1506, 2026 WL 1296172, at *10 (N.D.N.Y. May, 12, 2026) (Coombe, J.) (citing *Craig v. Connecticut Dep't of Mental Health Nov. 28, 2017 & Addiction Servs.*, 16-CV-2100, 2017 WL 5892193, at *5 (D. Conn. Nov. 28, 2017) ("[Plaintiff's] request for injunctive relief - 'an order that each defendant shall fully comply with the provisions of [sic] pursuant to 42 U.S.C. § 1981 . . .'- is impermissibly vague and overbroad."); *Peregrine Myanmar Ltd. V. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.")) (internal quotation marks omitted).

For each of these reasons, I recommend that Plaintiff's claims against Defendant Pasqua be dismissed.

**2. Claims Against Defendant Massena Police Department**

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850 at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014)

(Sharpe, C.J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *rep't and rec. adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

Hence, Defendant Massena Police Department is not proper party amenable to suit. As a result, I recommend that Plaintiff's claims against Defendant Massena Police Department be dismissed.

To the extent that the Complaint is liberally construed as asserting claims against the municipality of Massena, I recommend that it be dismissed.

"[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Complaint here essentially complains of discrete incidents in March 2024 and June 2025, during which Plaintiff was allegedly treated improperly by employees of the municipality of Massena. (*See generally* Dkt. No. 1.) Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of the municipality of Massena.

As a result, I recommend that any claims against Defendant Massena Police Department—or the municipality of Massena—be dismissed for failure to state a claim upon which relief may be granted.

### 3. Claims Against Defendant Truax[4]

#### a. Fourth Amendment Claims

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on state and municipal officers such as Defendant Truax. *See Tsinberg v. City of New York*, 20-CV-0749, 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021) (citing *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010)).

##### i. False Arrest

"In analyzing claims alleging the constitutional tort of false arrest, '[the Court has] generally looked to the law of the state in which the arrest occurred.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). "To establish [a claim of false arrest under New York law] the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975). Confinement is

---

4 To the extent that the Complaint is construed as asserting claims against Defendant Truax in his official capacity, I recommend that they be dismissed for failure to state a claim upon which relief may be granted. A "claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself." *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012). For the reasons set forth above in Part IV.A.2. of this Order and Report-Recommendation, Plaintiff fails to allege claims asserting liability against the municipality of Massena.

In addition, the undersigned notes that the Complaint does not allege facts plausibly suggesting Defendant Truax's involvement in Plaintiff's arrest on June 8, 2025, and the subsequent criminal proceedings from that arrest. As a result, the claims against Defendant Truax relate solely to Plaintiff's arrest on March 11, 2024, and the consequences flowing therefrom.

"otherwise privileged" when probable cause exists, in other words, "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). However, "[p]laintiffs are not required to set forth a lack of probable cause in their complaint." *Case v. City of New York*, 233 F. Supp. 3d 372, 384 (S.D.N.Y. 2017).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendant Truax in his individual capacity.

**ii. Unlawful Search and Seizure[5]**

In analyzing an unlawful search and seizure claim, "courts look to the reasonableness of the search when determining whether a search violated a plaintiff's constitutional rights." *Serrano v. City of New York*, 16-CV-8105, 2018 WL 3392869, at *8 (S.D.N.Y. July 12, 2018), *aff'd,* 793 F. App'x 29 (2d Cir. 2019). "However, officers are generally permitted to conduct reasonable searches incident to a lawful arrest. Therefore, to the extent that there was probable

---

[5] To the extent that Plaintiff attempts to separately assert an unlawful search and seizure claim predicated on the seizure of his person based on his arrest on March 11, 2024, I recommend that the Court dismiss the claim as duplicative of his false arrest claim. *Passino v. Fulton Cnty. New York*, 25-CV-0727, 2026 WL 817990, at *7 (N.D.N.Y. Mar. 25, 2026) (Nardacci, J.) (citing *Parkinson v. Town of Niskayuna*, 22-CV-0070, 2023 WL 8574309, at *4 (N.D.N.Y. Dec. 11, 2023) (Sannes, C.J.) ("To the extent Plaintiff premises his Fourth Amendment claim on the seizure of his person, such a claim is dismissed because it is tantamount to a claim for false arrest[.]"); *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (finding that plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims because plaintiff "does not allege a search or seizure beyond the actions supporting her false arrest claim")).

cause to support plaintiff[’s] arrests, any reasonable searches incident to [his] arrest[ ] were also lawful.” *Serrano*, 2018 WL 3392869, at *8 (collecting cases and citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). Under the “search incident to arrest” exception to the Fourth Amendment’s warrant requirement, a search incident to an arrest based on probable cause “is a reasonable intrusion under the Fourth Amendment” and “requires no additional justification.” *United States v. Koron*, 95-CV-1657, 1996 WL 197234, at *2 (2d Cir. 1996). Indeed, “[a]n arrest pursuant even to a simple traffic violation permits a search incident to arrest.” *Evans v. Solomon*, 681 F. Supp. 2d 233, 248 (E.D.N.Y. 2010).

However, out of an abundance of caution, mindful of the Second Circuit’s instruction that a *pro se* plaintiff’s pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, as set forth above, Plaintiff’s false arrest claim survives initial review and thus, I recommend that a response be required to his Fourth Amendment unlawful search incident to arrest claim against Defendant Truax in his individual capacity.

**iii. Malicious Prosecution**

“The elements of a [Section] 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.” *Wagner v. Hyra*, 518 F. Supp. 3d 613, 633 (N.D.N.Y. 2021) (Hurd, J.) (quoting *Bernshtein v. City of New*

*York*, 496 F. App'x 140, 142 (2d Cir. 2012) (summary order)); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment malicious prosecution claim against Defendant Truax in his individual capacity.

**iv. Abuse of Process**

Courts look to state law for the elements of a Section 1983 claim based on malicious abuse of process. *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013) (citing *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003)). In New York, in order to prevail on a claim for malicious abuse of process, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Wagner*, 518 F. Supp. 3d at 627 (quoting *Savino*, 331 F.3d at 76).

"The third element, which forms the crux of this claim, requires that the defendants had an improper *purpose* in instigating the action, as opposed to merely a malicious motive." *Thorpe v. Delta Air Lines, Inc.*, 24-CV-1089, 2024 WL 5007423, at *8 (E.D.N.Y. Dec. 6, 2024) (internal quotation marks and citations omitted) (emphasis in original), *aff'd*, No. 25-58, 2025 WL 2868136 (2d Cir. Oct. 9, 2025). "The same elements apply to a [Section] 1983 claim for malicious abuse of process, but the plaintiff must also show the deprivation of a constitutional

right." *Rivera v. Jahmi*, 801 F. Supp. 3d 129, 161 (E.D.N.Y. 2025) (internal quotation marks and citation omitted).

Here, regarding the third element, i.e., alleging a collateral objective, Plaintiff fails to state any facts, beyond conclusory allegations, that Defendant Truax pursued his prosecution for any improper purpose. The Complaint alleges that Defendant Truax punished Plaintiff with "trump[ed] up" charges for his refusal to act as a police informant. (Dkt. No. 1 at ¶¶ 13-16.) These allegations are conclusory and, in any event, allegations of retaliation without more are insufficient because they suggest only that the defendant "acted maliciously" in instigating the prosecution. *Zappin v. Cooper*, 23-CV-165, 2024 WL 3084015, at *2 (2d Cir. June 21, 2024) (citing *Savino*, 331 F.3d at 77; *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (N.Y. 1984)); *see LoPorto v. Cnty. of Rensselaer*, 15-CV-0866, 2018 WL 4565768, at *14 (N.D.N.Y. Sept. 24, 2018) (noting that a malicious motive alone does not give rise to a cause of action for abuse of process and that plaintiff must instead claim that defendants "aimed to achieve a collateral purpose beyond or in addition to [plaintiff's] criminal prosecution").

As a result, I recommend that Plaintiff's abuse of process claim against Defendant Truax be dismissed for failure to state a claim upon which relief may be granted.

**b. Sixth Amendment Claim**

In general, "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 349 (2d Cir. 1998) (quoting *Kirby*, 406 U.S. 688). When "the underlying charges against [a plaintiff] were state charges, the Court looks to state law to determine when the adversarial proceedings were initiated." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 465 (E.D.N.Y. 2010)

(citing *Deshawn E.*, 156 F.3d at 349). "[U]nder New York law, the filing of an accusatory instrument at an arraignment commences a criminal action." *Podlach v. Vill. of Southampton*, 14-CV-6954, 2017 WL 4350433, at *8 (E.D.N.Y. May, 11, 2017) (citing *Douglas v. People of the State of N.Y.*, 12-CV-3839, 2015 WL 9901710, at *8 (E.D.N.Y. Nov. 3, 2015), *report and recommendation adopted*, 2016 WL 270079 (E.D.N.Y. Jan. 21, 2016)). "In addition, the right to counsel attaches 'if substantial rights of the accused may be affected by a particular proceeding . . . .'" *Nimkoff*, 751 F. Supp. 2d at 465 (quoting *Meadows v. Kuhlmann*, 812 F.2d 72, 76 (2d Cir. 1987)).

The Complaint does not allege facts plausibly suggesting that an accusatory instrument had been filed before Plaintiff's interrogation on March 11, 2024, or that Plaintiff's rights were affected by a particular proceeding at that point in time. As a result, I recommend that Plaintiff's Sixth Amendment right to counsel claim against Defendant Truax be dismissed for failure to state a claim upon which relief may be granted.

**B. State Law Claim**

The Complaint appears to assert libel and slander claims against Defendants Pasqua and Truax. (*See generally* Dkt. No. 1.)

"Defamation . . . is the invasion of the interest in a reputation and good name," *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 84 A.D.2d 470, 446 (N.Y. App. Div. 4th Dep't 1982), *aff'd*, 58 N.Y.2d 630 (N.Y. 1982)), and "consist[s] of the twin torts of libel and slander," *Farrakhan v. Anti-Defamation League*, No. 24-1237, 2025 WL 24066, at *2 n.1 (2d Cir. Jan. 3, 2025) (alteration in original) (quoting *Albert*, 239 F.3d at 265). "Under New York law, spoken defamatory words are slander; written defamatory words are libel."

*Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 487 (E.D.N.Y. 2016) (internal citations omitted).

I recommend that Plaintiff's defamation claim be dismissed for two reasons.

First, this claim is likely barred by the statute of limitations. "The statute of limitations for defamation in New York is one year." *Lehman v. Discovery Commc'ns, Inc.*, 332 F. Supp. 2d 534, 537 (E.D.N.Y. 2004) (citing N.Y. C.P.L.R. § 215(3)). Libel claims "accrue at the time of the first publication, which is defined as the earliest date on which the work was placed on sale or became generally available to the public." *Lehman*, 332 F. Supp. 2d at 537 (cleaned up).

The Complaint appears to allege that the defamation occurred on or around March 11, 2024, when Plaintiff was "wrongfully arrested and slandered" and charged with first-degree robbery, fourth-degree criminal possession of a weapon, petit larceny, and fourth degree criminal mischief. (Dkt. No. 1 at ¶ 11.) Plaintiff commenced this action on or about October 3, 2025. (Dkt. No. 1 at 10.) Hence, the statute of limitations on Plaintiff's defamation claim likely expired on March 11, 2025, over six months before he commenced this action.[6]

Second, based on the allegations in the Complaint Defendants Truax and Pasqua are entitled to absolute immunity.

"Under New York law, statements made in the course of, and pertinent to, litigation are entitled to an 'absolute privilege' from defamation claims." *Roberts by and through Roberts v. LifeMD Atlantic Patient Medical Care, P.C.*, 24-CV-8162, 2026 WL 1745713, at *4 (S.D.N.Y.

---

[6] To the extent that Plaintiff's defamation claim against Defendant Pasqua relates to conduct that occurred during the presentation to the grand jury, the Complaint appears to allege that the grand jury action occurred six months after Plaintiff's arrest. (Dkt. No. 1 at ¶ 22.) As a result, Defendant Pasqua's alleged defamation occurred on September 11, 2024, and this action—which was commenced more than one year later, on October 3, 2025—Plaintiff's claim is untimely.

June 16, 2026) (citing *Gottwald v. Sebert*, 220 N.E.3d 621, 628-29 (N.Y. 2023)). Protected statements include those in pleadings and other court filings. *See Kelly v. Albarino*, 485 F.3d 664, 665-66 (2d Cir. 2007) (under New York law, accusations in affidavit filed in opposition to motion were protected by the litigation privilege); *Deaton v. Napoli*, 17-CV-4592, 2019 WL 4736722, at *6 (E.D.N.Y. Sep. 27, 2019) (same where statements were in complaint). The public policy underlying this privilege is to allow participants in litigation to "write or speak with that free and open mind which the administration of justice demands." *Youmans v. Smith*, 47 N.E. 265, 268 (N.Y. 1897); *accord Sherman v. Graves*, 24-CV-8494, 2025 WL 1558476, at *3 (S.D.N.Y. June 2, 2025). This principle prioritizes the administration of justice over individual reputational interests. *See Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442-43 (N.Y. 2007); *Martirano v. Frost*, 255 N.E.2d 693, 694-95 (N.Y. 1969).

The Complaint appears to allege that Defendant Truax "slandered Plaintiff . . . by placing him under arrest" (Dkt. No. 1 at ¶ 11) and Defendant Pasqua "did slander . . . Plaintiff . . . when Defendant [Pasqua] attempted to indict by way of Grand Jury of St. Lawrence County" (*id.* at ¶ 22). The alleged actions of Defendants Truax and Pasqua were in the course of and pertinent to Plaintiff's state court criminal litigation. As a result, they are entitled to absolute privilege with respect to the defamation claim.

For each of these reasons, I recommend that Plaintiff's defamation claims be dismissed.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when

justice so requires.”). An opportunity to amend is not required, however, where “the problem with [the plaintiff's] causes of action is substantive” such that “better pleading will not cure it.” *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (“Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.”). Stated differently, “[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.” *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[7]

The deficiencies identified related to Plaintiff’s claims (1) against Defendant Massena Police Department, and (2) pursuant to 42 U.S.C. § 1983 against Defendant Pasqua, are substantive such that a better pleading cannot cure them. As a result, I recommend that Plaintiff’s (1) Section 1983 claims against Defendant Pasqua, and (2) claims against Defendant Massena Police Department be dismissed without leave to amend.

Although I have serious doubts about whether Plaintiff can replead to assert actionable claims against (1) the municipality of Massena, (2) Defendant Pasqua asserting a defamation claim, and (3) Defendant Truax in his individual capacity asserting (a) an abuse of process claim, (b) a violation of Plaintiff’s right to counsel, and (c) a defamation claim, given that this is the

---

[7] *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend “unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim”—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev’d on other grounds*, 682 F. App’x 30.

Court's first review of Plaintiff's Complaint, out of an abundance of caution and in light of Plaintiff's status as a *pro se* litigant, I recommend that he be permitted leave to amend.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

PLAINTIFF IS ADVISED THAT HE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HIS COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE BRINDISI RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT. ANY FURTHER AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE BRINDISI'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (Dkt. No. 18) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 19) and notify that official that Plaintiff has filed this action and is required to pay the Northern District of New York the entire statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization form (Dkt. No. 19) to the Financial Deputy of the Clerk's office; and it is further respectfully

**RECOMMENDED** that the Court **ACCEPT FOR FILING** Plaintiff's Complaint to the extent that it asserts the following three claims against Defendant Truax in his individual capacity: (1) a claim of false arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim of unlawful search and seizure related to the search incident to arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; and (3) a malicious prosecution claim pursuant to the Fourth Amendment and 42 U.S.C. § 1983; **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint to the extent that it asserts claims (1) against Defendant Massena Police Department, and (2) pursuant to 42 U.S.C. § 1983 against Defendant Pasqua; and **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint to the extent that it asserts claims against (1) the municipality of Massena, (2) Defendant Pasqua asserting a defamation claim, and (3) Defendant Truax in his individual capacity asserting (a) an abuse of process claim, (b) a claim that Plaintiff's right to counsel was violated, and (c) a defamation claim, pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[8]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September _1_, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

[8] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[9] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2022 WL 523458
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Faris ABDUL-MATIYN, Plaintiff,
v.
DISTRICT ATTORNEY'S OFFICE
BRONX COUNTY, Defendant.

21-CV-11074 (LTS)
|
Signed 02/22/2022

**Attorneys and Law Firms**

Faris Abdul-Matiyn, Ozone Park, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

***1** Plaintiff, who is appearing *pro se*, brings this action under 42 U.S.C. § 1983, alleging that Defendant, the Bronx County District Attorney's Office, deprived him of his right to a fair trial. Plaintiff seeks declaratory relief. By order dated February 3, 2022, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis* (IFP). [1] The Court dismisses the complaint for the reasons set forth below.

## STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court has held that, under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

## BACKGROUND

***2** The following allegations are taken from the complaint. Plaintiff alleges that Defendant Bronx District Attorney's Office "conspired against" him because Plaintiff "is of the 'black race' and wouldn't just submit to the charges" by pleading guilty. (ECF 2, at 1.) Defendant "conspire[ed] with others" to convict Plaintiff using false testimony, and "even used [Plaintiff's] attorney to assist them by having [P]laintiff's attorney disclose privileged information." (*Id.* at 1.) Specifically, Plaintiff alleges that Defendant "conspired to have witnesses falsely testify that [P]laintiff lived in a one-bedroom kitchenette instead of a two bedroom apartment." (*Id.*) Plaintiff maintains that this testimony was "vital" to the prosecution because it made the prosecutor's version of events "more believable" than Plaintiff's version, and thereby "reassure[ed] a conviction." (*Id.*)

Plaintiff alleges that the prosecutor "could have easily obtained a[ ] copy of the blueprints" of Plaintiff's apartment in order to compare the layout of the apartment with the "story given by all the prosecutor['s] witnesses who testified about how plaintiff's apartment was structured." (*Id.* at 11.) Plaintiff states that he "think[s]" the prosecutor did in fact look at

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the blueprints and then "hatched his conspiratorial plan after seeing that he would not win and get a guilty verdict if the true structure of plaintiff's apartment was known to the jury." (*Id.*)

He further alleges that the Defendant "told the court that there was a bloody machete that was used by plaintiff which they never produced, because it never existed." (*Id.* at 4.)

Plaintiff's factual allegations are interspersed with summaries of legal concepts and case law that appear only tangentially related, if at all, to Plaintiff's factual allegations. For example, Plaintiff includes a lengthy discussion of the rule laid out by the Supreme Court in *Brady v. Maryland* and its progeny, (*see id.* at 5-6), as well as summaries of concepts and the historical development of case law arising under the Fourteenth Amendment, (*see id.* at 6-12).

Plaintiff seeks a declaratory judgment that Defendant's actions deprived him of a right to a fair trial, that his conviction was obtained by means of false testimony, and that his constitutional rights were violated "solely because he was a person of the poor black race." (*Id.* at 13.)

Plaintiff provides no information about his conviction, such as when, where, or of what he was convicted, or the sentence imposed. He does, however, state that the Defendant "recently re-iterated the conviction in court just a month ago, to turn plaintiff's 25 year sentence into a life sentence on parole." (*Id.* at 4.)

Public records show that, on February 27, 1984, following a jury trial, Plaintiff, who was formerly known as Stephen Jackson, was convicted in the Supreme Court of the State of New York, Bronx County, of several counts of first-degree rape, sodomy, and sexual abuse, as well as assault and criminal possession of a weapon. *See Abdul-Matiyn v. Mitchell*, No. 92-CV-6654, 1994 WL 367075, at *1 (S.D.N.Y. July 14, 1994) (describing Plaintiff's conviction). On March 20, 1984, Plaintiff was sentenced, as a predicate felony offender, to concurrent indeterminate terms of imprisonment of from 12 ½ to 25 years on each of the four counts of rape and sodomy, 3 ½ to 7 years on each of the three counts of sexual abuse and assault, and a determinate term of 1 year on the possession of a weapon count. *See id.* Plaintiff filed appeals in both the state and federal courts, which were denied. *See id.* By order dated July 14, 1994, the Hon. Judge Peter Keeton Leisure of this court denied Plaintiff's petition for a writ of *habeas corpus*. *Id.* at 4. The Court of Appeals for the Second Circuit dismissed Plaintiff's appeal. *See* No. 94-2434 (2d. Cir. Mar. 7, 1995).

According to records maintained by the New York State Department of Corrections and Community Supervision (DOCCS), Plaintiff was released on parole on May 5, 2006. [2] On March 9, 2008, Plaintiff was discharged from parole. [3]

## DISCUSSION

***3** Plaintiff's claim, in which he seeks a declaratory judgment that Defendant violated his federal constitutional rights, arises under 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

Prosecutors are immune from civil suits for money damages under Section 1983 for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are " 'intimately associated with the judicial phase of the criminal process.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)). In addition, federal prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 70-72 (2d Cir. 2019) (holding that ADAs' direction as to where criminal defendant would be arraigned was in preparation for a court proceeding in which the prosecutors were acting as advocates, and ADAs were therefore shielded by absolute immunity) (citing, *inter alia*, *Van de Kamp*).

Additionally, "as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity ...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted). This immunity shields the States from claims for monetary damages, injunctive relief, and

retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 72-74 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.* (internal quotation marks and citation omitted). "[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017).

Prosecutors are not immune, however, from suits seeking certain injunctive and declaratory relief. *See Li v. Lorenzo*, 712 F. App'x 21, 23–24 (2d Cir. 2017). "If a complaint 'alleges an ongoing violation of federal law and seeks relief properly characterized as prospective,' then such injunctive or declaratory relief is not barred by immunity." *Li*, 712 F. App'x at 23 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective injunctive relief from violations of federal law.") (citations and quotation marks omitted); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000); *see also Pulliam v. Allen*, 466 U.S. 522, 541-42, 104 S. Ct. 1970, 80 L.Ed.2d 565 (1984) ("[J]udicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."); *Shmueli v. City of New York*, 424 F.3d 231, 239 (2d Cir. 2005) (applying *Pulliam* to prosecutorial immunity).

***4** While prosecutorial immunity "does not bar the granting of injunctive relief," *Shmueli*, 424 F.3d at 329, simply "ask[ing] the Court only to recognize a past wrong ... in the context of declaratory relief, does not in itself 'amount to that real and immediate threat of injury necessary to make out a case or controversy,' " *Morales v. City of New York*, 59 F. Supp. 3d 573, 581 (S.D.N.Y. 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)); *see also Ippolito v. Meisel*, 958 F. Supp. 155, 165 (S.D.N.Y. 1997) ("[C]ourts are not obliged to entertain actions for declaratory judgment not seeking prospective relief but merely declaring past wrongs.")

Here, Plaintiff cannot be seeking prospective injunctive or declaratory relief because the criminal case that forms the basis of his complaint has long since ended. According to records maintained by DOCCS, Plaintiff has served the prison sentence arising from his conviction and has been discharged from parole. There is no ongoing prosecutorial conduct that could be the subject of injunctive relief. In seeking a declaration that Defendant violated his rights during his 1984 criminal trial, Plaintiff is asking the Court "only to recognize a past wrong," a request that does not "amount to that real and immediate threat of injury necessary to make out a case or controversy." *Morales*, 59 F. Supp. 3d at 581–82 (internal quotation marks and citation omitted); *see also Green v. Mansour*, 474 U.S. 64, 71-73 (1985) (holding that if there is no allegation of an ongoing violation of federal law, the Eleventh Amendment prevents federal courts from providing notice relief or a declaratory judgment that state officials violated federal law in the past). Plaintiff's Section 1983 claims for declaratory relief are therefore barred by both the doctrine of prosecutorial immunity and the Eleventh Amendment, and fail to present a justiciable case or controversy and are therefore dismissed.

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend his complaint.

**CONCLUSION**

Plaintiff's complaint, filed IFP under 28 U.S.C. § 1915(a)(1), is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to mail a copy of this order to Plaintiff and note service on the docket.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 523458

## Footnotes

1 Plaintiff filed this action on December 22, 2021. By order dated December 28, 2021, the Court dismissed the complaint for Plaintiff's failure to comply with the May 5, 2016, order in *Richardson, et al. v. City of New York*, 1:15-CV-6025, 10 (S.D.N.Y. May 5, 2016), which barred Plaintiff from filing any new action IFP without first obtaining from the court leave to file. (ECF 3.) On January 19, 2022, Plaintiff filed a motion seeking permission to file this action. (ECF 5.) Because Plaintiff's motion was an attempt to comply with the bar order and because this action appeared to be a departure from Plaintiff's pattern of repetitive and vexatious litigation that led to the bar order, the Court treated Plaintiff's motion as a motion for reconsideration of its order of dismissal, granted the motion, and directed the Clerk of Court to vacate its order of dismissal and judgment and to reopen this matter. (ECF 8.)

2 *See* http://nysdoccslookup.doccs.ny.gov/.

3 *See* https://publicapps.doccs.ny.gov/ParoleeLookup/default.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 8:25-cv-01403-AJB-ML Document 24 Filed 09/01/26 Page 30 of 330

KeyCite Blue-Striped Flag
Appeal Filed by Adams v. City of Syracuse, 2nd Cir., October 17, 2025

2025 WL 2772081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,
v.
CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

## I. INTRODUCTION

***1** On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

## II. BACKGROUND[3]

### A. The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

### B. Relevant Events

#### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

**2. May 6, 2016**

**a. 941 James Street**

***2** At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

**i. 911 call**

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

**ii. Police response**

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

***3** Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him." [5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

***4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?" [6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

***5** Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

**3. Criminal Investigations Division**

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication." [7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

***6** The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed."[8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

***7** Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

***8** Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also* United States v. Moran, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

***9** Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do,"[9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....
>
> (g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....
>
> (h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and
>
> (i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

***10** According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

**b. Officer Cecile**

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

**c. Officer Tolone**

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

**d. Other Police Reports**

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

**5. Criminal Prosecution**

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff[10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

***11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter.[11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1st with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.
>
> ***12** ....
>
> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

> As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.
>
> I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.
>
> Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.
>
> I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt. No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

**a. Plaintiff's Capacity**

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

***13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

**6. Additional Investigation by CID**

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

***14** *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

**D. Procedural History**

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

**E. Plaintiff's Claims**

Plaintiff's remaining claims, [12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

## III. STANDARD OF REVIEW

***15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord* *Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord* *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505).

## IV. DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from

> which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

***16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

### A. False Arrest under Section 1983 and New York law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also* *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

**1. Plaintiff's Detention at 941 James Street**

***17** Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case. [14] *See, e.g., United States v. Lefebvre*, 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario*, 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice*, 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: [']the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

***18** Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice*, 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice*, 873 F.3d at 167. *See also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice*, 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

**2. Probable Cause**

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id.* The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id.* Ms. Goldych also indicated that the man's name was Pete. *Id.* Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

***19** Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

***20** At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a "green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New* York, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

**3. Subsequent Information**

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, 153 F.4th at 179 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

**a. Plaintiff's Continued Detention Prior to His Interrogation**

***21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

**b. Plaintiff's Interrogation**

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

***22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

***23** Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally

acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch. J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

***24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons,[18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

### B. Malicious Prosecution under Section 1983

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562, 144 S.Ct. 1745, 219 L.Ed.2d 262 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019.

*See, e.g., Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury*, 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

***25** Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano*, 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta*, 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g., Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort*, 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello*, 612 F.3d at 163); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell, [19] *see, e.g., Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser*, 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello*, 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti*, 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y.

Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

***26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also* *Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkheiser*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at *13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also* *Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

***27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at *13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

### C. Fabricated Evidence under Section 1983

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also Ortiz*, 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's] testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting *United States v. Ocampo-Guarin*, 968 F.2d 1406, 1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

***28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants. [22]

### D. *Monell* Claim

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." *Alexander*, 132 F.4th at 160 (citing *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet*,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

***29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)). The Second Circuit has set forth the following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

> "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green*, 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

***30** The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12.[23] Following that conclusion are signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at *11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis*.") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state,"[24] Dkt. No. 85-11 at 9.

***31** At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-

employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 972 N.Y.S.2d 169, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.*, 972 N.Y.S.2d 169, 995 N.E.2d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 592, 960 N.E.2d 356 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

**F. Qualified Immunity for the Individual Defendants**

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

***32** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of

the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 51 A.D.2d 432, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

***33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact —such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074).[25]

**G. John Does 1-100**

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

**V. CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

## Footnotes

1 The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2 This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3 Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4 A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5 During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6 Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

7 Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8 Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9 The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10 Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11 From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12 The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13 To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See* *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14 It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15 Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

16 The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.*, Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

17 Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

18 Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

19 Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

20 Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

21 To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also* *Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

22 To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also* *Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

23 This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

24 It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC,

https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25 Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also* *Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656, 134 S.Ct. 1861). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

***1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See* *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

***2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* *Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* *Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation").

***3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

## ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

## BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

***4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

***5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* *LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See* *Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

***6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

***7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1 I note, however, that the report-recommendation would survive even *de novo* review.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,
v.
BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

PITMAN, United States Magistrate Judge.

***1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> ***2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous,

> malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson*[3] *v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

***3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury,

or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury”). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS ***WILL*** RESULT IN A WAIVER OF OBJECTIONS AND ***WILL*** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

## Footnotes

1 At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

2 Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

3 It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services (“DOCS”) is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

4 Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

5 Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 5892193
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Lois CRAIG, Plaintiff,
v.
State of CONNECTICUT DEPARTMENT OF MENTAL HEALTH NOVEMBER 28, 2017 AND ADDICTION SERVICES, et al., Defendants.

CIVIL CASE NO. 3:16-CV-2100 (JCH)
|
Signed 11/28/2017

**Attorneys and Law Firms**

Richard C. Gordon, Law Office of Richard C. Gordon, Esq., Hartford, CT, for Plaintiff.

Colleen B. Valentine, Office of the Attorney General, Hartford, CT, for Defendants.

**RULING RE: MOTION TO DISMISS**

Janet C. Hall, United States District Judge

## I. INTRODUCTION

***1** Plaintiff Lois Craig ("Craig") brings this action against the Connecticut Department of Mental Health and Addiction Services ("DMHAS") and Celeste Cremin-Endes, Rachel Manemeit, Melody Davis, Abby Cramer, Tommy Wilson, Debby Baker, and Stephanie Leonard Harris in their individual and official capacities on the basis of claims arising out of Craig's employment relationship with DMHAS. Second Amended Complaint ("2nd Am. Compl.") (Doc. No. 45). In her five-count Second Amended Complaint, Craig alleges violations of her rights under sections 1981 and 1983 of title 42 of the United States Code (Count One); negligent infliction of emotional distress ("NIED") (Count Two) and defamation (Count Three) under state common law; violations of the Americans with Disabilities Act ("ADA") (Count Four); and violations of her rights under sections 1985 and 1986 of title 42 of the United States Code (Count Five). Id.

The defendants bring this Motion to Dismiss (Doc. No. 49) under Federal Rules of Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6), asserting that the Second Amended Complaint should be dismissed in its entirety. For the reasons that follow, defendants' Motion to Dismiss is granted.

## II. FACTUAL BACKGROUND [1]

Craig is an African-American female who has been employed by DMHAS as a Mental Health Assistant II for over sixteen years. 2nd Am. Compl. at ¶ 3. As a union delegate, Craig frequently represents her coworkers and herself in disputes between the union and management. Id. at ¶ 5.

In October 2012, Craig received a five-day suspension on the grounds that she failed to supervise a client and then falsified documents about her client's whereabouts. Id. at ¶ 9, Ex. 2. Craig filed a complaint of discrimination with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO") in November 2012. Id. The notice of Craig's five-day suspension should have been removed from her file after eighteen months, but remains there as of October 2016. Id. at ¶ 10. Defendants have used the notice of the five-day suspension as a pretext to place Craig on multiple 90-day Performance Improvement Plans ("PIP"), which limit her promotional opportunities and expose her to termination. [2] Id. at ¶ 11.

On September 24, 2015, a DMHAS Safety Officer sent an office-wide email informing DMHAS employees that several staff members had the air released from their cars' tires in a DMHAS parking lot. Id. at ¶ 13, Ex. 4. The email stated that an investigation was ongoing and did not name any suspects. Id. Subsequently, several of the defendants questioned Craig about the incident and gave her a brochure titled, "Violence in the Workplace." Craig was the only employee questioned and counseled on workplace violence at the meeting. Id. at ¶ 13–14.

***2** At an unspecified time, defendant Debby Baker referred to Craig as "an angry Black Woman [sic], who often wore dread locks styled hair." Id. at ¶¶ 16, 112. Baker also described Craig as "cocky, lacking respect, intimidating, exhibiting poor communication skills, being illogical, and rude"; said that Craig's hair style "harbored head lice"; and stated that Craig "was too cocky and needed to be cut down to size." Id. at ¶¶ 17–18, 113–14. In addition, in Craig's performance evaluations, defendants wrote that Craig was "working too slowly on the job." Id. at ¶¶ 22, 27, 118. DMHAS never disciplined any of the individual defendants for making derogatory remarks towards Craig. Id. at ¶¶ 17, 113.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Following defendants' conduct described above, Craig developed serious mental and emotional conditions, including anxiety, depression, post-traumatic stress disorder, high blood pressure, and insomnia. Id. at ¶ 23. Craig was granted a leave of absence under the Federal Family and Medical Leave Act ("FMLA") in January 2016. Id. at Ex. 9. Craig later applied for an accommodation for her mental health conditions, which she supported with documentation of her diagnosis of a nervous breakdown in 2016. Id. at ¶¶ 24, 29. In her accommodation request, Craig asked to be moved from the second shift to the third shift. Id. at Ex. 9. On November 18, 2016, the ADA Review Committee denied her request. Id. Craig states that the defendants determined that Craig's mental and emotional "conditions were not serious enough, and that she needed to develop a more concrete [version] of a nervous breakdown in order to qualify for an accommodation under the ADA."[3] Id. at ¶ 30.

In June 2016, Craig attempted to a file a grievance about receiving discipline without cause. Id. at ¶¶ 38–39. The defendants told Craig that "only managers could file complaints." Id.

## III. LEGAL STANDARDS

A. Rule 12(b)(1)

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). Where jurisdictional facts are in dispute, the court has the power to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. Id. The burden is on the plaintiffs to establish jurisdiction. Renne v. Geary, 501 U.S. 312, 316 (1991); see also Tandon, 752 F.3d at 243.

A motion to dismiss pursuant to Rule 12(b)(1) is "the proper procedural route" to bring a challenge to a plaintiff's Article III standing to adjudicate a claim. Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006).

B. Rule 12(b)(2)

Upon a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court may properly exercise jurisdiction over the defendants. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84–85 (2d Cir. 2013). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 167–68 (2d Cir. 2015) (internal quotation marks omitted). "A plaintiff can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." Whitaker v. American Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2008) (citations, internal quotation marks, brackets, and ellipsis omitted). The court "construe[s] the pleadings and affidavits in the light most favorable to the plaintiffs, resolving all doubts in their favor." Dorchester, 722 F. 3d at 85.

C. Rule 12(b)(5)

***3** When a plaintiff fails to effect proper service upon a defendant and the defendant does not waive service of process pursuant to Rule 4(d), the plaintiff's action may be subject to dismissal pursuant to Rule 12(b)(5). "On a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service was sufficient." Khan v. Khan, 360 Fed.Appx. 202, 203 (2d Cir. 2010).

D. Rule 12(b)(6)

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether a plaintiff has stated a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief' " (alteration in original)). The court takes all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015). However, the principle that a court must accept a complaint's allegations as true is inapplicable to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

## IV. DISCUSSION

A. Service of Process for the Individual Defendants in their Official Capacities

Under Federal Rule of Civil Procedure 4, a plaintiff may serve process upon a government agency by "delivering a copy of the summons and of the complaint to its chief executive officer" or "serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Taylor v. Norwalk Cmty. Coll., No. 3:13-cv-1889 (CSH), 2015 WL 5684033, at *5 (D. Conn. Sept. 28, 2015) (quoting Fed. R. Civ. P. 4(j)(2)).

Under Section 52-64 of the Connecticut General Statutes:

> Service of civil process in any civil action ... against any officer, servant, agent or employee of the state ... may be made by a proper officer (1) leaving a true and attested copy of the process, including the declaration or complaint, with the Attorney General at the office of the Attorney General in Hartford, or (2) sending a true and attested copy of the process, including the summons and complaint, by certified mail, return receipt requested, to the Attorney General at the office of the Attorney General in Harford.

Defendants argue that Craig never served the individual defendants in their official capacities. See Defs.' Mem. in Supp. of the Mot. to Dismiss ("Defs.' Mem.") (Doc. No. 49-1) at 9–13. Instead, DMHAS was the only defendant served at the Attorney General's Office. See id. at 11. Craig argues that all of the individual defendants received copies of the summons and complaint indicating that they were being sued in their individual and official capacities. See Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") (Doc. No. 57) at 12–15. Further, the summons and complaint served on the Office of the Attorney General provided notice that the individual defendants were being sued in their official capacities. See id. at 14. [4]

*4 Craig did not serve individual defendants in their official capacities under Rule 4(j)(2) or Connecticut law. None of the returns of service Craig has filed show that the individual defendants were served in their official capacities. See Doc. Nos. 17, 20, 27, 46. Presumably, the basis for Craig's argument that the individual defendants were on notice that they were being sued in their official capacities is that they were served a copy of the Complaint in their individual capacities. If Craig is suggesting that the caption of the Complaint, which states each defendant's name followed by "in her individual and in her official capacities," accomplished service, then that is clearly inadequate under Rule 4(j)(2) or Connecticut law. [5] With the exception of the summons naming DMHAS that was delivered to the Attorney General's Office in Hartford in compliance with section 52-64, see Doc. No. 20, the returns of service only evidence the service of defendants in their individual capacities, see Doc Nos. 17, 27, 46.

Craig also argues that the copy of the complaint and summons served on the Office of the Attorney General gave notice that the individual defendants were being served in their official capacities. The basis for Craig's argument is again uncertain, but to the extent that she is referring to the list of every defendant in the case that appeared on the cover page of the summons, she has plainly not complied with the federal or state rules for service. No summons for any of the individual defendants were delivered to the Attorney General's Office. See Conn Gen. Stat. § 52-64 (describing the method for serving process "against any ... employee of the state"). The requirements of Rule 4(j)(2) and Connecticut law have not been satisfied as to the individual defendants in their official capacities because there has been no service on each of the defendants in accordance with section 52-64.

When the plaintiff shows "good cause" for failing to serve the defendants, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). Even without good cause, district courts have discretion to grant extensions of time to serve process. See Zapata v. City of New York, 502 F.3d 192, 196 (2d Cir. 2007). The defendants repeatedly alerted plaintiff's counsel to the fact that he had not served the individual defendants in their official capacities. Defendants' counsel stated that she was appearing for the individual defendants in their individual capacities only, see Doc Nos.

11, 18, 48, and later stated that the defense contested personal jurisdiction over the individual defendants in their official capacities, see Report of Rule 26(f) Planning Meeting (Doc. No. 35). Given the ample opportunity she had to cure the deficiency in her service of process, Craig has not shown good cause for her failure to properly effect service on the individual defendants in their official capacities. See George v. Prof'l Disposables Int'l, Inc., 221 F. Supp. 3d 428, 433 (S.D.N.Y. 2016) (A "delay in service resulting from the mere inadvertence, neglect, or mistake of a litigant's attorney does not constitute good cause.") (quoting AIG Managed Mkt. Neutral Fund v. Askin Capital Mgmt., L.P., 197 F.R.D. 104, 108 (S.D.N.Y. 2000)). The court need not determine whether it would nonetheless exercise its discretion to grant Craig an extension of time to serve process because her claims against the individual defendants in their official capacities all fail on the grounds of the Eleventh Amendment.

B. John Doe and Jane Doe Defendants

***5** Apart from listing John Does and Jane Does in the caption of the Second Amended Complaint, Craig does not make allegations against the unnamed defendants anywhere in the Complaint. See Fed. R. Civ. Pro. 12(b)(6). In addition, Federal Rule of Civil Procedure 4(m) requires that defendants be served with process within ninety days after a complaint is filed. Fed. R. Civ. Pro. 4(m). No John Doe or Jane Doe has been served.

Craig argues that the claims against the unnamed defendants should not be dismissed because discovery has not yet begun. Craig filed her initial Complaint on December 21, 2016. She filed her Opposition to Defendant's Motion to Dismiss stating that she had not begun discovery on September 12, 2017. The deadline for discovery is January 15, 2018. Craig cannot show "good cause" for extending the time for service beyond ninety days when, 265 days after filing her Complaint, she had not yet begun discovery.

The claims against the Doe defendants are dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted and Rule 4(m) for failure to provide service of process.

C. Sections 1981 and 1983 (Count I) [6]

1. 11th Amendment

In response to defendants' argument that Craig's sections 1981, 1983, 1985, and 1986 claims are barred by the Eleventh Amendment, see Defs.' Mem. at 16–18, Craig has withdrawn her claims for monetary damages under those sections against DMHAS and the individual defendants in their official capacities, see Pl.'s Opp'n at 16. Craig maintains her claims for injunctive relief.

Craig does not make an argument for why her claims for injunctive relief in Counts One and Five are not barred by the Eleventh Amendment. See Pl.'s Opp'n at 16. Defendants argue that Craig's requests for injunctive relief are too vague to satisfy the requirements of the Ex parte Young doctrine, which allows claims for "prospective injunctive relief" against individual state officers. See Defs.' Reply to Pl.'s Opp'n to Mot. to Dismiss ("Defs.' Reply") (Doc. No. 61) at 8 (citing In re Deposit Ins. Agency, 482 F.3d 612, 618 (2d Cir. 2007)).

The Ex parte Young doctrine requires that plaintiff's complaint " '(a) alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " In re Deposit Ins. Agency, 482 F.3d at 618 (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)). Because the Ex parte Young doctrine does not apply to suits against the state itself, Craig's claim for injunctive relief against DHMAS cannot proceed. See Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255 (2011). Moreover, assuming that Craig served process on the individual defendants in their official capacities, her request for injunctive relief—"an order that each defendant shall fully comply with the provisions of [sic] pursuant to 42 U.S.C. § 1981 ..."—is impermissibly vague and overbroad. See Peregrine Myanmar Ltd. V. Segal, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."). Thus, her claim for injunctive relief under sections 1981, 1983, 1985, and 1986 is dismissed.

2. Section 1981

***6** Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. The analysis of employment discrimination claims under Title VII applies to comparable claims under sections 1981 and 1983. See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004). "When the defendant is a

state actor, Section 1983 is the exclusive remedy for violations of rights guaranteed under Section 1981." See Bermudez v. City of New York, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011); see also Gladwin v. Pozzi, 403 Fed.Appx. 603, 605 (2d Cir. 2010) (explaining that plaintiff's section 1981 claims are "encompassed" by her section 1983 claims and are therefore analyzed under Section 1983); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989) (holding that section 1983 is the exclusive remedy for violations of rights guaranteed under section 1981 when the defendant is a state actor). The term "state actor" as used in Jett included both state entities and individuals acting under color of state law. See Burbank v. Office of Atty. Gen. of Connecticut, 250 F. Supp.2d 167, 174 (D. Conn. 2003). Accordingly, Craig's claims under section 1981 against DHMAS and the individual defendants in their official and individual capacities are dismissed.

3. Section 1983

To state a claim under section 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States ... committed by a person acting under color of state law." See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87–88 (2d Cir. 2015) (quoting Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004)). Defendants do not contest that the conduct Craig alleges violated her rights was under color of state law because it was "committed by state employees acting in their official capacities as [DMHAS] employees and exercising their responsibilities pursuant to state law." See Feingold, 366 F.3d at 159. However, defendants contend that Craig has not identified violations of any constitutional rights. See Defs.' Mem. at 30.

4. First Amendment Retaliation

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2, 545 Fed.Appx. 23, 26 (2d Cir. 2013) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)). "[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.' " Singer v. Ferro, 711 F.3d 334, 339 (2d Cir. 2013) (alteration in original) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

Defendants argue that Craig has not identified any constitutionally protected speech in which she engaged, or in which she was prevented from engaging. See Defs.' Mem. at 31. Defendants also argue that Craig did not experience any retaliation for engaging in protected speech. Id. Defendants assert that the only speech Craig has identified—a complaint she made in 2012 to the CHRO and an attempt to file a grievance in 2016—cannot form the basis of a First Amendment claim. Id. The 2012 complaint is barred by Connecticut's three-year statute of limitations, see Harnage v. Torres, 665 Fed.Appx. 82, 83 (2d Cir. 2016) and, in 2016, Craig's supervisor merely conveyed to Craig the DHMAS policy that only supervisors could complete the form Craig filed, but informed Craig she could present her supervisor with a complaint at any time, see 2nd Am. Compl., Ex. 16. In Craig's Opposition to Defendants' Motion to Dismiss, she restates the facts of her case in a background section, but she does not respond to the defendants' argument that she has not stated a plausible claim for First Amendment retaliation. See Pl.'s Opp'n at 1–7.

***7** In the section of her Second Amended Complaint labeled "The Parties," Craig alleges that defendants have retaliated against her as a result of her union activity. See 2nd Am. Compl. at ¶¶ 5–6. [7] Although the references to Craig's union activity at the beginning of the Second Amended Complaint would seem to suggest that Craig's union activity lies at the heart of her claims, Craig subsequently makes no mention of her union activity in any of the Counts, including the section of Count One where she presents her First Amendment retaliation claim. See id. at ¶ 131. Instead, in subsections purportedly supporting her First Amendment claim, Craig asserts that she has been subject to disparate treatment "on the basis of his [sic] race, color, age, harassment and by subjecting the Plaintiff to a racially hostile work place...." See id. at ¶ 131(a). [8] In oral argument on November 20, 2017, Craig represented that the alleged protected activity she engaged in was filing personal complaints and grievances against the defendants. When asked how union activity figured into her First Amendment retaliation claim, Craig's counsel stated that she was referring to union hearings for her own complaints.

Personal grievances are not speech on a matter of public concern that can form the basis of a First Amendment retaliation claim. See Ruotolo v. City of New York, 514 F.3d

184, 190 (2d Cir. 2008). "[S]peech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009) (quoting Lewis v. Cohen, 165 F.3d 154, 164 (2d Cir. 1999)). This is in part because "government officers could not function if every employment decision became a constitutional matter." See Connick v. Myers, 461 U.S. 138, 143 (1983). Craig's attempt to file a personal grievance in 2016, and her complaint in 2012 to the CHRO, are not instances of protected First Amendment speech, even assuming the latter was not time-barred. Craig does not state a claim under the First Amendment.

5. Due Process

"In order to prevail on a due process claim, a claimant must identify a constitutionally protected property or liberty interest and demonstrate that the government has deprived that party of the interest without due process of law." Weinstein v. Albright, 261 F.3d 127, 134 (2d Cir. 2001). Property interests are created by independent sources such as state law. See Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). "Under Connecticut law, only 'classified' employees 'have a property right in continued employment which is protected by the due process clause of the [F]ourteenth [A]mendment.' " Torres-Hicks v. Conn. Housing Finance Authority, 575 F. Supp. 2d 393, 404 (quoting King v. Lensink, 720 F. Supp. 236, 239 n.1 (D. Conn. 1989)). Craig does not assert that she was terminated from her employment and thus she cannot assert a violation of due process.

6. Equal Protection Clause: Discrimination

***8** In Count One of the Second Amended Complaint, Craig claims that defendants violated her rights under the Equal Protection Clause and that she experienced disparate treatment and retaliation. [9] Presumably because Craig did not clearly state what her claims are or the factual bases for them, the defendants did not respond to her disparate treatment claim specifically.

"The Fourteenth Amendment provides public employees with the right to be 'free from discrimination.' " Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)). With the addition of the requirement that the person who allegedly violated plaintiff's rights have acted under color of state law, a section 1983 discrimination claim is analyzed under the same framework as a Title VII discrimination claim. See id. at 88. "[T]o defeat a motion to dismiss in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." Id. at 87. A plaintiff can allege that her employer took adverse action against her at least in part for a discriminatory reason "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Id.

Craig alleges that defendants took adverse employment actions against her in the form of keeping her on a PIP and failing to remove her five-day suspension from her file. [10] "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabaya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (alteration omitted) (internal quotation marks omitted).

Craig alleges that defendants have kept the notice of her five-day suspension from 2012 in her file as a pretext to place her on PIPs. 2nd Am. Compl. at ¶ 11. Craig alleges that her placement on PIPs has in turn prevented her from pursuing promotional opportunities. Id. The Second Circuit has held that a performance improvement plan is not an adverse employment action insofar as it requires an employee to follow certain requirements. See Brown v. Am. Golf Corp., 99 Fed.Appx. 341, 343 (2d Cir. 2004). However, when a performance improvement plan affects an employee's possibility for advancement or compensation, it may be an adverse employment action. See E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 893 (S.D.N.Y. 2013) (finding that plaintiff's placement on a performance plan could constitute an adverse employment action when it impacted her eligibility to receive additional compensation).

***9** Here, Craig argues that the tangible effect of the PIPs is to prevent her from being promoted. In order to state a claim for a failure to promote, a plaintiff must show that "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." See Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). It is not sufficient to allege that a plaintiff generally requested promotion consideration. See Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir. 2004). Instead, there must be a specific position to which a plaintiff applied. Id. Craig has not alleged any facts about a specific promotional opportunity for which she applied.

While the Second Amendment Complaint only pleads the PIPs' effect on her ability to attain a promotion, the court notes, after digging deeper into materials appended to the complaint than any court should have to, that Craig has provided emails in which she complains of limitations upon her ability to transfer positions. [11] In one email, Craig expresses her desire for a lateral transfer because there are "no avenues for personal growth or advancement." 2nd Am. Compl. Ex. 1 at 27. In another email, a DMHAS employee informs Craig that she is not permitted to add her name to the transfer list because, per DMHAS policy, an employee with discipline more serious than a written warning and a Service Rating that is not satisfactory or better is ineligible to transfer. Id. at 20. However, there is no indication in the documents Craig provided that the PIPs or the five-day suspension notice from 2012 limited Craig's ability to transfer. Without an accompanying negative consequence, the PIPs and the continued presence of the 2012 discipline notice in her file cannot qualify as adverse employment actions. See Bloomberg L.P., 967 F. Supp. 2d at 893. Craig's discrimination claim is dismissed for failure to state a claim.

However, the court notes that Craig has alleged that defendant Debby Baker made discriminatory comments about her. Baker allegedly made references to Craig as "an angry Black woman, who often wore dread locks styled hair." See 2nd Am. Compl. at ¶ 112. Someone also allegedly overheard Baker telling a coworker that Craig's dreadlocks hair style "harbored head lice." See id. at ¶ 113. If Craig is able to allege that these comments reveal discriminatory intent in connection with an adverse employment action, she may state a claim for discrimination. At the motion to dismiss stage, the plaintiff "need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.' " Id. at 87 (quoting Littlejohn v. City of New York 795 F.3d 297, 311 (2d Cir. 2015)).

Because it appears that Craig may be able state a claim against defendant Debby Baker, the court grants Craig leave to file an amended complaint in seven (7) days against Baker, or any specific defendant, who allegedly discriminated against her. If Craig chooses to file an amended complaint, she must allege facts on the face of her complaint. See Fed. R. Civ. P. 8(a)(2).

### 7. Equal Protection Clause: Retaliation

Craig repeatedly makes reference to retaliation without specifying whether she is referring to First Amendment retaliation or retaliation by a supervisor against an employer for complaining of or otherwise opposing discrimination in violation of the Equal Protection Clause. In order for an Equal Protection Clause retaliation claim under section 1983 to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination." Vega, 801 F.3d at 91. As with discrimination claims brought under section 1983, retaliation claims under section 1983 mirror the analysis for Title VII cases. Id. For the purposes of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " See id. at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Indirect evidence such as proximity in time between the protected activity and the adverse employment action can be sufficient to plead causation. See id. at 90.

***10** The only protected activity Craig alleges is a complaint to the CHRO in 2012. This complaint is too remote in time from Craig's placement on the PIP beginning in 2014 to plausibly allege a causal link between a protected activity and an adverse employment action. Craig's retaliation claim under the Equal Protection Clause is therefore dismissed for failure to state a claim.

### 8. Equal Protection Clause: Hostile Work Environment

In order to state a cause of action for a hostile work environment claim, Craig must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted). A "[p]laintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." Id. "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " Id. (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). A section 1983 equal protection claim must allege the personal involvement of the individual defendants. See Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004).

Craig has not plead facts that plausibly allege a claim to a hostile work environment. The comments Craig attributes to Debby Baker are concerning and have supported the court's decision to grant Craig leave to replead her discrimination claim, see supra at 20, but Craig does not describe her interactions with Baker beyond the two remarks about her race and hair. Stray remarks cannot constitute the basis for a hostile work environment claim. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("[M]ere utterance of an epithet which engenders offensive feelings in a [sic] employee does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation citation, quotation marks, and editing omitted)); Payton v. City Univ. of New York, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) ("Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim. Nor can offhand comments, isolated incidents, stray remarks, or [the plaintiff's] subjective belief constitute a viable claim.") (internal citation and quotation marks omitted).

Furthermore, the Second Amended Complaint indicates that Craig heard of the remarks second-hand. While racial remarks need not be spoken in the presence of the plaintiff to contribute to a hostile work environment, Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997), the two insults at issue, both spoken out of earshot of Craig, do not amount to a hostile work environment. See Bennette v. Cinemark U.S.A., Inc., 295, F. Supp. 2d 243, 251–52 (considering that remarks were heard second-hand in evaluating the totality of the circumstances in a hostile work environment claim). Craig does not make any allegations about defendants' conduct beyond Baker's remarks and the conclusory statement that Craig has been "subjected to repeated acts of harassing conduct, retaliation, and a hostile work environment." See 2nd Am. Compl. at ¶ 12. Craig's hostile work environment claim is therefore dismissed.

D. Negligent Infliction of Emotional Distress (Count II)

***11** Defendants argue that the 11th Amendment bars Craig's suit against DMHAS and the individual defendants in their official capacities. Craig does not respond to this argument. Craig has not presented any arguments that the state defendants have consented to be sued on an NIED claim nor that any statute has abrogated their immunity. The court finds that the NIED claim against DMHAS and the individual defendants in their official capacities is barred by state sovereign immunity.

The Supreme Court of Connecticut has found that an individual municipal employee can only be found liable for negligent infliction of emotional distress in the context of the termination of employment, as opposed to actions occurring in the context of an ongoing employment relationship. See Bakhit v. Safety Markings, Inc., 33 F. Supp. 3d 99, 105 (D. Conn. 2014) (citing Perodeau v. City of Hartford, 259 Conn. 729, 763 (2002)). Craig does not allege that she was fired and therefore has not stated a claim for NIED against the defendants in their individual capacities. See id.

E. Defamation (Count III)

As with Craig's NIED claim, the court finds that the defamation claim against DMHAS and the individual defendants in their official capacities is barred by the Eleventh Amendment.

Under Connecticut law, "[a] defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627 (2009). "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." Id. at 627–28. A statement must be false to be actionable as defamation. See Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 228–29 (2004).

Craig alleges that the defendants accused her of "releasing the air from the tires of two of her coworkers." Craig alleges

that defendants then counseled her and presented her with a manual on workplace violence. However, nowhere in her Second Amended Complaint does Craig allege that any defamatory statement was made about her. The email that was sent out alerting DHMAS employees to the investigation into the tire deflating did not identify Craig or any particular individual. The defendants' presentation of a manual on workplace violence is not a defamatory statement. This leaves the "counseling." Defendant alleges that "[t]his incident was witnesses [sic] by other [sic] at Defendants DMHAS [sic]." Without any factual allegations of what was said, that third parties heard the statement, or that there was harm to her reputation, Craig has not alleged facts that plausibly state a claim for relief. Her defamation claim is dismissed.

F. The Americans with Disabilities Act (Count IV)

Having failed to exhaust her administrative remedies, Craig withdrew her ADA claim at oral argument on November 20, 2017. [12]

G. Sections 1985 and 1986 (Count V)

***12** "To state a claim under § 1985, a plaintiff must allege: (1) a conspiracy, (2) an intent or purpose to deprive a person of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to a person, including injury to property, person, or constitutional right." Bhatia v. Yale Sch. of Med., 347 Fed.Appx. 663, 665 (2d Cir. 2009). To plead a conspiracy, a plaintiff must "provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (quoting Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)). Craig has not plead any facts to support her conspiracy claim beyond her conclusory statement that there was a conspiracy. See 2nd Am. Compl. at ¶ 184–86. Section 1986 provides a cause of action against a defendant that failed to prevent an underlying section 1985 conspiracy. Consequently, her section 1986 claim must fail along with her section 1985 claim. See Maack v. Wyckoff Heights Medical Center, 2017 WL 4011395 at *8 (S.D.N.Y. Sept. 11, 2017). Both claims are therefore dismissed.

**V. CONCLUSION**

For the foregoing reasons, the defendants' Motion to Dismiss is granted. Count One is dismissed, with permission to replead the discrimination claim within seven (7) days of this Ruling. Counts Two, Three, and Five are dismissed. Count Four has been withdrawn.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5892193

## Footnotes

1 All "facts" are taken from the Second Amended Complaint unless otherwise stated.

2 Craig attaches her Annual Service Ratings, Employee Service Ratings, and PIP as exhibits in support of her allegation that defendants used the five-day suspension as a pretext to place her on the PIPs. 2nd Am. Compl. at ¶ 11. The ratings detail many aspects of Craig's performance, but there is no mention of the 2012 suspension on any of the forms. Id. at Exs. 20–23.

3 Craig provides a copy of the letter from the DMHAS Affirmative Action Office denying her accommodation request as an exhibit to the Second Amended Complaint. 2nd Am. Compl., Ex. 9. The letter provided several reasons for denying Craig's request, but does not include the quoted language regarding the severity of Craig's condition. It is unclear when the defendants told Craig the language quoted in the Second Amended Complaint was the basis for their denial of her request.

4 Craig spends a page addressing the distinction between a "proper officer" and an "indifferent person" in response to an argument Craig states the defendants put forward. See Pl.s' Opp'n at 13. However, the

defendants did not discuss the type of person who can serve process. The only conceivable explanation for Craig's imagined dispute is that her attorney copied and pasted an argument from another case.

5 The caption of the Second Amended Complaint only lists the individual defendants in their individual capacities even though it includes claims against the individual defendants in their official capacities. The captions in Plaintiff's Opposition to the Motion to Dismiss, the Amended Complaint, and the Complaint all list the individual defendants in their individual and official capacities. The court will assume that the change in the Second Amended Complaint was inadvertent.

6 Craig includes sections 1985 and 1986 in the heading for Count I in the Second Amended Complaint, but she does not plead violations of sections 1985 and 1986 in that count. The court will thus address her allegations under sections 1985 and 1986 in Count V, where she includes her allegations under those sections.

7 Rather than pleading facts in her Second Amended Complaint, Craig makes conclusory statements followed by references to exhibits. While exhibits may supplement facts plead in a complaint, the plaintiff cannot refer the court to exhibits as a substitute for following Rule 8's requirement to state claims with sufficient clarity that the defense, and the court, have notice of what is being plead and can assess the merits of the complaint. Here, for example, Craig alleges in vague terms that she was active in the union and, instead of pleading facts, refers the court to 52 pages of "assorted emails." The sections of her Second Amended Complaint on each of her five counts are entirely devoid of factual content—besides incorporating all of the preceding paragraphs of the complaint—and consist of nothing more than long chains of generalized allegations.

8 In the section of the Second Amended Complaint titled "Parties," Craig introduces various facts as grounds for claims of retaliation, racially hostile work environment, harassment, and discrimination. See 2nd Am. Compl. at ¶¶ 7, 8, 9, 12, 19, 28. It is not clear which facts are alleged in support of any given claim. The sections on each individual count include pages and pages of recitations of the elements of various causes of action without including any allegations specific to Craig's claims. Moreover, the paragraphs under section 1983 blend various causes of actions, resulting in a claim that is difficult to decipher. See id. at ¶ 131, 131(a) (listing disparate treatment on the "basis of his [sic] race, color, age, harassment" and racially hostile workplace as the basis of a "First Amendment to Free Speech" claim.)

9 As with her First Amendment retaliation claim, Craig does not clearly state what constitutional violation she seeks to vindicate under section 1983 and how that right was violated. It is not clear if Craig is alleging that she was retaliated against for her union activity, discriminated against on the basis of her race, or retaliated against for complaining of racial discrimination.

10 Craig does not allege facts in connection with any of her specific legal claims. Instead, she alleges acts of "retaliation" in the "Parties" section of her Second Amended Complaint. It is not clear whether these acts of retaliation are also claimed to be discrimination on the basis of race. Although Craig only characterizes the PIP as an act of retaliation, the court presumes that Craig intends the PIP to form a part of her discrimination claim as well because, without an adverse employment action, her discrimination claim would be incomplete.

11 Craig attached 237 pages of exhibits to a 44 page Second Amended Complaint.

12 Because Craig withdrew her ADA claim, the court does not reach the question of whether her ADA claim against DHMAS and the individual defendants in their official capacities is barred by the Eleventh Amendment. However, the court is troubled that Craig argues that she has brought her employment discrimination claim not under Title I of the ADA, but pursuant to Title II, which, unlike Title I, has been found to abrogate state sovereign immunity. See Pl.'s Opp'n at 24–26. Craig's position flies in the face of Second Circuit law that is directly to the contrary. See Mary Jo C. v. New York State & Local Ret. Sys., 707 F.3d 144, 171 (2d Cir. 2013) ("[W]e conclude that the [ADA] unambiguously limits employment discrimination claims

to Title I. A public employee may not bring a Title II claim against his or her employer, at least when the defendant employer employs fifteen or more employees.")

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4736722
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

John DEATON and Maria F. Deaton, Plaintiffs,
v.
Paul NAPOLI and Marie Napoli, Defendants.

17-CV-4592 (RRM) (GRB)
|
Signed 09/27/2019

**Attorneys and Law Firms**

John E. Deaton, The Deaton Law Firm, East Providence, RI, for Plaintiffs.

John Deaton, Barrington, RI, pro se.

Maria F. Deaton, Rumford, RI, pro se.

Holly G. Gydus, Melick & Porter, LLP, New York, NY, Michael J. Mazurczak, Pro Hac Vice, Melick & Porter, LLP, Boston, MA, John A. Caletri, Melick & Porter, LLP, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, United States District Judge.

***1** Plaintiffs John Deaton and Maria F. Deaton ("the Deatons"), proceeding *pro se*, bring this action pursuant to the Court's diversity jurisdiction, alleging defamation and tortious interference with business relations by defendants Paul Napoli and Marie Napoli ("the Napolis"). Presently before the Court is the Napolis' motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted and the amended complaint is dismissed.

## BACKGROUND [1]

The Deatons are attorneys in Rhode Island who were previously married. (Am. Compl. (Doc. No. 28) at ¶ 11.) The Deatons filed for divorce on June 5, 2007, and a formal divorce hearing was held on December 18, 2007. (*Id.* at ¶ 31.) John Deaton is the owner of the Deaton Law Firm, LLC, which is headquartered in Rhode Island and almost exclusively practices asbestos litigation. (*Id.* at ¶ 12.) The Napolis are attorneys who reside in New York. (*Id.* at ¶¶ 4, 5, 12.) The Deaton Law Firm is a competitor of Paul Napoli's former firm, Napoli Bern Ripka Shkolnik LLP ("Napoli Bern"). (*Id.* at ¶ 12.)

In November 2007, John Deaton employed a woman named Vanessa Dennis. (*Id.* at ¶ 14.) Dennis worked as an associate or paralegal at the Deaton Law Firm for several years before giving her notice in December 2010. (*Id.* at ¶¶ 14–15.) Shortly thereafter, she began working at Napoli Bern, where it is alleged that she had a relationship with Paul Napoli. (*Id.* at ¶¶ 15–16.) As the amended complaint further alleges, the relationship was discovered by Marie Napoli, and Dennis was fired from Napoli Bern. (*Id.* at ¶ 16.) Several lawsuits have been filed related to these circumstances. (*Id.* at ¶ 17.)

On May 21, 2013, Marie Napoli sent a Facebook message to the Deatons, asking whether John had a relationship with Dennis, and whether that had caused their divorce. (*Id.* at ¶ 19.) John denied the relationship and claimed that the divorce was not due to infidelity. (*Id.*) He told Marie that his divorce was underway before he ever met and hired Dennis, and he asked Marie not to contact him or his family again. (*Id.*) She replied, "I want to know so I can warn any future employer's wives of this if it [is] a recurring problem." (*Id.*)

The Deatons allege that despite John Deaton's denial, Marie Napoli proceeded to make knowingly false statements about a relationship between John Deaton and Vanessa Dennis in letters, emails, texts, and social media messages. (*Id.* at ¶ 18.) First, on August 27, 2013, Marie Napoli posted on Dennis' Facebook page: "[Dennis] has lost her last two jobs for sexually perusing [sic] her last two bosses who were both married at the time. It ended badly." (*Id.* at ¶ 20; 8/27/2013 Facebook Post, Pls.' Ex. A to Am. Compl.) A few months later, around November 2013, Marie Napoli wrote letters to two wives of Dennis' "current employers," who reside in Houston, Texas, and who are referred to as Mrs. Shroder and Mrs. Stomel in the amended complaint. (Am. Compl. at ¶ 21.) The amended complaint's reference to "current employers" appears to refer to Shrader & Associates LLP., a Texas-based law firm focusing on asbestos litigation, where Dennis began working after she was fired from Napoli Bern. (*Id.* at ¶ 18 & n.1.) The letters intended to warn the women about Dennis' history with her former bosses, stating that Dennis "assisted her previous boss in his divorce" and that he "bought her a Mercedes and expensive gifts." (*Id.* at ¶ 21; Letters from

Marie Napoli, Pls.' Ex. B and Ex. F to Am. Compl.) The letters stated that Dennis had received harassing emails from John Deaton, that she was "petrified to see him," and that after Marie Napoli contacted Maria Deaton, Maria would not allow John Deaton to see his children. (Am. Compl. at ¶ 21.) [2]

***2** Shrader & Associates previously had a business relationship with John Deaton and the Deaton Law Firm. (*Id.* at ¶ 38.) However, the Deatons allege that after "Partners" at Shrader & Associates received Marie Napoli's letters, "claiming John Deaton not only had an affair with Ms. Dennis resulting in his ex-wife preventing him from seeing his children, but most significantly, was harassing Ms. Dennis at her new employment, Shrader and Associates decided to no longer continue their business relationship" with the Deaton Law Firm. (*Id.*) [3]

Marie Napoli also sent LinkedIn e-mails to "individuals associated with Ms. Dennis's current employer in Texas" in May 2014, stating, *inter alia*, "[Dennis] caused her boss from RI's divorce. She had to relocate and move to NY." (*Id.* at ¶ 22; 5/15/2014 LinkedIn E-mails, Pls.' Ex. C to Am. Compl.)

Marie then sent a message to Dennis' husband in June 2014, containing "other" knowingly false statements about an affair between Dennis and John Deaton. (Am. Compl. at ¶ 24.) She also sent messages to Dennis' Facebook friends in June and July 2014, stating that Dennis was forced to leave her job in Rhode Island due to an affair with her boss. (*Id.* at ¶ 23.)

In November 2014, Paul Napoli spoke to the *New York Post.* (*Id.* at ¶ 26; Nov. 2014 News Article, Pls.' Ex. D to Am. Compl.) He allegedly stated, "[e]verything my wife said in any email whether it sounds terrible or not was all true and was all factually correct." (Am. Compl. at ¶ 26.)

Additionally, the Napolis allegedly made false statements about the Deatons in the course of various lawsuits. The Deatons first discovered this in February 2017 through civil defense attorneys, their colleagues in the asbestos litigation community, who told them that their divorce and children had been discussed in court filings. (*Id.* at ¶ 28.)

Marie Napoli filed at least three lawsuits relevant to the Deatons' claims. First, on June 15, 2015, Marie filed a complaint against Dennis in Cook County, Illinois. (*Id.* at ¶ 27.) The Deatons allege that she made false statements in connection with that case, including, *inter alia*, that Dennis' "previous boss had bought her expensive gifts ... and was harassing her via texts and emails after his divorce," and that Dennis was "the cause" his divorce. (*Id.*)

On December 9, 2016, Marie Napoli commenced an action, *Napoli v. Ratner*, which was removed to the United States District Court for the Eastern District of New York. *See* 16-CV-6483 (JMA) (AKT) (E.D.N.Y.). (*Id.* at ¶ 28.) The Deatons attach an excerpt of the complaint in *Ratner* to the pleading, and allege that it contained several false statements, including that Dennis "had a sexual relationship with her previous employer from Rhode Island," that "Deaton was harassing" Dennis, that he was "threatening" to "tell her husband everything," and that he was unable to see his children after his wife discovered the affair. (*Ratner* Compl., Pls.' Ex. E to Am. Compl. at ¶¶ 27, 28, 30.) The *Ratner* complaint also alleged that Dennis "specifically targets her bosses and uses sex to advance her career," and that "[s]he has done this with her previous boss from Rhode Island, with [Marie Napoli's] husband, and appears to be doing it now with her current boss." (*Id.* at ¶ 55.)

***3** Finally, on April 28, 2017, Marie Napoli filed claims against Dennis and other third parties in the Eastern District of New York in the case of *Napoli v. Kern, et al.*, 17-CV-2563 (ADS) (AKT) (E.D.N.Y.). (Am. Compl. at ¶¶ 32, 33.) A portion of the relevant complaint in *Kern* is attached to the amended complaint. (*See Kern* Compl., Ex. H to Am. Compl.) The *Kern* complaint restates the aforementioned allegations, including that Dennis claimed John Deaton harassed and threatened her. (*See* Am. Compl. at ¶ 32; *Kern* Compl. at ¶¶ 63–66.)

On March 28, 2017, the Deatons commenced this action against the Napolis for defamation and tortious interference. The action was initially filed in the Superior Court of Rhode Island, (Doc. No. 2), but the case was removed to the United States District Court for the District of Rhode Island on the grounds of diversity jurisdiction. (Notice of Removal (Doc. No. 1).) Upon the Napolis' motion to dismiss for lack of personal jurisdiction and improper venue, in which they moved in the alternative to transfer venue, (Doc. No. 8), the case was transferred to the Eastern District of New York. (Doc. No. 15). [4]

In the amended complaint, the Deatons bring claims for (1) defamation, specifically libel *per se*, libel, and slander, and (2) tortious interference with business relations. They allege that the Napolis made defamatory statements with malicious and intentional disregard for the truth, and that the

statements "originated" with Paul Napoli and were repeated by Marie. (Am. Compl. at ¶¶ 35–36.) They assert that the Napolis (1) "knew their statements were false" because John Deaton told Marie Napoli as much in 2013; (2) had "no reliable basis" for their claims; and (3) "fabricated" details. (*Id.* at ¶ 36.) The Deatons emphasize that the Napolis are sophisticated attorneys who ignored readily available legal documents which would have confirmed that their divorce was filed five months before John Deaton ever met Dennis, and that the alleged affair "clearly could not have been a cause" of the Deatons' divorce. (*Id.* at ¶ 31.)

The Deatons assert that the alleged defamation implicated their entire family in a "malicious tale," and also "intentionally interfere[d] with business relationships between" the Deatons, "fellow attorneys, and clients." (*Id.* at ¶ 1.) They believe that the Napolis spread lies "in an effort to intentionally harm" the reputations of John Deaton and the Deaton Law Firm, a "direct competitor[ ]" to Napoli Bern. (*Id.* at ¶ 37.). (*Id.* at ¶ 36.) They believe that Shrader & Associates' decision to end its business relationship with the Deaton Law Firm was driven by Marie Napoli's accusation that John Deaton harassed Dennis, a then-new Shrader & Associates employee. (*Id.* at ¶ 38.) The Deatons allege that the loss of that relationship cost the Deaton Law Firm hundreds of thousands of dollars in attorney fees, and the "continued loss will ultimately result in a loss of millions of dollars." (*Id.*) They claim that by "making and widely disseminating" defamatory statements, the Napolis have "directly caused" them to "suffer reduced referrals of clients and income." (*Id.* at ¶ 40.) The Deatons also contend that Dennis, at Paul Napoli's "direction, attempted to use employees at the Deaton Law Firm to secretly file asbestos cases" in Rhode Island for Napoli Bern. (*Id.* at ¶ 36.)

***4** The Deatons seek declaratory and injunctive relief, as well as damages. They ask the Court to declare that the defamatory statements are false, and they seek an order requiring the Napolis to retract any false statements and permanently enjoining them from making defamatory statements. (Am. Compl. at 10–11.) The Deatons seek special damages of $3,000,000 for tortious interference with business relations, and $10,000,000 in compensatory damages for the "emotional distress and loss of reputation" resulting from the alleged libel *per se*, libel, and slander. (*Id.* at 11–12.)

In their motion to dismiss, the Napolis argue that (1) the majority of statements at issue are barred by the statute of limitations; (2) the remaining statements are privileged because they were made in the course of litigation; (3) the amended complaint fails to allege that Paul Napoli made any defamatory statements; and (4) to the extent the Deatons base their claim on Paul's statements to Marie Napoli, those communications are subject to spousal privilege. (Defs.' Mem. (Doc. No. 39).)

The Deatons insist that their claims are timely, as the Napolis' republished statements fall within the statute of limitations. (Pls.' Opp'n (Doc. No. 41) at 3–4.) Further, they assert that the statements are not subject to the litigation privilege because they were not only immaterial to the proceedings at issue, but were motivated solely by malice. (*Id.* at 5.) The Deatons allege that they should be afforded the opportunity to prove malice through discovery. (*Id.* at 5–6.)

## STANDARD OF REVIEW

While the Deatons proceed *pro se*, they are experienced attorneys. Accordingly, their pleading is "not entitled to the degree of liberality given to non-attorney *pro se* plaintiffs." *Bliven v. Hunt*, 418 F. Supp. 2d 135, 137 (E.D.N.Y. 2005) (citations omitted). Still, the Court construes the complaint liberally, accepting all factual allegations in it as true and "drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (internal quotation marks omitted) (citation omitted).

Although the Napolis frame the instant motion as one for judgment on the pleadings under Rule 12(c), the Court will treat it as a motion for failure to state a claim under Rule 12(b)(6), as no answer has been filed to the amended complaint. *See* FED. R. CIV. P. 12(c) ("After the pleadings are closed ... a party may move for judgment on the pleadings." (emphasis added)); *see also S&L Vitamins, Inc. v. Australian Gold, Inc.*, No. 05-CV-1217 (JS) (MLO), 2006 WL 8423836, at *4 (E.D.N.Y. Mar. 30, 2006) (construing a Rule 12(c) motion as a 12(b)(6) motion because no answer had been filed to amended counterclaims). In any event, courts apply the same standard in deciding motions under Rules 12(b)(6) and 12(c). *See Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 75 (2d Cir. 2014).

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Detailed facts are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. The determination of whether "a complaint states a plausible claim for relief" is "a context-specific task" requiring the court to "draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

***5** On a Rule 12(b)(6) motion to dismiss, a court may consider facts alleged in the complaint, exhibits attached to it, and documents incorporated therein by reference. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Additionally, Rule 201(b) of the Federal Rules of Evidence permits courts to take judicial notice of certain documents. A judicially noticed fact must be one "that is not subject to reasonable dispute," in that it is either (1) "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). "Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions." *Johnson v. Levy*, 812 F. Supp. 2d 167, 176 (E.D.N.Y. 2011) (internal quotation marks omitted) (citation omitted). However, judicial notice of court filings is taken for the limited purpose of establishing "the fact of such litigation and related filings," not for "the truths of the matters asserted...." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (citation omitted); *see also Glob. Network Commc'ns Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

## DISCUSSION

### I. Defamation

Defamation, "consisting of the twin torts of libel and slander," is "the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (citation omitted). Written defamatory words are classified as libel, while spoken defamatory words are slander. *See Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161, 168 (E.D.N.Y. 2018). Defamatory statements "tend[ ] to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community." *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 629 (E.D.N.Y. 2018) (internal quotation marks omitted) (citation omitted).

To state a claim for defamation under New York law, the complaint must allege (1) a false statement, (2) published to a third party, (3) without authorization or privilege, (4) through fault amounting to at least negligence, which (5) either constitutes defamation *per se* or caused "special damages." *See Greene*, 340 F. Supp. at 168; *see also Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017); *Albert*, 239 F.3d at 266–67. A statement is defamatory *per se* if it "tends to injure [the plaintiff] in her trade, business, or profession ... or if the statement is so severe that serious injury to the plaintiff's reputation may be presumed." *Baez v. JetBlue Airways*, No. 09-CV-0596 (ENV) (RML), 2014 WL 11462719, at *8 (E.D.N.Y. July 7, 2014) (internal quotation marks omitted) (citation omitted); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000); *Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*, No. 18-CV-1736 (ER), 2019 WL 1259102, at *8 (S.D.N.Y. Mar. 19, 2019).

However, the Court need not address whether the amended complaint makes out a claim for defamation. For the reasons explained below, the Deatons' claim is not actionable because the statements upon which the claim is based are either untimely or privileged.

#### A. Statute of Limitations

New York law sets a one-year statute of limitations for defamation claims. *See* N.Y. C.P.L.R. § 215(3); *see also Solomon v. Amazon.com, Inc.*, No. 18-CV-5528 (ERK) (PK), 2019 WL 2601794, at *2 (E.D.N.Y. June 24, 2019). Under New York's "single publication rule," the statute of limitations "ordinarily begins to run at the time of the 'first publication' ...." *Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 305 (S.D.N.Y. 2014) (citing *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003)); *see also Thomas v. City of New York*, No. 17-CV-06079 (ARR) (JO), 2018 WL 5791965, at *6 (E.D.N.Y. Nov. 5, 2018). An exception exists where a statement is republished in a new format, in which case the time "begins to run anew from the date of republication." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 276 (S.D.N.Y. 2016) (citing *Firth v. State*, 98 N.Y.2d 365, 371 (N.Y. 2002)). However, republication only occurs "upon a separate aggregate publication from the original, on a

different occasion, which is not merely a delayed circulation of the original edition" and is intended to reach a "new audience." *Firth*, 98 N.Y.2d at 371 (internal quotation marks omitted) (citations omitted). Moreover, a "later discovery of defamatory material does not toll the one-year statute of limitations." *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 571 (S.D.N.Y. 2016) (citations omitted), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016).

***6** Here, the one-year statute of limitations mandates that the statements must have been published no earlier than March 28, 2016, as the Deatons filed the original complaint on March 28, 2017. There are only two sets of statements that are not time-barred: (1) allegations made in December 2016, in the complaint filed in *Napoli v. Ratner, et al.*, 16-CV-6483 (JMA) (AKT) (E.D.N.Y.), and (2) allegations made in April 2017, in the complaint filed in *Napoli v. Kern, et al.*, 17-CV-2563 (ADS) (AKT) (E.D.N.Y.). Most of the statements at issue – the Facebook messages, letters, emails, Paul Napoli's statement to the media, and Marie Napoli's statements in relation to her Illinois lawsuit – were made prior to 2016, well outside the one-year limitations period. Thus, the majority of statements are time-barred.

To the extent the Deatons attempt to circumvent the limitations period by broadly asserting that the Napolis republished statements "to as many new audiences as they possibly could," this portrayal of continuous republication, without more, does not suffice. (Pls.' Opp'n at 4.) In order to survive a motion to dismiss, the Deatons must point to a concrete statement made to an identifiable third party. *See Kamdem-Ouaffo*, 160 F. Supp. 3d at 572 & n.24 (finding plaintiff could not "seek to evade the statute of limitations" by alleging that "[u]p to this date," defendants "continued to defame" her, without identifying a particular statement made within the limitations period); *see also Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015) (finding that a "complaint must at least identify" the statements, the publisher, the time the statements were made, and the third parties to whom they were made). Moreover, "a cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception." *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 205 (E.D.N.Y. 1998).

Accordingly, the Court is compelled to dismiss as untimely any defamation claim predicated on statements published prior to March 28, 2016.

### B. Litigation Privilege

With respect to the remaining statements made in connection with the civil complaints related to this action, although they are not time-barred, they are privileged and thus not actionable.

One of the requisite elements of a defamation claim is the publication of a false statement made without privilege or authorization. New York law "accord[s] an absolute privilege" to statements made "in the course of judicial proceedings and which relate to the litigation." *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012). A statement made in the course of a judicial proceeding is absolutely privileged, "so long as it is considered material and pertinent to the litigation." *Id.* (citations omitted); *see also Weinstock v. Sanders*, 42 N.Y.S.3d 205, 207–08 (2d Dep't 2016) (noting that the privilege applies "at all stages" of litigation). "The test of pertinency ... is extremely liberal, so as to embrace anything that may possibly or plausibly be relevant or pertinent." *Weinstock*, 42 N.Y.S.3d at 208 (citing cases). While the Second Circuit recently emphasized that pertinence is "an important (if rarely implemented) limitation on [the] scope" of the litigation privilege, *Brown v. Maxwell*, 929 F.3d 41, 53 n.47 (2d Cir. 2019), it is generally considered "the broadest possible of privileges," covering "any matter which, by any possibility, under any circumstances, at any stage of the proceeding, may be or may become material or pertinent." *Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007) (per curiam) (internal quotation marks omitted) (citations omitted).

Courts routinely find that statements in pleadings are shielded by absolute privilege. *See Lader v. Delgado*, 941 F. Supp. 2d 267, 273 (E.D.N.Y. 2013) (finding statements "made in pleadings that relate to the subject matter" of the action were "absolutely privileged" (citation omitted)); *see also D'Annunzio*, 876 F. Supp. 2d at 217. Further, these statements are protected "irrespective of the motive" of the publisher. *Kelly*, 485 F.3d at 666. If the litigation privilege applies, then the protection is absolute, and it is "not lost even in the presence of malice." *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 48 (S.D.N.Y. 2016) (citation omitted), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015).

***7** Here, the only statements published within the one-year statute of limitations were all made in the context of civil lawsuits brought by Marie Napoli. The Deatons argue that the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

statements are nevertheless not privileged because they "did not address 'the core of the underlying proceeding,' " (Pls.' Opp'n at 5 (citation omitted)), "had no legal justification, and provided no value to any legitimate legal claims made by the Defendants." (Am. Compl. at ¶ 36.) While the Court must accept the factual allegations in the amended complaint as true, it will not accept the Deatons' legal conclusion that the statements were not valuable to the judicial proceedings.

In both cases at issue, the defamatory statements were made by Marie Napoli in the pleadings. In *Napoli v. Ratner*, Marie asserted claims for abuse of process, infliction of emotional distress, and prima facie tort against Dennis' lawyers, who had filed a lawsuit against her. [5] She alleged injuries sustained as a result of Dennis' affair with her husband, and the complaint was premised on a theory that Dennis is a sex addict who habitually engages in affairs with her bosses. The complaint focused on how "Dennis specifically targets her bosses," citing John Deaton repeatedly as a prime example. (*Ratner* Compl., Pls.' Ex. E to Am. Compl. at ¶¶ 27–30, 55.) Accordingly, the Court finds that the allegations in the *Ratner* complaint that Dennis had an affair with John Deaton and caused the Deatons' divorce were material and pertinent to Marie Napoli's claims and her ability to prove damages in that case.

In *Napoli v. Kern*, Marie Napoli brought claims against Dennis, Dennis' attorneys, and a New York State Supreme Court Justice pursuant to 42 U.S.C. § 1983, alleging violations of her constitutional rights under the First Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments. (*See Kern* Compl., Pls.' Ex. H to Am. Compl. at ¶ 2.) Napoli alleged that a gag order imposed on her in a separate lawsuit prevented her from exercising her right to free speech and to warn others about Dennis. As in *Ratner*, the portrayal of Dennis as a "predatory" sex addict who targets married colleagues was central to Napoli's theory of her case. (*Id.* at ¶ 60.) The *Kern* complaint's numerous allegations about Dennis' affair with John Deaton provided factual support for this theory. (*See id.* at ¶¶ 61, 63-66.) Accordingly, the Court simply cannot say that such statements were not "possibly or plausibly" material and pertinent. *Weinstock*, 42 N.Y.S.3d at 207–08.

Considering the relative importance of the allegations about John Deaton in the *Kern* and *Ratner* complaints, and in light of the Second Circuit's characterization of the litigation privilege as "the broadest possible of privileges," *Kelly*, 485 F.3d at 666, the Court finds that the alleged defamatory statements were material and pertinent to the underlying lawsuits, and are therefore absolutely privileged.

To the extent the Deatons attempt to avoid application of the privilege by arguing that statements made in the course of litigation actually constitute republications, this argument defies logic. Even if the statements made in the *Ratner* and *Kern* complaints were republications, they were made in complaints filed in court. The Deatons cannot avoid the inescapable fact that the only timely defamatory statements alleged in their complaint were made in judicial proceedings and are shielded by absolute privilege.

***8** Finally, the Deatons assert that this case should proceed to discovery to afford them an opportunity to prove malice. (Pl. Opp'n at 5–6.) As explained *supra*, when a statement is absolutely privileged, the publisher's motive is irrelevant. *See Kelly*, 485 F.3d at 666. Even assuming that Marie Napoli maliciously accused John Deaton of infidelity and harassment, and even if she made those statements to harm the business interests of the Deaton Law Firm, she did so through civil complaints related to ongoing litigation. Because those statements were pertinent to her case, they are afforded absolute protection.

Given that none of the alleged statements are actionable, the defamation claim is dismissed. [6]

### II. Tortious Interference

Under New York law, to state a claim for tortious interference with business relations, a plaintiff must satisfy four conditions: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (citations omitted); *see also Chanicka v. JetBlue Airways Corp.*, 243 F. Supp. 3d 356, 360 (E.D.N.Y. 2017). Failure to identify a specific business relationship with a third party is a "fatal" deficiency to pleading tortious interference. *Stephens v. Trump Org. LLC*, 205 F. Supp. 3d 305, 311 (E.D.N.Y. 2016) (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010)). Moreover, plaintiffs face a "high bar" in establishing wrongful interference. *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015); *see also Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 268 (E.D.N.Y. 2016). In the specific context

of tortious interference with business relations, distinct from tortious interference with contract, "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004); *see also* *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 187 (E.D.N.Y. 2016). While New York courts have found an exception to this rule where the defendant "engage[d] in conduct for the sole purpose of inflicting intentional harm," that exception is "narrow." *16 Casa Duse, LLC*, 791 F.3d at 262.

Here, the amended complaint only names one identifiable business relationship with a third party. [7] The Deatons point to their prior connection to Shrader & Associates, alleging that the "relationship previously led to attorney fees being earned," and that the relationship ended after "the Partners received Defendant Marie Napoli's letters." (*Id.* at ¶ 38.) The Deatons allege two acts that might be construed as interference: the letters sent to the wives of employees at Shrader & Associates, and the LinkedIn e-mails sent to "individuals associated with Ms. Dennis's current employer in Texas." (*Id.* at ¶ 22.) However, for the reasons explained below, the claim for tortious interference is dismissed as time-barred or, alternatively, duplicative of the defamation claim.

### A. Statute of Limitations

***9** Under New York law, claims for tortious interference with business relations are generally governed by a three-year statute of limitations. *See* *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 239 (S.D.N.Y. 2018), *reconsideration denied*, No. 15-CV-4244 (JGK), 2018 WL 5650004 (S.D.N.Y. Oct. 30, 2018); *see also* *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000) (citing N.Y. C.P.L.R. § 214(4)). The statute of limitations begins to run when the alleged interference occurs and "the injury is sustained, not at the time the plaintiff discovers the injury." *Techno-Comp, Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 742 (E.D.N.Y. 2015) (citation omitted).

Given that the Deatons filed this action on March 28, 2017, any claim predicated on acts occurring earlier than March 28, 2014, are untimely under a three-year statute of limitations. The letters mailed to the wives of Shrader & Associates employees were sent in November 2013, and thus any claim based on those letters must be dismissed as untimely. To be sure, the LinkedIn e-mails were sent in May 2014, and are not time-barred. However, the cause of action for tortious interference is duplicative, which constitutes an independent ground for dismissal.

### B. Duplicative Claim

"[I]t is well settled that a claim for tortious interference is duplicative of a defamation claim ... where the entire injury complained of by plaintiff flows from the effect on his reputation." *Travelex Currency Servs., Inc.*, 2019 WL 1259102, at *7 (quoting *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order)). Where defamatory statements harmed a plaintiff's reputation and he lost business contacts as a result, those claims are "in truth defamation claims." *Katz v. Travelers*, 241 F. Supp. 3d 397, 407 (E.D.N.Y. 2017) (finding tort claims were actually "[d]isguised" defamation claims where the "gravamen" of the injury was harm to plaintiff's reputation "or harm that flows from the alleged effect" on his reputation), *reconsideration denied*, No. 16-CV-4389 (ADS) (SIL), 2017 WL 4180012 (E.D.N.Y. Sept. 20, 2017). The Second Circuit has affirmed dismissals of tortious interference claims as duplicative where "economic damages derive[d] from defamatory statements." *Goldman v. Barrett*, 733 F. App'x 568, 571 (2d Cir. 2018) (summary order) (citation omitted). In *Goldman*, for example, "converging claims" for defamation and tortious interference were "premised on identical underlying factual content": statements made to plaintiffs' potential business partners impugning plaintiffs' integrity. The Court found that, "[e]ven if the Defendants possessed more than one intention, Plaintiffs have not alleged an independent source of harm." *Id.*; *see also* *Wexler v. Allegion (UK) Ltd.*, No. 16-CV-2252 (ER), 2018 WL 1626346, at *8 (S.D.N.Y. Mar. 30, 2018); *Pusey v. Bank of Am., N.A.*, No. 14-CV-04979 (FB) (LB), 2015 WL 4257251, at *4 (E.D.N.Y. July 14, 2015).

Here, too, the alleged interference and resultant loss of business flowed from reputational damage. The Deatons allege that they lost a business relationship because the Napolis damaged their reputation by disseminating accusations of infidelity and harassment. Insofar as their claim is based on defamatory statements, their alleged injuries "flow directly from such statements" and the impact they had on their reputation. *Travelex Currency Servs., Inc.*, 2019 WL 1259102, at *7. Because the Deatons' tortious

interference claim sounds in defamation, it must be dismissed as duplicative.

***10** Moreover, given the Court's finding, the one-year statute of limitations for defamation applies. *See Guelen v. Distinctive Pers., Inc.*, No. 11-CV-01203 (JG) (SMG), 2011 WL 3420852, at *4–5 (E.D.N.Y. Aug. 4, 2011) (noting that "the essence" of a claim, rather than the name plaintiff gives it, "dictates the applicable statute of limitations"). Because all of the alleged conduct, including the LinkedIn emails, occurred before March 28, 2016, the claim is untimely.

Accordingly, the Deatons' tortious interference claim is dismissed as time-barred, and in addition, as duplicative.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion, (Doc. No. 39), and the amended complaint is dismissed in its entirety. The Clerk of Court is respectfully directed to enter judgment in favor of defendants, to mail a copy of the judgment and this Memorandum and Order to the *pro se* plaintiffs, to note the mailing on the docket, and to close this case.

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 4736722

## Footnotes

1 The following facts are drawn from the amended complaint and its attachments, and are assumed true for the purpose of this Order. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). The facts of this case are also set forth in the January 10, 2019, Order of the Honorable Joseph F. Bianco, to whom this case was originally assigned. *See Deaton v. Napoli*, No. 17-CV-04592 (JFB) (GRB), 2019 WL 156930 (E.D.N.Y. Jan. 10, 2019) (finding New York law applies to this case).

2 Although not entirely clear, the amended complaint appears to allege that the Deatons did not learn of these letters until February 2017. (Am. Compl. at ¶ 29.)

3 The Court notes that in sections of the amended complaint, the Deatons refer to "letters" sent by the Napolis to John Deatons' colleagues, without naming the recipients or clarifying whether or not these are the same letters referenced *supra*, sent to Mrs. Shroder and Mrs. Stomel. *See* Am. Compl. at ¶ 29 (alleging that the Napolis wrote "several letters to colleagues and fellow plaintiff attorneys of Plaintiff John Deaton and their wives, Mrs. Shroder and Mrs. Stomel"); *see also id.* at ¶ 46 (alleging that statements were made to "Plaintiff's small asbestos legal community"). Regardless, as explained *infra*, both defamation and tortious interference claims require plaintiffs to identify specific third-parties, and thus, vague allegations regarding statements to the "legal community" or unnamed "colleagues" are not actionable.

4 On May 21, 2019, the case was reassigned to this Court from the Honorable Joseph F. Bianco upon Judge Bianco's elevation to the Second Circuit Court of Appeals.

5 While excerpts of the *Ratner* and *Kern* complaints are attached to the Deatons' amended complaint, the Court takes judicial notice of the complaints in their entirety, in order to note the causes of action brought and relief sought in those cases. *See Hargrove v. N.Y.C. Sch. Const. Auth.*, No. 11-CV-6344 (CBA) (LB), 2013 WL 2285173, at *4 (May 23, 2013) (taking judicial notice of related actions filed by parties (citing cases)). The Court views these documents solely to observe the existence of the allegations made therein, not for the truth of the matters asserted.

6 As such, the Court need not address the Napolis' additional arguments concerning spousal privilege.

7 Allegations that the Napolis interfered by propagating falsities "to lawyers and others involved in the nationwide practice of asbestos litigation," (Am. Compl. at ¶ 37), or to "fellow attorneys, and clients," (*id.* at ¶ 1), do not sufficiently identify specific business relationships. Failure to name a third-party business relationship is fatal and the Deatons cannot base their claim on these vague allegations alone. Similarly, the claim that Paul Napoli "attempted to use employees at the Deaton Law Firm to secretly file asbestos cases in Rhode Island" is not a cognizable claim. (*Id.* at ¶ 36.) Here, too, the Deatons fail to allege that a business relationship with a third party was harmed.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 9901710
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Houston DOUGLAS, Petitioner,
v.
PEOPLE OF THE STATE OF NEW YORK, [1] Respondent.

12 CV 3839 (NGG)(LB)
|
Signed November 3, 2015

**Attorneys and Law Firms**

Houston Douglas, Sonyea, NY, pro se.

Kings County District Attorneys Office, New York State Attorney Generals Office, Seth M. Lieberman, Brooklyn, NY, for Respondent.

**REPORT & RECOMMENDATION**

BLOOM, United States Magistrate Judge

***1** Petitioner, Houston Douglas, files this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2006 Kings County conviction. The Honorable Nicholas G. Garaufis, United States District Court Judge, referred this petition to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition should be denied.

***BACKGROUND***

According to the evidence adduced at trial, on September 26, 2003, shortly before 11:00 p.m., Karen Williams met Krishna Ramotar, a driver in her commuter van business, at the comer of Ocean and Parkside Avenues in Brooklyn, New York to collect her daily payment. (Tr. at 45, 349, 351.) [2] Williams sat in the van with Ramotar, who was in the driver's seat; Kyron James was in the front passenger seat and Williams was in the first passenger row behind them. (Id, at 45–49, 353.) While Williams was collecting the money from Ramotar, petitioner, who was driving a white Jeep, backed into a vacant spot beside the van. (*Id.* at 50–51, 354–55.) While parking, the Jeep rolled over a glass bottle, causing it to pop; Williams and a couple of people standing nearby were struck with shattered glass. (*Id.* at 354–56.) Allen Williams—Karen Williams' son, who was standing on the sidewalk at the time along with Williams' brother, Michael—told the petitioner to apologize for breaking the bottle, but petitioner just got out of his Jeep and walked into a deli. (*Id.* at 48–52, 355–56.) When petitioner exited the deli, he engaged in a loud and heated altercation with Allen Williams, Michael Williams, and a couple of passerbys. (*Id.* at 51–52, 354–56.) Petitioner then reentered his Jeep, drove a short distance, pulled over to remove something from a panel on the rear of his Jeep, and sped off. (*Id.* at 51–53, 357–58.) Shortly thereafter, petitioner returned, parked his Jeep across the street from the van, exited the vehicle holding a gun in his hand, and ran towards the van. (*Id.* at 53–54, 358.)

As petitioner was running towards the van holding a gun, Karen Williams crouched down and told Ramotar to go, because petitioner had a gun. (*Id.* at 53–55, 99–100, 358–61.) Petitioner ran towards the van and fired a shot that struck James in the leg (*id.* at 53–54), ran passed Karen Williams, stuck the gun through the open front passenger window, and fired a second shot. (Id at 54, 363.) Petitioner continued running alongside the van as it rolled away, stuck his arm further through the open window, and fired a third shot. (Id. at 54, 363.) Petitioner came back to where Karen Williams was still crouched down and pointed the gun at her face. (Id at 364, 382.) Police Officer Mathieu Pierre, who had been a short distance away on foot patrol, had arrived on the scene in time to see petitioner fire the gun twice and then point it at Karen Williams. (Id. at 96–100.) Officer Pierre ordered petitioner to freeze, but petitioner instead ran back to his Jeep and drove off. (*Id.* at 100–02, 155.)

***2** Sergeants Timchenko and Marrone briefly pursued petitioner and eventually apprehended him a few blocks away. (Id. at 104, 178–79, 254–60.) The officers ordered petitioner out of the car, and upon frisking him, recovered a nine-millimeter pistol from his waistband. (*Id.* at 179–80, 263–64.)

*Investigatory Lineup*

At the 70th Precinct the next morning, Detective Neil Siegel chose five fillers with similar physical characteristics to petitioner from a men's shelter to participate in a lineup. (*Id.* at 404.) Fillers with hair on their heads were instructed to shave their heads bald. (*Id.*) Defendant switched shirts with one of the fillers, and chose where to sit in the lineup. (*Id.* at 405.) Karen Williams viewed the six-person lineup conducted by

Detective Siegel. Karen Williams identified petitioner as the shooter at the lineup. (*Id.* at 366–67, 404, 409–10.)

*Charges*

Petitioner was initially charged by a felony complaint with Assault in the First Degree in addition to other offenses. (*See* ECF No. 5–1, Att. 1.) Petitioner thereafter was charged, by Kings County Indictment Number 6977/2003, with two counts each of Attempted Murder in the Second Degree, and Assault in the Second Degree; as well as one count each of Attempted Assault in the First Degree, Assault in the Third Degree, Criminal Possession of a Weapon in the Second, Third, and Fourth Degrees, and Reckless Endangerment in the First Degree. (*See* ECF No. 5–1, Att. 2.) On September 28, 2003, petitioner was arraigned on Indictment Number 6977/2003 and was represented by Calvin Garber at the arraignment. [3]

Petitioner was subsequently charged by a superseding indictment—Indictment Number 6029/2004—with two counts each of Assault in the First Degree and Assault in the Second Degree, and one count each of Attempted Murder in the Second Degree, Criminal Possession of a Weapon in the Second, Third, and Fourth Degrees, Reckless Endangerment in the First Degree, Unlawful Possession of Marihuana, and Possession of Knives/Instruments in Violation of New York City Administrative Code § 10–133(b). (ECF No. 5–1, Att. 4.)

**I. Pre–Trial Motions**

Before trial, petitioner's counsel moved to dismiss the superseding indictment— Indictment Number 6029/2004— pursuant to New York Criminal Procedure Law § 30.30. In a decision and order dated November 29, 2005, the Supreme Court, Kings County, denied the motion. (*See* ECF No. 5–1, Att. 9.) Petitioner moved *pro se* to dismiss the superseding indictment on the ground that the indictment had been obtained in violation of New York Procedure Law § 210.20(6) because the State had obtained the indictment, without permission of the court, beyond thirty days after the entry of the order dismissing the count of attempted murder in Indictment Number 6977/2003. The Supreme Court, Kings County, denied the motion and held that the indictment had been lawfully obtained pursuant to N.Y.Crim. Proc. Law § 200.80, which permits the State to file, without court approval, a superseding indictment *at any time* prior to the disposition of a pending indictment. (*See* ECF No. 5–1, Att. 10.) (emphasis added).

**II. Pre–Trial Hearings**

***3** On December 8, 2005, a combined *Dunaway, Wade,* and *Mapp* hearing was held. (Hr'g at 6.) [4] Defense counsel moved to suppress the three [5] lineup identifications as unduly suggestive based on an age discrepancy as well as distinguishable physical characteristics between petitioner and the fillers. (Id. at 65–66.) The court made note of the poor quality of the photographs of the lineup, but found no violation. (Id. at 72–73.) The court noted that although there was an age difference between petitioner and some of the fillers, the officer who conducted the lineup was "extremely solicitous" of petitioner's rights, and that petitioner was allowed to switch clothing with one of the fillers. (*Id.* at 75–76.)

**III. Petitioner's Trial**

Petitioner's jury trial commenced on March 14, 2006, before the Honorable Gustin Reichbach. The People called nine witnesses to testify, including eyewitnesses Kyron James (Tr. at 41), and Karen Williams (*id.* at 349); Officer Mathieu Pierre (*id.* at 89), who witnessed the shots being fired towards the van and eventually apprehended petitioner (*id*. at 99–102) with Sergeant Yelena Timchenko (*id.* at 168) and Sergeant Christopher Marrone (*id*, at 247); Officer Robert Anderson (*id*, at 284), who witnessed the white Jeep pass by soon after receiving a radio transmission about the incident (*id.* at 287); Detective Michael Sandano (*id.* at 298), a ballistics expert who determined that the gun seized from the petitioner had in fact been fired (*id.* at 312); Detective David DeLaRosa (*id*, at 332), an expert in firearms and munitions (*id*, at 335); and Detective Neil Siegel (*id.* at 402.), who conducted the lineup. (*Id*, at 404.) Petitioner presented no witnesses, and did not testify at the trial. (*Id*, at 390.)

Petitioner was convicted of Assault in the First Degree, Criminal Possession of a Weapon in the Second Degree, and Reckless Endangerment in the First Degree. (*Id.* at 565.) On April 26, 2006, petitioner was sentenced to concurrent prison terms of 16 years for assault, 10 years for criminal possession of a weapon, and one year for reckless endangerment. (*Id.*)

**IV. Post–Trial Litigation**

*Post–Conviction Motion*

On May 19, 2006, petitioner moved *pro se* to vacate his judgment of conviction pursuant to N.Y.Crim. Proc. Law § 440.10. (ECF No. 5–2, Ex. B.) Petitioner claimed, *inter alia,*

that his constitutional rights had been violated because he was denied the effective assistance of counsel. *Id.* Petitioner's motion to vacate was denied on November 14, 2006. (*See* November 14, 2006, Decision and Order ("Reichbach, J. Decision and Order"), ECF No. 5–2, Ex. D.) The court found that petitioner s ineffective assistance of counsel claim was a record-based claim reviewable on direct appeal, and thus review of the claim was barred pursuant to N.Y.Crim. Proc. Law § 440.10(2)(b).[6] The court further found that even if it reached the merits of petitioner's claims, it would deny petitioner's motion because defense counsel "mounted a zealous and cogent defense." (*Id.*)

*Direct Appeal*

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department, and argued that (1) the evidence was legally insufficient to establish petitioner's guilt of depraved indifference first-degree assault; (2) the trial court erred by failing to properly instruct the jury regarding the State's burden to prove beyond a reasonable doubt that defendant's mental state constituted depraved indifference; (3) the court improperly delegated a judicial function to a court officer who talked to a juror who was "drifting off"; and (4) the New York State Department of Corrections improperly imposed post-release supervision on petitioner. (Pet'r's Appellate Br., ECF No. 5–2, Ex. E.)

***4** Petitioner also filed a *pro se* supplemental brief which raised many of the same claims that he raises in the instant petition: (1) petitioner was deprived of his right to counsel at the investigatory lineup because he was forced into the lineup without the presence of counsel;[7] (2) petitioner was deprived of his right to counsel because he was represented by a purportedly unlicensed attorney at his September 28, 2003 arraignment; (3) the count of Attempted Assault in the First Degree in Indictment number 6977/2003 was jurisdictionally defective, because the felony complaint did not contain either that count or a count that charged a lesser-included offense; (4) petitioner was deprived of his right to counsel because he was not represented by counsel at the March 5, 2004 proceeding; (5) the State obtained Indictment Number 6029/2004 in violation of New York Criminal Procedure Law § 210.20(6), because the State obtained that superseding indictment without permission of the court beyond thirty days after the entry of the order dismissing the count of attempted murder in Indictment Number 6977/2003;[8] and multiple claims regarding ineffective assistance of counsel[9] and the right to a speedy trial.[10] (*See* Pet'r's *Pro Se* Supplemental Br., Jan. 2, 2008, ECF No. 5–2, Ex. G.)

The Appellate Division vacated petitioner's sentence regarding the post-release supervision, but otherwise affirmed the judgment of conviction. *People v. Douglas,* 73 A.D.3d 30 (2d Dep't 2010), *abrogated on other grounds, People v Dubarry,* 25 N.Y.3d 161 (2015). The Court also held that the evidence was legally sufficient to establish petitioner's guilt of depraved indifference first-degree assault and that petitioner's remaining contentions were without merit. *Id.*[11] Petitioner's case was remitted for resentencing to include post-release supervision. *Id.* at 35.

Petitioner sought leave to appeal to the New York Court of Appeals on every ground raised in both his counseled and *pro se* briefs. Petitioner's application for leave to appeal was denied on May 30, 2010. *People v. Douglas,* 15 N.Y.3d 804 (2010) (Jones, J.). Petitioner requested reconsideration *pro se* and his request was denied. *People v. Douglas,* 15 N.Y.3d 920 (2010) (Jones, J.).

***5** On June 16, 2010, petitioner was resentenced to the same terms of imprisonment, and to a period of post-release supervision. Petitioner appealed from his resentence, and the Appellate Division affirmed petitioner's resentence. *People v. Douglas,* 89 A.D.3d 959 (2d Dep't 2011). Petitioner's application for leave to appeal was denied. *People v. Douglas.* 18 N.Y.3d 957 (2012) (Jones, J.).

### V. Instant Petition

Petitioner timely filed the instant *pro se* petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner seeks relief on six grounds: (1) that he was denied the right to counsel pretrial when he was (i) forced into the lineup conducted on September 23, 2003, after he had told officers that he wanted his attorney; (ii) unrepresented by counsel at his September 28, 2003 arraignment; and (iii) unrepresented by counsel at the March 5, 2004 court proceeding;[12] (2) that he was denied the right to effective assistance of counsel when he was denied his request for new counsel on March 13, 2006 which forced him to proceed with assigned attorney Labe Richman against his will; (3) petitioner's constitutional right to a speedy trial was violated when the People proceeded on Indictment Number 6977/2003, and when the People returned Indictment 6029/2004—the superseding indictment; (4) petitioner's right to be prosecuted on a valid indictment was violated; (5)

petitioner's due process right was violated when the People superseded Indictment Number 6977/2003 with Indictment Number 6029/2004 in violation of State law; [13] and (6) petitioner was denied the right to effective assistance of appellate counsel when his appellate counsel refused to raise the issues raised in the instant petition on direct appeal.

Respondent opposed the instant petition (ECF No. 5.), and petitioner filed a reply. (ECF No. 12.)

## *DISCUSSION*

### I. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the AEDPA, the reviewing court may only grant a habeas petition if the petitioner's claim "was adjudicated on the merits in State court proceedings" and the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An " 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, *and* (2) reduces its disposition to judgment.' " *Bell v. Miller,* 500 F.3d 149, 155 (2d Cir.2007) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001)). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011).

***6** A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' " the state court arrived at an opposite result. *Evans v. Fischer,* 712 F.3d 125, 132 (2d Cir.2013) (quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410; *see also Grayton v. Ercole,* 691 F.3d 165, 174 (2d Cir.2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable."). A federal habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011).

### II. Exhaustion and Procedural Bar

A federal court may not grant a writ of habeas corpus unless a petitioner has exhausted the remedies available in the state court. 28 U.S.C. § 2254(b)(1)(A). A petitioner exhausts statecourt remedies by fairly presenting each federal claim for relief to the highest state court capable of review. *Baldwin v. Reese,* 541 U.S. 27, 29 (2004); *Pickard v. Connor,* 404 U.S. 270, 275–76 (1971) ("[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."); *Jackson v. Edwards,* 404 F.3d 612, 618 (2d Cir.2005); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808–09 (2d Cir.2000). "The purpose of the exhaustion requirement is to ensure that a state court is given the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.' " *Jackson,* 404 F.3d at 618 (quoting *Pickard.* 404 U.S. at 275). Consistent with this principle, "a state prisoner [must] present the state courts with the same claim he urges upon the federal courts." *Pickard,* 404 U.S. at 276.

Federal courts also have no authority to review state court decisions that rest upon independent and adequate state law grounds. *Lee v. Kemna,* 524 U.S. 362, 375 (2002); *see also Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005) ("A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment 'rests on a state law ground that is independent of the federal question and adequate to support the judgment' ...." (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)). "The rule applies with equal force whether the state-law ground is substantive or procedural." *Lee,* 534 U.S. at 375 (citing *Coleman,* 501 U.S. at 729); *accord Whitley v. Ercole,* 642 F.3d 278, 285 (2d Cir.2011). Federal habeas review of a

claim is foreclosed where the state court has expressly relied on the petitioner's procedural default as an independent and adequate state law ground. *Green,* 414 F.3d at 294; *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990). A petitioner may, nevertheless, obtain federal habeas review of a procedurally defaulted claim, if petitioner demonstrates either “cause for the default and prejudice,” or that “failure to consider the claims will result in a miscarriage of justice (i.e., the petitioner is actually innocent).” *Aparicio v. Artuz,* 629 F.3d 78, 90 (2d Cir.2001) (citing *Coleman,* 501 U.S. at 748–50).

**III. State Law Claims**

Petitioner argues that: (1) his right to be prosecuted on a valid indictment was violated; (2) his due process rights were violated when the State improperly superseded the indictment; and (3) his right to a speedy trial was violated. Respondent asserts that these claims are unexhausted, but even if they were not, the claims should be denied because the claims are not cognizable on federal habeas review. The Court agrees.

***7** When reviewing a habeas petition, a federal court is limited to deciding whether petitioner is in custody “in violation of the Constitution, laws, or treaties of the United States.” 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode,* 464 U.S. 78, 83 (1983) (“[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.”). “Federal habeas corpus relief does not lie for errors of state law.” *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (internal quotation marks omitted); *see also Howard v. Walker,* 406 F.3d 114, 121 (2d Cir.2005) (“A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.”); *Ponnapula v. Spitzer,* 297 F.3d 172, 182 (2d Cir.2002) (“It is well established that a federal habeas court does not sit to correct a misapplication of state law....”).

Petitioner's claims regarding the indictments are not cognizable on federal habeas review. [14] “The Supreme Court has never held that state criminal defendants enjoy a federal constitutional right to an indictment.” *McCray v. New York,* 573 Fed. App'x. 22, 24 (2d Cir.2014) (citing *Alexander v. Louisiana,* 405 U.S. 625, 633 (1972)); *see also Nordahl v. Rivera,* No. 08–CV–5565, 2013 WL 1187478, at *5 (S.D.N.Y. Mar. 21, 2013) (“Challenges to state indictments will merit habeas corpus relief only in the *exceptional* case where the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime.”) (quoting *Edwards v. Mazzuca,* No. 00–CV–2290, 2007 WL 2994449, at *5 (S.D.N.Y. Oct. 15, 2007) (emphasis added)). [15] Petitioner contends that Indictment Number 6977/2003 omitted the charge of Assault in the First Degree, which was charged in the felony complaint. This claim is not cognizable on federal habeas review. Assuming, *arguendo,* that petitioner is contending he lacked notice of the essential elements of the crime with which he was being charged, this claim is entirely without merit. As respondent points out, there is no provision of law—state or federal—that renders an indictment invalid merely because the indictment fails to charge a crime that was charged in the accusatory instrument (i.e., the felony complaint). In any case, petitioner was tried and convicted on the superseding Indictment Number 6029/2004, which charged petitioner with Assault in the First Degree.

Petitioner's claim that the State superseded Indictment Number 6977/2003 without permission from the court is also not cognizable on federal habeas review, and in any case, is without merit. To the extent this claim is derived from the claim that petitioner raised on direct appeal to the Appellate Division—that the State obtained Indictment Number 6029/2004 in violation of N.Y.Crim. Proc. Law § 210.20(6)—petitioner is raising a claim regarding a violation of state law, which is not cognizable on federal habeas review. Moreover, Indictment Number 6029/2004 satisfied the basic due process requirements by providing notice of the time, place, and essential elements of the crime. *See Nordahl, supra.*

Petitioner's speedy trial claim pursuant to N.Y.Crim. Proc. Law § 30.30 is also a state law claim for which habeas relief does not lie. *See Smith v. Murray,* No. 03–CV–6553L, 2007 WL 2581687, at *6 (W.D.N.Y. Sept. 5, 2007) (holding that a claim based on CPL § 30.30 does not raise a federal constitutional claim upon which federal habeas relief may be granted); *Cooke v. Graham,* 06–CV–3053 (DLI) (RER), 2009 WL 3111790, at *7 (E.D.N.Y. Sept. 28, 2009) (finding petitioner's speedy trial claim based on § 30.30 “not cognizable on federal habeas review”); *Wilson v. Goord,* No. 00 Civ. 4849(LTS), 2004 WL 226149, at *4 (S.D.N.Y. Feb. 6, 2004) (stating that petitioner “fail[s] to raise a constitutional claim that is cognizable on federal habeas corpus review” where he “refers only to his statutory speedy trial right” under § 30.30).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***8** Because these claims do not arise under the Constitution and laws of the United States, they are not cognizable on federal habeas review, and the petition should be denied.

### IV. Petitioner's Remaining Claims

#### A. Right to Counsel

As a threshold matter, "before considering a habeas petition on the merits, it must be established that the petitioner's claim of violation of his right to counsel was exhausted in state court." *Madison v. Burge,* No. 07–CV–342(ARR), 2007 WL 3253568, at *4 (E.D.N.Y. Nov. 1, 2007) (internal citations omitted). "It must be shown that the arguments on which petitioner relies were 'fairly present[ed] [...] to the state courts in order to give the state the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.' " *Id.* As was stated above, a § 2254 habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In order to exhaust a claim in state court, "a petitioner must present the *substance* of the same federal constitutional claims he raises in his federal petition to the highest court in the state." *Carpenter v. Reynolds,* 212 F.Supp.2d 94, 96 (E.D.N.Y.2002) (emphasis added). Here, petitioner raised the substance of his right to counsel claims on all three grounds raised in this petition in his *pro se* appellate brief to the Appellate Division on his direct appeal, and sought leave to appeal to the Court of Appeals. Therefore, the Court should consider these claims on their merits.

#### 1. Investigatory Lineup

Petitioner argues that his Sixth Amendment right to counsel was violated when he was denied his request for counsel at the investigatory lineup. (Pet. at 6, ECF No. 1.) [16] This claim should be denied. On a petition for federal habeas relief, a district court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle,* 502 U.S. at 68; *see also* 28 U.S.C. § 2254(a). It is firmly established that an individual's right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689 (1972). Once the right to counsel attaches, the right applies only to "critical" stages of the proceedings. *United States v. Wade,* 388 U.S. 218, 224 (1967). State law determines when adversary judicial proceedings have commenced. *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 465 (E.D.N.Y.2010). Under New York law, the filing of an accusatory instrument commences a criminal action. *Id.; see also* N.Y.Crim. Proc. Law. § 100.05.

Here, the challenged lineup occurred prior to the filing of the accusatory instrument—the felony complaint. (Hr'g at 30, 36.) Therefore, petitioner's claim that he was denied counsel in violation of his Constitutional rights is without merit. *See, e.g., Miller v. Smith,* No. 05 CV 5076(ENV), 2010 WL 4961666, at *6 (E.D.N.Y. Dec. 1, 2010) ("Since the subject lineup occurred before petitioner was charged, there is no Sixth Amendment violation."); *Manuel v. Conway,* No. 07–CV–6623, 2010 WL 2104302, at *6 (W.D.N.Y. May 25, 2010) ("proceedings against petitioner were initiated after the lineup[;][a]t that time, petitioner had no Sixth Amendment right to counsel, and petitioner thus cannot establish that the lineup was conducted in violation of his constitutional rights."). Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established Federal Law and this claim should be denied.

#### 2. September 28, 2003 Arraignment

***9** Petitioner next contends that his right to counsel was violated when Calvin Garber, an unlicensed attorney, represented petitioner at his September 28, 2003 arraignment. (Pet. at 7, ECF No. 1.) Respondent argues that (1) on petitioner's direct appeal, he asserted that the attorney who represented him at his arraignment was someone named Calvin *Gaber,* when in fact Calvin *Garber,* a licensed attorney, was present at the arraignment; [17] and (2) even if Calvin Garber had not been a licensed attorney, petitioner's constitutional right to the assistance of counsel would not have been violated because the initial arraignment in New York is not a critical stage of the criminal proceedings. The Court agrees.

In New York State, the initial arraignment is not a critical stage of the proceedings that requires the presence of counsel. *Holland v. Allard,* No. 04–CV–3521(DRH)(MLO), 2005 WL 2786909, at *7 (E.D.N.Y. Oct. 26, 2005); *see also U.S. ex rel. Guber v. Koson,* 273 F.Supp. 998, 1001 (S.D.N.Y.1967) ("Arraignment is not such a crucial juncture of the proceeding in New York."); *U.S. ex rel. John Hussey v. Fey,* 220 F.Supp. 562, 563 (S.D.N.Y.1963) ("Under New York law, a

defendant suffers no such prejudice, for whatever counsel could have done upon arraignment on defendant's behalf, counsel were free to do thereafter."). The record does not support petitioner's claim that he was unrepresented at his arraignment. (*See* Transcript of Proceedings on Sept. 28, 2003, ECF No. 5–1, Ex. 5.) However, even if petitioner had not been afforded counsel at his initial arraignment, as it is not a critical stage of the proceedings, the state court's decision was not contrary to or an unreasonable application of clearly established Federal law. Therefore, this claim should be denied.

### 3. In–Court Proceedings on March 5, 2004

Petitioner also claims that he was deprived of his right to counsel when his attorney was not present on March 5, 2004. (Pet. at 9–10, ECF No. 1.) Respondent in turn argues that although petitioner's retained counsel did not appear in court on that date, another attorney, Mario Romano, Esq., represented petitioner on that date in lieu of his retained counsel. [18]

The record reflects that petitioner was represented by counsel—Mario Romano, Esq.—at the March 5, 2004 hearing. [19] Even if petitioner was without counsel, the March 5, 2004 hearing was not a critical stage of the proceeding that would warrant the right to counsel. *Wade,* 388 U.S. at 224. Rather, the proceeding was limited to the court providing the prosecutor with a copy of its decision on defendant's motion to dismiss the indictment, and adjourning the case to March 19, 2004, for trial—it was purely procedural. *Carpenter v. Conway,* No. 07–CV–3602(JS), 2011 WL 795860, at *9 (E.D.N.Y. Feb. 25, 2011) (finding that the Sixth Amendment "only guarantees the right to counsel when necessary to assure a meaningful defense[,]" not for procedural matters). Accordingly, the state court's decision that petitioner was not deprived of his right to counsel on March 5, 2004 was not contrary to or an unreasonable application of clearly established Federal Law and this claim should be denied.

### B. Ineffective Assistance of Counsel

Petitioner raises several ineffective assistance of counsel claims. [20] First, petitioner claims that his right to effective assistance of counsel was violated when he was denied his request for new counsel on March 13, 2006. This claim is without merit.

***10** The Sixth Amendment guarantees the right to competent counsel, but an "indigent defendant has no right to choose his counsel." *Montejo v. Louisiana,* 556 U.S. 778, 784 (2009); *see also Nelson v. Brown,* No. 07 Civ. 3568(JSR)(HBP), 2009 WL 6340020, at *12 (S.D.N.Y. July 1, 2009) ("'... the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.") (internal citations omitted); *Felder v. Goord,* 564 F. Supp.2d 201, 220 (S.D.N.Y.2008) ("[I]ndigent defendants do not have a veto over who is appointed to defend them, provided that appointed counsel's representation is adequate."). Where a defendant requests substitute counsel on the eve of trial or during trial, "the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *Lopez v. Graham,* No. 10– CV–0468(NGG), 2012 WL 1865502, at *6 (E.D.N.Y. May 22, 2012) (quoting *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir.1981) (internal quotation marks and alteration omitted)); *Pagan v. Brown*, 07–CV–0453(JS)(WDW), 2011 WL 3235769, at *2 (E.D.N.Y. July 28, 2011) ("[R]equests made on the eve of trial should only be granted in 'unusual circumstances,' such as a 'complete breakdown of communication or an irreconcilable conflict." ' (quoting *United States v. Miranda,* 152 F.3d 921 (2d Cir.1998))). "Personal dislike and strategic disagreement alone are insufficient." *Barrett v. Garvin,* No. 98 CIV. 1532(NRB), 2000 WL 1364352, at *4 (S.D.N.Y. Sept. 21, 2000) (internal citations omitted).

Here, on the eve of the trial, petitioner expressed a strategic disagreement with his counsel, Labe Richman: "I'm not proceeding with Mr. Richman. I don't think the Court should force me to proceed with that attorney I don't want to proceed with." (VD. at 2–3.) [21] Petitioner stated that counsel was unwilling to include issues petitioner wished to raise in a motion that counsel filed. (*Id.* at 4.) The Court told petitioner: "[w]hatever the attorney's advice might be, at the end of the day the defendant has the right to make, such tactical decisions about whether the defendant chooses to testify or not ... *[a]s to legal issues, that's the bailiwick of the attorney and not the defendant*." (*Id.*) (emphasis added). The record reflects that petitioner's dissatisfaction with counsel's representation stemmed from disagreements regarding strategy, not from a complete breakdown of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

communication or an irreconcilable conflict. Thus, the state court's decision not to replace petitioner's attorney on the eve of trial was not contrary to or an unreasonable application of clearly established Federal law.

Next, petitioner contends that his trial counsel was ineffective, again without specifying grounds. This claim is presumably the same claim raised in petitioner's *pro se* brief to the Appellate Division. However, to establish a Sixth Amendment ineffective assistance of counsel claim, petitioner must demonstrate both that (1) that counsel's performance was "deficient" as measured by an "objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984). Reasonable probability is "probability sufficient to undermine confidence in the outcome" of the trial. Id. at 694. Considerable deference is accorded to a counsel's performance, as counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690; *see also Bierenbaum v. Graham,* 607 F.3d 36, 50–51 (2d Cir.2010) (stating that the *Strickland* standard is "highly deferential" to eliminate the "distorting effects of hindsight"). The "highly deferential" *Strickland* standard is made "doubly" so on habeas review, as the AEDPA requires deference to the state court's ruling on this claim. *Harrington v. Richter,* 562 U.S. 86, 105, 131 S.Ct. 770, 788 (2011).

***11** Here, petitioner's claims fail because he cannot show that prejudice resulted from any error that his counsel may have committed by failing to raise that he was denied the right to counsel at the investigatory lineup, at the March 5, 2004 proceeding, and at his arraignment; and for failing to raise, in support of petitioner's speedy trial motion, that the superseding indictment was obtained in violation of state law. As previously stated, petitioner's claims are without merit and do not warrant habeas relief.[22] Petitioner has failed to demonstrate that the state court's decision on his ineffective assistance of counsel claims was contrary to or an unreasonable application of Federal law. Accordingly, these claims should be denied.

### C. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are also evaluated under the *Strickland* standard. Petitioner asserts that his right to effective assistance of appellate counsel was violated because his appellate counsel failed to raise on appeal the issues that petitioner raised in his *pro se* supplemental brief. (Pet. at 14, ECF No. 1.) Respondent states that this claim is unexhausted, but that it should nonetheless be denied. The Court agrees.

Petitioner did not raise his ineffective assistance of appellate counsel claim in the proper manner by filing a writ of error *coram nobis. Beck v. Conway,* No. 11–CV–0060(SJF), 2014 WL 774967, at *4 (E.D.N.Y. Feb. 25, 2014); *Beuther v. Lefevre,* No. 88 C 2397, 1989 WL 18726, at *1 (E.D.N.Y. Feb. 15, 1989) ("[T]he proper vehicle for raising [an ineffective assistance of appellate counsel] claim before the state court is a writ of error *coram nobis* to the Appellate Division.") (citing *People v. Bachert,* 69 N.Y.2d 593, 596 (1987)). Under New York law, there is no time limit for an application for a writ of error *coram nobis. Beck.* 2014 WL 774967, at *4. Since petitioner did not bring a *coram nobis* proceeding, petitioner's ineffective assistance of appellate counsel claim is unexhausted.

However, even if the claim was exhausted, it is without merit. "A claim for ineffective assistance of appellate counsel is evaluated under the same standard as a claim for ineffective assistance of trial counsel." *Pain v. New York,* 04–CV–1232(NG)(LB), 2007 WL 2902955, at *7 (E.D.N.Y. Oct. 1, 2007) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994)). "A petitioner alleging ineffective assistance of appellate counsel must prove both that the appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful." *Id.* (citing *Smith v. Robbins,* 528 U.S. 259, 285 (2000) (applying the *Strickland* test to appellate counsel's performance)). Appellate counsel has no duty to raise every nonfrivolous claim that could be made. *Mayo,* 13 F.3d at 533. Rather, a habeas petitioner claiming ineffective assistance of appellate counsel based on failure to raise certain issues must demonstrate that counsel 'omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.' " *Farr v. Greiner,* at *36 (E.D.N.Y. Apr. 10, 2007) (quoting *Mayo,* 13 F.3d at 533); *Smith,* 528 U.S. at 288 (a petitioner may establish constitutionally ineffective assistance of counsel only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").

***12** Here, petitioner's appellate counsel filed a brief raising four issues. (*See* Section IV, *supra.*)[23] Appellate counsel was not objectively unreasonable in choosing to raise the claims he did and in advising petitioner to raise the other claims in his *pro se* supplemental brief. Therefore, even though petitioner failed to exhaust his ineffective assistance of appellate counsel claim, this claim should be denied under 22 U.S.C. § 2254(b)(2).

### *CONCLUSION*

Accordingly, it is respectfully recommended that petitioner's application for a writ of habeas corpus should be denied. As petitioner has not made a substantial showing of the denial of any constitutional right, it is recommended that no certificate of appealability should be issued. 28 U.S.C. § 2253; *see Lozada v. United States,* 107 F.3d 1011, 1017 (2d Cir.1997), *abrogated on other grounds, United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997) (discussing the standard for issuing a certificate of appealability); *see also Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112–13 (2d Cir.2000), *cert. denied,* 531 U.S. 873 (2000). It is further recommended that for the purposes of an appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a judgment denying this petition would not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438 (1962).

### FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. *DeLeon v. Strack,* 234 F.3d 84, 86 (2d Cir.2000); *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 174 (2d Cir.2000); *see also Thomas v. Arn,* 474 U.S. 140 (1985).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9901710

## Footnotes

1 The Court notes that the proper respondent in this case is the official who has custody of the petitioner, not the People of the State of New York. *See* 28 U.S.C. § 2243.

2 "Tr." refers to the transcript of the jury trial held in the Supreme Court of the State of New York, King's County, on March 14 through March 20, 2006. (ECF No. 5–1.)

3 In a Decision and Order dated March 5, 2004, the Supreme Court, Kings County, dismissed the count in Indictment Number 6977/2003 charging petitioner with the attempted murder of Karen Williams, on the ground that the grand jury evidence was not legally sufficient to support that count, but held that there was sufficient evidence to support the other counts in the indictment. (*See* ECF No. 5–1, Att. 3.)

4 "Hr'g" refers to the transcript of the pre-trial hearing conducted on Decem?er 8, 20~5. (ECF No. 5-1, Ex. A.)

5 The Hearing transcript states that three lineups were conducted, but the Tnal transcnpt only refers to the one lineup that was viewed by Karen Williams.

6 N.Y. Crim. Proc. Law§ 440.10(2)(b) provides that a court must deny a motion to vacate a judgment when "the judgment is, at the time of the motion appealable ... and sufficient facts appear on the record with respect to the

ground or issue raised upon the motion to permit adequate review thereof upon such an appeal." (emphasis added).

7 In support of his claim that he was denied the right to counsel with respect to the lineup, petitioner relies solely on the facts alleged in his pro se supplemental brief and on the two police reports prepared by Detective Siegel, dated September 27, 2003.

8 Petitioner moved in the Appellate Division and attached a copy of Detective Siegel's police report which stated, inter a/ia, that petitioner "would not answer any questions from the police with [sic] his attorney"; that the detective told petitioner that the detective would contact petitioner's attorney; that at approximately 3 :00 am, the detective gave petitioner "the opportunity to call his attomey[']s cell phone number and notify the attorney regarding his arrest." (See Defendant's Motion, dated Dec. 18, 2008, and police report prepared by Detective Siegel, attached to Resp's Opp. to Habeas Pet., Atts. 12 and 13.)

9 Petitioner alleges that his counsel was ineffective for failing to raise (I) his request for counsel at the lineup at both the Wade hearing and at trial; (2) that the prosecutor purportedly made a false assertion regarding petitioner's representation by counsel at the March 5, 2004 hearing; and (3) that the superseding indictment was obtained in violation of State law in support of petitioner's speedy trial motion.

10 Petitioner alleges violations of his right to a speedy trial on the grounds that (1) the initial indictment (Number 6977 /2003) was jurisdictionally defective and thus the State could not properly announce its readiness for trial; and (2) the superseding indictment was obtained in violation of State law.

11 The Court notes that, while this petition was pending, the Appellate Division's holding that a defendant can simultaneously be convicted of separate charges of intentional and reckless assault for the same conduct was abrogated by the New York Court of Appeals in People v. Dubarry, 25 N.Y.3d 161 (2015). Even if the holding in Dubarry is found to be retroactive and would apply to petitioner's case, this would be a state law claim that r:etitioner would have to pursue in the state court.

12 Petitioner additionally argues that his due process rights were violated "when the court proceeded at a critical stage of the proceedings without petitioner [sic] counsel." (*See* Pet. at 10, ECF No 1.)

13 Petitioner raised the same claim in his *pro se* appellate brief and cites to N.Y.Crim. Proc. § 210.20(6).

14 Petitioner claims: (1) Indictment Number 6977/2003 was jurisdictionally defective, and thus petitioner's right to be prosecuted by a valid indictment was violated; and (2) the State improperly superseded Indictment number 6977/2003 because it obtained Indictment Number 6029/2004 (“superseding indictment”) in violation of N.Y.Crim. Proc. Law § 210.20(6).

15 The Clerk of Court is directed to send petitioner the attached copies of all unreported cases cited herein.

16 There is no record evidence that petitioner ever requested counsel at the September 27, 2003 lineup.

17 *See* Transcript of Proceedings on Sept. 28, 2003, ECF No. 5–1, Ex. 5.

18 “Moreover, defense counsel was not present for the calendar call, having faxed a letter of engagement to the Court. Mario Romano of the 18b panel covered the case for the defense.” (*See* ECF No. 12–2, Exhibit O, excerpt of People's Memorandum of Law in Opposition to Defendant's Speedy Trial Motion, dated Oct. 21, 2005.)

19 19 (ECF No. 5–1, Att. 15.)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

20 Although petitioner raised his ineffective assistance of counsel claim through the appropriate mechanisms—first by filing a 440 motion, and then by appealing it to the highest state court capable of review—petitioner did not allege with specificity the basis for the claim. Respondent contends that petitioner now seeks habeas relief based on off-the-record claims that should have been raised in a 440 motion, and thus, are unexhausted. It is unclear whether petitioner exhausted his state court remedies by fairly presenting each of his ineffective assistance claims to the New York Court of Appeals. However, whether or not these claims were fairly presented to the state court, they should be denied. *See* 28 U.S.C. § 2254(b)(2) (granting federal courts discretion to deny a claim on the merits even if not properly exhausted).

21 "VD." refers to the transcript of the Voir Dire proceedings conducted on March 13, 2006. (ECF No. 5–1.)

22 *See* Sections IV(A)(1)-(3), *supra see also Erdheim v. Greiner,* 22 F.Supp.2d 291, 295 (S.D.N.Y.1998) ("Since petitioner has not proved that he had a meritorious speedy trial claim, there is no reasonable probability that his counsel's failure to raise the motion affected the outcome of the case. Consequently, his ineffective assistance of counsel claim fails.")

23 In a letter dated November 20, 2007, petitioner's appellate counsel, Josh Levine, sent petitioner a letter detailing the claims that he would raise on appeal to the Appellate Division, Second Department. (ECF No. 12–4, Exhibit U.) Appellate counsel noted that he would not be raising certain issues that petitioner asked him to raise, including: § 30.30 arguments, that his lineup was conducted in violation of his right to counsel, and that the superseding indictment was not filed in a timely fashion (*Id.*) Levine further advised petitioner of his right to raise those claims in a *pro se* supplemental brief. (*Id.*)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 270079
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Houston DOUGLAS, Petitioner,
v.
PEOPLE OF THE STATE OF NEW YORK, Respondent.

12-CV-3839 (NGG) (LB)
|
Signed January 20, 2016
|
Filed 01/21/2016

**Attorneys and Law Firms**

Houston Douglas, Sonyea, NY, pro se.

Kings County District Attorneys Office, New York State Attorney Generals Office, Seth M. Lieberman, New York State Attorney Generals Office, Brooklyn, NY, for Respondent.

**ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

***1** On August 1, 2012, Petitioner Houston Douglas ("Petitioner") brought this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2006 conviction from the Supreme Court of the State of New York, Kings County. (Pet. (Dkt. 1).) Respondent filed an opposition brief on October 12, 2012 (Resp. to Order to Show Cause (Dkt. 5)), [1] and Petitioner filed a reply on April 1, 2013 (Pet'r's Reply (Dkt. 12)). By Order dated May 15, 2014, the court referred the Petition to Magistrate Judge Lois Bloom for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (May 15, 2014, Order (Dkt. 15).)

On November 3, 2015, Judge Bloom issued an R&R recommending that the court deny the Petition. (R&R (Dkt. 17) at 22.) On December 28, 2015, Petitioner filed an objection to Judge Bloom's R&R. [2] (Obj. to R&R ("Pl.'s Obj.") (Dkt. 20).) For the reasons set forth below, Plaintiff's objections are OVERRULED and the R&R is ADOPTED IN FULL.

In reviewing the R&R of a dispositive matter from a magistrate judge, the district court "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000); see also Gesualdi v. Mack Excavation & Trailer Serv., Inc., No. 09-CV-2502 (KAM) (JO), 2010 WL 985294, at *1 (E.D.N.Y. Mar. 15, 2010) ("Where no objection to the Report and Recommendation has been filed, the district court need only satisfy itself that there is no clear error on the face of the record." (internal quotation marks and citation omitted)). The district court must review de novo "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1).

However, to obtain this de novo review, an objecting party "must point out the specific portions of the report and recommendation to which they object." U.S. Flour Corp. v. Certified Bakery. Inc., No. 10-CV-2522 (JS) (WDW), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012); see also Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [R&R]."). If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Enteeris. Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (internal quotation marks and citation omitted): see also Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002) (holding that plaintiffs objection to an R&R was "not specific enough" to "constitute an adequate objection under ... Fed. R. Civ. P. 72(b)"). "A decision is 'clearly erroneous' when the Court is, 'upon review of the entire record, left with the definite and firm conviction that a mistake has been committed.' " DiPilato v. 7-Eleven. Inc., 662 F. Supp. 2d 333, 339-40 (S.D.N.Y. 2009) (quoting United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006)).

***2** Where a pro se party objects to an R&R, "the court reads his objections 'liberally and will interpret them to raise the strongest arguments that they suggest.' " Velasquez v. Metro Fuel Oil Corp., 12 F. Supp. 3d 387, 398 (E.D.N.Y. 2014) (quoting Burgos v. Hopkins, 14 F.3d 787, 780 (2d Cir. 1994)). However, a court "need not argue a pro se litigant's case nor create a case for the pro se which does not exist." Molina v. State of N.Y., 956 F. Supp. 257, 259 (E.D.N.Y. 1995).

Plaintiff's objections are entitled only to clear error review because they are either conclusory or are simply reiterations of his original arguments. First, Petitioner asserts that Judge

Bloom is biased and prejudiced against him, and that she should have recused herself from this case. ( Pl.'s Obj. at 1.) This objection is conclusory, as Petitioner does not present any explanation or evidence in support of his allegation. See Person v. General Motors Corp., 730 F. Supp. 516, 518 (W.D.N. Y. 1990) ("In general, unsubstantiated suggestions of personal bias or prejudice do not mandate recusal."). Petitioner's other objections simply repeat his arguments that he was deprived of his Sixth Amendment right to counsel. (See Pl.'s Obj. at 2; Pet. at 6-7, 9-10.) Judge Bloom fully addressed these arguments in her well-reasoned R&R. (See R&R at 14-20.) The court therefore has reviewed Judge Bloom's R&R for clear error and finds none. See Pall Corp., 249 F.R.D. at 51 ("When a party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." (internal quotation marks and citation omitted)). In addition, even under de novo review, the court finds no error.

Finding no error, the court OVERRULES Petitioner's objections, ADOPTS IN FULL the R&R and DENIES Petitioner's Petition for a writ of habeas corpus. See Porter v. Potter, 219 F. App'x 112 (2d Cir. 2007) (summary order). Because Petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The court certifies pursuant to 28 U.S.C. § 1915(a) that an appeal from this judgment would not be taken in good faith, and in forma pauperis status is therefore denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 270079

## Footnotes

1 The proper respondent in this case is the official who has custody of Petitioner, not the People of the State of New York. See 28 U.S.C. § 2243. Here, the District Attorney of Kings County represented Respondent by agreement with the Attorney General of the State of New York. (Resp. to Order to Show Cause (Dkt. 5) ¶ 12.)

2 The court granted Petitioner an extension of time to file objections to the R&R (Order (Dkt. 19).)

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 24066
Only the Westlaw citation is currently available.
**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**
United States Court of Appeals, Second Circuit.

Minister Louis FARRAKHAN,
Nation of Islam, Plaintiffs-Appellants,
v.
ANTI-DEFAMATION LEAGUE, Jonathan Greenblatt, individually, in his capacity as CEO and national director of the Anti-Defamation League, Rabbi Abraham Cooper, individually and in his official capacity as Director of Social Global Action Agenda for Simon Wiesenthal Center, Simon Wiesenthal Center, Defendants-Appellees.

24-1237-cv
|
January 3, 2025

Appeal from a judgment of the United States District Court for the Southern District of New York (Denise Cote, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court, entered on April 5, 2024, is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFFS-APPELLANTS: Sa'ad A. Muhammad (Abdul A. Muhammad, Office of the General Counsel, Nation of Islam, Chicago, Illinois; and Michael K. Muhammad, Muhammad Law Firm, Dallas, Texas, on the brief), Power and Dixon, PC, Chicago, Illinois.

FOR DEFENDANTS-APPELLEES: Nathan E. Siegel (Adam I. Rich, on the brief), Davis Wright Tremaine LLP, Washington, District of Columbia, and New York, New York, for Anti-Defamation League and Jonathan Greenblatt. Julie R. F. Gerchik (Patricia L. Glaser and Eric Y. Su, on the brief), Glaser Weil Fink Howard Jordan & Shapiro LLP, Los Angeles, California, for Rabbi Abraham Cooper and Simon Wiesenthal Center.

PRESENT: SUSAN L. CARNEY, JOSEPH F. BIANCO, WILLIAM J. NARDINI, Circuit Judges.

## SUMMARY ORDER

***1** Plaintiffs-Appellants Minister Louis Farrakhan ("Farrakhan") and the Nation of Islam ("NOI") appeal from the district court's dismissal of their second amended complaint ("SAC") against Defendants-Appellees the Anti-Defamation League ("ADL"), Jonathan Greenblatt ("Greenblatt"), the Simon Wiesenthal Center ("SWC"), and Rabbi Abraham Cooper ("Cooper"). Plaintiffs' sprawling allegations in the 150-page SAC boil down to two types of claims: (1) First Amendment claims that focus on defendants' alleged speech-chilling activities against plaintiffs through third parties, and (2) defamation claims arising from defendants' various references to plaintiffs as anti-Semitic. The district court dismissed the First Amendment claims for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and the defamation claims for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally Farrakhan v. Anti-Defamation League*, No. 23-cv-9110 (DLC), 2024 WL 1484449 (S.D.N.Y. Apr. 5, 2024). The district court also declined to grant plaintiffs' requests for declaratory and injunctive relief. *Id.* We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, which we reference only as necessary to explain our decision to affirm.

"We review *de novo* a district court's dismissal of a complaint for lack of standing and for failure to state a claim on which relief can be granted." *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 44 (2d Cir. 2023) (en banc). In doing so, we "constru[e] the complaint in plaintiff's favor and accept[ ] as true all material factual allegations contained therein." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012).

**I. First Amendment Claims**

We agree with the district court that plaintiffs lack standing to assert their First Amendment claims.

Standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations adopted) (internal quotation marks and citation omitted).

To the extent plaintiffs assert claims against defendants because third parties—Morgan State University and Vimeo—denied or rescinded plaintiffs' access to speech platforms, those alleged First Amendment injuries are not fairly traceable to the defendants' actions. "Standing requires more than mere speculation about the decisions of third parties and must rely instead on the predictable effect of [defendants'] action on the decisions of third parties." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352 (2d Cir. 2023) (internal quotation marks and citation omitted). Plaintiffs' allegations that ADL's general advocacy caused the third parties' decisions are unsupported by particularized factual assertions and, instead, rely on mere "[s]peculative inferences." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 (1976).

***2** Plaintiffs' remaining First Amendment claims do not state any injuries in fact. The SAC alleges that that ADL assisted in creating the "U.S. National Strategy [t]o Counter Antisemitism." App'x at 72, 84. However, such an allegation does not articulate a concrete and particularized injury. Although plaintiffs suggest that the National Strategy will provide a justification to arrest and prosecute Farrakhan, the SAC does not sufficiently plead that such a threat is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). Moreover, plaintiffs' claims that ADL's involvement with the New York government caused reputational harm to, and chilled the religious activities of, NOI and its members, and resulted in threatened sanctions from the state government, fail for similar reasons. At bottom, those claims rest on a tenuous chain of hypothetical events and do not show "an imminent threat of future harm or a present harm incurred in consequence of such a threat." *Hedges v. Obama*, 724 F.3d 170, 188–89 (2d Cir. 2013); *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Accordingly, we affirm the district court's dismissal of plaintiffs' First Amendment claims for lack of standing.

**II. Defamation Claims**

We conclude that plaintiffs fail to state any plausible defamation claims [1] because the challenged statements are nonactionable opinions or, even if actionable, are not adequately alleged to be false or to have been made with actual malice.

To recover for defamation under New York law, a plaintiff must establish five elements: "1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 259 (2d Cir. 2021) (internal quotation marks and citation omitted). "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008); *accord Elias v. Rolling Stone LLC*, 872 F.3d 97, 110 (2d Cir. 2017) ("Under New York law, (with some exceptions) statements that do not purport to convey *facts* about the plaintiff, but rather express certain kinds of *opinions* of the speaker, do not constitute defamation." (emphases in original) (internal quotation marks and citation omitted)).

In addition, because Farrakhan does not dispute that he is a public figure, he must plead that defendants made the alleged defamatory statements with actual malice—"that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). At the motion to dismiss stage, "a public-figure plaintiff must plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice." *Id.* at 546 (alteration adopted) (internal quotation marks and citation omitted).

Plaintiffs challenge a number of defendants' statements that label plaintiffs in various ways as "anti-Semitic." Under New York law, these statements are nonactionable opinions. *See, e.g.*, *Silverman v. Daily News, L.P.*, 11 N.Y.S.3d 674, 675–76 (2d Dep't 2015) (holding that statements in articles referring to plaintiff's "racist writings" were nonactionable opinions); *Russell v. Davies*, 948 N.Y.S.2d 394, 395–96 (2d Dep't 2012) (holding that news stories describing plaintiff's essay as "racist" and "anti-Semitic" were nonactionable opinions); *see also, e.g.*, *Rapaport v. Barstool Sports Inc.*, No. 22-2080-cv, 2024 WL 88636, at *3 (2d Cir. Jan. 9, 2024) (summary order) (concluding that "accusations of racism and fraud are non-actionable because they lack a clearly defined meaning and, in this context, are incapable of being objectively proven true or false.").

***3** Plaintiffs also challenge statements made by defendants interpreting Farrakhan's own statements. The challenged statements were either accompanied by disclosures of Farrakhan's actual statements or were based on Farrakhan's statements that were widely reported by the media. For example, the letter sent by Greenblatt to Ticketmaster, in which Greenblatt states that Farrakhan is "one of the most notorious antisemites in the country," quotes multiple statements made by Farrakhan and provides hyperlinks to two articles on ADL's website that contain additional statements by Farrakhan. App'x at 306–07. Similarly, the headline of an article challenged by plaintiffs—"Farrakhan Predicts Another Holocaust"—is accompanied by an extensive quote from Farrakhan that, as the district court found, "could be fairly interpreted as a reference to the Holocaust." *Farrakhan*, 2024 WL 1484449, at *8. Those challenged statements therefore also constitute inactionable opinions. *See Elias*, 872 F.3d at 111 (dismissing defamation claims based on statements that "clearly represent [defendant's] interpretation of the Article based on the words in the Article and general knowledge" where "the statements do not imply that [defendant's] view is based on any undisclosed facts"); *Gisel v. Clear Channel Commc'ns, Inc.*, 942 N.Y.S.2d 751, 752 (4th Dep't 2012) ("Because [defendant's] statements were based on facts that were widely reported by [relevant] media outlets and were known to his listeners, it cannot be said that his statements were based on undisclosed facts."); *see also Cooper v. Franklin Templeton Invs.*, No. 22-2763-cv, 2023 WL 3882977, at *4 (2d Cir. June 8, 2023) (summary order) (rejecting plaintiff's argument that the challenged statements implied the existence of undisclosed facts because they were "based on the publicly available video of the incident" discussed in the statements).

Finally, plaintiffs challenge certain of defendants' factual statements. On *de novo* review, we agree with the district court that the SAC fails to sufficiently allege the falsity of those statements. We further agree with the district court that the SAC did not contain "facts that would raise a reasonable expectation that discovery will reveal evidence that Greenblatt or the ADL made the statement with knowledge of or reckless disregard as to the statement's falsity." *Farrakhan*, 2024 WL 1484449, at *8 (internal quotation marks and citation omitted).

In sum, we find that the district court, after analyzing each of the statements at issue in its thorough and well-reasoned opinion, correctly determined that none could serve as a plausible claim for defamation.

### III. Declaratory and Injunctive Relief

The district court did not abuse its discretion in declining to exercise jurisdiction over plaintiffs' claims for declaratory judgment. "The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003); *see* 28 U.S.C. § 2201(a). We have emphasized that the district court's discretion is "broad," and its exercise "is reviewed deferentially, for abuse of discretion." *Dow Jones*, 346 F.3d at 359. The district court properly exercised this broad discretion when it concluded that the requested declaratory judgments "would not serve a useful purpose" because each of plaintiffs' substantive claims failed to either establish standing or state a plausible claim. *Farrakhan*, 2024 WL 1484449, at *8; *see Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023) (stating that "whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved" is one factor a district court may consider in exercising this broad discretion (alterations adopted) (internal quotation marks and citation omitted)).

The district court also properly denied plaintiffs' request for injunctive relief. *See Alexander v. United States*, 509 U.S. 544, 550 (1993) ("[P]ermanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 386 (2d Cir. 2018) ("[P]rior restraints constitute the most serious and the least tolerable infringement on our freedoms of speech and press." (internal quotation marks and citation omitted)).

* * *

We have considered plaintiffs' remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 24066

## Footnotes

1 To be precise, because plaintiffs challenge written statements, their claims are for libel. *See Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (noting that defamation "consist[s] of the twin torts of libel and slander," and that "written defamatory words are libel" (internal quotation marks and citations omitted)).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

***1** The Clerk has sent me an amended[1] civil rights complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No. 3). Plaintiff Flagg has also filed an application to proceed in forma pauperis ("IFP"). (Dkt. No. 4).

**I. IFP Application**

A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 4). The court finds that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

**II. Complaint**

Plaintiff states that she is the mother of Mario Leslie, who at the time of the incidents described in the complaint, was on parole. (Amended Complaint ("AC") at 1).[2] On August 8, 2016, defendant New York State Parole Officer ("PO") Mark Saben went to Mr. Leslie's home at 514 Marcellus Street in Syracuse, New York, to conduct a "standard home visit."[3] (*Id.*) Mr. Leslie lived at the Marcellus Street address with his girlfriend, Tamacha Rodriguez. (*Id.*) Plaintiff claims that Ms. Rodriguez answered the door for PO Saben, and that Mr. Leslie was "summoned" from his bedroom to speak with defendant Saben. (*Id.*) After some discussion, PO Saben was walking toward the front door, when he spotted some glassine packets "known to contain heroin." (*Id.*) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (*Id.*)

***2** Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set

of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department." [4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York. (AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant. [5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home. [6] (*Id.*) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (*Id.*) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (*Id.*)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (*Id.*) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3 rd party (Feldman, Kramer & Monaco, P.C.)" (*Id.*) Plaintiff claims that the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr. Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property. [7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (*Id.*) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

***3** Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (*Id.*) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (*Id.*) In

applying a very liberal reading of the AC, [8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours" worth of lost income [9] on the day of the search, unspecified lost income for the day that she had to appear in court, [10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

## III. Eleventh Amendment/New York State Division of Parole

### A. Legal Standards

***4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home. [11]

## IV. Syracuse Police Department/Municipal Liability

### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at *24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an

individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).

***5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York*, No. 17-CV-3563. 2019 WL 1434597, at *10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton*, 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

## V. Prosecutorial Immunity/Personal Involvement

### A. Legal Standards

#### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

***6** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*.

*Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

**B. Application**

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

***7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

**VI. Search and Seizure**

**A. Legal Standards**

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.' " *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is " 'based on seemingly reliable information which is later found to be erroneous.' " *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

**B. Application**

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

***8** The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture.[17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5002215

## Footnotes

1 When plaintiff filed her original complaint, the case was administratively closed due to plaintiff's failure to comply with the filing fee requirement. (Dkt. No. 2). Prior to re-filing her motion to proceed IFP, (Dkt. No. 4), plaintiff also filed an amended complaint, which the court will review as the operative pleading. The case was re-opened on August 1, 2019. (Dkt. No. 6).

2 Plaintiff numbered the pages of the “Fact” section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits (“AC Ex.”) with the page number as assigned by the court's electronic filing system (“CM/ECF”).

3 Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

4 This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

5 Plaintiff does not allege that PO Rigby participated in the search of her apartment.

6 Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

7 Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF p.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

8 Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See* *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

9 Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

10 Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

11 It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint, and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

12 Article 13-a is entitled "Proceeds of a Crime -Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

13 Although not relevant to the court's decision because it is based on absolute immunity of the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's ***sworn*** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

14 Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under

New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

15 To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit. *See Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

16 Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

17 The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau*, 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios*, the District Attorney was the proper "defendant" in New York State Court.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

***1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order and Report-Recommendation dated August 15, 2019 (Dkt. No. 7), Magistrate Judge Baxter grants Plaintiff's application to proceed in forma pauperis, and examines the sufficiency of the allegations set forth in the Amended Complaint ("AC") in light of 28 U.S.C. § 1915. He recommends that the AC (Dkt. No. 3) be dismissed in its entirety as against defendants N.Y.S. Division of Parole, Syracuse Police Department, William J. Fitzpatrick, and Sean Chase; that to the extent that the AC may be read as naming Sgt. Llukaci or PO Rigby, the AC be dismissed without prejudice for failure to state a claim; and that if the Court adopts these recommendations that the case be returned to him for further proceedings, including an order serving the remaining defendants Saben, Summers, Proud, and Curran. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

## II. DISCUSSION

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice.

## III. CONCLUSION

Accordingly, the Court **ACCEPTS and ADOPTS** the recommendations in the Order and Report-Recommendation (Dkt. No. 7) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3) is **DISMISSED IN ITS ENTIRETY** as against defendants N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may be read as naming SGT. LLUKACI or PO RIGBY, it is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge Baxter for further proceedings, including an order serving the remaining defendants: SABEN, SUMMERS, PROUD, and CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1296172
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

H.E. Amir M. HAMZA and
Francis Arthur Yakel, Plaintiffs,
v.
Athansios Dimadis KOTSIDIS, et al., Defendants.
H.E. Amir M. Hamza, Plaintiff,
v.
Chris Liberati-Conant, et al., Defendants.
H.E. Amir M. Hamza, Plaintiff,
v.
Athanasios Dimadis Kotsidis, a/k/
a Thanos Dimadis, et al., Defendants.

1:25-cv-968 (ECC/ML), 1:25-cv-1429
(ECC/ML), 1:25-cv-1506 (ECC/ML)
|
Signed 05/12/2026

**Attorneys and Law Firms**

H.E. Amir M. Hamza, Pro se Plaintiff

Francis Arthur Yakel, Pro se Plaintiff

**MEMORANDUM-DECISION AND ORDER**

Elizabeth C. Coombe, United States District Judge:

**I. INTRODUCTION**

***1** Plaintiffs H.E. Amir M. Hamza and Francis Arthur Yakel commenced the above captioned lead case by filing a Complaint on July 22, 2025. *Hamza et al. v. Kotsidis et al.*, 1:25-cv-968 (ECC/ML) (*Hamza I*) Dkt. No. 1. On August 7, 2025, the Court accepted Plaintiffs' Amended Complaint filed as of right. Dkt. No. 37. [1] Plaintiffs subsequently filed a motion to amend the Amended Complaint, which the Court granted on October 8, 2025, and the Second Amended Complaint became the operative pleading. Dkt. Nos. 49, 50. Hamza subsequently commenced the above captioned member cases by filing separate Complaints on October 13, 2025 and October 26, 2025. *Hamza v. Liberati-Conant, et al.*, 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) (*Hamza II*) Dkt. No. 1; *Hamza v. Kotsidis et al.*, 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) (*Hamza III*) Dkt. No. 1. Plaintiffs filed applications to proceed in forma pauperis (IFP) in the above captioned actions. *Hamza I* Dkt. Nos. 3, 4; *Hamza II* Dkt. No. 2; *Hamza III* Dkt. No. 4.

These cases were referred to Magistrate Judge Miroslav Lovric who, on November 26, 2025, granted Plaintiffs' motions for IFP status and ordered the consolidation of these actions, designating *Hamza I* as the lead case. *Hamza I* Dkt. No. 54; *Hamza II* Dkt. No. 6; *Hamza III* Dkt. No. 7. Magistrate Judge Lovric further recommended that the *Hamza I* Second Amended Complaint, *Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as frivolous, or, in the alternative, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (iii) because they seek relief against defendants who are immune from such relief and for failure to state a claim upon which relief may be granted. *Id*.

Hamza filed objections to Magistrate Judge Lovric's recommendation on December 3, 2025. Dkt. No. 55. On December 7, 2025, Plaintiffs filed a letter motion seeking leave to file a Third Amended Complaint consolidating various claims from *Hamza I, Hamza II*, and *Hamza III* into a single action, in light of Magistrate Judge Lovric's recommendations. Dkt. No. 56. That motion, along with Magistrate Judge Lovric's Report-Recommendation, is presently before this Court.

**II. REPORT-RECOMMENDATION**

This Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections "must be specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report[-]Recommendation must be specific and clearly aimed at particular findings in the magistrate [judge]'s proposal ...." *Machicote v. Ercole*, No. 06 Civ. 13320, 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

***2** Hamza filed a 741-page submission in objection to Magistrate Judge Lovric's report-recommendation recommending dismissal of *Hamza I, Hamza II* and *Hamza III.* Dkt. No. 55. Namely, Hamza takes issue with Magistrate Judge Lovric's characterization of the pleadings, and otherwise attempts to interject new facts and allegations for consideration in conjunction with Plaintiffs' claims. Ultimately, Hamza requests the Court permit amendment in order to file a more streamlined and clarified pleading – that is, the proposed Third Amended Complaint that Plaintiffs filed soon after submitting objections to the report-recommendation. *See* Dkt. No. 56 at 3-32 (TAC).

Under de novo review, the Court agrees with Magistrate Judge Lovric's recommendations that the *Hamza I* Second Amended Complaint*, Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2), and the report-recommendation is therefore adopted in this respect. The Court shares Magistrate Judge Lovric's concerns regarding Hamza's abusive litigation history, and joins in cautioning Hamza that voluminous, frivolous filings that overwhelm the judiciary's resources, and congest the docket, will not be tolerated. Hamza represents, and the Court recognizes, that he is an experienced pro se litigant – having actively litigated numerous matters in federal and state court. Dkt. No. 56 at 1. Hamza states that these experiences have afforded him the ability to learn and understand the legal process. *Id.* Although a court "is ordinarily obligated to afford a special solicitude to pro se litigants," the "appropriate degree of special solicitude is not identical with regard to all pro se litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010). The "degree of solicitude may be lessened," for example, where a particular pro se litigant is "experienced in litigation and familiar with the procedural setting presented." *Id*. A court may exercise its discretion, "based on the totality of the relevant circumstances," to determine "what degree of solicitude, if any, should be afforded." *Id*. at 102–03. Thus, to the extent the Court recognizes that Plaintiff Hamza is an experienced pro se litigant, the Court expects that he be "conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits." *Zimmerman v. Burge*, No. 06-cv-0176 (GLS/GHL), 2008 WL 850677, at *9 (N.D.N.Y. Mar. 28, 2008).

Notwithstanding these concerns, the Court recognizes that Magistrate Judge Lovric's report-recommendation was the first instance in which any pleading deficiencies were identified to the pro se Plaintiffs. Generally, when the court dismisses a pro se complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, in an abundance of caution regarding Plaintiffs' pro se status, and recognizing Plaintiffs' effort to consolidate their numerous claims across the three actions into one streamlined pleading, the Court exercises its authority to accept Plaintiffs' Third Amended Complaint for filing, and will proceed to review its sufficiency pursuant to 28 U.S.C. 1915(e)(2).

## III. THIRD AMENDED COMPLAINT

Plaintiffs' allegations in the Third Amended Complaint will be summarized to the extent they are relevant to the Court's analysis.

### A. Personal Involvement

"To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). The Second Circuit has also made clear that "there is no special rule for supervisory liability" under Section 1983. *Tangreti*, 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Tangreti*, 983 F.3d at 618).

***3** Plaintiffs identify Philip Tkacy, Douglas Cropper, Carla Ingersoll, and Morgan Klima as defendants in the caption and list of parties. However, these defendants are not otherwise referenced anywhere in the body of the Third Amended Complaint, and the pleading lacks factual allegations sufficient to allege that these individuals were personally involved in conduct that violated Plaintiff's constitutional rights. Accordingly, Plaintiffs fail to state a cognizable claim against Tkacy, Cropper, Ingersoll, and Klima, and the Third Amended Complaint is dismissed as against them. *See Cipriani v. Buffardi*, No. 06-cv-0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what

the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, No. 14-cv-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint).

Plaintiffs also name Village of Philmont Police Chief Vernon Doyle as a defendant. The minimal allegations against Doyle in the Third Amended Complaint are asserted in his supervisory capacity, and Plaintiffs do not assert that Doyle was personally involved in conduct violating their constitutional rights. *See* TAC ¶¶ 36 ("The Philmont Police Department, under Chief Doyle, responded to multiple calls and complaints but failed to curb Thanos and Marou's surveillance ...."), 84 (generally alleging supervisory liability against Doyle because he "knew of and condoned" allegedly unconstitutional practices). Plaintiffs' conclusory allegations are insufficient to show that Doyle personally violated their rights. Accordingly, the claims against Doyle fail to state a claim.

**B. State Action under § 1983**

"It is well-settled that a plaintiff alleging a violation of his constitutional rights under Section 1983 must show that the defendant acted under color of state law." *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 112 (N.D.N.Y. 2023) (citing *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012)); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). As a general rule private parties are not state actors subject to § 1983 liability. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-cv-1624, 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.' ") (citation omitted). However, the actions of private individuals and entities may be attributed to the state for Section 1983 purposes if "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citation omitted). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

**1. Thanos and Marou**

Plaintiffs allege that Defendants Athanasios Dimadis Kotsidis (Thanos) and Maroula Kotsidou (Marou) acquired an adjacent property to Hamza's residence (the property) in June 2022. TAC ¶¶ 13, 25-26. Plaintiffs further allege that the property is utilized for charitable purposes, in conjunction with an organization founded by Hamza and operated, in part, by Yakel. *Id.* at ¶¶ 11, 26-27. Plaintiffs contend that Thanos and Marou "began a pattern of conduct directed at Plaintiffs designed to interfere with the use, enjoyment, and charitable development" of the property. *Id.* at ¶ 28. Specifically, Plaintiffs allege that Thanos and Marou conducted video and camera surveillance of Plaintiffs on the property, and "obstructed or attempted to obstruct vehicular and pedestrian access" to the property, including blocking driveways, interfering with construction deliveries, and using "exaggerated, fabricated, or wholly false" complaints to officials to frustrate the charitable organization's purpose. *Id.* at ¶¶ 29-31. Thanos and Marou also "publicly and privately defamed Plaintiffs by spreading statements accusing them of criminal behavior, dishonesty, and instability, including in communications to neighbors, public officials, and third parties ...." *Id.* at ¶ 33.

***4** Plaintiffs allege that officials responded to some of Thanos and Marou's "false" complaints, and "initiated investigations and/or enforcement actions that, upon information and belief, were premised on false information from Thanos and Marou and were selectively pursued against Plaintiffs while similar or worse conditions nearby were ignored." TAC ¶ 32. Plaintiffs further allege that they "repeatedly notified" Village of Philmont officials of Thanos and Marou's ongoing surveillance and harassment, however "[i]nstead of providing even-handed support of enforcing neutral rules, the Village and its agents routinely took Thanos and Marou's side, treating Plaintiff's own reports as nuisances, delaying responses to FOIL requests, and selectively applying ordinances to Plaintiffs while overlooking comparable conduct by others." *Id.* at ¶¶ 34-35; *see also id.* at ¶ 36 (alleging that Village of Philmont Police Department responded to multiple calls and complaints but failed to curb the surveillance, and instead used the dispute to scrutinize Plaintiffs' conduct).

Liberally construed, Plaintiffs seek to proceed against Thanos and Marou under the "joint action" doctrine. " 'To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.' " *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting *Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999)). "The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action." *Id.* (citing *Ginsberg*, 189 F.3d at 272).

The Third Amended Complaint does not sufficiently allege joint action between Thanos and Marou and any state officials, such that the former could be held liable under § 1983. Liberally construed, Plaintiffs' allegations suggest that village and law enforcement officials did not respond favorably to their complaints about Thanos and Marou, but instead credited Thanos and Marou's complaints and otherwise scrutinized Plaintiffs' conduct in an unfair manner. Plaintiffs, however, do not allege any facts that Thanos and Marou directed or pressured state actors in pursuing the alleged violation of their constitutional rights. Nor is there any allegation that Thanos and Marou were involved in a plan, prearrangement, or conspiracy with any state officials. Even assuming Thanos and Marou intended to harm Plaintiffs by reporting their conduct, "a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 386 (E.D.N.Y. 2013) (citing *Kash v. Honey*, 38 F. App'x 73, 75–76 (2d Cir. 2002) (finding no state action by private lawyer who plaintiff alleged "maliciously, for purpose or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights ... falsely charged [plaintiff] in an accusatory instrument")). Otherwise, Plaintiffs' allegations do not plausibly allege joint action with state actors for purposes of § 1983. *See* *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) ("[T]he provision of information to police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983."); *Sherman v. City of New York*, No. 18-cv-5359, 2019 WL 2164081, at *7 (E.D.N.Y. May 16, 2019) ("Plaintiff's allegations simply amount to the assertion that Eilenberg provided the officers with false information and the officers inappropriately accepted Eilenberg's version of events despite evidence to the contrary. This is patently insufficient to state a claim of joint action."); *United States v. Hanratty*, No. 24-cr-153, 2024 WL 4892742, at *3 (S.D.N.Y. Nov. 26, 2024) ("That EBCC was eager to cooperate with the Government does not convert EBCC's conduct in the Civil Case into joint activity or state action.").[2] In the absence of state action, Plaintiffs' allegations fail to state a § 1983 claim against Thanos and Marou.

#### 2. U-Haul and Hudson Rentals

***5** Plaintiffs' only allegation against Defendants U-Haul, Inc. and Hudson Rentals and Garden Design is that these entities "were involved in actions related to a U-Haul truck and equipment on or near Elm Street that Thanos and Marou used as pretext for further complaints, obstruction, and allegations against Plaintiffs, with resulting interference in Plaintiffs' property rights and [the foundation's] operations." TAC ¶ 37. Even assuming that Plaintiffs articulated a constitutional violation as against these entities, which they have not, Plaintiffs' conclusory and vague allegations do not suffice to plead state action on their part, under any of the relevant tests enumerated above. Accordingly, Plaintiffs' allegations against U-Haul, Inc. and Hudson Rentals and Garden Design fail to state a claim under § 1983 for, among other reasons, lack of state action.

### C. Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citation omitted); *see also* *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002). "To state a conspiracy claim under 42 U.S.C. § 1985[,]" a plaintiff must allege "(1) some racial or other class-based discriminatory animus underlying the [defendants'] actions; and (2) that the conspiracy was aimed at interfering with [the plaintiff's] protected rights." *Brito v. Arthur*, 403


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

F. App'x 620, 621 (2d Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).

In order to state a claim under either statute, allegations of direct evidence of conspiracy are not necessary, "but detailed allegations of the conspiracy's 'time and place' must be provided for a complaint to cross the plausibility threshold." *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 82 (N.D.N.Y. 2025) (citing *Ciambriello*, 292 F.3d at 325). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190 (2d Cir. 2012) (quoting *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)). "Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)." *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (citing *Kiryas Joel Alliance*, 495 F. App'x at 190-91); *see also* *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011).

Here, Plaintiffs fail to state a plausible cause of action for conspiracy under either § 1983 or § 1985(3). At the outset, even viewing the allegations in the light most favorable to Plaintiffs, the Third Amended Complaint fails to allege any specific facts regarding a "meeting of the minds" among *all*, much less any, of the individual defendants. Instead, Plaintiffs' allegations regarding a meeting of the minds merely reiterate the relevant statutory language without any factual support. *See, e.g.,* TAC ¶ 77 ("Defendants reached an agreement, tacit or express, to deprive Plaintiffs of their constitutional rights...."), ¶ 80 ("Defendants conspired ... to deprive [Hamza] of equal protection and equal privileges and immunities.").

Furthermore, Plaintiffs have not sufficiently set forth how all the individual defendants acted in concert with one another to violate Plaintiffs' rights. Plaintiffs contend that the offending conduct includes "using Thanos and Marou's surveillance and reports as a pipeline to law enforcement and the DAO," "selectively targeting Plaintiffs with tickets, investigations, and criminal charges," "denying equal access to volunteer and civic opportunities," and "maintaining prosecutions and investigations as leverage." TAC ¶ 77. As previously discussed, evidence that private actors reported purported criminal activity to law enforcement does not establish a "meeting of the minds" or concerted behavior sufficient to state a conspiracy claim. Otherwise, these general and conclusory allegations do not plausibly allege that all the individual defendants acted in concert with one another, as claimed.

***6** Finally, the Court notes that while "a plaintiff may assert a civil conspiracy claim under § 1983 for the deprivation of a constitutional right, he must first show a violation of the underlying constitutional right." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 373 (E.D.N.Y. 2016). It is unclear which of Plaintiffs' constitutionally protected rights the Defendants allegedly acted in concert to violate. However, to the extent Plaintiffs have failed to plausibly allege an underlying violation of their constitutional rights, they cannot sustain a claim of conspiracy to violate those rights.

For all of these reasons, Plaintiffs' conspiracy claims under § 1983 and § 1985(3) fail to state a claim as a matter of law.

**D. *Monell* Liability**

"Under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), local governments may be held liable in § 1983 actions." *Frost v. New York City Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020). *Monell* emphasized, however, that "a municipality cannot be held liable ... on a respondeat superior theory." *Monell*, 436 U.S. at 691. Thus, "[t]he elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020)). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *Moran v. Cnty. of Suffolk*, No. 11 Civ. 3704, 2015 WL 1321685, at *9 (E.D.N.Y. Mar. 24, 2015) (citations omitted).

Plaintiffs allege that "[t]he constitutional violations described" in the Third Amended Complaint "were caused by policies, customs, or practices" of the Village of Philmont. [3] TAC ¶ 83. With respect to Plaintiffs' claims premised on a failure-to-train theory, the Court is mindful that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

Connick v. Thompson, 563 U.S. 51, 61 (2011). A failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

***7** To set forth a failure-to-train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015). Here, Plaintiffs' claim fails because they have not alleged a specific training deficiency, nor does the Third Amended Complaint contain sufficient factual matter to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plaintiffs' broad allegation that that the municipality failed to train and supervise officers [4] on "neutral handling of neighbor disputes and petitioning," without more, is the sort that is regularly dismissed as too general and conclusory. *See Taranto v. Putnam Cnty.*, No. 21-cv-2455, 2023 WL 6318280, at *19 (S.D.N.Y. Sept. 28, 2023) (collecting cases).

The remainder of Plaintiffs' *Monell* claims are liberally construed as alleging an actionable policy or custom through actions or decisions made by municipal officials with decision making authority. Although not specifically articulated in Plaintiffs' cause of action asserting *Monell* liability, the pleading as a whole can be construed to allege liability based on the Village of Philmont Trustees' alleged decision to reject Plaintiff Hamza's volunteer firefighter application in retaliation for his prior complaints and lawsuits. At this stage of the litigation, the Court will permit this claim to proceed to service. In doing so, the Court expresses no opinion on the merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

**E. Detzel and MacFarlane**

Plaintiffs allege that Defendants Jason Detzel and Bob MacFarlane were Village trustees, employees and/or officials. TAC ¶ 17. Plaintiffs allege that Detzel and MacFarlane were repeatedly notified of Thanos and Marou's ongoing surveillance and harassment, and "routinely took Thanos and Marou's side" to the Plaintiff's detriment. *Id.* at ¶ 34-35. Plaintiffs further allege that Plaintiff Hamza's application to become a volunteer firefighter with the village was "rejected ... without explanation" by the Village Board of Trustees, and that in an "informal conversation, [ ] Detzel indicated that the rejection stemmed from a perception that Hamza was a 'rabble rouser' tied to his complaints, FOIL requests, and litigation[.]" *Id.* at ¶¶ 38-41.

Plaintiffs assert a First Amendment retaliation claim against Detzel and MacFarlane based on the denial of his volunteer application. TAC ¶¶ 57-62. At this stage of the litigation, the Court will permit only this claim to proceed to service as to Detzel and MacFarlane, as Plaintiffs' allegations otherwise fail to state any other § 1983 claims against them. In doing so, the Court expresses no opinion on the merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

**F. New York State Police**

Plaintiffs name the New York State Police (NYSP) in the Third Amended Complaint "only to the extent permitted for declaratory and injunctive relief and under state law as appropriate." TAC ¶ 20. "The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)). "The doctrine of *Ex parte Young* is a limited exception to the general principle of sovereign immunity and allows 'a suit [for injunctive relief] challenging the constitutionality of a state official's actions in enforcing state law' under the theory that such a suit is not 'one against the State,' and therefore not barred by the Eleventh Amendment." *CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (quotation omitted). The *Ex parte Young* doctrine "does not apply when the state is the real, substantial party in interest." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp.*

*v. Halderman*, 465 U.S. 89, 101 (1984)) (additional quotation and quotation marks omitted); *see also* *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that *Ex parte Young* has "no application in suits against the States and their agencies, which are barred regardless of the relief sought"). "[A] plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly." *Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991). Accordingly, Plaintiffs' claims against the NYSP do not fall within the *Ex parte Young* exception, and are barred by sovereign immunity.

**G. Trooper Miguel Rodriguez**

***8** Plaintiff alleges that on August 1, 2025, "officers – including [Defendant] Trooper Rodriguez – arrived at Hamza's home and seized him on a Menacing 3° charge arising from allegations connected to the Elm Street dispute. No contemporaneous warrant or probable cause documentation was shown." TAC ¶ 48. Hamza "was subjected to custodial questioning without Miranda warnings, and the timing of the arrest, its execution, and its maintenance reflected retaliatory and selective motives tied to his ongoing speech and previous federal filings." *Id.* at ¶ 49.

"To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Whitbeck v. Otsego Cnty.*, No. 3:25-cv-00673 (AMN/ML), 2025 WL 2959467, at *2 (N.D.N.Y. Oct. 20, 2025) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)). Confinement is otherwise privileged when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id*. (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Here, although thin, Plaintiffs' allegations are sufficient at this juncture to permit the Fourth Amendment false arrest claim against Rodriguez to proceed to service. In making this determination, the Court expresses no opinion on the merits, or to whether Plaintiff Hamza's false arrest claim can survive a properly filed dispositive motion.

Plaintiffs have otherwise failed to state a First Amendment retaliation, Fourteenth Amendment equal protection or Fourteenth Amendment due process claim against Rodriguez, as alleged in the Third Amended Complaint. Namely, Plaintiffs have failed to allege that Rodriguez had any personal involvement in the conduct giving rise to these claims. Plaintiffs' general allegations surrounding the "custodial questioning without Miranda warnings" do not identify Rodriguez or otherwise suggest he was personally involved in said conduct. Otherwise, the pleading is devoid of any reference to Rodriguez plausibly supporting these claims.

**H. Liberati-Conant and Davidson-Cunningham**

**1. Individual Capacity**

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)). "Instead of relying on strict categories of actions with respect to which absolute immunity attaches, the relevant question is 'whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate.' " *Id.* (quoting *Warney v. Monroe Cty.*, 587 F.3d 113, 123 (2d Cir. 2009)). Ultimately, the Court asks "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012). "The decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function." *Ogunkoya v. Monaghan*, 913 F.3d 64, 71 (2d Cir. 2019) (citations omitted).

Plaintiffs purport to sue District Attorney of Columbia County Chris Liberati-Conant "in his individual capacity for non-advocacy, administrative, and policy-making acts." TAC ¶ 22. It is, however, clear from the pleading that Plaintiffs' allegations against Liberati-Conant arise from his functional roles in the prosecutor's office. Specifically, Plaintiff contends that the district attorney's office, "through" Liberati-Conant, failed to sufficiently evaluate criminal charges against Thanos and Marou. TAC ¶ 45. Plaintiffs further allege that Liberati-Conant refused to recuse himself from Hamza's criminal prosecution, notwithstanding a purported conflict. *Id.* at ¶¶ 50-51. At a minimum, Liberati-Conant's decision whether or not to bring charges against Thanos and Marou is undoubtedly protected by absolute prosecutorial immunity. *Cruz v. Vill. of Spring Valley*, No. 21-cv-2073, 2022 WL 428247, at

*4 (S.D.N.Y. Feb. 11, 2022) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("It is clear that 'the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions' covered by absolute immunity.")); *see also* *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).

***9** Liberati-Conant's decision not to recuse himself from prosecuting Hamza's criminal action, although a closer call, is also protected by prosecutorial immunity. *See* *McDonough v. Smith*, No. 1:15-cv-01505 (MAD), 2016 WL 5717263, at *20 (N.D.N.Y. Sept. 30, 2016), *vacated and remanded on other grounds*, 783 F. App'x 91 (2d Cir. 2019) (evaluating whether district attorney's decision to recuse himself is entitled to absolute immunity in the absence of authority from the Second Circuit, and concluding that "a district attorney is entitled to absolute immunity for the act of recusing himself from a prosecution because such act is intimately tied to his functions as an advocate for the people."); *see also* *Delta Fuel Co., Inc. v. Maxwell,* 485 F. App'x 685, 686 (5th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976)) ("[B]ecause the recusal was done in [the defendant's] role as district attorney, [the defendant] was entitled to absolute prosecutorial immunity"); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 934 (9th Cir. 2012) applying absolute immunity to prosecutor's acts of recusing himself and appointing a special prosecutor upon evaluation of existing conflicts of interest).

Plaintiffs also name the Columbia County District Attorney's Office Chief of Staff Zechariah Davidson-Cunningham as a defendant in this action. Plaintiffs' allegations against Davidson-Cunningham are based on his involvement in the "intake, maintenance, and communications" concerning Hamza's criminal case. TAC ¶ 23. Plaintiffs allege Davidson-Cunningham also failed to properly evaluate their complaints against Thanos and Marou, and that Davidson-Cunningham "continued to oversee intake and decisions, allowing the [criminal case against Plaintiff Hamza] to remain pending without meaningful progress toward trial or dismissal." *Id.* at ¶¶ 45-47, 51. Assuming that Plaintiffs have alleged a plausible constitutional violation by Davidson-Cunningham, it is for conduct committed in the course of his duties as staff of the prosecutor of the state. Accordingly, he is also entitled to absolute immunity. *See* *Andrews v. Grillot*, No. 3:22-cv-873, 2023 WL 5228179, at *4 (D. Conn. Aug. 15, 2023) (concluding that agents of the EPA acting at the direction of the EPA's lawyers during the course of an enforcement action were shielded from suit by absolute immunity) (citing *Maqablh v. Heinz*, No. 3:16-cv-289, 2017 WL 1347695, at *3 (W.D. Ky. Apr. 10, 2017) ("The immunity afforded to prosecuting attorneys also applies to members of the prosecutor's staff for acts committed in the course of their duties as staff of a prosecutor of the state.") (cleaned up))); *see also* *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)).

### 2. Official Capacity – Prospective Relief

Plaintiff also names Liberati-Conant as a defendant "in his official capacity for prospective injunctive and declaratory relief concerning ongoing practices of the [district attorney's office]." TAC ¶ 22. The Eleventh Amendment does not "bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)); *see also* *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004) ("To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law."). The *Ex parte Young* doctrine requires that plaintiffs' complaint " '(a) alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). "In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (quoting *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011)); *see also* *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, N.Y.*, 945 F.3d 83, 110 (2d Cir. 2019) (" '[C]onjectural' injuries do not suffice under Article III.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983)) ("[The plaintiffs] lack standing to pursue

injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

***10** In this case, Plaintiffs' requests for prospective relief against Liberati-Conant fail to state a claim. Even assuming Plaintiffs' plausibly alleged a constitutional violation, which the Court seriously questions, the injunctive relief they seek is not sufficiently pled to be tied to an allegation of ongoing violations of federal law. At the outset, Plaintiff's request for declaratory relief finding that "Defendants' actions violated Plaintiffs' rights under" §§ 1983 and 1985(3) is "wholly retrospective," and therefore does not fall under the *Ex parte Young* exception. *See T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025) (concluding that request for "only a declaration – in the past tense – that the Board '*violated* Title II' " is retrospective).

With respect to Plaintiffs' requests for prospective injunctive relief, Plaintiffs must plead more than conclusory, general requests that the "defendants" be enjoined from "selective enforcement of laws against Plaintiffs." TAC at 30. *Craig v. Connecticut Dep't of Mental Health Nov. 28, 2017 & Addiction Servs.*, No. 3:16-cv-2100, 2017 WL 5892193, at *5 (D. Conn. Nov. 28, 2017) ("[Plaintiff's] request for injunctive relief - 'an order that each defendant shall fully comply with the provisions of [sic] pursuant to 42 U.S.C. § 1981 ...'- is impermissibly vague and overbroad."); *Peregrine Myanmar Ltd. V. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."). For these reasons, Plaintiffs' official capacity claim against Liberati-Conant fails to state a claim.

### I. Plaintiff Yakel

Yakel does not have standing to bring the limited claims this Court is permitting to proceed to service. To have standing to sue, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing, among others, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must also "assert his [or her] own legal rights and interests, and cannot rest his [or her] claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Rejamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("The 'prudential standing rule ... normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.' ") (quoting *Warth*, 422 U.S. at 509). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Id*. (citation omitted).

Here, Yakel has failed to identify any concrete and particularized harms he has suffered that are fairly traceable to (1) the Village of Philmont's alleged rejection of Hamza's volunteer firefighter application in retaliation for his complaints and litigation, or (2) Rodriguez's alleged false arrest of Hamza on August 1, 2025. Indeed, Plaintiff Yakel is barely referenced throughout the body of the Third Amended Complaint. Because the surviving claims do not allege independent claims for relief on behalf of Yakel, he lacks standing to maintain this action. *See, e.g., Hesse v. E. Windsor Police Dep't*, No. 3:24-cv-2044, 2025 WL 2379269, at *3 (D. Conn. Aug. 15, 2025) (wife lacked standing to bring claims alleging violations related to the arrest and prosecution of her husband); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) ("First, Angela Morgan lacks standing to bring individual claims under § 1983 based upon a deprivation of her daughter's constitutional rights."). Accordingly, Plaintiff Yakel is dismissed from this action without prejudice.

### IV. CONCLUSION

***11** For these reasons, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation is **ADOPTED** to the extent set forth above, and Plaintiffs' Second Amended Complaint in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) Dkt. No. 50, Complaint in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) Dkt. No. 1, and Complaint in *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) Dkt. No. 1 are **DISMISSED,** and it is further

**ORDERED** that in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) and *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.), the Clerk of the Court enter judgment closing these actions for the reasons set forth in this Memorandum-Decision and Order, and it is further

**ORDERED** that in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) the Third Amended Complaint is accepted for filing. The Clerk of the Court shall docket the Third Amended Complaint, as set forth in Dkt. No. 56 at 3-32, as a separate

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

entry on the docket, attaching as exhibits the submissions found at Dkt. No. 55-1; [5] and it is further

**ORDERED** that the Clerk of the Court serve a Rule 11 affidavit and a copy of the Third Amended Complaint on Plaintiff Hamza, [6] and it is further

**ORDERED** that, pursuant to the Court's careful review of the Third Amended Complaint under 28 U.S.C. § 1915(e)(2), the following claims **SURVIVE** initial review and require a response: (1) Hamza's First Amendment retaliation claim against Defendants Jason Detzel and Bob MacFarlane arising from the rejection of Hamza's volunteer firefighter application, (2) Hamza's *Monell* claim against Defendant Village of Philmont arising from the rejection of Hamza's volunteer firefighter application, and (3) Hamza's Fourth Amendment false arrest claim against Defendant Trooper Miguel Rodriguez arising from Hamza's arrest on August 1, 2025; and it is further

***12 ORDERED** that Plaintiff is directed to submit proposed summonses to the Clerk of the Court for Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez; [7] and upon receipt of the Rule 11 affidavit and proposed summonses, the Clerk shall issue summonses and forward them, along with the necessary copies of the Third Amended Complaint and a copy of this Memorandum-Decision and Order to the United States Marshal for service upon Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez. The Clerk shall forward a copy of the summons, Third Amended Complaint, and this Memorandum-Decision and Order by electronic mail to the New York State Attorney General's Office, and it is further

**ORDERED** that a response to the Third Amended Complaint be filed by Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez as provided for in the Federal Rules of Civil Procedure after service of process, and it is further

**ORDERED** that, except as to the foregoing, the remaining claims asserted in the Third Amended Complaint are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2); and it is further

**ORDERED** that the Clerk of the Court shall **TERMINATE** the following defendants from the *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) docket: Athanasios Dimadis Kotsidis, Maroula Kotsidou, Chief Vernon Doyle, U-Haul, Inc., New York Department of Environmental Conservation, Philip Tkacy, Douglas Cropper, Carla Ingersoll, Morgan Klima, Hudson Rentals and Garden Design, New York State Police, Chris Liberati-Conant, Zechariah Davidson-Cunningham, The Government of the Hellenic Republic, (Greece), Association of Foreign Press Correspondents in the USA, Inc. (AFPC-USA), The George Washington University Graduate School of Political Management (GPSM), and The United States Department of State, and it is further

**ORDERED** that the claims brought by Plaintiff Yakel are **DISMISSED,** and the Clerk of the Court shall **TERMINATE** Plaintiff Yakel from the docket.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 1296172

## Footnotes

1 Citations to docket entries refer to those filed in *Hamza I,* unless otherwise noted.

2 The Court notes that Magistrate Judge Lovric provided an extensive list of allegations contained in Plaintiffs' *Hamza I* Second Amended Complaint, strongly suggesting that state actors were *not* acting in concert with Thanos and Marou to violate Plaintiffs' constitutional rights. Dkt. No. 54 at 32-34.

3 Plaintiff also alleges *Monell* liability against the New York State Police and the "DA in Official Capacity." TAC ¶¶ 82-84. However, the "holding in *Monell* was limited to local government units which are not considered part of the State for Eleventh Amendment purposes," and therefore does not apply to state agencies such as the

NYSP or the District Attorney's Office. *See* *Daly v. Town of Dewitt*, No. 18-cv-845 (TJM), 2019 WL 4170162, at *3–4 (N.D.N.Y. Sept. 2, 2019) (dismissing municipal liability claim against NYSP); *see also* *Strasser v. New York*, No. 10-cv-141 (FJS/DEP), 2012 WL 253391, at *3 (N.D.N.Y. Jan. 26, 2012) (adopting magistrate judge's recommendation to dismiss *Monell* claims against the state or its entities, including the NYSP, and noting that *Monell* "provides no basis to permit plaintiff to assert claims against the state or its agencies"); *Mobley v. Rodriguez*, No. 7:25-cv-6784, 2025 WL 3042024, at *3 (S.D.N.Y. Oct. 31, 2025) ("In the State of New York, a District Attorney's Office, when prosecuting a criminal matter, is deemed an arm of the State of New York and, therefore, in that context, enjoys Eleventh Amendment immunity from suit."). Accordingly, Plaintiffs fail to state a *Monell* claim against the NYSP and the District Attorney's Office.

4 Moreover, and to reiterate, Plaintiff has not alleged an underlying constitutional violation by any Village of Philmont law enforcement officer that would support such a *Monell* claim based on a failure-to-train theory.

5 In his letter motion seeking to file the Third Amended Complaint, Hamza contends that the draft pleading "references certain exhibits cited in [his] objections to the RRO," and states that "if the Court grants leave to amend, [he] will formally incorporate those exhibits and provide the Court with detailed descriptions of each exhibit so their relevance and evidentiary value are clear." Dkt. No. 56. To the extent the pleading relies on these documents, they will be docketed as exhibits to the Third Amended Complaint. Hamza's request to otherwise formally incorporate the exhibits and provide descriptions is denied.

6 The Third Amended Complaint is not signed. *See generally* Dkt. No. 56 at 3-32. Rule 11(a) of the Federal Rules of Civil Procedure requires that every pleading be signed "by at least one attorney of record in the attorney's name ... or by a party personally if the party is unrepresented." Therefore, as the only plaintiff with surviving claims, Hamza must, within fourteen days, execute and file an affidavit which states that he has read the Third Amended Complaint and the text of Federal Rule of Civil Procedure 11. By executing the same, Hamza shall be declaring that he is representing to the Court all of the representations delineated in Federal Rule of Civil Procedure 11(b) with respect to the Third Amended Complaint. Hamza is advised that if he does not comply, this action may be dismissed without prejudice.

7 The Clerk is directed to provide Plaintiff with blank summonses to complete.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,
v.
THE CITY OF NEW YORK, Assistant District Attorney Robert Henoch, Captain of Corrections Martin, Corrections Officer Schmidt, Corrections Officer Brown and Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

***1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants.[1] *Id.* ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. *Id.* Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the people against whom he was to testify were held and that he alerted ADA Henoch of this fact. *Id.* ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." *Id.* at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. *Id.* at 5.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." *Id.* As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. *Id.* ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." *Id.*

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See Jamison v. Dee,* 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

I. *Absolute Immunity*

***2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,*

996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

***3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818). To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

***4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson.[2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, *3 (S.D.N.Y. Nov. 6, 1995) (citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

> "[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

III. *The Pendent State Claims*

***5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1335865

## Footnotes

1 The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

2 Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Broadwater v. County of Onondaga, N.D.N.Y., March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,
v.
COUNTY OF CAYUGA; Cayuga County Sheriff's Department; City of Auburn; Shawn I. Butler, Chief of Auburn Police Department, as an Individual and in his official capacity; Cayuga County District Attorney's Office; Jon E. Budelmann, as an Individual and in his capacity as District Attorney for Cayuga County; and Anthony Spinelli, as an Individual and in his capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF JARROD W. SMITH, 11 South Main Street, P.O. Box 173, Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville, New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER, 6575 Kirkville Road, East Syracuse, New York 13057, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

***1** On or about February 18, 2020, Plaintiff filed a complaint against Defendants City of Auburn, Shawn L. Butler, County of Cayuga, Cayuga County District Attorney's Office, Jon E. Budelmann, and Anthony Spinelli, asserting eight claims pursuant to 42 U.S.C. §§ 1983 and 1988, and state law. *See* Dkt. No. 5. Specifically, Plaintiff's complaint alleges the following causes of action: (1) false arrest under the Fourth and Fourteenth Amendments; (2) malicious prosecution under the Fourth and Fourteenth Amendments; (3) negligent failure to train or supervise; (4) state law false arrest; (5) state law false imprisonment; (6) intentional and negligent infliction of emotional distress under New York State law; (7) negligence; and (8) deliberate indifference to medical care under the Eighth Amendment. *See* Dkt. No. 5 at ¶¶ 40-114. Currently before the Court is Defendants' motion to dismiss the complaint in its entirety. *See* Dkt. No. 9.

## II. BACKGROUND

According to the complaint, on August 10, 2018, Plaintiff was the passenger in a vehicle that was driven by 140 Wall Street, allegedly in violation of an order of protection for Linda Fitzsimmons and Lee Joyner, who both reside at that address. *See* Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145 Wall Street, several houses down from 140 Wall Street, on the opposite side of the street. *See id.* at ¶ 25. Plaintiff was not the driver of the vehicle and had no control over how the driver was delivering him to his home. *See id.*

On August 13, 2018, Plaintiff was arraigned on two felony complaints charging him with two counts of Criminal Contempt in the First Degree based on the alleged violation of the order of protection. *See id.* at ¶ 22. At the conclusion of his arraignment, Plaintiff was remanded to the Cayuga County Jail. *See id.* Plaintiff claims that "Defendant police officer lacked the requisite requirement of having probable cause to arrest the Plaintiff; and did falsely arrest and imprison the Plaintiff." *Id.* at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his capacity as Cayuga County District Attorney, presented Plaintiff's charges to a grand jury, which "No Billed" the case. *See id.* at ¶ 26. At this point, Plaintiff was released from custody. *See id.*

During the fifty-three days during which Plaintiff "was being illegally imprisoned," he slipped and fell at the Cayuga County Jail. *See id.* at ¶ 31. According to Plaintiff, on August 31, 2018, a water pipe burst at the Cayuga County Jail near Plaintiff's cell while he was already locked in for the night and sleeping. *See id.* at ¶ 32. Plaintiff was woken by a bursting water pipe that was turned off by a Cayuga County

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water off" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

***2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

## III. DISCUSSION

### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

### B. Documents Considered in Deciding Motion to Dismiss

In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

***3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, *3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*, No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

**C. *Monell* and Supervisory Liability**

***4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

> custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

***5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted). [1]

**D. Cayuga County District Attorney's Office and Auburn Police Department**

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rensselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

**E. False Arrest**

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of

Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

***6** In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

***7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

**F. Malicious Prosecution**

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt.

No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution. [3]

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also* *Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See* *Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

***8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.' " *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also* *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

***1. Initiation of Criminal Prosecution***

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See* *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See* *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

***2. Malice***

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

***9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

***3. Prosecutorial Immunity***

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, *3 (W.D.N.Y. June 22, 2017) (quoting Doe *v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, *3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses 'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, *4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at *4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983

liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

***10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also* *Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress

In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

***11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

### H. Negligence

In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a

plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

**I. Deliberate Indifference to Serious Medical Needs**

In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a '*mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

***12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/ or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

***13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See Connick*, 131 S. Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At best, the facts set forth in the

complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

## IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

***14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**;[4] and the Court further

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

## Footnotes

1 As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

2 Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

3 Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case, not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up

with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

4 As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 772685
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Heather KELLY, Plaintiff,
v.
WELLS FARGO BANK NATIONAL ASSOCIATION SECURITIZED ASSET BACKED RECEIVABLE MORTGAGE PASS THROUGH CERTIFICATE - WELLS FARGO 101, et al., Defendants.

3:19-CV-1366 (MAD/ATB)
|
Signed 02/18/2020

**Attorneys and Law Firms**

HEATHER KELLY, 38 Avon Street, Johnson City, New York 13790, Plaintiff, pro se.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

***1** Plaintiff commenced this action *pro se* on November 5, 2019, against Wells Fargo Bank National Association Securitized Asset Backed Receivable Mortgage Pass-Through Certificate-Wells Fargo 101 ("Wells Fargo"), Fremont Investment and Loan ("Fremont"), and Hon. Joseph F. Cawley, Supreme Court Judge in Broome County, New York. *See* Dkt. No. 1 at 1. Plaintiff alleges that she had a mortgage agreement with Defendant Fremont and Fremont subsequently "sold the loan" to Defendant Wells Fargo. *See* Dkt. No. 1 at ¶ 4. Plaintiff states that Defendant Wells Fargo initiated a foreclosure proceeding in Supreme Court, Broome County, which is still pending. *See id.* at ¶¶ 1, 16.

Further, Plaintiff claims Defendant Cawley has acted "negligently" in presiding over the foreclosure action. *See id.* Specifically, Plaintiff alleges that the foreclosure is illegal and "Defendant Joseph F. Cawley possessed a duty of care to dismiss the claim of the lower court defendant" based on all the "defects" Plaintiff presented. *Id.* at ¶ 23. Plaintiff asserts four "Causes of Action": (1) "Negligence," (2) "Gross Negligence," (3) "Willful Misconduct," and (4) "Conspiring to Fraudulently Transfer Assets." *See id.* at ¶¶ 35-62. Plaintiff seeks substantial monetary relief. *See id.* at 10.

On January 10, 2020, Magistrate Judge Andrew T. Baxter issued an Order and Report-Recommendation granting Plaintiff's IPF application, and recommending that Plaintiff's Complaint be **DISMISSED** for judicial immunity, abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and lack of subject matter jurisdiction. *See* Dkt. No. 9 at 10. Neither party objected to the Order and Report-Recommendation.

## II. DISCUSSION

### A. Standard of Review

When a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."[1] 28 U.S.C. § 1915(e)(2)(B). In making this determination, "the court has the duty to show liberality towards *pro se* litigants," however, "there is a responsibility on the court to determine that a claim has some arguable basis in law before permitting a plaintiff to proceed with an action *in forma pauperis.*" *Moreman v. Douglas*, 848 F. Supp. 332, 333–34 (N.D.N.Y. 1994) (internal citations omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

***2** Thus, although the court has the duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606

(2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the court also has a responsibility to determine whether the plaintiff may properly proceed with this action.

**B. Judicial Immunity**

Judges are afforded absolute immunity from suit for actions related to the exercise of their judicial functions. *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967). Judges maintain judicial immunity "even when [the] judge is accused of acting maliciously and corruptly." *Id.* at 554. Judicial immunity is only defeated by "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity;" or "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (citations omitted).

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions." *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (citations omitted). This immunity is "from suit, not just from ultimate assessment of damages." *Mireles*, 502 U.S. at 11 (citation omitted). The 1996 amendments to Section 1983 further barred injunctive relief and provided that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853 (1996); *see also Montero v. Travis, 171* F.3d 757 (2d Cir. 1999). Therefore, a judge is immune from all forms of suit unless he or she has acted either beyond the judge's judicial capacity, or "in the complete absence of all jurisdiction." *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 711 (S.D.N.Y. 2011) (citing *Mireles*, 502 U.S. at 11, 112 S. Ct. 286).

As Magistrate Judge Baxter acknowledges, Defendant Cawley is entitled to judicial immunity for all acts alleged by Plaintiff. *See* Dkt. No. 9. at 6. In the "Background" section of her complaint, Plaintiff describes an interaction in the courtroom between herself and Judge Cawley. *See* Dkt. No. 1 at ¶¶ 6-13. Plaintiff's recount of the interaction does not suggest that Judge Cawley acted in absence of jurisdiction. *See Ceparano v. Southampton Justice Court*, 404 Fed. Appx. 537, 539 (2d Cir. 2011). Accordingly, the Court finds that Magistrate Judge Baxter correctly determined that Defendant Cawley is entitled to absolute judicial immunity.

**C. Defendant Fremont**

Plaintiff states no claim against Defendant Fremont. The only mention of Fremont in Plaintiff's complaint comes with regard to Fremont being the original holder of Plaintiff's mortgage, and Fremont "sold the loan, allegedly that was agreed upon." Dkt. No. 1 at ¶ 4. Plaintiff never alleges any wrongdoing on the part of Fremont. Therefore, the action against Fremont is dismissed without prejudice.

**D. Defendant Wells Fargo**

***1. Younger* Abstention**

Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264 (1821). The Supreme Court has recognized a limited exception to this general rule, holding that federal courts should abstain from exercising jurisdiction over suits to enjoin pending state criminal proceedings, absent a showing of bad faith, harassment, or a patently invalid state statute. *Younger v. Harris*, 401 U.S. 37, 53-54 (1971). Although *Younger* itself dealt only with a pending criminal proceeding, "*Younger* abstention has been extended to civil proceedings and state administrative proceedings, so long as the state court has a means of reviewing constitutional claims." *Cecos International, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir. 1990) (citations omitted).

***3** As noted by the Sixth Circuit, "*Younger* cases generally have a common procedural posture." *Devlin v. Kalm*, 594 F.3d 893, 894 (6th Cir. 2010). " 'In the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings. Moreover, the basis for the federal relief claimed is generally available to the would-be federal plaintiff as a defense in the state proceedings.' " *Id.* at 894-95 (quoting *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 30 (6th Cir. 1984)).

The Second Circuit has instructed that "*Younger* abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Spargo v. New York State Com'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003). However,

the Supreme Court held that *Younger* abstention does not extend to "all parallel state and federal proceedings" that meet those three conditions, even "where a party could identify a plausibly important state interest." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81 (2013). Instead, the *Younger* doctrine applies only to three classes of parallel proceedings: (1) "pending state criminal proceeding[s];" (2) "particular state civil proceedings that are akin to criminal prosecutions;" and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* at 72-73; *see also In re Standard & Poor's Rating Agency Litigation*, 23 F. Supp. 3d 378, 409 (S.D.N.Y. 2014).

"Courts have routinely concluded that a pending state court foreclosure proceeding falls within the third category articulated in *Sprint* – a civil proceeding that implicates a states interest in enforcing the orders of its courts." *Plotch v. Wells Fargo Bank, N.A.*, No. 17–CV–309, 2018 WL 344967, *2 (E.D.N.Y. Jan. 9, 2018), *aff'd*, 758 Fed. Appx. 221 (2d Cir. 2019); *see also Santana v. Federal Nat'l Mortg. Ass'n*, No. 15–CV–1424, 2016 WL 3149731, *2 (N.D.N.Y. June 3, 2016) (collecting cases). "However, the Court must first determine whether the state-court foreclosure proceeding is in fact pending." *Santana*, 2016 WL 3149736, at *2.

According to Plaintiff's complaint, a "civil action" involving at least some of the parties present in this current action "is currently still active in District Broome County Court where it was given docket number EFCA2018001367." Dkt. No. 1 at ¶ 1. The state court action involves a foreclosure action initiated by Defendant Wells Fargo against Plaintiff. *See id.* at ¶¶ 14, 16. A foreclosure action falls under the third category articulated in Sprint, and as the action is pending, this Court cannot exercise jurisdiction over the state action. *See* Plotch, 2018 WL 344967, at *2.

### *2. Subject Matter Jurisdiction*

The subject matter jurisdiction of the federal district courts is limited and is set forth generally in 28 U.S.C. §§ 1331 and 1332. Under these statutes, federal jurisdiction is available only when a federal question is presented or when the parties are of diverse citizenship and the amount in question exceeds $75,000. A party seeking to invoke federal jurisdiction bears the burden of establishing that jurisdiction's existence within a reasonable probability. *See Pucci v. Brown*, 423 Fed. Appx. 77, 77-78 (2d Cir. 2011). It is well established that the Court may raise the question of jurisdiction *sua sponte*, and that where jurisdiction is lacking, "dismissal is mandatory." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994); *see also* Fed. R. Civ. P. 12(h)(3).

***4** Diversity jurisdiction exists only if there is diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000.[2] *See* 28 U.S.C. § 1332(a). It is well settled that "a case falls within the federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, *i.e.*, only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dep't of Corr. v. Schact*, 524 U.S. 381, 388 (1998).

Plaintiff asserted federal question jurisdiction under 28 U.S.C. § 1331. *See* Dkt. No. 1 at ¶ 2. However, nowhere in her complaint does Plaintiff allege a federal claim against Defendant Wells Fargo. Further, although Plaintiff never asserts diversity jurisdiction under 28 U.S.C. § 1332, both Plaintiff and Defendant Cawley are citizens of New York.[3] *See id.* at 1. Therefore, the Court has neither federal question jurisdiction nor diversity jurisdiction over Plaintiff's claims.

### E. Opportunity to Amend

Generally, when a district court dismisses a *pro se* action *sua sponte*, the plaintiff will be allowed to amend his or her action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the deficiencies in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

As emphasized by Magistrate Judge Baxter, any attempt by Plaintiff to amend this complaint, with regard to all issues discussed above, would be futile. *See* Dkt. No. 9 at 9-10. Therefore, the Court agrees with Magistrate Judge Baxter and Plaintiff's action will be dismissed with prejudice as against Judge Cawley based on judicial immunity, without an opportunity to amend. The Court will also abstain from exercising jurisdiction under *Younger*. And, the Court will dismiss Plaintiff's claims against Wells Fargo and Fremont without prejudice, but without the opportunity to amend, for lack of subject matter jurisdiction.

## III. CONCLUSION


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's January 10, 2020 Order and Report-Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE** as to Defendant Cawley; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**, but without the opportunity to amend, as against Wells Fargo and Fremont, for lack of subject matter jurisdiction; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 772685

## Footnotes

1 To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

2 "The Supreme Court has held that the party asserting diversity jurisdiction in federal court has the burden of establishing the existence of the jurisdictional amount in controversy." *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 273 (2d Cir. 1994).

3 Plaintiff lists the headquarters for Defendant Wells Fargo in South Dakota and Defendant Fremont in California.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4565768
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael LOPORTO, Plaintiff,
v.
COUNTY OF RENSSELAER, et al., Defendants.

1:15-CV-0866 (LEK/DJS)
|
Signed 09/24/2018

**Attorneys and Law Firms**

John E. Sweeney, Attorney at Law, Albany, NY, for Plaintiff.

Crystal R. Peck, John W. Bailey, Bailey, Johnson PC, Thomas J. O'Connor, Andrew S. Holland, Diane Lufkin Schilling, Napierski, Vandenburgh Law Firm, Robert A. Becher, Office of Robert A. Becher, James E. Long, Office of James E. Long, William A. Scott, New York State Attorney General, Albany, NY, for Defendants.

John F. Brown, Troy, NY, pro se.

Daniel B. Brown, Green Island, NY, pro se.

## MEMORANDUM-DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

***1** Plaintiff Michael LoPorto commenced this civil rights action against Rensselaer County, former officials, and several private individuals pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint").[1] In the Complaint, Plaintiff alleges that defendants Rensselaer, Youel C. Smith III, Richard J. McNally, Jr., William A. McInerney, John F. Brown, Daniel B. Brown, and John J. Ogden violated and conspired to violate his rights under the United States Constitution and federal law. E.g., id. ¶¶ 1–3. Presently before the Court are five motions to dismiss the Complaint for failure to state a claim, Dkt. Nos. 24 ("Browns Motion"), 24-3 ("Brown Memorandum"), 29 ("McNally Motion"), 29-3 ("McNally Memorandum"), 40 ("McInerney Motion"), 40-2 ("McInerney Memorandum"), 57 ("Ogden Motion"), 57-2 ("Ogden Memorandum"), 66 ("Smith Motion"), 66-3 ("Smith Memorandum"), a motion for judgment on the pleadings, Dkt. No. 96 ("Rensselaer Motion"), 96-1 ("Rensselaer Memorandum"), and the Browns' motion for sanctions, Dkt. Nos. 58 ("Sanctions Motion"), 58-2 ("Sanctions Memorandum"). For the reasons that follow, the Sanctions Motion is denied, and the remaining motions are granted.

## II. BACKGROUND

### A. Factual Background

The following facts are drawn from the allegations of the Complaint, which are accepted as true on a motion to dismiss. Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[ ] all reasonable inferences in her favor").

***2** This action stems from an alleged voter fraud scheme that came to light after the 2009 election in Troy, New York. At that time, Plaintiff, McInerney, and the Browns were "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009." Compl. ¶ 16.[2] At some point after the 2009 election, non-party Robert Mirch reported to Defendants and the New York State Police his belief "that forgeries on absentee ballots and absentee ballot applications occurred throughout August and September 2009." Id. ¶ 17. The State Police conducted an investigation, which produced evidence incriminating multiple individuals, including McInerney and the Browns. Id. ¶ 18. The evidence was provided to Rensselaer, the county in which Troy is situated. Id. Once word of the investigation became public, McInerney told "other political party operatives in the [Rensselaer County] Democratic Party," including McNally and the Browns, that "if he were involved in the prosecution, he was going to 'take everyone down with him.' " Id. ¶ 19.

McNally, who was the Rensselaer District Attorney at the time, decided to recuse himself from the voter fraud investigation. Id. ¶ 20. The New York State Supreme Court, Rensselaer County, granted McNally's request even though, according to Plaintiff, McNally provided "no apparent or least stated[ ] reason" to support his recusal application. Id. The Complaint alleges that McNally actually sought recusal because he

> had reason to suspect that guilty parties involved in the prior elections of 2007 and 2008 and the current election of 2009 were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated by a conspiracy of the false, fraudulent and forgery activities during elections in the City of Troy which he either knew of or should have known of in the course of his own candidacy for District Attorney in 2007.

Id. Plaintiff maintains that the recusal was "clearly illegal." Id.

Following McNally's recusal, Smith was appointed Special Prosecutor to investigate the voter fraud allegations. Id. ¶ 21. Smith and McNally had previously worked together in the District Attorney's Office. Id. Plaintiff alleges that McNally "t[ook] steps to have" Smith appointed because he knew "Smith would work with him in making sure that Defendant McInerney and other operatives who assisted him in these type of false, fraudulent and forgery activities in previous elections were not implicated or involved." Id. As a result, "a conspiracy arose at the very beginning of the investigation and administration to cover up false, fraudulent and forgery behavior relative to the elections of 2007, 2008 and 2009 in the City of Troy." Id.

Plaintiff claims that Smith "utilized the false, fraudulent and coerced evidence obtained during his investigation and administration of this voter fraud case" to obtain a twenty-nine count grand jury indictment against Plaintiff. Id. ¶ 24. He further alleges that Defendants conspired to fabricate evidence against him in order to cover up the "clearly guilty activities" of other "Democratic operatives, including" McInerney and the Browns. Id. ¶ 23. In other words, Smith sought to "scapegoat" Plaintiff in order to protect political allies. Id. ¶¶ 23–25.

Ogden, a New York State Police investigator, id. ¶ 15, "uncovered no evidence" incriminating Plaintiff, but "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert" in an effort "to try to pin guilt on" Plaintiff, id. ¶ 29. In the course of their investigation, Smith and Ogden "forged[ ] and falsely created" affidavits "for the sole purpose of prosecuting the Plaintiff to cover up the obvious guilt of" McInerney and the Browns. Id. ¶ 30. The fabrication of evidence was "part of an unofficial policy allowed to exist, and not protected or instructed against, by" Rensselaer. Id. ¶ 43. Additionally, Smith "and others ... maliciously gave false statements and information to the press in order to coerce" Plaintiff to plead guilty. Id. ¶ 34.

***3** Smith also learned "that there was a great deal of evidence against" McInerney and the Browns, as well as "other Democratic operatives." Id. ¶ 31. After the State Police uncovered evidence against McInerney and John Brown, Smith "went to the trouble of having his authority as Special Prosecutor extended to" McInerney so he "could soft peddle anything that [McInerney] faced and protect[ ] [him] from prosecution." Id. ¶ 43.

Despite being recused, McNally "met and consulted" with McInerney about the case, id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37. Plaintiff also alleges that McNally "approached" a witness "in a completely illegal manner," id. ¶ 42, met with Smith to "discuss[ ] the case," took "custody of evidence and g[ot] DNA reports," told Democratic operatives, including McInerney and the Browns, that they would not be prosecuted, and made public statements supporting Smith and "adverse to" Plaintiff, id. ¶ 49.

Plaintiff was tried twice for crimes connected to the voter fraud scheme, and ultimately acquitted. Id. ¶ 41. Meanwhile, Smith offered McInerney and John Brown a generous plea deal "with no or little jail time." Id. ¶ 43. In connection with that deal, McInerney testified at Plaintiff's second trial, where he "admitted to guilt for forgeries during the 2009 Working Families Party primary," id. ¶ 44. McInerney was ultimately sentenced to ninety days of community service and five years of probation for his role in the scheme. Id. ¶ 45. John Brown received a sentence of six months incarceration, followed by five years of probation. Id.

### B. Procedural History

Plaintiff commenced this action on July 15, 2015, alleging eight causes of action pursuant to § 1983. Compl. He claims that Defendants "deprived [him] of his civil rights," id. ¶ 47, "maliciously and intentionally deprived [him] of his civil and constitutional rights," id. ¶ 57, and acted "in violation of federal law," id. ¶ 65. Although not explicitly stated, Plaintiff seems to allege the following claims against

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Defendants: (1) malicious prosecution, id. ¶¶ 63–69, and conspiracy to maliciously prosecute in violation of the Fourth Amendment, id. ¶¶ 47–55, (2) "negligent investigation," id. ¶¶ 56–62, (3) abuse of process in violation of the Fourteenth Amendment, id., (4) "stigma-plus" defamation in violation of the Fourteenth Amendment, id. ¶¶ 70–78, (5) obstruction of a criminal investigation in violation of 18 U.S.C. § 1510, id. ¶¶ 79–82, (6) unlawful racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, Compl. ¶¶ 88–94, and RICO conspiracy, id. ¶¶ 95–100. Plaintiff also alleges § 1983 municipal liability against Rensselaer under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Compl. ¶¶ 83–87. [3]

***4** Between September and December 2015, the Browns, McNally, McInerney, and Ogden moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Brown Mot.; McNally Mot.; McInerney Mot.; Ogden Mot. The Browns also moved for sanctions in December 2015. Sanctions Mot. Between the end of 2015 and mid-2016, the parties entered into settlement negotiations. But when, in July 2016, those negotiations stalled, Smith also moved to dismiss. Smith Mot.

In August 2016, the Court discovered a serious attorney conflict issue. At a settlement conference held on August 12, 2016, it came to light that Plaintiff's attorney, Paul F. Dwyer, had joined the law firm of Cooper Erving & Savage LLP, which represented the Browns. Dkt. No. 83 ("2016 Order") at 2. On November 16, 2016, the Court disqualified Dwyer and Cooper Erving from representation and appearance in this case and stayed the action to allow Plaintiff and the Browns to obtain new counsel. Id. at 7. The Court also afforded Plaintiff and the Browns an opportunity to request additional briefing in the event they determined that their prior attorneys' papers were inadequate. Id.

The Browns did not secure new counsel, opting to proceed pro se. Docket. On January 24, 2017, Plaintiff's new attorney, John J. Sweeney, requested an extension of time in which to "familiarize [him]self with the prior proceedings in the matter." Dkt. No. 89 ("Extension Request"). The Court denied the Extension Request because Sweeney was not admitted to practice in this District. Dkt. No. 90. Two months later, Sweeney, now admitted to appear before the Court, submitted a notice of appearance. Dkt. No. 91. In April 2017, he submitted a seven page supplemental brief in opposition to the pending motions to dismiss. Dkt. No. 93 ("Supplemental Brief"). In June 2017, Rensselaer moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Rensselaer Mot., which Plaintiff opposed, Dkt. No. 97 ("Rensselaer Opposition").

Between June 2017 and August 2018, settlement negotiations resumed. As a result, multiple conferences were held before the Court to discuss the parties' progress and the likelihood of their reaching a settlement. See, e.g., Dkt Nos. 101, 106, 107. At the final such conference, held August 30, 2018 (the "August 2018 Conference"), the parties confirmed that no settlement would be reached, and the Court informed the parties that motion practice would resume. Dkt. No. 108 ("August 2018 Conference Transcript") at 3. Sweeney then requested that, "should the motions to dismiss be granted," the Court grant Plaintiff "leave for 30 days to refile [his] papers." Id. That request was objected to by Smith's counsel. Id. at 4. Finally, Sweeney informed the Court that he had accepted a position with Rensselaer County and would, therefore, be withdrawing as Plaintiff's counsel. Id. at 3.

### III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556.

***5** The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pled facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79. [4]

### IV. DISCUSSION

Plaintiff brings this action pursuant to § 1983, which "provides a civil claim for damages against any person who, acting under color of state law, deprives another of the right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; it provides civil litigants a procedure to redress the deprivation of rights established elsewhere. Id. "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under the color of state law deprived him of a federal right." Id.

**A. Malicious Prosecution and Conspiracy Claims**

Plaintiff's first claim is for malicious prosecution and conspiracy to maliciously prosecute in violation of the Fourth Amendment, brought pursuant to § 1983. Compl. ¶¶ 47–55, 63–69. When analyzing a malicious prosecution claim under § 1983, a court "adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." Cornejo v. Bell, 592 F.3d 121, 129 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997) ).

To establish a § 1983 conspiracy, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases). A private party is deemed to have acted under color of state law if he conspires with a state actor to violate a plaintiff's constitutional rights. Charlotten v. Heid, No. 09-CV-891, 2011 WL 3423826, at *11 (N.D.N.Y. Aug. 4, 2011) (Kahn, J.). To survive dismissal, a complaint alleging a § 1983 conspiracy must allege more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." Ciambriello v. Cty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002) (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) ).

*1. McNally and Smith*

a. *Eleventh Amendment Immunity*

***6** Plaintiff sues McNally and Smith in their official and individual capacities. Compl. ¶¶ 10–11. McNally argues that he is immune from the official capacity claims under the Eleventh Amendment. McNally Mem. at 6–7.

The Eleventh Amendment provides that "[t]he judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens." Edelman v. Jordan, 415 U.S. 651, 662–63 (1974) (collecting cases). Sovereign immunity is lost when a state explicitly consents to suit or Congress "unequivocal[ly]" abrogates immunity. Chayoon v. Chao, 355 F.3d 141, 143 (2d Cir. 2004). It is well-settled that Congress did not abrogate states' immunity when it enacted § 1983, e.g., Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and New York State has not waived immunity from suit on the claims Plaintiff asserts, e.g., Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 39–40 (2d Cir. 1977). Although Smith does not assert an Eleventh Amendment defense, the Court "may raise the issue of Eleventh Amendment immunity sua sponte." Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ., 466 F.3d 232, 238 (2d Cir. 2006).

"When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988), cert. denied, 488 U.S. 1014 (1989). To the extent he is sued in his official capacity, Smith stands in the shoes of the recused prosecutor. See Aretakis v. Durivage, No. 07-CV-1273, 2009 WL 249781, at *27 (N.D.N.Y. Feb. 3, 2009) (noting that a special prosecutor is "an independent contractor standing in for a recused district attorney"). Therefore, Plaintiff's official capacity claims against McNally and Smith are construed as claims against the State and are thus barred by the Eleventh Amendment. See, e.g., Woodward v. Office of Dist. Atty., 689 F. Supp. 2d 655, 659 (S.D.N.Y. 2010) ("To the extent that [the plaintiff] seeks to assert claims against the District Attorney's Office in federal court, his claims are also barred by the Eleventh Amendment." (citing

Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ) ).

Plaintiff's argument that the Eleventh Amendment does not bar his official capacity claims appears to confuse Eleventh Amendment immunity with prosecutorial immunity. Dkt. No. 43-1 ("McNally Opposition") at 3–5. His claim that "absolute immunity is reserved for officials who perform 'special functions and deserve absolute immunity from civil liabilities,' " id. at 4 (quoting Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995) ), has no bearing on whether state actors are immune from a § 1983 damages claim, see Ying Jing Gan, 996 F.2d at 529 ("The availability of immunity under the Eleventh Amendment does not depend on the nature of the function performed by the state."). The issue of absolute versus qualified immunity concerns prosecutorial, not Eleventh Amendment, immunity, and is addressed below.

***7** Because they are barred by the Eleventh Amendment, the official capacity claims against McNally and Smith are dismissed.

b. *Prosecutorial Immunity*

McNally and Smith's Eleventh Amendment immunity does not extend to those claims brought against them in their individual capacity. See id. ("To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). McNally and Smith argue that they are entitled to prosecutorial immunity against Plaintiff's claims against them in their individual capacity. McNally Mem. at 7–8; Smith Mem. at 20–21.

To determine whether a prosecutor enjoys absolute immunity against a claim for damages, courts apply a " 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.' " Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) ). "Prosecutors are entitled to absolute immunity when they engage in activities 'intimately associated with the judicial phase of the criminal process,' and done 'in the course of [their] role as ... advocate[s] for the State.' " Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011) (alterations in original) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976) and Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) ). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.' " Hill, 45 F.3d at 661 (alteration in original) (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) ). Thus, a prosecutor has absolute immunity from claims seeking damages for "initiating a prosecution and ... presenting the State's case," Imbler, 424 U.S. at 431, filing a criminal information and procuring arrest warrants, Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987), negotiating a guilty plea, Taylor v. Kavanagh, 640 F.2d 450, 453 (2d Cir. 1981), or entering "an agreement to forgo prosecution in exchange for certain types of concessions," Kent v. Cardone, 404 F. App'x 540, 542 (2d Cir. 2011). In Hill, the Second Circuit concluded that a prosecutor's alleged acts of "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as all are part of his function as an advocate." 45 F.3d at 661.

The initiation of a prosecution is an essential element of a malicious prosecution claim, and so prosecutors are generally immune to malicious prosecution claims. See, e.g., Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) ("Because the immunity attaches to the official prosecutorial function and because the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions, the prosecutor has absolute immunity for the initiation and conduct of a prosecution unless [he] proceeds in the clear absence of all jurisdiction." (alteration in original) (internal citations and quotations omitted) ); McKeon v. Daley, 101 F. Supp. 2d 79, 87 (N.D.N.Y. 2000) ("[I]t is well-established in the Second Circuit that claims of malicious prosecution of a particular charge are tied to the judicial phase, and warrant absolute immunity for a defendant district attorney." (collecting cases) ), aff'd, 8 F. App'x 138 (2d Cir. 2001). Plaintiff's allegation that McNally's disqualification was part of a politically-motivated scheme to scapegoat Plaintiff, Compl. ¶¶ 20–21, does not change the Court's analysis, see Bernard v. Cty. of Suffolk, 356 F.3d 495, 502 (2d Cir. 2004) (concluding that prosecutors' alleged "improper political motive" underlying their "decisions to prosecute plaintiffs and their conduct before the grand jury" was "irrelevant to the applicability of absolute immunity"); see also Peay v. Ajello, 470 F.3d 65, 68 (2d Cir. 2006) ("Plaintiff's claims against [a prosecutor], which encompass activities involving the initiation and pursuit of prosecution [including fabricating evidence and suborning perjury], are foreclosed by absolute prosecutorial immunity, regardless of their alleged illegality.").

***8** Absolute immunity for prosecutorial acts is lost where a defendant "proceeds in the clear absence of all jurisdiction." Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir. 2005) (quoting Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987) ). Plaintiff asserts that Smith lacked jurisdiction to prosecute him because McNally's recusal was "clearly illegal," thus invalidating Smith's appointment as Special Prosecutor. Smith Opp'n at 4–5; Compl. ¶ 20. Smith was appointed on September 28, 2009 by Justice Robert M. Jacon of the New York Supreme Court, Rensselaer County. Dkt. No. 68-3 ("Appointment Order").[5] Plaintiff alleges that McNally's recusal was invalid because it was based on McNally's belief that the potential targets of the investigation "were Democratic operatives who had assisted him in his prior elections and had a very good chance of being implicated by a conspiracy ... which [McNally] either knew or should have known of." Compl. ¶ 20. A district attorney in New York may seek recusal "[w]here there is legitimate doubt as to whether a district attorney and his office may proceed with a case." Working Families Party v. Fisher, 15 N.E.3d 1181, 1185 (N.Y. 2014). Plaintiff's allegation that McNally recused himself from the voter fraud case because he feared he or his political allies would be implicated, Compl. ¶ 20, suggests that recusal was reasonable, not unlawful. In addition, because courts "are not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), Plaintiff's claim that the recusal was "clearly illegal" is not enough to plausibly suggest the Appointment Order was invalid.

Furthermore, McNally and Smith are entitled to absolute immunity against Plaintiff's conspiracy claim—at least insofar as that claim is brought, in McNally's case, with regard to his pre-recusal behavior—because "it is also well established that absolute prosecutorial immunity extends to conspiracy allegations." Covington v. City of New York, 916 F. Supp. 282, 287 (S.D.N.Y. 1996); see also Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) (holding that absolute prosecutorial immunity from § 1983 liability extends for "allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial").

That said, McNally's post-recusal actions—which included (1) approaching a witness, id. ¶ 42; (2) meeting and consulting with McInerney, Compl. ¶ 35; (3) referring McInerney to an attorney, id. ¶ 37; and (4) meeting with Smith to discuss the case, id. ¶ 49—are not entitled to absolute immunity and could therefore support a conspiracy claim, if they were undertaken in agreement with Smith to further Plaintiff's alleged malicious prosecution. McDonough v. Smith, No. 15-CV-1505, 2016 WL 5717263, at *21 (N.D.N.Y. Sept. 30, 2016) (citing Kulwicki v. Dawson, 969 F.2d 1454, 1467 (3d Cir. 1992) ), aff'd 898 F.3d 259 (2d Cir. 2018). However, none of those allegations are sufficient, as pled, to give rise to a cognizable claim against McNally and to survive Defendants' motions.

Plaintiff alleges that McNally "in a completely illegal manner, and despite [his] recusal," approached a witness to be called during Plaintiff's second trial. Compl. ¶ 42. However, while Plaintiff claims that McNally's behavior was "illegal, false, fraudulent, and criminal" and made up part of his conspiracy with Smith "to falsely scapegoat prosecute the Plaintiff," id., he neither describes the content of the conversation that occurred between McNally and the witness nor provides any factual support tying that conversation to any alleged conspiracy. Similarly, the fact that McNally "met and consulted with [ ] McInerney about [Plaintiff's] case," id. ¶ 35, and referred McInerney to an attorney, id. ¶ 37, does not show that McNally engaged in a conspiracy with Smith to maliciously prosecute Plaintiff. Indeed, the Complaint fails to connect those interactions in any way to Smith's prosecution of Plaintiff, and its "conclusory, vague, [and] general allegations" are insufficient to plausibly show that McNally conspired with Smith to "deprive [Plaintiff] of his constitutional rights." Ciambriello, 292 F.3d at 325.

***9** Plaintiff's allegations that McNally met with Smith to "discuss[ Plaintiff's] case," Compl. ¶ 49, also fail to state a plausible conspiracy claim. "Mere communications between an individual and a prosecutor, without more concrete allegations of wrongdoing, are insufficient to state a malicious prosecution conspiracy claim." McDonough, 2016 WL 5717263, at *21. Therefore, while McNally's contact with Smith may not have been advisable "given the potential appearance of impropriety," such behavior "does not necessarily indicate a conspiratorial agreement." Id.

As a result, the Court concludes that Smith and McNally are entitled to absolute prosecutorial immunity against Plaintiff's malicious prosecution claims, and that McNally's alleged post-recusal actions do not give rise to a cognizable conspiracy claim. Plaintiff's claims against Smith and McNally in their individual capacities are therefore dismissed in their entirety.

*2. The Browns*

Plaintiff also brings claims for malicious prosecution against the Browns. He alleges that the Browns were "engaged in the political process by assisting the Working Class Party of the City Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16, and that they participated in the 2009 voter fraud scheme, id. ¶¶ 18, 20, 23, 25–27. The Complaint also alleges that John Brown was eventually convicted for his role in the scheme. Id. ¶ 45. However, the Complaint does not allege that the Browns initiated or played any role in the criminal investigation and proceedings against Plaintiff, or that they did so with malice. The fact that the Browns allegedly participated in the 2009 voter fraud scheme, id. ¶¶ 20, 23, 25–27, in no way suggests that they initiated the prosecution against Plaintiff.

Moreover, though Plaintiff alleges that the Browns acted under color of state law, Compl. ¶ 3, nothing in the Complaint indicates that the Browns were state actors or held any position in local government or law enforcement, compare id. ¶ 10 (alleging that Smith was the Special District Attorney for Rensselaer County and acted "in his capacity as an agent, servant, and/or employee of [Rensselaer]"), with id. ¶ 13 (alleging that John Brown "was a resident of the County of Rensselaer and State of New York"), ¶ 14 (alleging that Daniel Brown "was a resident of the County of Rensselaer and State of New York").[6] Therefore, Plaintiff's § 1983 malicious prosecution claim against the Browns must fail. See, e.g., Krug v. McNally, 488 F. Supp. 2d 198, 199 (N.D.N.Y. 2007) (Kahn, J.) ("It is also well settled that in order for a plaintiff to bring a § 1983 claim against a defendant, that defendant must be a State actor, acting under color of State law.") (citing Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997) ), aff'd, 368 F. App'x 269 (2d Cir. 2010).

***10** Plaintiff has similarly failed to allege a viable conspiracy claim against the Browns. In opposing the Brown Motion, Plaintiff argues that "there are a myriad of listed facts supporting the allegation of conspiracy," Dkt. No. 45-3 ("Brown Opposition") at 3, but he fails to provide specific citations to that effect. The Complaint does allege that Smith was aware of "a great deal of evidence against" the Browns, id. ¶ 31, that unspecified individuals entered a conspiracy "to hide and cover up" the misconduct of several Democratic operatives, including the Browns, id. ¶ 26, and that John Brown was eventually convicted for his role in the scheme, id. ¶¶ 43, 45. However, these allegations suggest only that Smith disregarded evidence against the Browns and attempted to conceal their wrongdoing; they do not support an inference that there was a conspiracy between the Browns and Smith (or anyone else, for that matter). Plaintiff does not allege that the Browns discussed the voter fraud investigation with Smith or anyone else, or that they encouraged Plaintiff's prosecution.

The Complaint also states as follows:

> [I]n support of this conspiracy and during the course of this investigation and administration of this case, Defendant Smith, upon information and belief, conspired with the other Defendants once the New York State Police had uncovered overwhelming evidence on their own of the guilt of Defendant McInerney of this forged, false and fraudulent absentee ballot applications and absentee ballots throughout the 2009 election and turn [sic] this overwhelming evidence over to [Rensselaer].

Compl. ¶ 35. Construed in the light most favorable to Plaintiff, that passage seems to indicate that Smith conspired with all of the other named defendants. However, it does not indicate what Smith and "the other Defendants" conspired to do, and does not suggest that they planned to violate Plaintiff's rights. Moreover, Plaintiff's allegation that the "actions and omissions of the Defendants, especially Defendant Smith, ... constituted a conspiracy to make him a scapegoat prosecution target to cover up and prevent the prosecution of the actual liable parties," id. ¶ 36, is too conclusory to support a § 1983 conspiracy claim. See, e.g., Ciambriello, 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." (citing Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992) ) ). In any event, the Browns' actions do not "constitute[ ] a conspiracy," Compl. ¶ 36, because they cannot be classified as overt acts undertaken in furtherance of any agreement.

Therefore, based on the foregoing analysis, the Court will dismiss Plaintiff's malicious prosecution and conspiracy claims as brought against the Browns.

*3. McInerney*

Plaintiff also brings claims against McInerney under § 1983 for malicious prosecution and conspiracy. Specifically, Plaintiff alleges that McInerney (1) was "engaged in the political process by assisting the Working Class Party of the City of Troy by passing petitions and absentee voting applications relevant to the election of 2009," Compl. ¶ 16; (2) participated in the 2009 voter fraud scheme, id. ¶¶ 18, 20, 23, 25–27; (3) told "other political party operatives in the [Rensselaer] Democratic Party ... [that, if prosecuted,] he was going to 'take everyone down with him,' " id. ¶ 19; (4) testified at Plaintiff's second trial, id. ¶ 43; and (5) "admitted to guilt for forgeries during the 2009 Working Families Party primary," id. ¶ 44, for which he was sentenced to community service and probation, id. ¶ 45. Plaintiff also alleges that McNally "met and consulted with" McInerney about the voter fraud investigation, id. ¶ 35, "referred" McInerney to an attorney, and "g[ave] him advice" "during the course of [this] consultation," id. ¶¶ 37, 49. Finally, the Complaint states that Smith told McInerney that he "would not be prosecuted despite the overwhelming evidence against [him]." Id. ¶ 49.

***11** To the extent Plaintiff bases his claims on McInerney's trial testimony, McInerney enjoys absolute immunity from suit. San Filippo v. U.S. Tr. Co. of N.Y., 737 F.2d 246, 254 (2d Cir. 1984) ("[I]t is settled under Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), that a witness has absolute immunity from § 1983 liability based on the substance of his trial testimony."). A witness's immunity "may not be circumvented by claiming that [the] witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." Rehberg, 566 U.S. at 369. "Were it otherwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.' " Id. (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part) ). In any event, Plaintiff does not allege that McInerney provided false testimony or agreed to do so. His claims appear to be premised on the mere fact that McInerney was guilty of voter fraud and testified against Plaintiff. Even if true, these facts do not support a claim for malicious prosecution or conspiracy.

Furthermore, Plaintiff's allegation that a witness met with a prosecutor is not enough to support a claim of conspiracy. There is "nothing suspicious or improper in" meetings between prosecutors and witnesses. Scotto v. Almenas, 143 F.3d 105, 115 (2d Cir. 1998) (quoting San Filippo, 737 F.2d at 256). The "mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them." Id. (alteration in original) (quoting San Filippo, 737 F.2d at 256).

Finally, Plaintiff alleges that, as part of the conspiracy, unidentified individuals "utilized ... false, fraudulent and coerced evidence, uncovered through the investigation and administration of this voter fraud case" against him to "hide and cover up the clearly guilty activities of ... Democratic operatives, including [McInerney and the Browns]." Compl. ¶ 23. However, it is unclear what "false, fraudulent and coerced evidence" Plaintiff is referring to or who "utilized" that evidence against him. The Complaint does not allege that McInerney was involved in gathering, fabricating, or presenting any "false" evidence, nor that he was aware that prosecutors utilized improper methods to protect him at Plaintiff's expense. The fact that Smith decided to prosecute Plaintiff instead of McInerney does not suggest that McInerney encouraged or had any role in the prosecution.

Plaintiff's malicious prosecution and conspiracy claims against McInerney are therefore dismissed.

*4. Ogden*

Plaintiff's malicious prosecution and conspiracy claims against Ogden, who at all relevant times worked as an investigator for the New York State Police, Compl. ¶ 15, appear to be based on his role in investigating the voter fraud scheme. While the Complaint makes several references to the "investigating officers behind the prosecution working ... at the behest of [Smith]," Compl. ¶ 27, it does not identify who these officers are or explicitly allege that Ogden investigated Plaintiff. However, because the Court must make all reasonable inferences in Plaintiff's favor in deciding a motion to dismiss, it will assume for the purposes of deciding the Ogden Motion that Ogden was one of the officers involved in the investigation.

To support his malicious prosecution and conspiracy claims, Plaintiff alleges that Ogden "uncovered no evidence of the guilt of [Plaintiff] in any forgery or fraud as to absentee voting applications and ballots, or anything else except clearly phony, baseless and contrived handwriting conclusions, based

upon the evidence procured during the investigation and administration of this case." Compl. ¶ 29. The Court construes that language as alleging that the only evidence Ogden found implicating Plaintiff was obviously fabricated. In addition, Plaintiff alleges in the Complaint that Ogden (1) "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided ... the prosecution false witness testimony statements to try to pin guilt on" Plaintiff, id.; (2) "forged[ ] and falsely created" affidavits "from witnesses who never signed nor read the affidavits ... for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of Democratic operatives, including" McInerney and the Browns, id. ¶ 30; and (3) provided "false, coerced, forged and fictitious evidence to [Smith] ... as part of the conspiracy ... to prosecute" Plaintiff, id. ¶ 39.

***12** As Ogden correctly notes, Ogden Mem. at 11, he is entitled to Eleventh Amendment immunity to the extent Plaintiff seeks money damages against him in his official capacity as a New York State Trooper, see, e.g., Kostok v. Thomas, 105 F.3d 65, 69 (2d Cir. 1997) ("Although the Eleventh Amendment does not altogether bar suits against states, the range of available remedies is narrow. Any claim for retroactive monetary relief, under any name, is barred." (collecting cases) ). Because Plaintiff seeks only compensatory damages and has not requested declaratory or injunctive relief, his official capacity claims against Ogden are therefore barred by the Eleventh Amendment.

To the extent that Plaintiff brings a malicious prosecution claim against Ogden in his individual capacity, Ogden argues that such a claim should be dismissed because, "[w]hile [Plaintiff] alleges that the 'Defendants prosecuted [him] maliciously,' nothing is offered to explain how Trooper Ogden was involved" in the prosecution. Ogden Mem. at 7. Ogden describes Plaintiff's allegations regarding the falsification of evidence as "[b]ald assertions devoid of any factual particularity," because the Complaint includes no "factual allegations as to what" Ogden "supposedly falsified." Id.

Plaintiff did not respond to Ogden's argument or contend that the Complaint alleges with sufficient particularity what evidence Ogden allegedly fabricated. See Dkt. No. 59-1 ("Ogden Opposition") at 11–12 (discussing Plaintiff's malicious prosecution claim). Instead, Plaintiff simply recites the standard for alleging a malicious prosecution claim several times, then argues that he has stated a claim because the Complaint alleges that "Ogden did not take any steps to discontinue the prosecution after learning that there was absolutely no probable cause that existed, which he clearly had a duty, at least in part, to do." Id. at 12.

The Court agrees with Ogden that Plaintiff has failed to state a claim for malicious prosecution against him. A police officer "initiates" a prosecution when he swears to and signs a criminal complaint. Burt v. Aleman, No. 05-CV-4493, 2008 WL 1927371, at *5 (E.D.N.Y. Apr. 30, 2008) (citing Cox v. Cty. of Suffolk, 827 F. Supp. 935, 938 (E.D.N.Y. 1993) ). The Complaint alleges that Ogden fabricated evidence against Plaintiff and lacked probable cause to prosecute him, but it does not allege that he signed a criminal complaint or otherwise initiated the prosecution. On the contrary, Plaintiff alleges that Smith initiated the prosecution. Compl. ¶¶ 24, 49. "Once control of a prosecution has passed to a prosecuting attorney, a police officer may only be liable for 'continuing' the prosecution if he or she '[insists] upon or [urges] further prosecution.' " Burt, 2008 WL 1927371, at *5 (alterations in original) (quoting Dirienzo v. United States, 690 F. Supp. 1149, 1158 (D. Conn. 1988) ). Plaintiff makes no such allegation, and the Complaint makes clear that Smith, not Ogden, controlled the investigation and prosecution. E.g., Compl. ¶¶ 24–36, 49. Therefore, because he has failed to allege that Ogden initiated or continued the prosecution against him, Plaintiff's malicious prosecution claim fails.

Ogden argues that the conspiracy claim should also be dismissed, because the Complaint contains "no allegation that [he] entered into any agreement with the named Defendants and against [Plaintiff's] purported interests." Ogden Mem. at 5. He further argues that Plaintiff's "bald assertion that affidavits were forged or falsified during the criminal investigation" is too vague and general because Plaintiff fails "to provide some factual allegations as to what was supposedly falsified by" Ogden. Id. at 7. In response, Plaintiff contends that he "can sufficiently establish a claim for conspiracy by setting forth ten separate interactions between defendants Smith, McInerney, McNally, J. Brown, and D. Brown, especially if and when Trooper Ogden is himself involved." Ogden Opp'n at 10. He also claims that he "does not need to address specific factual allegations as to the manner in which Trooper Ogden was involved as long as it can be established that he may have been circumstantially involved." Id.

***13** As already noted above, at the motion to dismiss stage, "complaints containing only conclusory, vague, or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ciambriello, 292 F.3d at 325 (quoting Dwares, 985 F.2d at 100). A plaintiff must "make an effort to provide some details of time and place and the alleged effect of the conspiracy." Dwares, 985 F.2d at 100 (quotation omitted). He meets this burden by alleging "facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights." Green v. McLaughlin, 480 F. App'x 44, 46 (2d Cir. 2012) (citing Iqbal, 556 U.S. at 680–81). While "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [ ] the pleadings must present facts tending to show agreement and concerted action." Dunlop v. City of New York, No. 06-CV-433, 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008) (alterations in original) (quoting McIntyre v. Longwood Cent. Sch. Dist, No. 07-CV-1337, 2008 WL 850263, at *11 (E.D.N.Y. Mar. 27, 2008) ).

Plaintiff has failed to meet this standard with respect to Ogden. The Complaint contains few specific factual allegations regarding Ogden's conduct, and largely "mashes together vague allegations, not parsed out as to each defendant, in the hopes that it will give rise to a conspiracy claim; it does not." Sanchez v. Hoosac Bank, No. 12-CV-8455, 2014 WL 1326031, at *7 (S.D.N.Y. Mar. 31, 2014). While a "general allegation of conspiracy" can state a plausible claim if "amplified by specific instances of conduct," Hernandez, 312 F. Supp. 2d at 546, Plaintiff's allegations contain no such amplification. He alleges that Ogden "uncovered ... clearly phony, baseless and contrived handwriting conclusions," Compl. ¶ 29, "fraudulently, falsely and maliciously procured an obviously false and defective handwriting expert and uncovered and prepared and provided t [sic] the prosecution false witness testimony statements," id., and "forged, and falsely created" affidavits "from witnesses who never signed nor read the affidavits ... for the sole purpose of prosecuting [Plaintiff] to cover up the obvious guilt of [other] Democratic operatives," id. ¶ 39. These allegations do not specify what the false "handwriting conclusions" were, why they were "phony," what was untrue about the handwriting expert's statements, who provided false testimony (and what made it false), what forged affidavits were presented, who the affidavits were purportedly from, or what facts were misstated. Nor can the Complaint's deficiencies be blamed on a lack of knowledge on Plaintiff's part. Given that the allegedly falsified evidence would have been submitted at one of Plaintiff's two criminal trials—or, at the very least, disclosed to Plaintiff's attorney—the Court can assume that Plaintiff had access to it.

As a result, because Plaintiff has failed to specifically plead that Ogden entered an agreement to violate Plaintiff's rights or to describe any specific instances of misconduct sufficient to support an inference of agreement, Plaintiff's conspiracy claim against Ogden is dismissed. See, Dunlop, 2008 WL 1970002, at *3–7 (dismissing a conspiracy claim premised on the defendants' alleged agreement to " 'alter, fabricate, and manufacture' false evidence to be used against the plaintiff" because the allegations lacked "sufficient factual details" to state a plausible claim of conspiracy); Brown v. Seniuk, No. 01-CV-1248, 2002 WL 32096576, at *4 (E.D.N.Y. Mar. 25, 2002) (holding that allegations that a prosecutor and police officer conspired "to obtain a conviction at any cost" by "making false statements and falsifying reports, presenting false evidence, giving hearsay testimony" was conclusory and "lack[ed] specific facts that show an agreement among the alleged co-conspirators or that the [i]ndividual [d]efendants acted with a shared purpose or common design").

**B. Negligent Investigation Claim**

***14** Plaintiff's second claim appears to be for negligent investigation. Compl. ¶ 57. In support of this claim, he alleges that "Defendants maliciously, intentionally and willfully failed to properly, appropriately and sufficiently examine the evidence and investigate the facts which they alleged to have supported [his] indictment and prosecution." Id. ¶ 58. Ogden argues that this claim should be dismissed because negligent investigation "is not a recognized cause of action." Ogden Mem. at 6 (citing Pawlicki v. City of Ithaca, 993 F. Supp. 140, 143 (N.D.N.Y. 1998) ). Plaintiff concedes "that a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate care in effecting an arrest," but contends that "those negligence claims can survive if couched in terms of malicious prosecution and false imprisonment, which the claims asserted in [the] [C]omplaint are." Ogden Opp'n at 10.

First, the Court is unaware of any court recognizing a § 1983 negligent investigation claim, and therefore agrees with Ogden that such a claim does not exist. See Pawlicki, 993 F. Supp. at 143 ("Where the negligence alleged is based upon an arrest, a plaintiff must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence.").

As to the arguments raised by Plaintiff in his Ogden Opposition, the Court finds that framing Plaintiff's negligence claim as a malicious prosecution claim would make it duplicative of Plaintiff's third cause of action. Repackaging it as a false imprisonment claim, on the other hand, is not warranted based on the facts alleged in the Complaint and, in any event, would work undue prejudice on Defendants. No defendant has interpreted the Complaint to include a false arrest claim, and the Court agrees that Plaintiff has not pled a claim for false arrest. See also Suppl. Opp'n at 2 (noting that Defendants "have been able to identify each of the claims set forth by [Plaintiff], reflecting fair notice of the allegations the Complaint asserts"). Plaintiff's negligent investigation claims are therefore dismissed.

**C. Abuse of Process Claim**

Plaintiff's third claim is for malicious abuse of process in violation of the Fourteenth Amendment. Compl. ¶¶ 63–69. "[A]buse of criminal process is actionable under § 1983 as a denial of procedural due process." Sullivan v. LaPlante, No. 03-CV-359, 2005 WL 1972555, at *3 (N.D.N.Y. Aug. 16, 2005) (citing Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994) ). The Court "turn[s] to state law to find the elements of the malicious abuse of process claim." Cook, 41 F.3d at 80. "In New York, 'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quoting Cook, 41 F.3d at 80).

The third element of an abuse of process claim—alleging a "collateral objective"—is where many pleadings fall short. The New York Court of Appeals has explained that "[a] malicious motive alone ... does not give rise to a cause of action for abuse of process." Curiano v. Suozzi, 469 N.E.2d 1324, 1326–27 (N.Y. 1984). "Accordingly, to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino, 331 F.3d at 77.

In Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc., Local 1889 AFT AFL-CIO, 343 N.E.2d 278 (N.Y. 1975), the New York Court of Appeals discussed the characteristics of collateral objectives that will support an abuse of process claim. Id. at 283–84. It explained that "[w]here process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party." Id. at 283. "Typical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution." Hoffman v. Town of Southampton, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), aff'd, 523 F. App'x 770 (2d Cir. 2013); see also Richardson v. N.Y.C. Health and Hosps. Corp., No. 05-CV-6278, 2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009) ("[T]he collateral objectives typically associated with abuse of criminal process are extortion, blackmail or retribution; and those objectives are usually characterized by personal animus." (alteration in original) (quoting Jovanovic v. City of New York, No. 04-CV-8437, 2006 WL 2411541, at *12 n.4 (S.D.N.Y. Aug. 17, 2006) ) ).

***15** Likewise, in Del Col v. Rice, No. 11-CV-5138, 2012 WL 6589839 (E.D.N.Y. Dec. 18, 2012), the plaintiffs properly pled a claim for abuse of process by alleging that the defendants had "started the legal process not only to have [the p]laintiffs wrongfully arrested, which is an improper motive, but also to gain control of [one plaintiff's] claim to [a disputed] patent without properly compensating [him], which is an improper collateral purpose." Id. at *10. The subtle motive-purpose distinction referred to by the Del Col court forms a fundamental pillar of the caselaw in this area. It is widely accepted that "[i]mproper motives in using [a] process do not, without more, constitute a collateral objective, provided the process itself is used for its legitimate purpose.... Abuse, therefore, lies not in the synthesis of proper purpose and suspect motive. Improper motive is only abuse when joined with improper purpose." Chamberlain v. Lishansky, 970 F. Supp. 118, 122 (N.D.N.Y. 1997) (citation omitted); see also Knox v. Cty. of Ulster, No. 11-CV-112, 2013 WL 286282, at *5 (N.D.N.Y. Jan. 24, 2013) ("Where a defendant's objective in initiating an arrest is to prevail on a criminal prosecution, the plaintiff will not prevail on a claim for abuse of process."); Hoffman, 893 F. Supp. 2d at 448 (dismissing an abuse of process claim because the plaintiffs "failed to allege that defendants had a collateral purpose beyond pursuing, and prevailing in, [the] plaintiffs' criminal prosecution"). Thus, the Del Col defendants possessed a collateral objective in violation of the Fourteenth Amendment because the *purpose* of the indictment and arrest they implemented "was to

invalidate [the plaintiff's] claim to the patent." Del Col, 2012 WL 6589838, at *10.

Plaintiff alleges that he was criminally prosecuted "for the intentional purpose of covering up the criminal liability" of others, including McInerney, the Browns, "and other Democratic operatives." Compl. ¶¶ 64–65. He argues that this allegation satisfies the collateral objective requirement. Smith Opp'n at 9. However, courts in this Circuit have concluded that allegations that defendants pursued a prosecution in order to "cover up" their own misconduct or protect other bad actors does not satisfy the collateral objective requirement. E.g., Gilliard v. City of New York, No. 10-CV-5187, 2013 WL 521529, at *14 (E.D.N.Y. Feb. 11, 2013) ("At most, Defendants issued the summons with the improver *motive* of 'cover[ing] up their abuse of authority in arresting plaintiff.' " (alteration in original) ); Crews v. Cty. of Nassau, No. 06-CV-2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute Crews, the abuse of process claim fails."); see also Cabisca v. City of Rochester, No. 14-CV-6485, 2017 WL 4221090, at *6 (W.D.N.Y. Sept. 21, 2017) (rejecting abuse of process claim premised on the allegation that the defendants commenced a prosecution "to provide some lame excuse for committing their outrageous actions ... [that] they could not defend in any manner without concocting an offense and crime with which to charge the plaintiff"). As the Second Circuit has explained, " 'the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process' where 'the process was both issued and used for its intended purpose.' " Silver v. Kuehbeck, 217 F. App'x 18, 21 (2d Cir. 2007) (quoting Butler v. Ratner, 619 N.Y.S.2d 871, 873 (App. Div. 1994) ).

In light of these cases, the Court concludes that Plaintiff has alleged that Defendants acted with an improper motive in prosecuting him, but he has not pled that they had an improper purpose. Therefore, his § 1983 abuse of process claim fails and is subject to dismissal.

**D. Stigma-Plus Defamation Claim**

Plaintiff's fourth claim is for defamation in violation of the Fourteenth Amendment. Compl. ¶¶ 70–78. The Fourteenth Amendment's Due Process Clause prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. It is well settled that "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause to create a cause of action under § 1983." Patterson v. City of Utica, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing Paul v. Davis, 424 U.S. 693, 701 (1976) ). "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Id. at 330 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 572–73 (1972) ). Such an action is generally referred to as a "stigma-plus" claim, and involves "injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citing Paul v. Davis, 424 U.S. 693, 701–02, 711–12 (1976) ).

***16** Plaintiff alleges that Defendants defamed him by subjecting him to a baseless prosecution, causing his "reputation in the community [to be] destroyed and permanently harmed." Compl. ¶ 73. As a result of Defendants' defamatory statements, Plaintiff's business, "a very successful restaurant in Troy, lost hundreds of thousands of dollars in profits, and is currently under great risk of failure." Id. ¶ 74. However, the Complaint does not allege what the defamatory statements were or who made them, nor does it point to any deprivation of a tangible (i.e., non-speculative) right or property interest.

The Second Circuit has held that " 'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) (alteration in original) (quoting Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994) ). The plaintiffs in Sadallah alleged that the defendants' acts caused "damage not only to their business reputation, but [also the deprivation] of the good will in their business" and "served to discourage customers from availing themselves of the [p]laintiffs' facility." Id. at 38–39 (first alteration in original). The court concluded that allegations of lost income and business reputation did not amount to "the additional state-imposed burden necessary for invoking the 'stigma plus' doctrine." Id. at 38. Such harms, the court explained, "are not 'in addition to' the alleged defamation, but rather are direct 'deleterious effects' of that defamation." Id. (citations omitted).

Like the plaintiff in Sadallah, Plaintiff's stigma-plus claim fails because he has failed to allege a deprivation of tangible liberty interest or property right tied to Defendants' alleged defamatory statements. He is correct that "[a]ll ... [he] need show here [to survive dismissal] is some allegation of credible evidence of deprivation of a liberty interest and defamation." Smith Opp'n at 10. But Plaintiff's allegation that his business suffered lost profits as a result of Defendants' acts and statements, Compl. ¶¶ 72–74, "does not satisfy the separate and independent 'plus' prong of the 'stigma plus' test," Sadallah, 383 F.3d at 39. Therefore, his § 1983 defamation claim fails and is dismissed.

**E. Obstruction of Criminal Investigation Claim**

Plaintiff's fifth claim, that Defendants violated 18 U.S.C. § 1510 by "intentionally obstructing a criminal investigation to scapegoat prosecute [sic] the Plaintiff and to cover up the criminal activities of the Defendants[ ] and others," Compl. ¶ 80, suffers from several deficiencies.

First, § 1510 only proscribes interference with *federal* criminal investigations. See § 1510 (imposing criminal liability for "[w]hoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States"); see also United States v. Abrams, 543 F. Supp. 1184, 1187 (S.D.N.Y. 1982) ("To prove a violation of 18 U.S.C. § 1510, the government must prove beyond a reasonable doubt that [ ] the defendant wilfully endeavored by one of the means set forth in the statute to prevent the communication of information *relating to a violation of the federal criminal laws.*" (emphasis added) (citing United States v. San Martin, 515 F.2d 317, 320 (5th Cir. 1975) ) ). Because Plaintiff alleges that Defendants obstructed a state investigation, they could not possibly have violated § 1510.

Second, there is no indication that § 1510 creates an individual right that can be enforced through § 1983. The Supreme Court has "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). To determine whether a statutory violation can be enforced through § 1983, a court "must first determine whether Congress *intended to create a federal right.*" Id. " '[T]he question whether Congress ... intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.' " Id. at 283–84 (second and third alterations in original) (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979) ). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.' " Id. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692, n.13 (1979) ).

***17** The Court concludes that § 1510 confers no individual rights that may be enforced through § 1983. Section 1510 "was designed to deter the coercion of potential witnesses by the subjects of federal criminal investigations prior to the initiation of judicial proceedings." United States v. San Martin, 515 F.2d 317, 320 (5th Cir. 1975) (quoting United States v. Cameron, 460 F.2d 1394, 1401 (5th Cir. 1972) ). Even if the provision created a federal right for witnesses and government informants to be protected from coercion by targets of federal investigations, there is no indication that § 1510 creates any rights for the targets themselves. Moreover, criminal provisions generally do not create private rights. See, e.g., Weinstein v. City of New York, No. 13-CV-6301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr. 8, 2014) ("[T]he Title 18 violations referenced in the Complaint are not actionable. Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action." (citing Cort v. Ash, 422 U.S. 66, 79–80 (1975) ) ), aff'd, 622 F. App'x 45 (2d Cir. 2015); Bender v. City of New York, No. 09-CV-3286, 2011 WL 4344203, at *2 (S.D.N.Y. Sept. 14, 2011) (concluding that 18 U.S.C. § 1512 and other federal criminal provisions did not create any private right of action). Plaintiff makes no effort to challenge this conclusion and has not identified any caselaw in support of his contention that he may bring a § 1983 action premised on an alleged § 1510 violation.

Therefore, for the reasons set forth above, Plaintiff's cause of action for obstruction of criminal investigation fails to state a claim and is dismissed.

**F. RICO Claims**

Plaintiff's sixth claim is for RICO violations and RICO conspiracy. Compl. ¶¶ 88–100.[7] "[T]o establish a violation of [RICO], a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). " 'Racketeering activity' is broadly defined to encompass a variety of state and federal offenses including,

inter alia, murder, kidnapping, gambling, arson, robbery, bribery and extortion." Id. (citing § 1961(1) ).

The Complaint purports to allege several predicate acts of racketeering, including the "criminal investigation le[a]ding to prosecution of [Plaintiff]'s federal and civil rights, obstruction of justice, ... fabrication of false testimony, ... fabricating and presenting false evidence and judicial proceedings against [Plaintiff]," and otherwise "aiding the Defendants to avoid prosecution and scapegoat" Plaintiff. Compl. ¶ 90. These allegations generally target the same underlying conduct: Defendants' purported conspiracy to target and criminally prosecute Plaintiff.

As a general matter, "[c]ivil rights violations and injury to reputation do not fall within the statutory definition of 'racketeering activity.' " Bowen v. Oistead, 125 F.3d 800, 806 (9th Cir. 1997) (dismissing RICO claims where the plaintiff alleged a "criminal conspiracy to deprive [him] of his civil rights and to injure his reputation and standing in the community"). Courts have consistently rejected attempts to repackage claims premised on malicious prosecution and fabrication of evidence as RICO claims. See, e.g., Hall v. Tressic, 381 F. Supp. 2d 101, 111 (N.D.N.Y. 2005) ("Malicious prosecution is not considered a predicate act for RICO purposes."); Gee Chan Choi v. Jeong-Wha Kim, No. 04-CV-4693, 2006 WL 3535931, at *9 (E.D.N.Y. Dec. 7, 2006) (dismissing RICO claim because "the indictment and trial were the result of the alleged malicious prosecution by defendants, which is clearly non-RICO conduct"); see also Gamboa v. Velez, 457 F.3d 703, 710 (7th Cir. 2006) ("RICO demands more than a straightforward case of malicious prosecution (such as the case before us) to open up its window to treble damages."); Streck v. Peters, 855 F. Supp. 1156, 1162 (D. Haw. 1994) (concluding that perjury in federal court may qualify as a RICO predicate act, but perjury in state court does not). Therefore, Plaintiff's allegations that Defendants illegally targeted him for criminal prosecution and frustrated the administration of justice to protect their political allies does not amount to racketeering activity under § 1961.

***18** Plaintiff's argument that Defendants engaged in "predicate acts of fraud," Brown Opp'n at 6; McNally Opp'n at 7–8, does not save his RICO claim. He asserts that Defendants "fraudulently attempted to avoid their [own] prosecution for obvious multiple criminal acts and allowed the acts to be placed at the feet of [Plaintiff] who was their scapegoat prosecution target for their own gain." Brown Opp'n at 6; McNally Opp'n at 8. However, "fraudulent prosecution" is not the sort of "fraud" targeted by RICO, and does not constitute "racketeering activity" as defined by § 1961. See § 1961(1) (defining "racketeering activity" to include certain state law crimes and enumerated federal offenses). [8]

As a result, Plaintiff's RICO claim fails and is dismissed. [9] And, because Plaintiff has failed to allege a viable RICO claim, his RICO conspiracy claim must also be dismissed. See Citadel Mgmt., Inc. v. Telesis Tr., Inc., 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) ("[A] RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met." (citing Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1062–63 (2d Cir. 1996) ) ).

### G. Claims Against Rensselaer

#### *1. Monell Claim*

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691. To establish municipal liability under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690–91). First, a plaintiff may establish the existence of a municipal policy or custom by showing

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.

McLennon v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). Thus, a plaintiff " 'need not identify an express rule or regulation,' but can show that 'a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.' " Littlejohn v. City of New York, 795 F.3d 297, 314–15 (2d Cir. 2015) (quoting Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) ). "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

***19** "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.' " McLennon, 171 F. Supp. 3d at 94 (quoting Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015) ). "To survive a motion to dismiss a municipal liability claim, 'a plaintiff must allege facts tending to support, at least circumstantially, an inference that ... a municipal policy or custom exists.' " Id. at 95 (quoting Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) ).

Plaintiff raises four arguments in support of his Monell claims. First, he contends that he has adequately alleged the existence of a municipal policy because McNally and Smith's conduct in investigating and prosecuting Plaintiff and non-party Edward McDonough for voter fraud "reflects a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n at 6. However, the fact that Plaintiff can only point to two allegedly unlawful prosecutions—his own and McDonough's, id. at 5–6—undermines his claims of widespread, systemic wrongdoing and fails to support an inference that Rensselaer had a policy or practice of wrongfully prosecuting criminal defendants. See, e.g., Jones, 691 F.3d at 85 (concluding that evidence of two or three instances in which police officers "abused the rights of black people" fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities"); Giaccio v. City of New York, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding such "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted) ); McLennon, 171 F. Supp. 3d at 96 (concluding that six allegations of unlawful searches and seizures was not "so widespread as to constitute a municipal custom"); Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that thirteen instances of similar excessive force allegations over a four year period failed to plausibly allege a widespread practice).

Second, Plaintiff argues that, as municipal policymakers, McNally's and Smith's actions while investigating and prosecuting Plaintiff constitute municipal policy and "reflect[ ] a pattern of unlawful practices of systemic and ongoing unconstitutional violations." Rensselaer Opp'n at 6; Compl. ¶¶ 38, 85. However, as explained earlier, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988), cert. denied, 488 U.S. 1014 (1989). Thus, "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." Walker v. City of New York, 974 F.2d 293, 301 (2d Cir. 1992) (citing Baez, 853 F.2d at 77).

That said, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." Id. Plaintiff argues that Smith was a county policymaker because he "had authority to supervise the investigation of [Plaintiff] and direct the conduct of other defendants." Rensselaer Opp'n at 6. He also states somewhat vaguely that "Smith's conduct went beyond 'typical prosecutor activities like negotiating pleas, scheduling hearings, and filing affirmation in support or writs.' " Id. (citing Peterson v. Tomaselli, 469 F. Supp. 146 (S.D.N.Y. 2007) ). But a prosecutor only acts as a "manager" for the purpose of Monell liability when (s)he performs administrative acts "such as 'workplace hiring, payroll administration, the maintenance of physical facilities, and the like.' " Jones v. City of New York, 988 F. Supp. 2d 305, 316–17 (E.D.N.Y. 2013) (quoting Van de Kamp v. Goldstein, 555 U.S. 335, 344 (2009) ). Contrary to Plaintiff's contention, Rensselaer Opp'n at 6, a district attorney is not a "manager" for purposes of municipal liability simply because he supervises an investigation or oversees the acts of others involved in a prosecution. See, e.g., Jones, 988 F. Supp. 2d at 317 (noting that "[t]asks directly connected with the

prosecutor's basic trial advocacy and prosecutorial duties—including Brady decisions—should under Van de Kamp be treated as 'prosecutorial conduct' " and concluding that "the training of ADAs in the proper disclosure of exculpatory DNA evidence [because it] is inextricably connected with prosecution of criminal cases"); see also Van de Kamp, 555 U.S. at 344 (explaining that "prosecutorial conduct" includes those tasks that "require legal knowledge and the exercise of related discretion"). At its core, the Complaint challenges the way in which McNally and Smith prosecuted Plaintiff and chose not to prosecute other individuals he claims were involved in the voter fraud scheme. Because this is prosecutorial conduct, McNally and Smith were not acting as county policymakers, and Rensselaer is not liable for their actions.

***20** Third, Plaintiff makes numerous references in the Complaint to Rensselaer's "policy of action and omission," id. ¶ 38, and "long standing unofficial policy of malfeasance," id. ¶ 85, which allegedly resulted in the criminal prosecution of innocent parties. "However, 'policy' is not a magic word. Simply saying it does not make it so." Zherka v. City of New York, N.Y., No. 08-CV-9005, 2010 WL 4537072, at *3 (S.D.N.Y. Nov. 9, 2010), aff'd, 459 F. App'x 10 (2d Cir. 2012). And the Complaint does not contain "sufficient factual matter" to plausibly suggest that Rensselaer had a policy of violating criminal defendants' rights, whether by fabricating evidence, covering up misconduct, or prosecuting individuals it knew to be innocent. Iqbal, 556 U.S. at 677; see also Zherka, 2010 WL 4537072, at *3 (dismissing claims for municipal liability because the complaint—which stated that the defendant city had "ethnically profil[ed]" the plaintiff and "opened a phony investigative file on [him]"—"fail[ed] to proffer any factual support that would allow the Court to deem the allegations conceivable, let alone plausible").

Though not clearly articulated, a liberal reading of the Complaint suggests that Plaintiff may also be seeking to establish a municipal liability claim under a fourth theory —on the basis that Rensselaer failed to adequately train its prosecutors. See Compl. ¶ 85 (alleging that Rensselaer's acts "amounted to establishing, promoting and allowing a long standing unofficial policy of malfeasance by the Defendant County officials in, among other things, failing to ... instruct and regulate against it"). As noted above, failure to train or supervise municipal agents can support a claim for municipal liability. E.g., McLennon, 171 F. Supp. 3d at 94. But "where ... [a municipality] has a training program, a plaintiff must ... 'identify a specific deficiency in the ... training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation.' " Wray, 490 F.3d at 196 (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir. 2004) ). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." Okin v. Vill. of Cornwall–On–Hudson Police Dep't, 577 F.3d 415, 440–41 (2d Cir. 2009) (quoting Canton, 489 U.S. at 390–91).

The Complaint does not satisfy this standard. In it, Plaintiff does not state whether Rensselaer provides any training program to its prosecutors, and, if it does, how that training was inadequate and "closely related to [his] injury, such that it actually caused the constitutional deprivation." Wray, 490 F.3d at 196 (quotation marks omitted). He alleges only that McNally and Smith violated his rights and, therefore, Rensselear must have failed to offer proper instruction to prevent the violation. Such an allegation cannot support municipal liability under § 1983; to hold otherwise would be to effectively impose respondeat superior liability on municipalities in direct contravention of the guidance offered in Monell.

Accordingly, Plaintiff's Monell claims against Rensselaer will be dismissed in their entirety.

*2. Remaining Claims Against Rensselaer*

Plaintiff also alleges that Rensselaer "had direct and vicarious liability for ... [the] actions and omissions of all of the other Defendants." Compl. ¶ 9; see also id. ¶ 22 ("Throughout these activities of commission and omission, Defendants Smith and McNally acted in the scope of his [sic] employment as an employee of, and District Attorney of the Defendant County who, as a matter of law, was directly and vicariously liable for his [sic] actions of commission and omission."). However, it is well-established that "vicarious liability is inapplicable to ... [section] 1983 suits." De Ratafia v. Cty. of Columbia, No. 13-CV-174, 2013 WL 5423871, at *8 (N.D.N.Y. Sept. 26, 2013) (alterations in original) (quoting Iqbal, 556 U.S. at 676). Therefore, to the extent Plaintiff seeks to hold Rensselaer vicariously liable for the conduct of its municipal officials, his claims are not cognizable under § 1983 and must be dismissed.

### H. Sanctions Motion

***21** The Browns have also moved for sanctions against Plaintiff and his former attorney, Dwyer, pursuant to Rule 11(c) of the Federal Rules of Civil Procedure. Sanctions Mot.

Pursuant to Rule 11(b), when an attorney or unrepresented party submits papers to a court, (s)he "certifies that to the best of [his/her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" (1) the submission "is not being presented for any improper purpose," such as harassment or "unnecessary delay," (2) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and (3) the factual contentions "have evidentiary support or, ... will likely have evidentiary support after a reasonable opportunity" for discovery. If a "court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). However, a court may not impose monetary sanctions "against a represented party for violating Rule 11(b)(2)," which concerns the legal claims and defenses asserted. Fed. R. Civ. P. 11(c)(5)(A).

Rule 11 "is targeted at situations 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.' " Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting Associated Indem. Corp. v. Fairchild Indus., 961 F.2d 32, 34 (2d Cir. 1992) ). "When divining the point at which an argument turns from merely losing to losing and sanctionable," the Second Circuit has "instructed district courts to resolve all doubts in favor of the signer." Id. (quoting Associated Indem., 961 F.2d at 34–35). "Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion." Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

The Browns argue that sanctions are warranted here because Plaintiff's "[c]ounsel failed to conduct a reasonable inquiry into the validity of the legal claims asserted against Defendants, and their likelihood of success, as well as to the underlying factual and legal contentions upon which [Plaintiff's] claims were based." Sanctions Mem. at 1. They describe the Complaint as "a classic example of frivolous litigation sanctionable under Rule 11." Id. at 12. However, while the Browns seek sanctions against both Plaintiff and Dwyer, their arguments focus exclusively on the attorney's conduct. See id. ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the facts to support the allegations asserted in the Complaint."); id. at 13 ("Plaintiff's Counsel breached his Rule 11 obligations by failing to conduct a reasonable inquiry into the law to support the claims asserted in the Complaint."). Because the Browns have not identified any acts by Plaintiff that they believe are sanctionable, it would be improper to award sanctions against him.

***22** As to the sanctions requested against Dwyer, the Court finds that, though the Complaint fails to allege sufficient facts to state a claim against the Browns and several of Plaintiff's claims are not legally cognizable, sanctions are not warranted in this case. In light of the Court's duty to resolve "any and all doubts" in the favor of the party opposing Rule 11 sanctions, Rodick, 1 F.3d at 1350, the Court concludes that there was "some arguable basis for" commencing this action, Perez v. Posse Comitatus, 373 F.3d 321, 326 (2d Cir. 2004). The Sanctions Motion is therefore denied.

### I. Leave to Amend

During the August 2018 Conference, Plaintiff's counsel requested that, should the Court decide to grant Defendants' motions to dismiss, Plaintiff be granted an opportunity to "refile [his] papers." Aug. 2018 Conference Tr. at 3. Smith's counsel objected to the request. Id. at 4. In the weeks following the August 2018 Conference, however, neither Plaintiff nor Defendants submitted any filings regarding Plaintiff's request.

Rule 15 of the Federal Rules of Civil Procedure commands that "[t]he court should freely give leave [to amend] when justice so requires." Therefore, when a complaint is dismissed for the first time pursuant to Rules 12(b)(6) or 12(c), leave to amend before reviewing the proposed amended pleading should typically be withheld only if amendment would be futile—namely, if it is clear from the facts alleged that the

events in question cannot give rise to liability and would not withstand a subsequent motion to dismiss. Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("As a matter of procedure, when a complaint is dismissed pursuant to Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint, that request should ordinarily be granted." (citations omitted) ); see also In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016) (discussing affirmance of dismissal without leave to amend due to futility); Orchard Hill Master Fund Ltd. v. SBA Commc'ns. Corp., 830 F.3d 152, 156 (2d Cir. 2016) (noting that denial of leave to amend on futility grounds is subject to de novo review); Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 191 (2d Cir. 2015) (holding that, by not allowing plaintiffs to submit a new pleading attempting to correct any deficiencies, the district court "violated the liberal spirit of Rule 15" (quoting Williams v. Citigroup, Inc., 659 F.3d 208, 214 (2d Cir. 2011) ) ).

Bearing in mind its foregoing analysis, the Court finds that allowing amendment of most of Plaintiff's claims would prove futile, because no amendment would allow them to survive a motion to dismiss. However, there are certain claims that, if pled with more particularity, *may* prove sufficiently plausible to give rise to liability. The Court will therefore grant Plaintiff forty-five days to move to amend his pleadings only insofar as they relate to his claims of (1) conspiracy against McNally; (2) malicious prosecution and conspiracy against the Browns; (3) conspiracy against McInerney; and (4) malicious prosecution and conspiracy against Ogden. Once Plaintiff has so moved, Defendants may respond and the Court can assess the proposed amendments' viability and the other factors governing leave to amend. [10] The Court will not consider or allow any attempts by Plaintiff either to replead any of his other claims or to plead additional claims not mentioned in the original Complaint.

## V. CONCLUSION

***23** Accordingly, it is hereby:

**ORDERED**, that the Brown Motion (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED**, that the McNally Motion (Dkt. No. 29) is **GRANTED**; and it is further

**ORDERED**, that the McInerney Motion (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED**, that the Ogden Motion (Dkt. No. 57) is **GRANTED**; and it is further

**ORDERED**, that the Smith Motion (Dkt. No. 66) is **GRANTED**; and it is further

**ORDERED**, that the Rensselaer Motion (Dkt. No. 96) is **GRANTED**; and it is further

**ORDERED**, that the Sanctions Motion (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED**, that if Plaintiff wishes to proceed with his (1) conspiracy claims against McNally; (2) malicious prosecution and conspiracy claims against the Browns; (3) conspiracy claim against McInerney; and (4) malicious prosecution and conspiracy claims against Ogden, he must file a motion to amend his complaint, in accordance with the Local Rules, within **forty-five days** from the date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that if Plaintiff fails to timely file a motion to amend as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED with prejudice** without further order of this Court; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 4565768

## Footnotes

1 The first paragraph of the Complaint states that this action is brought pursuant to 42 U.S.C. §§ 1983, 1984, 1985, and 1986. Compl. ¶ 1. Plaintiff's reliance on §§ 1984, 1985, and 1986 is misplaced. "Sections one and two of 42 U.S.C. § 1984 were declared unconstitutional by the Supreme Court in 1883, and sections three and four were repealed by Congress in 1948." Dennison v. Pa. Dep't of Corr., 268 F. Supp. 2d 387, 395 n.3 (M.D. Pa. 2003) (citing United States v. Singleton, 109 U.S. 3 (1883) ). Likewise, no subsection of § 1985—or, by extension, § 1986—appears relevant to Plaintiff's claims. "Section 1985(1) relates to conspiracies to interfere with a federal official in the performance of his or her duties," while§ 1985(2) prohibits interference in state proceedings by "force, intimidation, or threat," Butler v. Hesch, No. 16-CV-1540, 2018 WL 922187, at *20 (N.D.N.Y. Feb. 15, 2018), and a § 1985(3) claim requires "allegations of racial or other invidious class-based animus," Hernandez v. Goord, 312 F. Supp. 2d 537, 548 n.4 (S.D.N.Y. 2004) (citing United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828–29 (1983) ). Plaintiff makes no such allegations. In any event, aside from the first paragraph, the Complaint contains no reference to §§ 1984, 1985, or 1986, and each cause of action is expressly brought pursuant to § 1983 only. See Compl. ¶¶ 47–100. Therefore, the Court construes the Complaint as alleging claims under § 1983.

2 It is unclear from the Complaint whether Plaintiff was involved in the Working Class Party or the Working Families Party in 2009. Compare Compl. ¶ 16 (referencing the "Working Class Party of the City of Troy"), with id. ¶ 44 (discussing the "2009 Working Families Party primary"). However, that inconsistency is immaterial to the motions presently before the Court.

3 The Complaint appears to allege the Monell claim against all defendants. See Compl. ¶ 84 ("The actions and omissions of the Defendants described herein constitute valid Monell claims against the Defendants...."), ¶ 86 ("Pursuant to [§ 1983], Defendants are jointly and severally liable to Plaintiff in the sum of $5,000,000 ...."). Because a Monell claim is a vehicle for seeking relief under § 1983 from a municipality and its instrumentalities, e.g., Owen v. City of Indep., Mo., 445 U.S. 622, 635–36 (1980), the Court construes this cause of action as alleged against Rensselaer only. To the extent Plaintiff seeks to bring a Monell claim against the individual defendants, he fails to state a cognizable claim.

4 Rensselaer has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Rensselaer Mot. at 1. "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

5 Smith submitted the Appointment Order as an exhibit to his Motion. The Court takes judicial notice of the order because it is "integral" to the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) ). Moreover, "[c]ourts routinely take judicial notice of documents filed in other courts ... to establish the fact of such litigation and related filings." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (second alteration in original) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ).

6 The Browns state that John Brown was a member of the Troy City Council, and Daniel Brown, his brother, served as his campaign manager. Brown Mem. at 3. Because these facts are not alleged in the Complaint, the Court will not consider them in deciding the present motions. See Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (" '[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.' ") (alteration in original) (quoting Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988) ).

7 Plaintiff does not oppose the Rensselaer Motion insofar as it seeks dismissal of his RICO claims against the Rensselaer County, Dkt. No. 97-1 ("Renssselaer Opposition") at 1. Therefore, the Rensselaer Motion is granted with respect to those claims.

8 Plaintiff did allege the violation of one predicate statutory provision listed in § 1961(1), obstruction of a federal criminal investigation under § 1510. Compl. ¶¶ 83–87. However, as explained above, because he has failed to allege any interference with a *federal* investigation, his § 1510 claim fails and cannot support a RICO claim.

9 The Court notes that Plaintiff has failed to comply with Local Rule 9.2, which requires a party asserting a RICO claim to submit a civil RICO statement within thirty days of filing the pleading asserting the claim. L.R. 9.2. However, because his RICO claims are dismissed for failure to state a claim, the Court need not address the Browns' argument that his failure to comply with Rule 9.2 justifies dismissal. Dkt. No. 51 ("Brown Reply") at 9–10.

10 Plaintiff should note that any motion to amend he may choose to file must comply with the Local Rules, L.R. 7.1(a)(4), and must fully address the deficiencies identified in this Memorandum-Decision and Order. Should he fail to comply with any of those requirements, Plaintiff's motion will be denied and his claims dismissed with prejudice. See, e.g., Burrowes v. Combs, 124 F. App'x 70, 71 (2d Cir. 2005) (affirming the district court's dismissal without further leave to amend after a previous amendment was unsuccessful).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban, P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O. Edward Simonetti, P.O. Matthew Boorman, P.O. Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan; P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

***MEMORANDUM OPINION & ORDER***

PAUL G. GARDEPHE, District Judge.

***1** Plaintiff Ronald Moye has brought claims against the City of New York, former New York County Assistant District Attorney Dustin Chao, and eight members of the New York City Police Department ("NYPD") under 42 U.S.C. § 1983 and state law. Moye claims that Chao is liable for damages under Section 1983 and state law for malicious prosecution, abuse of process, denial of a fair trial, fabrication of evidence, conspiracy "to inflict an unconstitutional injury," and intentional and negligent infliction of emotional distress. (Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Claims) Chao has moved to dismiss the Amended Complaint on grounds of absolute immunity. For the reasons stated below, Chao's motion to dismiss will be granted.

***BACKGROUND***

For purposes of deciding Defendant Chao's motion to dismiss, the Court has assumed that the following facts presented in the Amended Complaint are true.

**I. *MOYE'S ARREST***

On or about March 12, 2002, at approximately 8:00 p.m., NYPD officers Paul Jeselson and Tawaina O'Neal were stationed on the rooftop of an apartment building on the south side of West 118th Street near the corner of Morningside Avenue conducting nighttime narcotics surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located on the north side of West 118th Street, near Manhattan Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed Plaintiff "extend his hand from the driver's side window and hand a small glassine" to another individual—later arrested —who, in turn, handed it to an unapprehended customer. (*Id.* ¶ 20) The Defendant officers moved in and arrested Moye in the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the officers searched Moye and his car and found United States currency, both in Moye's possession and inside the vehicle. (*Id.* ¶ 27) The Defendant officers unnecessarily grabbed Moye, pushed him, and placed excessively tight handcuffs on him (*id.* ¶ 30), causing him to suffer bruises to and numbness in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal Possession of a Controlled Substance in the Third Degree. (Am. Cmplt. ¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that the police officer defendants "conspired [to give] and gave false testimony and intentionally placed false evidence before the grand jury." [1] (Am.Cmplt.¶ 35)

**II. *MOYE'S FIRST TRIAL***

Moye's first trial began on January 14, 2003. (Schwartz Decl., Ex. B) A.D.A. Chao introduced photographs at trial which he claimed showed the position of Plaintiff s car as it was parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer Jeselson, and Officer Papa were present when a District Attorney's office photographer took these photos in June 2002 from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42, 44) Although the photographs were intended to convey the vantage point of the officers on the night of the arrest, they did not replicate the "nighttime conditions." (*Id.* ¶ 45) According to Moye, these photographs nonetheless showed that the officers could not have seen Plaintiff extend his hand from the driver's side window and pass a small glassine to another individual, because the driver's side could not be seen from the vantage point of the rooftop observation post, even with binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*

***2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers would have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

> "[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.
>
> "And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—
>
> "[DEFENSE counsel]: Mr. Chao is vouching for his witness.
>
> "THE COURT: Overruled.
>
> "[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.
>
> "[DEFENSE counsel]: That's objectionable vouching for his witness.
>
> "THE COURT: Overruled.
>
> "[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.
>
> ***3** "THE COURT: Overruled.
>
> "[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.
>
> "So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken....
>
> "[DEFENSE counsel]: He is vouching for his witness using the pronoun I.
>
> "THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Move,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

### IV. *THE CHARGES AGAINST MOYE ARE DISMISSED*

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Move,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id.* at 6. The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

## *DISCUSSION*

### I. *IMMUNITY*

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity. [2]

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

***4** As the Second Circuit has explained:

> Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).
>
> By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

> [t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

#### A. *Legal Standard for Absolute Prosecutorial Immunity*

A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b)(6) motion where facts establishing the defense may be

"gleaned from the complaint")). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.[3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

***5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

> not retreated ... from the principle that acts undertaken by a prosecutor preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

***6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also* *Barrett v. United States,* 798 F.2d

565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir.1986); *see also Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.1988) (*per curiam* ) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties. *See Imbler,* 424 U.S. at 426–428.

*Dory,* 25 F.3d at 83. [4]

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City,* No. 11 CV 0195 FB, 2012 WL 603561, at *4 (E.D.N.Y.2012) (citing *Barbera v. Smith,* 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. *Id.* While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley,* 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct." *Cousin v. Small.* 325 F.3d 627, 633 (5th Cir.2003); *accord Barbera,* 836 F.2d at 99 (noting "that in each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts"); *see also DiBlasio v. Novello,* 344 F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether absolute immunity should attach to a prosecutor ... we have focused on the timing of the conduct at issue....") Thus, in interpreting *Buckley,* the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand, with only the former entitling a prosecutor to absolute immunity. *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

***7** In assessing a prosecutor's claim of absolute immunity, the court employs a "functional approach," *see, e.g., Burns,* 500 U.S. at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229 (1988); *see also Van de Kamp v. Goldstein,* 555 U.S. 335, 335–336 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of ... 'functional' considerations"). The court must inquire whether the actions in question are part of a prosecutor's traditional function and whether they are closely associated with the judicial process. *Blouin v. Spitzer,* 356 F.3d 348, 357 (2d Cir.2004) (a court must examine the "nature of the function performed" in assessing whether absolute immunity will attach.); *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

### B. *Analysis*

#### 1. *Malicious Prosecution, Abuse of Process*

To the extent that the Amended Complaint seeks to hold Chao liable for initiating the prosecution of Moye, absolute immunity is clearly applicable. *Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."); *see also Hill,* 45 F.3d at 660–61 (holding that prosecutors and those working under their direction are absolutely immune for claims relating to the initiation of a prosecution and for conduct before a grand jury). Plaintiff s federal and state law claims alleging malicious prosecution and abuse of process will therefore be dismissed. [5]

**2. *Creation of Misleading Photographs, Conspiracy to Present False Evidence at Trial***

Moye alleges that Chao, in preparation for Moye's second trial, returned to West 118th Street and instructed Nancy Badger—the District Attorney's office photographer—to take photographs that inaccurately represented the position of Moye's car on the night of his arrest. Chao then presented these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40, 50, 50–54, 66–67) Moye alleges that these photographs gave the false impression that the police in the observation post would have been able to see Moye's hand outside the driver's side window. (*Id.* ¶ 60) Moye further argues that absolute immunity does not extend to Chao's role in obtaining these allegedly misleading photographs, because obtaining such evidence is "not a traditional prosecutorial function" and was "done for the purpose of misleading the second jury." (Pltf. Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for presentation of testimony," however, but also to preparatory conduct "relating to their advocacy." *Dory,* 24 F.3d at 83. The Supreme Court and the Second Circuit have emphasized that ' "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d at 571 ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....").

***8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at *10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at *5, *11, *13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at *21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at *30–*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ... conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

***9** Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

**3. *Misconduct at Trial***

Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at *4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony....' " ") (citations omitted); *Bertuglia,* 2012 WL 906958, at *23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at *2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at *2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff); *see Imbler,* 424 U.S. at 430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard.* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at *3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at *2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express [ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

***10** In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

* * * *

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

***CONCLUSION***

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

## Footnotes

1 The Amended Complaint does not disclose what false testimony or other false evidence was laid before the grand jury. Moreover, there is no suggestion that Chao was involved in presenting false testimony or false evidence to the grand jury.

2 Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See* *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

3 District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

4 By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See* *Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See* *Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also* *Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

5 Absolute immunity is a defense not only to Section 1983 claims but to related state law claims. *See* *Shmueli,* 424 F.3d at 238 (dismissing Section 1983 and related state law malicious prosecution claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112 (E.D.N.Y.2004) (dismissing abuse of process and civil conspiracy claims on grounds of absolute prosecutorial immunity); *Imbler,* 424 U.S. at 424 (same principles require conferral of absolute immunity for damage claims against prosecutors under Section 1983 and state law).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8574309
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jahnell PARKINSON, Plaintiff,
v.
TOWN OF NISKAYUNA, Detective Paul Hobson, Patrolman Jackson Archambault, Detective Mark Florell, Francis Wall, City of Schenectady, Officer Eric Reyell, Brandan Kietlinski, Town of Rotterdam, Detective Connor Lee, Officer Sean Simmons, County of Schenectady, David P. Marinucci, and John R. McFadden, Defendants.

1:22-cv-70 (BKS/CFH)
|
Signed December 11, 2023

**Attorneys and Law Firms**

Plaintiff pro se: Jahnell Parkinson, Schenectady, New York 12303.

For Defendants Town of Niskayuna, Paul Hobson, Jackson Archambault, Mark Florell, and Francis Wall: Ryan E. Manley, Conway, Donovan & Manley PLLC, 50 State Street, 2nd Floor, Albany, New York 12207.

For Defendants City of Schenectady and Brandan Kietlinski: Hannah H. Hage, Gregg T. Johnson, Johnson & Laws LLC, 646 Plank Road, Suite 205, Clifton Park, New York 12065.

For Defendants Town of Rotterdam, Connor Lee, and Sean Simmons: Ryan P. Bailey, Bailey, Johnson & Peck, P.C., 5 Pine West Plaza, Suite 507, Washington Avenue Extension, Albany, New York 12205.

For Defendant John R. McFadden: Jonathan M. Bernstein, Goldberg Segalla, LLP, 8 Southwoods Boulevard, Suite 300, Albany, New York 12211.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

## I. INTRODUCTION

***1** On January 26, 2022, Plaintiff pro se Jahnell Parkinson initiated this action by filing a complaint that asserted claims under 42 U.S.C. § 1983 for (1) denial of access to the courts; (2) deprivation of property without due process of law; (3) denial of due process and equal protection of the law; (4) municipal liability for deliberate indifference; and (5) conspiracy against eleven defendants: (1) the Town of Niskayuna Police Department; (2) Paul Hobson; (3) Jackson Archambault; (4) Mark Florell; (5) Francis Wall; (6) the City of Schenectady Police Department; (7) Eric Reyell; (8) Brian Kietlinski; (9) the Town of Rotterdam Police Department; (10) Connor Lee; and (11) Sean Simmons. (Dkt. No. 1, ¶¶ 9–21, 50–78.) All of the defendants, except Eric Reyell, who has not yet appeared in this action moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 8, 22, 25.)[1] On January 9, 2023, the Court granted the motions and dismissed Plaintiff's complaint with leave to amend. *See Parkinson v. Town of Niskayuna Police Dep't*, No. 22-cv-70, 2023 WL 131023, at *8, 2023 U.S. Dist. LEXIS 3067 (N.D.N.Y. Jan. 9, 2023).

On April 6, 2023, Plaintiff filed the operative amended complaint in which he asserts claims against fourteen defendants: (1) the Town of Niskayuna; (2) Paul Hobson; (3) Jackson Archambault; (4) Mark Florell; (5) Francis Wall; (6) the City of Schenectady; (7) Eric Reyell; (8) Brandan Kietlinski; (9) the Town of Rotterdam; (10) Connor Lee; (11) Sean Simmons; (12) the County of Schenectady; (13) David P. Marinucci; and (14) John R. McFadden. (Dkt. No. 36, ¶¶ 10–23.) Plaintiff asserts claims under 42 U.S.C. § 1983 for (1) denial of access to the courts; (2) deprivation of property without due process of law; (3) denial of due process and equal protection of the law; (4) municipal liability for deliberate indifference; (5) conspiracy; (6) "conspiracy to convict"; (7) violation of the right to counsel; (8) denial of Fourth and Fourteenth Amendment rights; (9) denial of Fifth and Fourteenth Amendment rights; and (10) denial of Sixth and Fourteenth Amendment rights. (Dkt. No. 36, ¶¶ 64–107.)

Presently before the Court are motions to dismiss under Rule 12(b)(6) of the Federal Rule of Civil Procedure by: (1) Defendants Town of Niskayuna, Hobson, Archambault, Florell, and Wall ("Niskayuna Defendants"), (Dkt. No. 47); (2) Defendants City of Schenectady and Kietlinski ("City of Schenectady Defendants"), (Dkt. No. 48); (3) Defendants Town of Rotterdam, Lee, and Simmons ("Rotterdam Defendants"), (Dkt. No. 50); and (4) Defendant McFadden, (Dkt. No. 52). Plaintiff opposes each of these motions. (Dkt. No. 67.)[2] Defendant McFadden, City of Schenectady Defendants, and Rotterdam Defendants filed replies in further support of their motions. (Dkt. Nos. 68, 69, 71.) For the following reasons, the Court grants the motions filed by City

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of Schenectady Defendants and Defendant McFadden and grants in part and denies in part the remaining motions to dismiss.

## II. FACTS [3]

***2** On or about May 23, 2019, Plaintiff alleges he was pulled over in his vehicle by Defendants Reyell, Lee, and Simmons in the Town of Rotterdam, "taken out of his vehicle, handcuffed, searched[,] and placed in the back of an unmarked vehicle." (Dkt. No. 36, ¶¶ 35, 37.) Plaintiff "did not know the nature of the stop" but knew "that he was legally driving his vehicle and not committing any crimes or in the process of such." (*Id.* ¶ 36.) Afterward, Defendant Lee said to Plaintiff: "[Y]ou messed up .... [Y]ou shouldn't have never [sic] tried to get a relative of a police officer arrested!" (*Id.* ¶ 37.) Plaintiff was taken to "the stationhouse" by a different car where Defendant Simmons conducted a strip search and an inventory search. (*Id.* ¶ 38.) While there, Defendant Simmons told Plaintiff that officers were at his residence with a search warrant and that if Plaintiff did not give Defendant Simmons a combination code to enter Plaintiff's residence, officers would "break open the door, causin[g] excessive damage to [Plaintiff's] home." (*Id.* ¶ 39.) Plaintiff gave officers access to the residence before learning that there was no valid search warrant. (*Id.* ¶ 40.)

Defendants Town of Niskayuna and Town of Rotterdam and its officers, "acting in concert" with Defendants Reyell, Florell, and Lee, seized property from Plaintiff's residence, including money, iPhones, watches, and cars. (*Id.* ¶ 41.) Plaintiff alleges that no drugs or paraphernalia were found there. (*Id.*) Plaintiff was arrested on drug charges, "his property was confiscated[,] and his bank accounts were frozen" by Defendants Town of Rotterdam, Town of Niskayuna, Florell, Lee, and Simmons "acting in conspiracy with" Defendants Hobson, Archambault, and Wall. (*Id.* ¶ 42.) Plaintiff's bail was set at $100,000, which Plaintiff alleges was "excessive in light of two minor drug sales." (*Id.* ¶ 43.) A judge ordered that Plaintiff's bank account be released and that Defendants return one of Plaintiff's vehicles. (*Id.* ¶ 48.)

Plaintiff was indicted by a grand jury and his case was scheduled for trial. (*Id.* ¶ 44.) Plaintiff hired Defendant Marinucci and, later, Defendant McFadden to represent him, but Plaintiff alleges that these Defendants "were compromised and in collusion with the prosecution." (*Id.* ¶ 45.) Without specifying which attorney is the subject of his claims, Plaintiff alleges that "he" [4] "failed to effectively challenge the legality of the stop frisk and the search of the plaintiff or his apartment[;] ... the arrest warrant[;] or the probable cause for the stop and search of the plaintiff." (*Id.* ¶ 47.) "He" "proceeded to trial without any discovery or witness[ ] statements and knew that the indictment was fraudulent ... [but] never requested the necessary hearings specified for the evidence presented in the case." (*Id.*) "He" "failed to investigate or object to the evidence and went to trial unprepared ... [and] coerced the plaintiff to plead guilty in the middle of trial." (*Id.*) Plaintiff pleaded guilty during the trial and was convicted of drug charges; he served two years in state prison. (*Id.* ¶¶ 47, 90.)

## III. STANDARD OF REVIEW

### A. Rule 12(b)(6)

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

***3** The complaint of a plaintiff proceeding pro se "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). "Nonetheless, a pro se complaint must state a plausible claim for relief." *Id.*

## IV. ANALYSIS

### A. Dismissal of Claims Previously Dismissed

The Court assumes familiarity with the analysis in its previous decision dismissing Plaintiff's claims of denial of access to the courts, deprivation of property without due process of law, and denial of due process and equal protection of the law. *See Parkinson*, 2023 WL 131023, at *4–7, 2023 U.S. Dist. LEXIS 3067. Though Plaintiff has added Defendants to the amended complaint, he has not alleged any new facts material to those causes of action. For the reasons set forth in the Court's previous ruling, these claims are dismissed.

Furthermore, though, as discussed below, Plaintiff has now alleged claims—for violation of his Fourth Amendment right against unreasonable searches—that survive the motions to dismiss, the amended complaint, as with the original complaint, contains no allegations of any municipal policy or custom, *see Monell*, 436 U.S. at 690, 98 S.Ct. 2018, widespread practice or unofficial policy, *see Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006), or inadequate training, *see Ambrose v. City of New York*, 623 F. Supp. 2d 454, 465 (S.D.N.Y. 2009), that could provide the basis for a claim for municipal liability. Therefore, Plaintiff's municipal liability claim is dismissed.

Finally, Plaintiff does not allege that his sole surviving claims provide the basis for his conspiracy claim. Rather, Plaintiff premises his conspiracy claim on claims that do not survive the motions to dismiss. (Dkt. No. 36, ¶¶ 91–98.) Accordingly, the Court dismisses Plaintiff's conspiracy claim for failing to plausibly allege an underlying constitutional violation. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995); *see also Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). To the extent Plaintiff does base his conspiracy claim on a surviving claim, it is wholly conclusory and, as described in this Court's previous ruling, vague and conclusory allegations that defendants have engaged in conspiracy are insufficient to state a plausible claim for conspiracy.

**B. Unlawful Seizure and Detention**

In his eighth cause of action, Plaintiff alleges that Defendants County of Schenectady, Town of Rotterdam, Hobson, Archambault, Florell, Wall, Reyell, Kietlinski, Lee, Simmons, Marinucci, and McFadden "unlawfully and wrongfully seized" Plaintiff, causing his "unlawful detention" in violation of the Fourth and Fourteenth Amendments. (Dkt. No. 36, ¶¶ 99–102.) Niskayuna Defendants argue that Plaintiff's allegations related to his unlawful seizure claim are conclusory and speculative. (Dkt. No. 47-1, at 22.) Rotterdam Defendants similarly argue that Plaintiff's allegations are conclusory, that any claim for unlawful seizure is subsumed by a claim for false arrest, and that Defendants' actions fell within well-established exceptions to the warrant requirement. (Dkt. No. 50-1, at 23–26.) Defendant McFadden argues that Plaintiff fails to allege any personal involvement by Defendant McFadden. (Dkt. No. 52-3, at 6.)

***4** The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This "protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy," *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004) (citations omitted), and includes freedom from arrest without probable cause, *see Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Arresting officers have probable cause to arrest when they have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *See Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)). "For circumstances to warrant an investigatory stop, law enforcement officials must have a 'reasonable basis to think that the person to be detained is committing or has committed a criminal offense.' " *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)).

Plaintiff alleges that he was stopped in his vehicle by Defendants Reyell, Lee, and Simmons. (Dkt. No. 36, ¶ 35.) Plaintiff alleges that he "did not know the nature of the stop," and that he was "legally driving his vehicle and not committing any crimes or in the process of such." (*Id.* ¶ 36.) Plaintiff alleges that he was handcuffed, searched, and placed in the back of an unmarked vehicle by Defendant Reyell and taken to "the stationhouse" by "[a]nother unit." (*Id.* ¶¶ 37–38.) Plaintiff alleges that he was "arrested on drug charges," that his bail was excessive "in light of two minor drug sales," and that he was "coerced to plead guilty in the middle of trial." (*Id.* ¶¶ 42–43, 47). Plaintiff alleges that he pleaded guilty during the trial, was convicted of drug charges, and served two years in state prison. (*Id.* ¶¶ 47, 90.)

To the extent Plaintiff premises his Fourth Amendment claim on the seizure of his person, such a claim is dismissed because it is tantamount to a claim for false arrest, *see Dixon v. City of Syracuse*, 493 F. Supp. 3d 30, 42 (N.D.N.Y. 2020) (dismissing a claim for an unlawful seizure as duplicative of a

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

claim for false arrest where no facts differentiate the claims); *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (same), and Plaintiff has neither stated a claim for false arrest nor alleged facts to differentiate the circumstances of his seizure from those of his arrest on charges that led to his conviction. To state a claim for false arrest under § 1983, a plaintiff must plead "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. County of Westchester*, 615 F. Supp. 3d 215, 224 (S.D.N.Y. 2022) (alteration in original) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003)). But "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852).

"[B]y pleading guilty to the crimes charged resulting from the purportedly false arrest, or to any lesser-included offenses to resolve all of the crimes charged, a plaintiff concedes as a matter of law that there was probable cause for all charges covered by the plea agreement." *Seward v. Antonini*, No. 20-cv-9251, 2023 WL 6387180, at *16, 2023 U.S. Dist. LEXIS 177138 (S.D.N.Y. Sept. 29, 2023) (alteration in original). Thus, a plaintiff "can under no circumstances recover" under § 1983 for false arrest if he pleaded guilty to the offense for which he was arrested. *See Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986); *see also Wahid v. Mogelnicki*, 406 F. Supp. 3d 247, 249 (E.D.N.Y. 2017).

***5** Here, because Plaintiff alleges that he was arrested on and convicted of drug charges after pleading guilty, (Dkt. No. 36, ¶¶ 42, 47, 90), and because Plaintiff has alleged no facts to differentiate the circumstances of his seizure from those of his arrest on charges that led to his conviction, his claims for false arrest and unlawful seizure must be dismissed. The same principles also prevent Plaintiff from stating a claim for false imprisonment or malicious prosecution. *See Cameron*, 806 F.2d at 387.

### C. Unreasonable Searches

Although Plaintiff does not include a claim for unreasonable search in any of his causes of action, Plaintiff does allege that he was "subjected to an illegal search," that Defendant "stripped searched him and conducted an inventory search while in custody all without probable cause," and that Plaintiff provided a combination code to his apartment after Defendant Simmons falsely stated that officers had a search warrant. (Dkt. No. 36, ¶¶ 7, 38–40.) Construing these allegations liberally, the Court interprets the amended complaint as asserting unreasonable search claims concerning the strip search and the search of Plaintiff's apartment. [5]

Rotterdam Defendants similarly construed the amended complaint and argue that Plaintiff's allegations are conclusory and that each search fell within a well-established exception to the warrant requirement. (Dkt. No. 50-1, at 23–26.)

#### 1. Strip Search

A search incident to an arrest "constitutes an exception to the warrant requirement" the Fourth Amendment otherwise imposes. *See Sloley v. VanBramer*, 945 F.3d 30, 37 (2d Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 382, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014)). But "the scope of a search incident to arrest is limited." *Id.* "To determine whether a particular search incident to arrest falls within this exception, '[courts] examine the degree to which [it] intrud[es] upon an individual's privacy and the degree to which [it is] needed for the promotion of legitimate governmental interests.' " *Id.* (second, third, and fourth alterations in original) (quoting *Birchfield v. North Dakota*, 579 U.S. 438, 461, 136 S.Ct. 2160, 195 L.Ed.2d 560 (2016)). The Second Circuit "has held that the 'uniquely intrusive nature of strip searches, as well as the multitude of less invasive investigative techniques available to officers' make it such that a strip search cannot be treated as a routine search of an arrestee's person." *Id.* (quoting *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008)). Therefore, a strip search conducted incident to a misdemeanor arrest requires reasonable suspicion that the arrestee is concealing contraband based on the crime charged, and a visual body cavity search incident to a misdemeanor or felony arrest requires reasonable suspicion that the arrestee is secreting evidence inside the body cavity. *See Sloley*, 945 F.3d at 39; *Hartline*, 546 F.3d at 100. Though the Second Circuit has not decided the issue, district courts within the Second Circuit "have consistently held that a reasonable suspicion is required to perform a strip search of a felony arrestee." *Seward*, 2023 WL 6387180, at *29, 2023 U.S. Dist. LEXIS 177138 (collecting cases).

***6** "Reasonable suspicion" requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a

preponderance of the evidence, and obviously less than is necessary for probable cause." *See Sloley*, 945 F.3d at 43 (quoting *Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014)). To determine whether an officer had reasonable suspicion, courts "look at the totality of the circumstances." *Id.* at 43 (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). An arrest for a drug offense does not automatically give rise to a reasonable suspicion to conduct a strip search. *See Seward*, 2023 WL 6387180, at *30, 2023 U.S. Dist. LEXIS 177138 (collecting cases).

Though Plaintiff alleges that Defendant Simmons conducted the strip search "without probable cause"—a standard more stringent than reasonable suspicion that is not required to justify a strip search incident to felony arrest, *see Sloley*, 945 F.3d at 43—Plaintiff alleges that he had not been committing any crimes when he was pulled over, (Dkt. No. 36, ¶ 36). Plaintiff's later arrest on drug charges does not alone amount to reasonable suspicion justifying a strip search. *See Seward*, 2023 WL 6387180, at *30, 2023 U.S. Dist. LEXIS 177138; *see also Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 273–74 (S.D.N.Y. 2002) ("[A]utomatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances ...." (citing *United States v. Arvizu*, 534 U.S. 266, 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002))). Thus, the Court declines to dismiss Plaintiff's claim that Defendant Simmons violated Plaintiff's Fourth Amendment rights by conducting a strip search of Plaintiff at the stationhouse.

**2. Search of Plaintiff's Residence**

Under the Fourth Amendment, warrantless searches are presumed unreasonable. *See Newton*, 369 F.3d at 665. But consent renders a search reasonable. *See United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). However, consent to search only satisfies the Fourth Amendment where it is voluntarily given, and "[t]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 370 (S.D.N.Y. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

"To ascertain whether consent is valid, courts examine the 'totality of all the circumstances' to determine whether the consent was 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.' " *Garcia*, 56 F.3d at 422 (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)). "The standard for evaluating consent is " 'objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?' " *United States v. Munoz*, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013) (quoting *Garcia*, 56 F.3d at 423). "Thus, 'the Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the [ ] consent permitted him to conduct the search that was undertaken.' " *Id.* (quoting *Garcia*, 56 F.3d at 423). But where "the police lie to a subject and claim to have a search warrant when they in fact have none, any consent to search is ... involuntary." *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 549–50, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)).

***7** Construing Plaintiff's allegations liberally and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has stated a claim against Defendant Simmons, Florell, and Lee for violation of his Fourth Amendment right against unreasonable searches arising from the search of his residence. Rotterdam Defendants point out that Plaintiff alleges that Defendants "knowingly and willfully submitt[ed] false data regarding the transactions that led to Plaintiff's arrest such as the search warrant and witness statements." (Dkt. No. 50-1, at 25 (quoting Dkt. No. 36, ¶ 104).) Rotterdam Defendants argue that this is an admission that there was a search warrant for Plaintiff's apartment. (*Id.*) However, the amended complaint refers to other seizures, including seizure of a 2016 Mercedes Benz, (Dkt. No. 36, ¶¶ 41–42), and the amended complaint does not identify the subject of "the search warrant" alleged to include "false data," (*id.* ¶ 104). Thus, liberally construing Plaintiff's allegations and drawing all reasonable inferences in favor of Plaintiff, the Court infers that there was no search warrant for Plaintiff's residence when Defendant Simmons asked for the combination code.

Plaintiff alleges that Defendant Simmons asked Plaintiff for the "combination code entry to his apartment" and told Plaintiff "the police were at his residence with a search warrant" and "that if he doesn't give it to him they would only break open the door, causin[g] excessive damage to his home." (*Id.* ¶ 39.) Plaintiff alleges that as a result, he gave

"defendant officers access to his apartment," but later learned that "there wasn't any search ... warrant." (*Id.* ¶¶ 40.) Plaintiff alleges that Defendants Florell and Lee searched the residence and seized various possessions. (*Id.* ¶ 41.) [6]

Niskayuna Defendants and Rotterdam Defendants argue that Plaintiff consented to the search of his residence by giving officers access. (Dkt. No. 47-1, at 22; Dkt. No. 50-1, at 25.) But these Defendants fail to address Plaintiff's allegation that Defendant Simmons lied to Plaintiff in order to get Plaintiff's consent to search the residence, (Dkt. No. 36, ¶¶ 39–40). Because consent to search satisfies the Fourth Amendment only where that consent is voluntary, *see Phillips*, 894 F. Supp. 2d at 370, and because consent to search is involuntary where police lie in claiming that they have a search warrant, *see Munoz*, 987 F. Supp. 2d at 444, Plaintiff has plausibly alleged that Defendants Simmons, Florell, and Lee violated Plaintiff's Fourth Amendment right by searching his residence without a search warrant. [7]

**D. Right to Counsel**

***8** Plaintiff asserts, without any specific factual allegations and without indicating against whom the claim is asserted, that Defendants violated his right to counsel. (Dkt. No. 36, at 10.) [8] Plaintiff has not alleged that he did not have the assistance of counsel during his criminal prosecution; rather, Plaintiff alleges that he "could not afford a lawyer of his own choosing, only a lawyer that was convenient" and that he later hired Defendants Marinucci and McFadden. (Dkt. No. 36, ¶¶ 43, 45.) Defendant McFadden argues that Plaintiff cannot state such a claim because Plaintiff was represented by counsel. (Dkt. No. 52-3, at 10.) Niskayuna Defendants and Rotterdam Defendants argue that by failing to allege any supporting facts whatsoever, Plaintiff has failed to plausibly allege such a claim. (Dkt. No. 47-1, at 12; Dkt. No. 50-1, at 18–19.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel attaches upon "the initiation of adversary judicial criminal proceedings" against the defendant and applies to all "critical stages" of the prosecution before, during, and after trial. *See Miller v. O'Bryan*, 498 F. Supp. 2d 548, 557 (N.D.N.Y. 2007) (quoting *United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)).

As a preliminary matter, the Court notes that, to the extent Plaintiff asserts this claim against Defendant McFadden, such a claim is dismissed because Plaintiff has not plausibly alleged that he was a state actor as is required under § 1983. *Cf. Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997) ("[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983"). And it is equally well-settled that "the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). That is, to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138 (citations omitted). To do so, a plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Here, Plaintiff has not plausibly alleged the personal involvement of any Defendant in any alleged violation of his right to counsel. To the extent Plaintiff premises this claim on an inability to "afford a lawyer of his own choosing" because "his bank account was frozen," (Dkt. No. 36, ¶¶ 43, 60), Plaintiff acknowledged having later hired two attorneys —Defendants McFadden and Marinucci—to represent him. (*Id.* ¶ 45.) And Plaintiff's failure to allege, beyond conclusory allegations, the personal involvement of any Defendant or facts from which the Court could infer that any bank account seizure was purposeful and unjustified requires dismissal of his claim. *Cf. United States v. Kolfage*, 537 F. Supp. 3d 559, 565 (S.D.N.Y. 2021). Thus, Plaintiff's claim for denial of his right to counsel is dismissed.

**E. Right to a Fair Trial**

The Court construes Plaintiffs ninth claim, which Plaintiff alleges arise under the Fifth and Fourteenth Amendments, as a claim for violation of Plaintiff's right to a fair trial. [9] Specifically, Plaintiff appears to allege claims for *Brady* violations, fabrication of evidence, and provision of false testimony. (Dkt. No. 36, ¶¶ 5, 7, 96–98, 103–07.) Plaintiff does not state against whom these claims are asserted. (*Id.* ¶¶ 103–07.) Niskayuna Defendants and City of Schenectady Defendants argue that Plaintiff's allegations in support of these claims are too vague and nonspecific to state a claim

and that Plaintiff fails to allege the personal involvement of any Niskayuna Defendant. (Dkt. No. 47-1, at 13, 26–27; Dkt. No. 48-1, at 13–14.) Rotterdam Defendants argue that these claims are barred by *Heck v. Humphrey.* (Dkt. No. 50-1, at 19–21.) [10] Defendant McFadden argues that Plaintiff has failed to allege personal involvement of Defendant McFadden and that Plaintiff otherwise fails to state a claim. (Dkt. No. 52-3, at 10.)

### 1. Brady Violation

***9** Plaintiff alleges that "the defendant ... failed to timely disclose 'BRADY' material to plaintiff's defense [ ] counsel" and that "the defendants knowingly, willfully and wrongfully concealed information that would have assisted plaintiff in his defense against serious criminal charges." (Dkt. No. 36, ¶¶ 98, 106.)

*Brady* violations [11] are actionable under 42 U.S.C. § 1983. *See Poventud v. City of New York,* 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc). Stating a *Brady* violation requires the pleading of three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)

Plaintiff does not allege what information was not disclosed, let alone that it constitutes exculpatory or impeachment evidence. *See Rivas*, 377 F.3d at 199. Nor has Plaintiff alleged the personal involvement of any Defendant. Thus, Plaintiff has failed to plausibly allege a claim under § 1983 for a *Brady* violation. *See Myers v. County of Nassau*, 825 F. Supp. 2d 359, 368 (E.D.N.Y. 2011) (dismissing a *Brady* claim under § 1983 where the Plaintiff "set forth no facts supporting any such theory").

### 2. Fabrication of Evidence and False Testimony

Plaintiff alleges that Defendants "knowingly and willfully submitt[ed] false data regarding the transactions that led to Plaintiff's arrest such as the search warrant and witness statements ... [and] ... uttered false testimony during plaintiff's prosecution as well as trial that led to him being indicted and convicted on narcotics sale charges." (Dkt. No. 36, ¶¶ 104–05.) [12]

***10** "It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Buari v. City of New York*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016)). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). The elements of a claim for denial of the right to a fair trial due to fabrication of evidence are: "(1) [an] investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130). However, law enforcement witnesses at grand jury proceedings and at trial, as with other witnesses, are absolutely immune from § 1983 claims arising from their testimony. *See Rehberg v. Paulk*, 566 U.S. 356, 367, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012) (citing *Briscoe v. LaHue*, 460 U.S. 325, 332–33, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)).

To the extent Plaintiff's claims are based on allegedly false testimony, such claims are dismissed because witnesses are afforded absolutely immunity from § 1983 claims arising from their testimony at grand jury proceedings or at trial. *See Rehberg*, 566 U.S. at 367, 132 S.Ct. 1497. To the extent Plaintiff's claims are based on allegedly fabricated evidence presented during his prosecution, such claims are dismissed because Plaintiff has not alleged the existence of any specific fabricated information that was either likely to influence a jury's verdict or forwarded to a prosecutor, let alone that any Defendant was personally involved in any such fabrication. *See Garnett*, 838 F.3d at 279. Indeed, the only allegation that can be construed as alleging the fabrication of specific information by a specific Defendant is that Defendant Kietlinski "failed to produce the necessary paperwork or falsified the paperwork to make it appear that [Plaintiff's] car was abandoned rather than stolen." (Dkt. No. 36, ¶ 58.) But Plaintiff does not allege that paperwork related to his allegedly stolen vehicle was provided to prosecutors in relation to his criminal prosecution, that such information was

likely to influence a jury's verdict, or that such information was relevant to his criminal prosecution at all. Rather, Plaintiff appears to point to that allegation in support of his claims for denial of access to the courts and failure to investigate, both of which the Court dismissed and neither of which is factually related to Plaintiff's criminal prosecution. Thus, Plaintiff has failed to plausibly allege a claim under § 1983 for fabrication of evidence. Accordingly, Plaintiff's ninth and tenth claims, arising under the Fifth, Sixth, and Fourteenth Amendments, are dismissed. [13]

### F. Qualified Immunity

***11** Niskayuna Defendants, of whom Defendant Florell remains, and Rotterdam Defendants, of whom Defendants Lee and Simmons remain, argue that they are entitled to qualified immunity. (Dkt. No. 47-1, at 24–26; Dkt. No. 71, at 12–13.) But a ruling on qualified immunity on this record would be premature, and the Court declines to address qualified immunity here. *See, e.g., Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) ("[A]dvancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch."). Accordingly, Niskayuna Defendants' and Rotterdam Defendants' motions to dismiss based on qualified immunity are denied, and Defendants may renew this argument at a subsequent stage.

### G. Temporary Restraining Order

In addition to compensatory and punitive damages, Plaintiff seeks "[i]njunctive relief in the form of a Temporary Restraining Order (TRO), to prevent these defendants from harassing, intimidating, retaliating and threatening plaintiff during this suit." (Dkt. No. 136 at 11.) Niskayuna Defendants appear to construe Plaintiff's request as a motion for a temporary restraining order and cite caselaw based on motions under Federal Rule of Civil Procedure 65. (Dkt. No. 47-1, at 27–28.) But Plaintiff has not moved for a temporary restraining order or a preliminary injunction under Rule 65; rather, Plaintiff seeks injunctive relief as a remedy. (Dkt. No. 36, at 11.) Because there is not a motion for a temporary restraining order pending, the Court need not address the issue at this point.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that City of Schenectady Defendants' and Rotterdam Defendants' requests to consider their motions unopposed, (Dkt. Nos. 61, 62), are **DENIED**; and it is further

**ORDERED** that Defendants Town of Niskayuna, Hobson, Archambault, Florell, and Wall's motion to dismiss, (Dkt. No. 47), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants City of Schenectady and Kietlinski's motion to dismiss, (Dkt. No. 48), is **GRANTED**; and it is further

**ORDERED** that Defendants Town of Rotterdam, Lee, and Simmons's motion to dismiss, (Dkt. No. 50), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendant McFadden's motion to dismiss, (Dkt. No. 52), is **GRANTED**; and it is further

**ORDERED** that the following claims alleging violations of Plaintiff's Fourth Amendment right against unreasonable searches may proceed: (1) his claim arising from the strip search against Defendant Simmons, and (2) his claim arising from the search of his residence against Defendants Simmons, Florell, and Lee; and it is further

**ORDERED** that all other claims which are the subject of Defendants' motions are **DISMISSED**; and it is further

**ORDERED** that all Defendants other than Defendants County of Schenectady, Simmons, Reyell, Florell, Lee, and Marinucci be terminated as parties to this action; and it is further

**ORDERED** that Plaintiff must file proof of service of the amended complaint on Defendants Eric Reyell, County of Schenectady, and David Marinucci by December 26, 2023.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2023 WL 8574309

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## Footnotes

1 Defendants City of Schenectady Police Department and Brandan Kietlinski state that Eric Reyell has not been employed by the Schenectady Police Department since 2015, (Dkt. No. 48-1, at 6 n.1), well before the events alleged in the amended complaint. Defendant Reyell has not appeared in this action, and Plaintiff has not filed a proof of service as to any Defendant. Plaintiff is directed to file proof of service as to Defendant Reyell, and the other Defendants who have not appeared in this action—the County of Schenectady and David Marinucci—by December 26, 2023. *See* Fed. R. Civ. P. 4(m) (providing for dismissal of a complaint "[i]f a defendant is not served within 90 days after the complaint is filed").

2 In light of Plaintiff's delay in responding to the motions to dismiss, City of Schenectady Defendants and Rotterdam Defendants requested that their motions be considered unopposed. (Dkt. Nos. 61, 62.) However, upon request from Plaintiff, (Dkt. No. 63), and given his pro se status, the Court extended the time for Plaintiff to respond to the motions to dismiss. (Dkt. No. 65.) Plaintiff filed his opposition on September 5, 2023. (Dkt. No. 67.) Accordingly, the Court denies City of Schenectady Defendants' and Rotterdam Defendants' requests to consider their motions unopposed.

3 These facts are drawn from the amended complaint. (Dkt. No. 36.) The allegations in the amended complaint are largely repetitive of the allegations in the original complaint. (Dkt. No. 1.) The Court assumes familiarity with those allegations and has only included what is relevant to the instant motions. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true the legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

4 Other than the collusion allegation, (*id.* ¶ 45), Plaintiff's factual allegations against Defendants Marinucci and McFadden are contained in a single paragraph. (*Id.* ¶ 47.) Plaintiff initially alleges that "Defendant Marinucci and McFadden failed to effectively challenge the legality of the stop frisk and the search of the plaintiff or his apartment," (*id.*). But the remainder of the allegations in that paragraph refer only to a single person without specifying to which Defendant, Marinucci or McFadden, Plaintiff is referring. (*Id.*)

5 The Court, however, does not find that Plaintiff has alleged a plausible claim for an unlawful inventory search. Plaintiff's allegations that he was pulled over, handcuffed, and taken to the police station in the back of a police car demonstrate objectively that he was seized within the meaning of the Fourth Amendment prior to arriving at the police station, where he has acknowledged that he was held in custody. *See Mara v. Rilling*, 921 F.3d 48, 70 (2d Cir. 2019). An "inventory search constitutes a well-defined exception to the warrant requirement," and Plaintiff has not alleged any facts from which the Court could infer that the inventory search while Plaintiff was in custody was unlawful. *See United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002).

6 Plaintiff alleged that "the Town of Niskayuna, Town of Rotterdam and its officer [sic] acting in concert with Reyell, Florell and Lee" seized items in the search, (*id.*), but this allegation is too vague to find that Plaintiff has plausibly alleged the personal involvement of any of the other individual moving Defendants, *see Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Plaintiff appears to be attempting to bring a Fourth Amendment claim against Defendants Town of Niskayuna and Town of Rotterdam. Plaintiff has also included government-entity Defendants in several of his other non-*Monell* claims. (Dkt. No. 36, ¶¶ 64–82, 91–102.) But "*Monell* expressly prohibits *respondeat superior* liability for municipalities" and Plaintiff has not plausibly alleged that any individual Defendant "is someone 'whose edicts or acts may fairly be said to represent official policy' " for any of the government-entity Defendants. *See Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97–98 (2d Cir. 2020) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, Plaintiff has failed to state any non-*Monell* claims against government-entity Defendants. *See id.* at 100–01; *Byrd v. Town of DeWitt*, No. 23-cv-390, 2023 WL 6467921, at *13, 2023 U.S.

Dist. LEXIS 179478 (N.D.N.Y. Oct. 5, 2023). Accordingly, Plaintiff's non-*Monell* claims against government Defendants are dismissed.

7 As discussed below, Rotterdam Defendants argue that other claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), (Dkt. No. 50-1, at 19–21), but they do not argue that Plaintiff's Fourth Amendment unreasonable search claims are so barred. In any event, based on the amended complaint, it does not appear that *Heck* bars Plaintiff's Fourth Amendment unreasonable search claims because Plaintiff alleges that, "[n]o drugs or paraphernalia w[ere] found in [Plaintiff's] apartment," he refers to "two minor drug sales," and he was "convicted of drug charges." (Dkt. No. 36, ¶¶ 41, 90.) It does not appear, therefore, that Plaintiff's Fourth amendment unreasonable search claims necessarily imply the invalidity of his conviction. *See Walker v. Johns*, No. 16-cv-437, 2016 WL 4508358, at *4, 2016 U.S. Dist. LEXIS 115204 (N.D.N.Y. Aug. 29, 2016) ("[W]here the Section 1983 action even if successful will not demonstrate that invalidity of any outstanding criminal judgment or prison disciplinary determination against the plaintiff, a court should allow the action to proceed.").

8 The Court also construes Plaintiff's tenth claim as asserting a violation of his Sixth Amendment right to counsel. (*Id.* at 11.)

9 Additionally, though the Court dismissed Plaintiff's conspiracy claim for the reasons stated in its prior decision, *see supra* section IV.A, the Court construes Plaintiff's sixth claim, which Plaintiff refers to as a "conspiracy to convict" claim, as alleging violations of Plaintiff's right to a fair trial, (Dkt. No. 36, ¶¶ 95–98), which the Court addresses here in connection with Plaintiff's ninth claim.

10 "Where a plaintiff brings a Section 1983 claim and 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence ... the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.' " *Beckwith v. City of Syracuse*, 642 F. Supp. 3d 283, 291 (N.D.N.Y. 2022) (quoting *Heck*, 512 U.S. at 487, 114 S.Ct. 2364). However, because the Court disposes of these claims on other grounds, the Court need not address this issue.

11 *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, "[t]he government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

12 Construed liberally, Plaintiff's allegation of fabricated evidence used to apply for a search warrant could suggest Plaintiff has asserted a claim for malicious prosecution. *See Bailey v. City of New York*, 79 F. Supp. 3d 424, 447 (E.D.N.Y. 2015). To state a claim for malicious prosecution, a plaintiff must plausibly allege " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *See Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). As discussed above, a proceeding that terminates in a conviction precludes a claim of malicious prosecution. *See Thompson v. Clark*, 596 U.S. 36, 39, 142 S.Ct. 1332, 212 L.Ed.2d 382 (2022) ("To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction."); *see also Barnes v. City of New York*, 68 F.4th 123, 128 (2d Cir. 2023) ("We accordingly affirm the dismissal of [Plaintiff]'s malicious prosecution claim because he cannot show that his 'criminal prosecution ended without a conviction.' " (quoting *Thompson*, 596 U.S. at 39, 142 S.Ct. 1332)). Here, Plaintiff concedes that he was convicted of drug offenses and served two years in state prison. (Dkt. No. 36, ¶¶ 47, 90.) Thus, Plaintiff has not shown that the proceeding terminated in his favor, and therefore, to the extent Plaintiff asserts a claim for malicious prosecution, that claim is dismissed.

13 Niskayuna Defendants also argue that the amended complaint must be dismissed because it violates Federal Rule of Civil Procedure 8. (Dkt. No. 47-1, at 11–14.) Rule 8(a) requires that a pleading contain: "(1) a short and plain statement of the grounds for the court's jurisdiction ...; [ ](2) a short and plain statement of the claim showing that the pleader is entitled to relief; and [ ](3) a demand for the relief sought, which may include relief in the alternative or different types of relief." The purpose of Rule 8(a) is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *See* *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Because the Court disposes of all but one of Plaintiff's claims on Rule 12(b)(6) grounds and finds that Plaintiff's surviving Fourth Amendment unreasonable search claim does not run afoul of Rule 8, the Court need not address Niskayuna Defendants' Rule 8 argument further.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 817990
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph R. PASSINO, Plaintiff,
v.
FULTON COUNTY NEW YORK, et al., Defendants.

1:25-cv-00727 (AMN/DJS)
|
Signed 03/25/2026

**Attorneys and Law Firms**

VINCENT U. UBA, ESQ., UBA LAW FIRM, P.C., 744 Broadway, Albany, New York 12207, Attorneys for Plaintiff.

STEPHEN M. GROUDINE, ESQ., MURPHY BURNS GROUDINE LLP, 407 Albany Shaker Road, Loudonville, New York 12211, Attorneys for Defendants Fulton County, Richard C. Giardino, Jeffrey Fake, Jordan M. Shannon, and Robert Stemmler.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

***1** On April 22, 2025, Plaintiff Joseph R. Passino commenced this suit in New York Supreme Court pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York state law alleging injuries arising out of two criminal prosecutions and raising various related claims against Richard C. Giardino, Jeffrey Fake, Jordan M. Shannon, and Robert Stemmler in their official and individual capacities, and against Fulton County (collectively, "County Defendants"). *See* Dkt. No. 2 ("Complaint"). Plaintiff also brings claims against Jodie-Lynn Vannie and Gladys K. Griffith, who have not appeared in the action, and an unidentified Jane Doe (collectively with County Defendants, "Defendants"). *See id*. County Defendants removed the state action to this Court on June 9, 2025. Dkt. No. 1.

Presently before the Court is County Defendants' motion to dismiss for failure to state a claim on which relief can be granted. Dkt. No. 10 (the "Motion"); *see* Fed. R. Civ. Pro. 12(b)(6). Plaintiff opposed the Motion, *see* Dkt. No. 19, and County Defendants replied in further support. Dkt. No. 20.

For the reasons set forth below, the Motion is granted in part and denied in part.

**II. BACKGROUND**

Unless otherwise noted, the following facts are drawn from the Complaint, its attachments, or materials it incorporates by reference, and are assumed to be true for purposes of ruling on the motion, *see Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*), or are otherwise matters of public record. *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020).

**A. The Parties**

Plaintiff Joesph R. Passino is an individual residing in Fulton County, New York. Dkt. No. 2 at ¶ 1. At all relevant times, Plaintiff was the Dog Control Officer for the Town of Perth, New York. *Id.* at ¶ 2. Plaintiff also served as a volunteer backup Animal Control Officer for the Fulton County Sheriff's Department, the New York State Police, the Town of Amsterdam, the Town of Bleecker, and the Village of Mayfield. *Id.* at ¶ 3.

Fulton County is a municipal corporation organized under New York law, with its principal administrative office in Johnstown, New York. *Id.* at ¶¶ 4, 7. At all relevant times, Defendant Richard C. Giardino was the Fulton County Sheriff, *see id.* at ¶ 14, Defendants Jeffrey Fake and Jordan M. Shannon were deputy sheriffs with the Fulton County Sheriff's Department ("FCSD"), *see id.* at ¶¶ 8, 10, and Defendant Robert Stemmler was a sergeant with FCSD who also supervised Defendant Shannon. *Id.* at ¶ 12.

At all relevant times, Defendants Jodi-Lynn Vannie and Gladys K. Griffith were individuals residing in Amsterdam, New York. *See* Dkt. No. 2-12 at 1; Dkt. No. 2-3 at 6. [1]

**B. Plaintiff's Allegations**

Plaintiff's claims arise out of two incidents, each leading to an arrest and a criminal proceeding. *See* Dkt. No. 2 at ¶¶ 42-220. For context, Plaintiff also alleges a particular history of interactions between himself and FCSD, *see id.* at ¶¶ 22-41, including two instances in which FCSD called him

to shoot a sick or injured animal within five hundred feet of a "dwelling house, farm building or farm structure, school building, school playground, or occupied factory or church," one instance in which FCSD members shot a horse within five hundred feet of the same, and one instance in which Plaintiff refused a directive by Defendant Giardino to break into a home without a warrant to seize an unlicensed dog that had been deprived of food and water for a week. *Id.* at ¶¶ 22-39. As to this last instance, Plaintiff alleges that "because [he] would not go along with FCSD's lawful or unlawful instructions[,]" FCSD employees and agents no longer wanted him as the Dog Control Officer. *Id.* at ¶ 40.

### 1. April 7, 2021 Arrest

***2** As to the first incident, Plaintiff alleges that on January 4, 2021, he received multiple calls regarding two at-large dogs, one of which was acting aggressively. *Id.* at ¶ 42. After Defendant Griffith informed Plaintiff that she had seen the dogs walking toward Perth Bible Church, Plaintiff drove to that location and saw the two dogs in the driveway of the pastor's house, which is also on the property. *Id.* at ¶¶ 43-44. Perth Bible Church also operates a school, which was in session. *See* Dkt. No. 2-3 at 2. Then, Plaintiff alleges that while he was waiting for backup, he observed one of the dogs barking and growling at someone in the house, at which point he attempted to engage the dogs himself next to the garage while armed with a loaded pistol. Dkt. No. 2 at ¶¶ 45-47. Plaintiff alleges that one of the dogs had already charged his truck aggressively when he pulled in, and that the same dog "lunged violently" at him when he was out of the truck. *Id.* at ¶¶ 45, 48. Plaintiff alleges that after he missed an attempt to hit that dog with the butt of his pistol, the dog again lunged violently at Plaintiff, who then "took the safety lock off his pistol and shot the male dog with the bullet grazing the male dog's tooth." *Id.* at ¶ 48. At that point, the dog retreated. *Id.* Plaintiff then reported the incident to FCSD, canvassed the neighborhood, and identified the dogs' owner, who later found and collected the dogs. *Id.* at ¶¶ 49-50.

After an investigation into the incident that took place on January 4, 2021, Defendant Fake arrested Plaintiff on April 7, 2021 and charged him with reckless endangerment in the second degree and illegal discharge of a firearm within five hundred feet of a dwelling house and school building, both misdemeanors. *Id.* at ¶¶ 51-53 (citing N.Y. Pen. Law § 120.20 and N.Y. Envir. Cons. Law § 11-9031.4(a)(2)). Defendant Fake's accusatory instrument indicates that he based the charges on Plaintiff's verbal statements and the depositions of Nicole Langlois, the owner of the dogs, Mark Appell, the pastor of Perth Bible Church, and Defendant Griffith. Dkt. No. 2-3. As a result of the charges and a securing order levying various conditions on Plaintiff, *see* Dkt. No. 2-4, Plaintiff alleges that he appeared in Northampton Town Court at least three times. Dkt. No. 2 at ¶ 72. On November 27, 2022, the town prosecutor issued Plaintiff an Adjournment in Contemplation of Dismissal for both charges, which were then dismissed on December 26, 2022. Dkt. No. 2-6; *see also* Dkt. No. 2 at ¶ 77.

### 2. August 10, 2022 Arrest

As to the second incident, Plaintiff alleges that on July 27, 2022, while Defendant Vannie was on her back porch with her two dogs, Plaintiff pulled up to her porch, informed her that he was the Dog Control Officer, and asked whether her dogs were licensed. Dkt. No. 2 at ¶¶ 93-94. After Defendant Vannie stated that they were not licensed, Plaintiff then alleges that he told Defendant Vannie that the law required her to license her dogs and provided her a handwritten note with his name, phone number, title, and the Town Hall hours of operation. *Id.* at ¶¶ 94-95.

During their interaction, Plaintiff alleges that Defendant Vannie asked for identification and Plaintiff responded by showing her his Town of Perth Dog Control Officer badge. *Id.* at ¶ 96. Plaintiff also alleges that he asked if Defendant Vannie wanted to see his identification card issued by FCSD, but she said no. *Id.* at ¶ 97. According to Plaintiff, FCSD issued him an identification card on January 20, 2000, identifying him as the "Perth Dog Control Officer," and some time after that, Plaintiff was issued a badge with the designation: "Town of Perth, Fulton County, New York, Dog Control Officer." *Id.* at ¶¶ 88-89; *see also* Dkt. Nos. 2-7, 2-8.

After that interaction, Defendant Vannie called FCSD and spoke with Defendant Jane Doe. Dkt. No. 2 at ¶ 102; *see* Dkt. No. 2-10 (call transcript). During the call, Defendant Vannie sought to confirm Plaintiff's identity, and also stated that Plaintiff had implied that Defendant Vannie might be ticketed if she didn't register her dogs and told her that he was "with the Sheriff's Department." *See* Dkt. No. 2-10. Jane Doe then expressed concern that Plaintiff purportedly identified himself as a member of FCSD and advised Defendant Vannie that their phone conversation would be forwarded to the administrative sergeant. *Id.* at 7:21-23, 9:14-18, 10:17-22. [2]

***3** On July 28, 2022, Defendant Vannie gave an in-person sworn deposition to Defendant Shannon. Dkt. No. 2 at ¶ 108; *see* Dkt. No. 2-11 (deposition transcript). During their conversation, Defendant Vannie recounts her version of the interaction with Plaintiff, specifically asserting that Plaintiff stated that he was "with the Sherriff's," that Plaintiff showed her his badge that "looked like any normal badge that a police officer would have," and that she believed that Plaintiff was functioning as a law enforcement official. Dkt. No. 2-11 at 18:11-24, 26:18-23.

On August 10, 2022, Defendant Shannon arrested Plaintiff outside of Plaintiff's home without a warrant and charged him with criminal impersonation of a law enforcement officer, a class E felony. Dkt. Nos. 2 at ¶ 125 (citing N.Y. Pen. Law § 190.26(1)); *see also* Dkt. No. 2-14. According to the accusatory instrument, Defendant Shannon based his arrest on Defendant Vannie's sworn deposition testimony. *See* Dkt. No. 2-14.

During the arrest, Plaintiff alleges that Defendant Shannon took Plaintiff's badge and never returned it. Dkt. No. 2 at ¶¶ 174-175. Plaintiff also alleges that Defendant Shannon initially agreed to not handcuff Plaintiff during transport for processing, but as they were walking to the police vehicle, Defendant Shannon grabbed Plaintiff by his left shoulder, shook him, and screamed, "stop resisting, stop resisting!" *Id.* at ¶ 182. Plaintiff then alleges that he told Defendant Shannon that he was hurting Plaintiff, but Defendant Shannon "continued to scream and shake [Plaintiff]." *Id.* At some point after, Defendant Shannon handcuffed Plaintiff. *Id.* at ¶ 195. Plaintiff alleges that Defendant Shannon knew that Plaintiff's left shoulder was injured, as evidenced by Defendant Shannon noting in his case report: Plaintiff "had informed me [that] he has a shoulder injury and could not be handcuffed from the back so I handcuffed [Plaintiff] from the front of his body." *Id.* at ¶ 183; *see* Dkt. No. 2-13 at 4.

Before and after processing, Plaintiff alleges that Defendant Shannon stated multiple times that Plaintiff would be lucky if Defendant Shannon did not also charge him with resisting arrest. Dkt. No. 2 at ¶¶ 184-185. Plaintiff then alleges that after Defendant Shannon brought him back home after processing, Plaintiff pointed to the security cameras around his house, and said: "[Y]ou have been caught doing dirty and a Black Sheriff Deputy can go to jail just as quick as a White man, so you have 10 seconds to arrest me for another bull charge or leave and always remember this!!" *Id.* at ¶ 185. Plaintiff alleges that Defendant Shannon's actions during the arrest exacerbated his shoulder injury and caused "severe physical, mental, and emotional pain ... to such an extent that more than two years after the incident, [Plaintiff] is still receiving medical treatment." *Id.* at ¶ 188.

On September 1, 2022, Plaintiff resigned as the Town of Perth Dog Control Officer. Dkt. No. 2 at ¶ 137.

Plaintiff attended Northampton Town Court four times due to his criminal impersonation charge and a securing order imposing conditions on Plaintiff. *Id.* at ¶¶ 134-135; *see also* Dkt. No. 2-15. On June 6, 2024, the town prosecutor issued Plaintiff an Adjournment in Contemplation of Dismissal, and the criminal impersonation charge was dismissed on June 7, 2024. Dkt. No. 2-16 at 2; *see also* Dkt. No. 2 at ¶ 136.

### C. Plaintiff's Claims

As to the charges filed on April 7, 2021, Plaintiff brings malicious prosecution claims pursuant to Section 1983 against Defendants Fake, Giardino, Fulton County, and Griffith. *See* Dkt. No. 2 at ¶¶ 78-87. As to the arrest and charges filed on August 10, 2022, Plaintiff brings claims for malicious prosecution, unlawful search and seizure, excessive force, false arrest, and malicious abuse of legal process pursuant to Section 1983, as well as conspiracy claims pursuant to Section 1983 and 42 U.S.C. § 1985(3) ("Section 1985(3)"), against Defendants Shannon, Stemmler, Fake, Giardino, Fulton County, Vannie, and Jane Doe. *See id.* at ¶¶ 146-161, 169-220. Finally, Plaintiff brings a malicious prosecution claim under New York law against Defendant Vannie. *Id.* at ¶¶ 162-168.

## III. STANDARD OF REVIEW

***4** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This presumption, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even

if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## IV. DISCUSSION [3]

### A. Fourth or Fourteenth Amendment

As an initial matter, "[w]hen a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously." *Fraser v. City of New York*, No. 20-cv-5741, 2022 WL 3045524, at *2 (E.D.N.Y. Aug. 1, 2022) (citations omitted). "In these circumstances, courts must identify the specific constitutional right allegedly infringed ... and judge the claim by reference to the specific constitutional standard which governs that right." *Id.* (internal quotation marks and citation omitted).

***5** To the extent that Plaintiff's Section 1983 claims of malicious prosecution, false arrest, unlawful search and seizure, and excessive force are based on the Fourteenth Amendment, those claims must be dismissed. "[I]t is the Fourth Amendment, and not [the Fourteenth Amendment right to] substantive due process, under which a [Section] 1983 malicious prosecution claim must be analyzed." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 635 (N.D.N.Y. 2021) (internal quotation marks and citation omitted). Regarding Plaintiff's false arrest claim, "because claims for unlawful arrest are governed by the Fourth Amendment, Plaintiff may not seek relief for ... alleged unlawful arrest[s] under the rubric of a denial of his substantive due process rights." *Barkai v. Nuendorf*, No. 21-cv-4060, 2023 WL 2691712, at *32 (S.D.N.Y. Mar. 29, 2023) (quoting *Harford v. Cnty. of Broome*, 102 F. Supp. 2d 85, 95 (N.D.N.Y. 2000)). Similarly, "because the Fourth Amendment provides an explicit textual source of constitutional behavior against searches by law enforcement officials, Plaintiff's unlawful search claim cannot be analyzed under the Fourteenth Amendment." *Rosado v. Vill. of Goshen*, No. 16-cv-6916, 2019 WL 1437522, at *4 (S.D.N.Y. Mar. 31, 2019) (internal quotation marks and citations omitted). Furthermore, courts evaluate excessive force claims arising out of an arrest or seizure under the Fourth Amendment using an objective reasonableness standard. *See Figuereo v. City of Saratoga Springs*, No. 23-cv-922 (AMN/PJE), 2025 WL 460784, at *7 (N.D.N.Y. Feb. 11, 2025).

Additionally, to the extent that Plaintiff's Section 1983 claim of malicious abuse of process is based on the Fourth Amendment, that claim must also be dismissed. "[I]n the criminal context, malicious abuse of process is by definition a denial of procedural due process." *Zappin v. Cooper*, No. 23-165, 2024 WL 3084015, at *2 (2d Cir. June 21, 2024) (citation omitted). Thus, Plaintiff's claims for malicious abuse of process must be evaluated under the Fourteenth Amendment.

### B. Malicious Prosecution

"The elements of a [Section] 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Wagner*, 518 F. Supp. 3d at 633 (quoting *Bernshtein v. City of New York*, 496 F. App'x 140, 142 (2d Cir. 2012) (summary order)); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

Here, Plaintiff's malicious prosecution claim fails because the underlying state court actions were not terminated in Plaintiff's favor. Attached to the Complaint are the certificate of dispositions for the underlying state court actions, which indicate that the criminal charges brought against Plaintiff were adjourned in contemplation of dismissal pursuant New York Criminal Procedure Law § 170.55. *See* Dkt. Nos. 2-6, 2-16. “It has long been established that the acceptance of an adjournment in contemplation of dismissal does not constitute a favorable determination for purposes of a malicious prosecution claim.” *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 85 (N.D.N.Y. 2025) (citations omitted); *see also Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (explaining that adjournment in contemplation of dismissal “is not a favorable termination because it leaves open the question of the accused's guilt and allows the state to pursue the criminal prosecution in the interests of justice during the conditional period”) (citation omitted).

Accordingly, the Court dismisses Plaintiff's malicious prosecution claim under the Fourth Amendment.

**C. False Arrest**

“A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law.” *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). “Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.” *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). “Under both federal and New York state law, probable cause is a complete defense to a false arrest claim.” *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. Aug. 20, 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)).

***6** Plaintiff alleges that Defendants confined Plaintiff without a warrant, without probable cause, and without his consent. Dkt. No. 2 at ¶¶ 195-198. County Defendants contend that Plaintiff's allegations fail to demonstrate that Defendant Shannon lacked probable cause to arrest Plaintiff and that Plaintiff fails to allege that Defendants Stemmler, Giardino, and Fake were personally involved in Plaintiff's arrest. *See* Dkt. No. 10-1 at 16-17.

The Court agrees with the County Defendants. “Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.” *Adams v. City of Syracuse*, No. 21-cv-650 (AMN/MJK), 2025 WL 2772081, at *16 (N.D.N.Y. Sept. 29, 2025) (quoting *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022)).

Here, the Court finds that Defendant Shannon had probable cause to arrest Plaintiff on August 10, 2022 for criminal impersonation of a law enforcement officer based on Defendant Vannie's sworn deposition testimony. *See* Dkt. Nos. 2-11, 2-14. When an officer receives his information from a putative victim or eyewitness, probable cause is established “unless the circumstances raise doubt as to the person's veracity.” *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (citation omitted); *see also Smith v. City of Utica*, No. 13-cv-767, 2015 WL 4366230, at *2 (N.D.N.Y. July 16, 2015) (noting that “[i]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness” (citations omitted)). According to the Complaint and its attachments, Defendant Vannie gave a sworn deposition to Defendant Shannon, during which she specifically stated that she believed that Plaintiff was functioning as a law enforcement official because Plaintiff told her that he was “with the Sherriff's” and showed her his badge, which “looked like any normal badge that a police officer would have.” *See* Dkt. No. 2 at ¶ 108; *see also* Dkt. No. 2-11 at 18:11-12, 26:18-23. Plaintiff also does not allege that he was a current member of the FCSD. Thus, Defendant Shannon had probable cause to arrest Plaintiff for criminal impersonation of a law enforcement officer.

With respect to Defendants Stemmler, Giardino, and Fake, Plaintiff fails to allege that these Defendants directly participated in Plaintiff's arrest. “A plaintiff cannot sustain a false arrest claim under New York law where there is no allegation that the defendant personally participated in the arrest or detention of the plaintiff.” *Kweller v. Cnty. of Broome*, No. 24-cv-1328, 2025 WL 3280745, at *5 (N.D.N.Y. Nov. 25, 2025) (collecting cases) (internal quotation marks and citations omitted). In opposition, Plaintiff asserts in a conclusory fashion that Defendants Stemmler, Giardino,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and Fake "participated in the unlawful conduct[ ]; and/or approved of it, and/or created the policies, practices, and customs that gave rise to the constitutional deprivations suffered by [Plaintiff]." Dkt. No. 19 at 23. Such general and conclusory assertions are insufficient to demonstrate Defendants' personal involvement. *See, e.g.*, *Daly v. Town of DeWitt*, No. 18-cv-845, 2019 WL 4170162, at *5 (N.D.N.Y. Sept. 2, 2019) (finding no plausible basis to hold defendant liable for false arrest where the complaint does not allege that defendant was an officer who arrived at the scene after plaintiff was pulled over or that defendant took any action to cause plaintiff's detention or instigate the charges against her).

***7** Accordingly, the Court dismisses Plaintiff's false arrest claim against the County Defendants.

### D. Unlawful Search and Seizure

First, to the extent that Plaintiff's unlawful search and seizure claim is predicated on the seizure of his person based on his August 10, 2022 arrest, the Court dismisses that claim as duplicative of his false arrest claim. *See* *Parkinson v. Town of Niskayuna*, No. 22-cv-70, 2023 WL 8574309, at *4 (N.D.N.Y. Dec. 11, 2023) ("To the extent Plaintiff premises his Fourth Amendment claim on the seizure of his person, such a claim is dismissed because it is tantamount to a claim for false arrest[.]"); *see also* *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (finding that plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims because plaintiff "does not allege a search or seizure beyond the actions supporting her false arrest claim").

To the extent that Plaintiff's unlawful search and seizure claim is predicated on the seizure of his property, the Court also dismisses that claim. Plaintiff alleges that Defendant Shannon seized his Town of Perth Dog Control Officer badge without a search warrant and without Plaintiff's consent during his arrest on August 10, 2022. *See* Dkt. No. 2 at ¶ 174. County Defendants argue that because Defendant Shannon had probable cause to arrest Plaintiff on August 10, 2022, and because Plaintiff was subsequently prosecuted for criminal impersonation after Plaintiff showed Defendant Vannie his badge, Plaintiff's badge was seized as evidence of a crime. Dkt. No. 10-1 at 13. In opposition, Plaintiff argues that the seizure of his badge was unreasonable because Defendant Shannon "invaded" Plaintiff's home without a warrant, without exigency, and without Plaintiff's consent and searched and seized Plaintiff's property within the confines of his home. *See* Dkt. No. 19 at 18.

The Court agrees with the County Defendants. As a preliminary matter, the Complaint does not plausibly allege any facts suggesting that Defendant Shannon entered Plaintiff's home to seize Plaintiff's badge, or at any time during Plaintiff's arrest. According to the case report attached to the Complaint, upon Defendant Shannon's arrival at Plaintiff's residence, Plaintiff was sitting in his garage. *See* Dkt. No 2-13 at 4. After conducting his interview of Plaintiff and concluding that Plaintiff "would need to come with [him] to retrieve an [a]ppearance [t]icket for [f]alse impersonation," Defendant Shannon gave Plaintiff the opportunity to drop all items on his person in his garage. *Id.* Plaintiff proceeded to empty all items off his person and put them on his motorcycle in his garage. *Id.* Defendant Shannon subsequently placed Plaintiff under arrest, collected his badge as evidence, and then transported him to the Fulton County Sheriff's Office for processing. *See id.*

Here, as explained in *supra* Section IV(C), there was probable cause to arrest Plaintiff for impersonating an officer. "A police officer may seize personal effects discovered during a search incident to arrest if the officer[ ] find[s] that these are evidence of criminal conduct, even if unrelated to that for which a suspect had been arrested." *Henton v. City of New York*, No. 24-cv-2270, 2025 WL 1907004, at *4 (E.D.N.Y. July 10, 2025) (citing, *inter alia*, *United States v. Robinson*, 414 U.S. 218, 236 (1973)). Thus, Defendant Shannon lawfully seized Plaintiff's personal property, including his badge, incident to arrest, without violating Plaintiff's Fourth Amendment rights. *See* *Henton*, 2025 WL 1907004, at *4-5. Moreover, "the government's failure to return lawfully seized property is not an unreasonable seizure under the Fourth Amendment." *Harding v. Gould*, No. 22-cv-6285, 2024 WL 3742688, at *7 (S.D.N.Y. Aug. 9, 2024) (citing *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) ("Where, as in this case, an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure.")).

***8** Accordingly, the Court dismisses Plaintiff's unlawful search and seizure claim.

### E. Excessive Force

"When assessing whether force is unreasonable under the Fourth Amendment, a court should pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Baptist v. Wheeler*, No. 24-cv-1478 (AMN/TWD), 2025 WL 3120480, at *5 (N.D.N.Y. Nov. 7, 2025) (quoting *Soares v. Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993)). "In doing so, a court takes the perspective of 'a reasonable officer on the scene' rather than that of hindsight." *Id.* (quoting *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015)).

"The police are not required to utilize the least amount of force possible to place someone into custody." *Figuereo*, 2025 WL 460784, at *8 (citation omitted). Moreover, "[c]ourts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force." *Pesola v. City of New York*, No. 15-cv-1917, 2016 WL 1267797, at *7 (S.D.N.Y. Mar. 30, 2016) (collecting cases). However, regardless of the amount of force, "a show of force by an officer that is overly disproportionate to the risk of harm may support a claim for excessive force." *Figuereo*, 2025 WL 460784, at *8 (citation omitted).

### 1. Defendant Shannon

County Defendants contend that Plaintiff's excessive force claim against Defendant Shannon must be dismissed because Plaintiff failed to allege facts plausibly suggesting that Defendant Shannon used beyond *de minimis* force. *See* Dkt. No. 10-1 at 15. Plaintiff argues that the Complaint sufficiently alleges plausible facts in support of his excessive force claim. Dkt. No. 19 at 19-21.

The Court agrees with Plaintiff. Plaintiff alleges that, despite complying with Defendant Shannon's orders, Defendant Shannon, knowing that Plaintiff had an injured left shoulder, "violently grabbed [Plaintiff's] left shoulder and started to shake and squeeze" Plaintiff while "screaming, 'stop resisting, stop resisting!' " Dkt. No. 2 at ¶¶ 182-183. Plaintiff further alleges that he told Defendant Shannon that he was hurting him, but Defendant Shannon "continued to scream and shake [Plaintiff]," which "exacerbated" Plaintiff's existing shoulder injury and caused Plaintiff "significantly severe physical, mental, and emotional pain" for which he is still receiving medical treatment, more than two years after the incident. *Id.* at ¶¶ 182, 188. Accepting these allegations as true, the Complaint plausibly alleges that Defendant Shannon used excessive force in the course of arresting Plaintiff. *See, e.g.*, *Goonewardena v. Spinelli*, No. 15-cv-5239, 2017 WL 9482109, at *13 (E.D.N.Y. Aug. 14, 2017) (recommending that excessive force claim against officer proceed where plaintiff alleged that officer's actions "resulted in plaintiff screaming for help in pain and caused injuries restricting plaintiff's ability to lift heavy objects for two months" (internal quotation marks and citations omitted)), *report and recommendation adopted*, 2017 WL 4280549 (E.D.N.Y. Sept. 26, 2017).

***9** Moreover, even in the context of an arrest, "[b]ecause of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020) (citation omitted). "These principles apply with even greater force at the motion to dismiss stage, where a court must assume the truth of the plaintiff's allegations and avoid resolving factual disputes." *Id.*; *see also Phillips v. City of Middletown*, No. 17-cv-5307, 2018 WL 4572971, at *3 (S.D.N.Y. Sept. 24, 2018) ("When courts grant motions to dismiss an excessive force claim, it is because the force used was objectively reasonable as a matter of law." (citation omitted)).

Thus, after drawing all reasonable inferences in Plaintiff's favor and taking into account the totality of the circumstances of his arrest, the Court denies County Defendants' motion to dismiss Plaintiff's excessive force claim against Defendant Shannon. [4]

### 2. Defendants Giardino, Stemmler, and Fake

"It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show 'the defendant's personal involvement in the alleged constitutional deprivation.' " *Enders v. Boone*, 658 F. Supp. 3d 70, 90 (N.D.N.Y. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted)), *aff'd sub nom. Siano Enders v. Boone*, No. 23-823, 2024 WL 3518058 (2d Cir. July 24, 2024). A plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Pursuant to this requirement, a Section 1983 plaintiff must

allege a tangible connection between the acts of the defendant and the injuries suffered." *Keyes v. Venettozzi*, No. 18-cv-372, 2022 WL 991402, at *6 (N.D.N.Y. Mar. 31, 2022) (internal quotation marks and citation omitted). In other words, "the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained." *Durr v. Slator*, 558 F. Supp. 3d 1, 20 (N.D.N.Y. 2021) (citations omitted).

"Personal involvement of a supervisor may be established by direct participation in a constitutional violation or by showing that he created a policy or custom under which the violation occurred." *Rindgen v. Cnty. of Broome*, No. 24-cv-1325, 2025 WL 2772080, at *17 (N.D.N.Y. Sept. 29, 2025) (internal quotation marks and citation omitted); *see also Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 416 (E.D.N.Y. 2023) ("Post-*Tangreti*, district courts in the Circuit have determined that personal involvement still may be established for a supervisory defendant if he or she 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.' ") (collecting cases). However, "conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Rindgen*, 2025 WL 2772080, at *17 (citation omitted).

***10** Thus, Plaintiff must allege facts suggesting that Defendants planned, directed, or authorized the excessive force against Plaintiff himself, or that they created or maintained policies which led to the use of excessive force against Plaintiff.

With respect to Defendant Giardino, Plaintiff alleges that Defendant Giardino "delegated authority to establish the policies, practices, supervision, implementation and conduct of all FCSD employees and agents." Dkt. No. 2 at ¶ 16. These allegations are unsupported by any specific facts, and thus insufficient to plausibly allege Defendant Giardino's personal involvement with respect to the alleged excessive force against Plaintiff. *See, e.g.*, *Baumeister v. Erie Cnty.*, No. 23-cv-1150, 2024 WL 4362311, at *10 (W.D.N.Y. Sept. 30, 2024) (finding that vague and conclusory allegations that sheriff and supervisory officer defendants were *inter alia* "responsible for the supervision, administration, policy practices, procedures, and customs of th[eir] offices," and "the pervasive and entrenched pattern of misconduct ... relating to utilizing force without justification, including the use of excessive force in effectuating arrests," are insufficient to establish personal involvement).

Plaintiff further alleges that after his arrest on August 10, 2022, while Defendant Shannon was transporting him home, Defendant Giardino pulled up next to Defendant Shannon's vehicle, and the two smiled at each other. Dkt. No. 2 at ¶ 128. This allegation is also insufficient to plausibly allege Defendant Giardino's personal involvement. Defendant Giardino was not present during the alleged incident, and, even accepting Plaintiff's allegations as true, an allegation that Defendants Giardino and Shannon smiled at one another, without more, is insufficient to demonstrate that Defendant Giardino was personally involved in Defendant Shannon's alleged use of excessive force. *See, e.g.*, *Green v. Garcia*, No. 18-cv-1745, 2020 WL 1467359, at *5 (S.D.N.Y. Mar. 25, 2020) (dismissing excessive force claims against certain officers because plaintiff failed to plead that "each of them was individually present during the alleged assault").

Plaintiff also fails to allege that Defendants Stemmler and Fake were personally involved in the alleged use of excessive force. Plaintiff fails to allege that Defendants Stemmler and Fake participated in the alleged use of excessive force or were responsible for a policy or custom which led to the alleged use of excessive force. Beyond unparticularized allegations against all Defendants, with respect to Plaintiff's excessive force claims, the Complaint alleges, at most, that Defendant Fake supplied a false statement to Defendant Shannon that Plaintiff had a prior history of impersonating law enforcement, *see* Dkt No. 2 at ¶ 119, and Defendant Stemmler instructed Defendant Shannon to take a written statement from Defendant Vannie, *see id.* at ¶ 118, both of which supported Defendant Shannon's arrest and prosecution of Plaintiff. Even granting Plaintiff all favorable inferences, the Court cannot find that Plaintiff plausibly alleges that Defendants Stemmler and Fake were personally involved in any alleged use of excessive force. *See, e.g.*, *Powell v. City of Jamestown*, No. 21-cv-721, 2022 WL 1913581, at *10 (W.D.N.Y. June 3, 2022) (dismissing excessive force claims against chief, sheriff, and undersheriff because plaintiff failed to allege that they personally used any physical force against him, or that they were even present during the alleged incidents).

***11** Accordingly, the Court dismisses Plaintiff's excessive force claim against Defendants Giardino, Stemmler, and Fake.

### F. Malicious Abuse of Process

Plaintiff also asserts a claim for abuse of process. *See* Dkt. No. 2 at ¶¶ 200-205. Courts look to state law for the elements of a Section 1983 claim based on malicious abuse of process. *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013) (citing *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003)). In New York, in order to prevail on a claim for malicious abuse of process, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Wagner*, 518 F. Supp. 3d at 627 (quoting *Savino*, 331 F.3d at 76). "The third element, which forms the crux of this claim, requires that the defendants had an improper *purpose* in instigating the action, as opposed to merely a malicious motive." *Thorpe v. Delta Air Lines, Inc.*, No. 24-cv-1089, 2024 WL 5007423, at *8 (E.D.N.Y. Dec. 6, 2024) (internal quotation marks and citations omitted) (emphasis in original), *aff'd*, No. 25-58, 2025 WL 2868136 (2d Cir. Oct. 9, 2025). "The same elements apply to a [Section] 1983 claim for malicious abuse of process, but the plaintiff must also show the deprivation of a constitutional right." *Rivera v. Jahmi*, 801 F. Supp. 3d 129, 161 (E.D.N.Y. 2025) (internal quotation marks and citation omitted).

Here, regarding the third element, i.e., alleging a collateral objective, Plaintiff fails to state any facts, beyond conclusory allegations, that County Defendants pursued his prosecution for any improper purpose. *See* Dkt. No. 2 at ¶¶ 201-204. In opposition, Plaintiff contends that Defendants "employed the ... process of [a] felony complaint ... to force [P]laintiff out of his job as the Dog Control [O]fficer." Dkt. No. 19 at 25. But, in addition to being conclusory, this argument goes to Defendants' motive, and thus, does not satisfy the collateral objective requirement. *See LoPorto v. Cnty. of Rensselaer*, No. 15-cv-866, 2018 WL 4565768, at *14 (N.D.N.Y. Sept. 24, 2018) (noting that a malicious motive alone does not give rise to a cause of action for abuse of process and that plaintiff must instead claim that defendants "aimed to achieve a collateral purpose beyond or in addition to [plaintiff's] criminal prosecution"); *see also Savino*, 331 F.3d at 77-78 (finding that the plaintiff's allegation that an investigation of him "was solely motivated to seek vindication for the City's great political embarrassment and humiliation for allowing plaintiff to be the highest paid city employee" went just to the defendants' motive and thus fell short of creating liability); *Zappin*, 2024 WL 3084015, at *2 (holding that allegations "suggest[ing] only that [defendant] acted maliciously in instigating the prosecution" are insufficient to state a claim of abuse of process).

Accordingly, the Court dismisses Plaintiff's abuse of process claim. [5]

### G. Conspiracy Claims

***12** "To prove a [Section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citations omitted); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). To state a conspiracy claim under Section 1985(3), a plaintiff must allege "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) and citing 42 U.S.C. § 1985(3)). Under Section 1985(3), the conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)).

Here, the Complaint fails to allege a plausible conspiracy claim under either Section 1983 or Section 1985(3). Even read in the light most favorable to Plaintiff, the Complaint contains only conclusory allegations of a conspiracy. Plaintiff alleges that (i) Defendants "conspired and worked in concert to carry out the unlawful actions alleged in th[e] [C]omplaint"; (ii) "[t]he unlawful actions of each of the [D]efendants was a part and parcel of an agreement and conspiracy between the [D]efendants to maliciously violate [P]laintiff's constitutional rights"; and (iii) "[e]ach of the [D]efendants was aware, agreed to, approved of, and/or engaged in one or more of the overt acts in furtherance of the conspiracy." Dkt. No. 2 at ¶¶ 207-209, 213, 217-218. "Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either [Section] 1983 or [Section] 1985(3)." *Brill*, 799 F. Supp. 3d at 82 (quoting

*Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) and citing *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011)). Plaintiff does not provide any factual basis that supports a meeting of the minds between Defendants indicating that they entered into an express or tacit agreement to achieve some unlawful end. *See, e.g.*, *Brill*, 799 F. Supp. 3d at 83 (finding that plaintiff does not "allege any specific facts regarding a 'meeting of the minds' among any or all [d]efendants, nor does [p]laintiff set forth how [d]efendants acted in concert with one another to violate [p]laintiff's rights").

Moreover, regarding Plaintiff's Section 1985(3) conspiracy claim, the Complaint fails to plausibly allege that Defendants were motivated by racial animus. Plaintiff's allegation that Defendant Shannon, who is black, "was sent, encouraged, and emboldened by the agreement and actions of the other [D]efendants" to deprive Plaintiff, who is white, of his equal protection rights, is conclusory, and thus insufficient to plausibly suggest that Defendants were motivated by Plaintiff's race. *See* Dkt. No. 2 at ¶ 215; *see also* *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 284 (S.D.N.Y. 2019) (dismissing Section 1985(3) claim because plaintiff, *inter alia*, has not shown that racial animus accounts for defendants' conduct). Plaintiff also has not alleged membership in a protected class under Section 1985(3). To the extent that Plaintiff claims that Defendants were motivated by class-based discriminatory animus due to Plaintiff's employment as a dog control officer, *see* Dkt. No. 19 at 28, dog control officers are not a protected class because they "plainly do not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement." *Dolan*, 794 F.3d at 296; *cf.* *Berenson v. Biden*, 791 F. Supp. 3d 398, 423-24 (S.D.N.Y. 2025) (noting that courts in this Circuit have found protected classes to include political affiliation, gender, religion, and disability, but not vaccination status, in the context of Section 1985(3)).

***13** Accordingly, the Court grants County Defendants' motion to dismiss Plaintiff's Section 1983 and Section 1985(3) conspiracy claims.

### H. *Monell* Claim

Lastly, Plaintiff's Section 1983 claims against Fulton County must also be dismissed because Plaintiff has not plausibly pled a *Monell* claim.

Municipalities are not liable under Section 1983 "unless action pursuant to official municipal policy of some nature causes a constitutional tort." *Glassman v. City of New York*, 557 F. App'x 97, 98 (2d Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "To bring a claim for municipal liability under *Monell*, [a plaintiff] must plausibly allege the existence of an official policy or custom that caused him to be denied a constitutional right." *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 138 (N.D.N.Y. 2024) (citations omitted). "*Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (summary order)). "Boilerplate statements that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim." *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 76 (N.D.N.Y. 2023) (internal quotation marks and citation omitted).

Here, Plaintiff's allegations are conclusory and fail to sufficiently plead a *Monell* claim against Fulton County. Specifically, Plaintiff alleges that "Fulton County and its decision-making officials instituted and carried out policies, practices, and/or customs of conducting [unlawful] search and seizures[.]" Dkt. No. 2 at ¶ 146. However, Plaintiff fails to allege any specific facts from which any policy, practice, or custom could be inferred that could support a plausible *Monell* claim. *See, e.g.*, *Dougal v. Lewicki*, No. 23-cv-1167, 2023 WL 6430586, at *10 (N.D.N.Y. Oct. 3, 2023) (recommending dismissal of *Monell* claims because plaintiff "does not include any allegations in his complaint concerning municipal conduct that states a *Monell* claim[,] ... does not allege what actions were taken by the County, or by its employees[,] [or] which [actions] the County knew about"), *report and recommendation adopted*, 2023 WL 7013384 (N.D.N.Y. Oct. 25, 2023).

In opposition, Plaintiff contends that Defendant Giardino, as "the final policymaker" for law enforcement in Fulton County, "established unconstitutional policies, practices and/

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

or customs," as evidenced by Defendant Giardino, on at least one previous occasion, ordering his deputies to break into a home without a warrant to seize an unlicensed dog that was locked in a home without food or water for one week. Dkt. No. 19 at 32; *see also* Dkt. No. 2 at ¶¶ 32-39. Even assuming that such act was unlawful, a single instance of alleged misconduct is insufficient to infer a policy or custom under *Monell*. *See* *Taranto v. Putnam Cnty.*, No. 21-cv-2455, 2023 WL 6318280, at *16 (S.D.N.Y. Sept. 28, 2023) (noting that "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality" (citations omitted)); *see also* *Boddie v. City of New York*, No. 15-cv-4275, 2016 WL 1466555, at *3 (S.D.N.Y. Apr. 13, 2016) (holding that pleading only "two or three instances" of a constitutional violation falls "far short of showing a policy, custom, or usage"). Accordingly, Plaintiff's conclusory allegations are insufficient to support a *Monell* claim against Fulton County.

***14** For these reasons, the Court dismisses Plaintiff's claims against Fulton County.

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the County Defendants' motion to dismiss, Dkt. No. 10, is **GRANTED in part and DENIED in part**, and the Court further

**ORDERS** that Plaintiff's excessive force claim shall proceed against Defendant Shannon; and the Court further

**ORDERS** that the remainder of Plaintiff's claims against the County Defendants are **DISMISSED** in accordance with this Memorandum-Decision & Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 817990

## Footnotes

1 Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2 Plaintiff contends that based on Defendant Shannon's case report, the administrative sergeant was Defendant Stemmler. Dkt. No. 19 at 27 n.5; *see also* Dkt. No. 2-13 at 2.

3 When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). Here, Plaintiff attaches numerous state court documents to the Complaint that he relies upon in support of his allegations. *See* Dkt. Nos. 2-1-2-17. Neither party challenges the relevance, authenticity, or accuracy of these documents. *See* *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (noting that if "there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind"). Accordingly, the Court finds that it may consider these documents for purposes of deciding the County Defendants' Motion.

4 In the alternative, County Defendants contend that Defendant Shannon is entitled to qualified immunity. *See* Dkt. No. 10-1 at 24. "[A]ny adjudication as to the applicability of the qualified immunity defense would be premature at this juncture, since resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Keir v. Donaldson*, No. 25-cv-542, 2025 WL 3442904, at *14 (N.D.N.Y. Dec. 1, 2025) (internal quotation marks, citation, and brackets omitted);

Passino v. Fulton County New York, Slip Copy (2026)

*see also* *O'Brien v. City of Syracuse*, No. 22-cv-948, 2023 WL 6066036, at *14 (N.D.N.Y. Sept. 18, 2023) (noting that "[a] defendant asserting a qualified immunity defense on a motion to dismiss ... 'faces a formidable hurdle and is usually not successful,' " as such defense " 'will succeed only where entitlement to qualified immunity can be established based solely on facts appearing on the face of the complaint' " (quoting *Barnett v. Mount Vernon Police Dept.*, 523 F. App'x 811, 813 (2d Cir. 2013) (alterations omitted)).

5 Because the Court dismisses Plaintiff's abuse of process claim, the Court does not reach the issue of whether such claim is time-barred, or whether Plaintiff has sufficiently alleged each Defendant's personal involvement.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1643392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Melania PERVU and Nicolae Pervu, Plaintiffs,
v.
CITY OF ONEONTA, David Merzig, Defendants.

6:19-CV-00861 (MAD/TWD)
|
Signed 04/02/2020

**Attorneys and Law Firms**

MELANIA PERVU, NICOLAE PERVU, 26 Maple Street, Oneonta, New York 13820, Plaintiff pro se.

OF COUNSEL: APRIL J. LAWS, ESQ., COREY A. RUGGIERO, ESQ., JOHNSON & JOHNSON, LLC, 648 Plank Road, Suite 204, Clifton Park, New York 12020, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

***1** On June 17, 2019, *pro se* plaintiffs Melania and Nicolae Pervu ("Plaintiffs") commenced this action against Defendants David Merzig and the City of Oneonta ("Defendants"). *See* Dkt. No. 1 at 1. In their complaint, Plaintiffs' only remotely cognizable allegation claimed that Defendants had falsely classified Plaintiffs' apartment building, located at 195 Main Street, Oneonta, New York 13820, as uninhabitable. *See* Dkt. No. 1 at 3. However, in their response to Defendants' motion to dismiss, Plaintiffs asserted a litany of additional claims, despite not seeking to amend their complaint. These claims include a 42 U.S.C. § 1983 violation for discrimination, defamation, perjury, false statements, witness tampering, and "a very clear case of judicial misconduct" during state court proceedings initiated by Defendants. *See* Dkt. No. 18 at 1-2.

Currently before the Court is Defendants' motion to dismiss pursuant to Federal Rules of Procedure 8(a) and 12(b)(6). *See generally* Dkt. No. 16-1.

## II. BACKGROUND

Plaintiffs have owned the property formerly known as the Oneonta Hotel since May 22, 2015 (the "Property"), and, until February 2019, ran it as an apartment building for low-income [1] residents. *See* Dkt. No. 1 at 3; Dkt. No 16-1 at 11. The building did not have a Certificate of Compliance, a prerequisite for rental occupancy, when Plaintiffs purchased it, as it was in some state of disrepair. *See* Dkt. No. 16-1 at 7. Plaintiffs failed to remedy the violations preventing them from obtaining this certificate, and on January 5, 2017, the City of Oneonta's Board of Public Service (the "Board") deemed the building to be "unsafe" and "order[ed] immediate repair." Dkt. No. 16-1 at 8. The Board also resolved that if Plaintiffs failed to make the repairs within thirty days, it would issue an order to vacate the Property. Dkt. No. 16-1 at 8.

On September 14, 2017, more than nine months after the Board's resolutions, the City's Code Enforcement Officer found multiple violations, including the following: "extensive water damage (including active water leaks), inoperable carbon monoxide detectors, inoperable and/or missing smoke detectors, incorrectly located smoke and/or carbon dioxide detectors and inoperable lights and/or emergency signage." Dkt. No. 16-1 at 9. The Code Enforcement Officer notified the Board, and on November 2, 2017, the Board moved to order that the building be vacated, but agreed not to take further action until after April 30, 2018, "so as to allow the low-income tenants to find substitute housing" and to give Plaintiffs one last chance to remedy the violations. Dkt. No. 16-1 at 9. On March 8, 2018, the City of Oneonta circulated a notice to tenants and funding agencies declaring the building "to be unsafe for occupancy, due to significant violations of the New York State Housing and Building Code" and advising tenants to vacate the building "[u]nless the landlord brings the property into full building code compliance by April 30, 2018[.]" Dkt. No. 1 at 5.

***2** On June 26, 2018, after Plaintiffs had continued to rent out the Property in violation of the Board's May 15, 2018 order to vacate, Defendants filed a petition in Otsego County Supreme Court pursuant to Sections 302, 303, and 309 of the New York State Multiple Dwelling Law. *See* Dkt. No. 16-1 at 10. On August 14, 2018, Plaintiffs answered the petition and brought a counterclaim against the City of Oneonta for violation of their due process rights under the Fifth and Fourteenth Amendments. *See* Dkt. No. 16-1 at 10. On September 7, 2018, the Otsego County Supreme Court

held an evidentiary hearing, and three days later issued an order requiring Plaintiffs to remedy all code violations by January 11, 2019, or "immediately be in Contempt of the Court." Dkt. No. 16-1 at 10.

However, after another inspection on January 15, 2019, the City of Oneonta found "numerous remaining Code violations such as extensive water damage and active leaks and inoperable or missing smoke detectors, as well as numerous other health and safety violations." Dkt. No. 16-1 at 11. Accordingly, in a February 5, 2019 hearing, the state court ordered all tenants to vacate the building by February 7, 2019. *See* Dkt. No. 16-1 at 11.

According to Plaintiffs, "the city Oneonta attorney David Merzig and his wife Margie Merzig, Chair of the City Board, decided to act against me, my family, and my tenants." Dkt. No. 1 at 3. Indeed, Plaintiffs allege that "[t]he city administration represented by David Merzig us[ed] false statements, weaponized the code enforcement office and using false pretenses, asked the court to evict by force my tenants[.]" Dkt. No. 1 at 3. Plaintiffs further allege that these acts, among others mentioned in the complaint, constitute "discrimination against [their] [immigrant] status, selective enforcement, defamation, and slander" and thus violate Section 1983. Dkt. No. 18 at 1. Specifically, Plaintiffs claim that Defendants used misleading photographs as evidence to obtain the warrant of eviction, and that their purpose "has been nothing but discriminatory, as their real interest was not [t]o work with us but to do everything in order to shut our property down." *Id.* at 4.

In their motion to dismiss, Defendants argue that, even under the more liberal pleading standard granted to *pro se* plaintiffs, the complaint fails to allege any cognizable injury under Section 1983. *See* Dkt. No. 16-1 at 12-13. Further, Defendants assert that Plaintiffs' complaint fails to include any factual statements or claims that would satisfy Rule 8's pleading standard. *See id.* at 14 (quoting Fed. R. Civ. P. 8(a)(2)). Regardless of the complaint's sufficiency, Defendants also argue that Plaintiffs claims are barred by collateral estoppel because "Plaintiffs have a full and fair opportunity to litigate their counterclaims in the state court proceeding." Dkt. No. 19 at 11. In short, Defendants claim that "Plaintiffs are merely unhappy with the rulings by the state court judge [who] direct[ed] Plaintiffs to either repair the building or vacate the tenants." Dkt. No. 16-1 at 15.

Currently before the Court is Defendants' motion to dismiss.

## III. DISCUSSION

### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See* *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See* *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See* *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

***3** Furthermore, "[w]hen deciding a motion to dismiss, the [c]ourt's review is ordinarily limited to 'the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.' " *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) and citing *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). Accordingly, "[w]hen matters outside the pleadings are presented [in support of or] in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) (alteration and internal quotation marks omitted). A court may, under appropriate circumstances, "consider material outside of the pleadings on a motion to dismiss." *Chamberlain*, 986 F. Supp. 2d at 379 (citing *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)). If, for example, the record clearly demonstrates "that no dispute exists regarding the authenticity or accuracy of the document[s]," *Faulkner*, 463 F.3d at 134, then "a court may consider documents upon the terms and effect of which the complaint relies heavily—that is, 'integral' documents —without converting a motion to dismiss into a summary judgment motion," *Chamberlain*, 986 F. Supp. 2d at 379 (citing *Chambers*, 282 F.3d at 153).

### B. Abstention Under *Younger v. Harris*, 401 U.S. 37 (1971)

Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). In *Younger*, the Supreme Court recognized a limited exception to this general rule, holding that federal courts should abstain from exercising jurisdiction over suits to enjoin pending state criminal proceedings, absent a showing of bad faith, harassment, or a patently invalid state statute. *See Younger v. Harris*, 401 U.S. 37, 53-54 (1971) (citation omitted).

*Younger* is not based on an Article III requirement, but instead is a "prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (citations omitted). The rationale behind *Younger* was set forth by the Second Circuit in *Spargo*:

> "Our Federalism" in its ideal form, as the Supreme Court explained in *Younger*, strives towards "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." In recognition of this balance of interests, *Younger* generally prohibits courts from "taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings" so as to avoid unnecessary friction. Giving states "the first opportunity ... to correct their own mistakes" when there is an ongoing state proceeding serves the vital purpose of "reaffirm[ing] the competence of the state courts," and acknowledging the dignity of states as co-equal sovereigns in our federal system.

*Spargo*, 351 F.3d at 75 (internal quotations and citations omitted).

Although *Younger* itself dealt only with a pending criminal proceeding, the "*Younger* abstention has been extended to civil proceedings, ... and state administrative proceedings[.]" *Cecos Int'l, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir. 1990) (internal citations omitted). As noted by the Sixth Circuit, "*Younger* cases generally have a common procedural posture." *Devlin v. Kalm*, 594 F.3d 893, 894 (6th Cir. 2010). "In the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings. Moreover, the basis for the federal relief claimed is generally available to the would-be federal plaintiff as a defense in the state proceedings." *Id.* at 894-95 (quoting *Crawley v. Hamilton Cty. Comm'rs*, 744 F.2d 28, 30 (6th Cir. 1984)); *see e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10-11 (1987) (federal plaintiff seeking to enjoin state plaintiff from enforcing a judgment against him); *Moore v. Sims*, 442 U.S. 415, 423 (1979) (federal plaintiffs seeking to enjoin state proceedings against them for child abuse).

***4** To determine whether abstention is appropriate under *Younger*, district courts must conduct a three-pronged inquiry: "[a]bstention is mandatory where: (1) 'there is an ongoing state proceeding; (2) an important state interest is implicated; and (3) the plaintiff has an avenue open for review of constitutional claims in the state court.' " *Glatzer v. Barone*, 394 Fed. Appx. 763, 764 (2d Cir. 2010) (quoting *Liberty Mutual Ins. Co. v. Hurlbut*, 585 F.3d 639, 647 (2d Cir. 2009)). The Supreme Court, however, has stressed that "[c]ircumstances fitting within the *Younger* doctrine ... are 'exceptional' " and include only " 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.' " *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367-68 (1989)).

Furthermore, Second Circuit has recently emphasized that "[c]ivil contempt orders and orders requiring the posting of bonds on appeal fall into" *Younger*'s third category, *i.e.*, "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Disability Rights New York v. New York*, 916 F.3d 129, 133 (2d Cir. 2019) (citing *NOPSI v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989)). Indeed, the Supreme Court has found that "[t]he contempt power lies at the core of the administration of a State's judicial system," and "stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory[,]" and, accordingly, that *Younger* requires abstention where federal adjudication would interfere with such authority. *Juidice v. Vail*, 430 U.S. 327, 335, 336 n.12 (1977)); *see also Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (finding that *Younger* abstention is appropriate when pending state court proceedings involve enforcing orders and judgments, as federal courts must exercise proper "respect for the ability of state courts to resolve federal questions presented in state-court litigation"); *Dudla v. P.M. Veglio LLC*, No. 1:13-CV-0333, 2016 WL 1068120,*7 (N.D.N.Y. Mar. 15, 2016) (quoting *Moore v.*

Sims, 442 U.S. 415, 423 (1979)) (noting that "the 'presence of such other vital concerns as enforcement of contempt proceedings' " may justify abstention under *Younger).*

Similarly, "the 'vindication of important state policies such as safeguarding the fiscal integrity of [public assistance] programs' " may also put a state court proceeding into Younger's third category. *Dudla v. P.M. Veglio LLC*, No. 1:13-CV-0333, 2016 WL 1068120,*7 (N.D.N.Y. Mar. 15, 2016) (quoting *Moore v. Sims*, 442 U.S. 415, 423 (1979)). Furthermore, "[i]n the context of applying the *Younger* abstention doctrine, courts have found that 'the State has an important interest in regulating zoning and land use.' " *Jureli, LLC v. Schaefer*, 53 F. Supp. 3d 552, 558 (E.D.N.Y. 2014) (quoting *Thomas v. Venditto*, 925 F. Supp. 2d 352, 357 (E.D.N.Y. 2013)) (other citation omitted).

***1. First Prong***

Under *Younger*'s first prong, "[n]ot only must state proceedings be pending[,] ... the proceedings must have been initiated 'before any proceedings of substance on the merits have taken place in the federal court.' " *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 647 (2d Cir. 2009) (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984)). Additionally, "a party ... must exhaust his state appellate remedies before seeking relief in the District Court[.]" *Glatzer v. Barone*, 394 Fed. Appx. 763, 765 (2d Cir. 2010) (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608, 610 (1975)).

***5** In the present matter, Plaintiffs appealed Judge Lambert's October 22, 2019, decision on November 18, 2019, and their case before the Otsego County Supreme Court remains pending. As "[a] state action is considered 'pending' for *Younger* purposes through the completion of the state appeals process," to the extent that the proceedings in the present matter remain pending before the state supreme court, they easily qualify as "ongoing" under *Younger. See Choi v. Kim*, 96-cv-2086, 1997 WL 722708, *5 (E.D.N.Y. Sept. 25, 1997) *aff'd*, 166 F.3d 1201 (2d Cir. 1998) (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 594 (1975)); *see also Glatzer v. Barone*, 394 Fed. Appx. 763, 765 (2d Cir. 2010) (finding that *Younger* abstention was warranted when the plaintiff's "state appellate proceedings were still pending").

Both parties' submissions indicate that their dispute continues before the state court. While the state court issued a decision on the order to show cause on March 12, 2020, granting the application and finding Plaintiffs in contempt, Plaintiff still has an appeal pending regarding the state court's earlier decision and the supreme court matter remains open. Thus, as Plaintiffs face pending proceedings before the state court, those proceedings would qualify as ongoing under *Younger* regardless of whether Plaintiffs decide to file an appeal of the March 12, 2020 decision. *See Homere v. Inc. Vill. of Hempstead*, 322 F. Supp. 3d 353, 367 (E.D.N.Y. 2018) (holding that "to the extent there is a pending action against [p]laintiffs in the Village Court, *Younger*'s first requirement is satisfied").

***2. Second Prong***

*Younger*'s second prong, requiring that "an important state interest is implicated in that proceeding[,]" has also been met in the present matter. *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). "[D]etermining whether a state interest is 'important' turns not on the narrow outcome of the particular state court proceeding at hand, but rather on the importance of the generic proceedings to the state." *Homere v. Inc. Vill. of Hempstead*, 322 F. Supp. 3d 353, 367 (E.D.N.Y. 2018) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989); *Grieve*, 269 F.3d at 152).

"It has long been held that issues involving public welfare and safety fall squarely within a state's plenary police powers and therefore implicate important state interests." *Homere*, 322 F. Supp. 3d at 367 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)). "In the context of applying the *Younger* abstention doctrine, courts have found that 'the State has an important interest in regulating zoning and land use.' " *Jureli, LLC v. Schaefer*, 53 F. Supp. 3d 552, 558 (E.D.N.Y. 2014) (quoting *Thomas v. Venditto*, 925 F. Supp. 2d 352, 357 (E.D.N.Y. 2013)) (citation omitted); *see also Novie v. Vill. of Montebello*, No. 10-CV-9436 CS, 2012 WL 3542222, *12 (S.D.N.Y. Aug. 16, 2012) (collecting cases) (finding that a "state proceeding implicates an important state interest insofar as it concerns a town land use regulation akin to a zoning requirement"). "[A] local building code is a policy manifestation of that uniquely local interest in public health, wellness, safety, and comfort[;] ... any enforcement proceedings against [p]laintiffs initiated for violations of the [v]illage building code satisfy *Younger*'s second requirement." *Homere*, 322 F. Supp. 3d at 368.

The genesis of the present matter lies in Plaintiffs' alleged failure to comply with the City of Oneonta's housing and building codes, as well as the New York State Multiple Dwelling Law. *See* Dkt. No. 16-1 at 10. In its October 22,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

2019, decision and order, the Supreme Court found that Plaintiffs' "proof failed to sufficiently rebut the evidence" of "significant outstanding violations" of those codes. In fact, that court specifically found that "[t]hese violations were serious and involve the health and safety of the public." Thus, "[i]t is clear the state interests implicated in the State action, to wit, the ability of the Town and the State to regulate zoning and land use, as well as the interest in protecting the health of its citizens and the environment, are important enough to warrant abstention." *Donangelo, Inc. v. Town of Northumberland*, No. 03 CV 934, 2005 WL 681494, *2 (N.D.N.Y. Mar. 24, 2005) (collecting cases).

***6** Lastly, the state court action, in addition to enforcing the important state interests discussed above, "seeks to sanction the Plaintiff for an allegedly wrongful act of violating a court order" and thus "involves an order uniquely in furtherance of the state court's ability to perform its judicial functions." *Jureli*, 53 F. Supp. 3d at 560. Accordingly, the state court's order to show cause "clearly constitutes a civil enforcement proceeding" that falls under *Younger*'s second category. *Id.*; *see also Juidice v. Vail*, 430 U.S. 327, 335 (1977) (finding that enforcing a state court's contempt process "is surely an important interest" under *Younger* because that process is how the state "vindicates the regular operation of its judicial system"); *Dosiak v. Town of Brookhaven*, No. CV 16-6658, 2017 WL 7048912, *7 (E.D.N.Y. Nov. 27, 2017) ("Plaintiffs' claim [challenging a state court's order to show cause] here clearly implicate both civil enforcement proceedings and New York State's interest in enforcing the orders and judgments of its courts.... *Younger* abstention is therefore appropriate").

Accordingly, the Court finds that *Younger*'s second prong has been satisfied.

### *3. Third Prong*

*Younger*'s third and final prong requires that "the state proceeding afford[ ] the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Const. Corp.*, 282 F.3d at 198 (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). In the present matter, nothing in the record suggests that the state supreme court or appellate division is unable to adequately adjudicate Plaintiffs' federal constitutional claims. *See Homere*, 322 F. Supp. 3d at 368. In fact, Plaintiffs asserted their federal claims during the state court proceeding. Specifically, in their answer in the state court proceeding, Plaintiffs brought counter claims alleging violations of their due process rights under the Fifth and Fourteenth Amendments.

Accordingly, the Court finds that the third prong under *Younger* has been satisfied. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (finding that "respect for the ability of state courts to resolve federal questions presented in state-court litigation" mandates *Younger* abstention where pending State proceedings involve enforcing orders and judgments); *Spargo*, 351 F.3d at 77 ("[I]n conducting the Younger inquiry, considerations of comity 'preclude[ ] any presumption that the state courts will not safeguard federal constitutional rights' ") (quoting *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982)).

### *4. Bad Faith Exceptions*

Even when a case has met all three of *Younger*'s prongs, "federal relief is obtainable[,] ... where the there is a showing of bad faith or harassment in bringing the or conducting the state proceeding." *Wandyful Stadium, Inc. v. Town of Hempstead*, 959 F. Supp. 585, 591 (E.D.N.Y. 1997) (citing *Younger*, 401 U.S. at 50). "[F]or such a showing to be made, generally 'the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome.' " *Homere*, 322 F. Supp. 3d at 368 (quoting *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994)) (citation omitted); *see also Kugler*, 421 U.S. at 126 n. 6 (noting that bad faith under *Younger* "generally means a prosecution has been brought without a reasonable expectation of obtaining a valid conviction"). Furthermore, "[a] pattern of harassment both before and after institution of the state prosecution would be probative of the animus that attended the decision to prosecute." *Colonial First Properties, LLC v. Henrico Cty. Virginia*, 166 F. Supp. 2d 1070, 1087 n.12 (E.D. Va. 2001).

In the present matter, Plaintiffs have failed to show that Defendants brought the state proceedings in bad faith, *i.e.*, with "no reasonable expectation of obtaining a favorable outcome." *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994)). Plaintiffs assert that Defendants acted in bad faith prior to and throughout the state court proceedings. *See* Dkt. No. 1 at 3 (stating that Defendants "never recognized [Plaintiffs'] arduous work" to improve the Property and used "false statements, weaponized the code enforcement office and us[ed] false pretenses" to evict their tenants). However, no facts in the record suggest that Defendants had "no reasonable expectation of obtaining a favorable outcome" in the state proceedings. *Cullen*, 18 F.3d at 103. Nor does the record contain sufficient evidence to find that

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Defendants harassed Plaintiffs in bringing the proceedings. *See Colonial First Properties*, 166 F. Supp. 2d at 1089 (finding that the plaintiffs failed to establish harassment in a police investigation showing no signs of "malice, use of illegal arrest methods, high numbers of repeated arrests and raids[,] or evidence of a concerted effort to put [the plaintiffs] out of business").

***7** Plaintiffs appear to deny all code violations brought by Defendants. *See* Dkt. No. 18 at 4 (stating that a January, 2019, inspection had found a "[s]mall number of violations — cosmetic ones, no hazardous [ones] were found, and corrections were done with pictures sent to my lawyers ... [who] checked everything"). Plaintiffs further allege that Defendants offered misleading photographs to establish the code violations in the state court. *See id.* ("the code enforcement officer ... [was] looking only in storage areas, places that are not for living, taking pictures to use against us"). Lastly, Plaintiffs also attack the state court judgment for being "jurisdictionally defective — thus ... not just void-able [sic], but Void, as in [ ]never existed, as in [ ]zero" and for being "a pure punishment order ... meant from the beginning as a punishment order." However, these "allegations [of bad faith and harassment] are too conclusory and barebones to serve as the factual predicate for a plausible finding of bad faith." *DeMartino*, 167 F. Supp. 3d at 355-56. Furthermore, Plaintiffs brought a number of the same claims during the state court proceedings, which the state court rejected.

Accordingly, the Court finds that Plaintiffs have failed to demonstrate that the bad faith exception to *Younger* abstention should apply. Therefore, the Court "must abstain from exercising subject matter jurisdiction over" these claims. *See Wilson v. Emond*, 373 Fed. Appx. 98, 100 (2d Cir. 2010).

**C. Rule 12(b)(6)**

Even assuming that this action was not barred by *Younger*, the complaint is nevertheless subject to dismissal.

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," see Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570. However, a complaint filed by *a pro se* litigant should not be dismissed without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991) (citation omitted).

Additionally, "in *a pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (citations omitted). The Second Circuit has directed that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

In the present matter, even affording Plaintiffs the special solicitude due to *pro se* litigants, the complaint fails to plausibly state any cause of action. In the "complaint," Plaintiffs complain that they are being charges fees by the City of Oneonta that they believe they have already paid and that David Merzig and Margie Merzig "continue to destroy [their] business by removing tenants." Dkt. No. 1 at 2. Further, they claim that federal agencies were instructed "by David Merzig to stop payment and remove tenants from [their] property." *Id.* Plaintiffs then mention the fact that they still have a case pending in Otsego County Supreme Court and that the lawyers that they had previously retained in the state court litigation have since withdrawn. *See id.* Nothing in the complaint even hints at what federal causes of action Plaintiffs are attempting to assert.

***8** Attached to the complaint are various exhibits that are likewise unhelpful. For example, the first exhibit is a letter Plaintiff Melania Pervu sent to the Attorney General of the United States asking for assistance with the issues underlying the state court litigation. *See* Dkt. No. 1 at 3. Also attached is a scheduling order from the Otsego County Supreme Court

and the various March 8, 2018 eviction notices sent by the City of Oneonta Department of Law to both tenants and social services agencies. *See id.* at 4-9.

As Defendants correctly contend, Plaintiffs have failed to plead any plausible cause of action. Accordingly, the Court grants Defendants' motion to dismiss on this alternative ground.

**D. Leave to Amend**

"While *pro se* plaintiffs are generally given leave to amend a deficient complaint, a district court may deny leave to amend when amendment would be futile." *Hassan v. U.S. Dep't of Veteran Affairs*, 137 Fed. Appx. 418, 420 (2d Cir. 2005) (citing *Dluhos v. Floating & Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 69–70 (2d Cir. 1998)). "Amendment of a complaint is futile where the proposed amended complaint would be unable to withstand a subsequent motion to dismiss." *Tatum v. Oberg*, No. 08 Civ. 1251, 2009 WL 5066812, *2 (D. Conn. Dec. 18, 2009) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

In the present matter, there is no question that granting Plaintiffs leave to amend would be an exercise in futility. Any amended complaint, even if it were to plausibly allege claims under 42 U.S.C. § 1983, it would nevertheless be subject to dismissal under *Younger.* Accordingly, Plaintiffs' complaint is dismissed with prejudice.

**IV. CONCLUSION**

After carefully the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion to dismiss is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve the parties with a copy of this Memorandum-Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1643392

## Footnotes

1 Information contained in the "Background" section of this Memorandum-Decision and Order that is not otherwise taken from Plaintiffs' complaint, is taken from the publicly available information from the ongoing litigation between the parties in Otsego County Supreme Court. *See* Index No. EF2018-503.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Siracusa v. New Hyde Park-Garden City Union Free School District, E.D.N.Y., March 28, 2025

2017 WL 4350433
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elizabeth PODLACH, Plaintiff,
v.
VILLAGE OF SOUTHAMPTON, Southampton Village Police Department, Police Officer Ashley E. Jones, Jane Doe 1, John Doe 1, and John Doe 2, in their individual and official capacities, Defendants.

14-CV-6954 (SJF)(SIL)
|
Signed 05/11/2017

**Attorneys and Law Firms**

Elizabeth Podlach, Hampton Bays, NY, pro se.

David H. Arntsen, Jeltje DeJong, Kelly E. Wright, Devitt Spellman Barrett, LLP, Smithtown, NY, for Defendants.

**REPORT AND RECOMMENDATION**

STEVEN I. LOCKE, United States Magistrate Judge

***1** Presently before the Court in this section 1983 civil rights litigation on referral from Honorable Sandra J. Feuerstein for Report and Recommendation is Defendants', the Village of Southampton, the Southampton Village Police Department, Police Officer Ashley E. Jones ("Officer Jones"), and three unnamed Police Officers, Jane Doe and John Does 1 and 2 (collectively "Defendants"), motion to dismiss *pro se* Plaintiff Elizabeth Podlach's ("Podlach" or "Plaintiff") First Amended Complaint ("Amended Complaint"). *See* Second Motion to Dismiss ("Def. Mot."), Docket Entry ("DE") [33]. The Amended Complaint restates with additional detail, and a substantial amount of commentary and legal argument, alleged civil rights violations and state-law causes of action relating to Plaintiff's arrest on August 31, 2013. *See* First Amended Complaint ("Amend. Compl."), DE [26]. These allegations were first pled in the original Complaint, which was dismissed with leave to amend. *See* 2/25/2016 Dismissal Order, DE [25]; *compare* Complaint ("Compl."), DE [1] *with* Amend. Compl. In response to the Amended Complaint, Defendants filed a motion to dismiss, which Podlach opposed. *See* Def. Mot.; Memorandum in Opposition ("Pl. Opp."), DE [34]. On September 16, 2016, Judge Feuerstein referred that motion to this Court for a report and recommendation as to whether it should be granted. *See* DE [18]. For the reasons set forth herein, the Court respectfully recommends that Defendants' motion be granted in its entirety and that the Amended Complaint be dismissed with prejudice.

## I. PROCEDURAL HISTORY

Podlach filed the original Complaint on November 26, 2014. *See* DE [1]. In response, Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss, and Judge Feuerstein referred that motion to this Court for report and recommendation. *See* DE [18]. Upon due consideration, this Court recommended dismissal of the original Complaint with leave to amend, and Judge Feuerstein adopted that conclusion. *See* Report and Recommendation, DE [20]; 2/25/2016 Dismissal Order.

Plaintiff subsequently filed her Amended Complaint on June 16, 2016. *See* Amend. Compl. The Amended Complaint, though over twice as long, contains the same eight causes of action as the original Complaint. Podlach alleges federal claims for excessive force, denial of medical care, conspiracy/retaliation for the exercise of her First Amendment rights, and denial of her Sixth Amendment right to counsel, as well as state-law claims for intentional infliction of emotional distress, negligence, respondeat superior, and negligent supervision, retention, and training. Compare *id.* at 24-41 *with* Compl. ¶¶ 54-75. In response to the Amended Complaint, Defendants filed the instant motion to dismiss. *See* Def. Mot.

## II. STATEMENT OF RELEVANT FACTS

The following facts, set forth in the Amended Complaint, are presumed true for the purpose of Defendants' motion.

Podlach alleges that, at approximately 11:45 p.m. on August 30, 2013, she, a resident of Hampton Bays, was driving to pick up her boyfriend at the Southampton Long Island Railroad station. Amend. Compl. ¶¶ 13-15.[1] At 12:10 a.m., upon arriving in Southampton, unfamiliar with the area and dependent on printed directions, Plaintiff became disoriented and proceeded to drive through downtown Southampton in search of the train station, traveling up and down multiple streets attempting to read the street signs. *Id.* At approximately 12:15 a.m., "after driving around the village

several times," she saw a police officer, Officer Jones, ticketing another motorist. *Id.* ¶¶ 16-17. Podlach stopped her vehicle, exited, and approached the officer to ask directions while the officer was still involved with the stopped motorist. *See id.* According to Podlach, Officer Jones yelled at her, ordering her to get back into her car immediately. *Id.* ¶¶ 17, 19. Podlach complied and then drove away. *See id.* At 12:45 a.m., still lost in Southampton Village, Podlach stopped her car on Main Street to ask a group of men coming out of a bar for directions. *Id.* ¶¶ 21, 22. Just as one of those men finished giving Plaintiff directions to the train station, a police vehicle came speeding down the street and pulled up immediately adjacent to Plaintiff's car. *See id.* The driver, Officer Jones, yelled out the window, "Why didn't you wait for me?" and barked, "You just go straight," in reference to the station's location. *Id.* ¶¶ 23-24. In response, Podlach said the words, "Thank you," to Officer Jones and then audibly cursed at her. *Id.* ¶ 25.

***2** Still unable to find the station, Podlach continued driving slowly through Southampton, eventually down a dirt road, when she noticed a police car behind her. *Id.* ¶¶ 26-27. That vehicle eventually turned on its lights and flashers. *Id.* Podlach claims that at this point she was terrified, first, due to the location, a wooded and deserted area approximately ten minutes from town, and, second, due to an unrelated prior violent encounter that she had with law enforcement in a different state. *Id.* at ¶¶ 28-34. Officer Jones, who was the driver of the police vehicle, came to Podlach's car window and accused Plaintiff of swearing at her and asserted that such conduct was against the law. *Id.* ¶ 30. Officer Jones then directed Podlach to step out of her vehicle, but Podlach ignored this instruction and said to the officer that she was afraid to leave her car. *Id.* ¶¶ 32-34. She then turned the engine back on and slowly drove away. *Id.*

A few minutes later, Podlach stopped to call her boyfriend who was still waiting for her at the train station when a different police vehicle that was also driving at an extremely high rate of speed pulled in front of her blocking her car. *Id.* ¶¶ 34, 36. A male officer jumped out and, according to Plaintiff, immediately drew his service weapon and pointed it at her from about ten feet away while in a "shooting stance ... ready to shoot." *Id.* at ¶ 37. Plaintiff claims that she could see straight down the barrel of the gun and that the Officer's finger was on the trigger. *Id.* Another police vehicle arrived at the scene moments later while Podlach was still sitting in her car with her hands up. *Id.* ¶ 39. An older male officer got out of the same car as the younger officer and ordered Plaintiff to get out of her vehicle. *Id.* ¶ 40. As he was effecting the arrest, the older officer grabbed Podlach, turned her around, pulled her hands behind her back to handcuff her, and pushed her into the side of the car. *Id.* ¶¶ 41-42.

At about 1:00 a.m., Podlach arrived at the police station for processing. *Id.* ¶ 47. Plaintiff claims that she was at that time promised food, which she urgently needed due to her thyroid condition, about which she had already alerted the arresting officers. *Id.* Even though she told the officers at her arrest that she had not eaten for over twelve hours prior to being taken into custody, once lodged in her cell, the matron refused to give her any food, stating that Plaintiff must have done something wrong to end up in jail. *Id.* at 32-33, ¶¶ 47-49.

Podlach remained incarcerated through the night awaiting her arraignment and did not eat again until 10:00 a.m. that morning. *Id.* ¶ 49. Additionally, although Plaintiff requested to speak to her attorney while in custody for the "hearing," her requests were ignored, despite the fact she was questioned by various officers prior to her arraignment. *Id.* ¶ 50. Podlach also alleges in the Amended Complaint that the officer to whom she spoke informed her that she was not allowed to have a lawyer for her "hearing." *Id.* After her arraignment, the Southampton Court released Podlach on $1,500.00 of bail, and, ultimately, on July 28, 2014, Plaintiff pled guilty to disorderly conduct in satisfaction of all charges against her. *See id.* at 20, ¶ 52; Certificate of Disposition, DE [10-3].

### III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).

***3** In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the non-moving


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

party. *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Where the complaint is filed by a *pro se* litigant, the Court must also be careful to "interpret the complaint liberally to raise the strongest claims that the allegations suggest." *Rosen v. N. Shore Tower Apartments, Inc.*, 11-CV-00752, 2011 WL 2550733, at *2 (E.D.N.Y. June 27, 2011) (citing *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Notwithstanding, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted).

## IV. DISCUSSION

Applying the standards outlined above, and for the reasons set forth herein, the Court respectfully recommends that Defendants' motion to dismiss the Amended Complaint be granted in its entirety.

### A. Causes of Action Arising Under 42 U.S.C. § 1983, generally

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. Although section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state[-]law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).

In the Amended Complaint, Plaintiff reasserts multiple causes of action under 42 U.S.C. § 1983 against Defendants for: (i) excessive force, (ii) denial of adequate medical care, (iii) conspiracy and retaliation for exercising her First Amendment rights; and (iv) denial of her right to counsel.

### B. Excessive Force

#### 1. Display of a Firearm

The Court first turns to Plaintiff's renewed excessive force claim regarding the display of a firearm by a member of law enforcement during her arrest. Here, just as it was originally pled, Podlach's first cause of action is premised primarily upon an unknown male officer drawing his weapon and pointing it at her during her arrest while she was inside of her car, approximately ten-feet away, and unarmed. *See* Amend. Compl. at 24-31. On this Court's recommendation, the District Court dismissed this same claim in the original Complaint as such actions by an officer effectuating an arrest, even when presumed true, do not constitute excessive force. *See Dunkelberger v. Dunkelberger*, 14–CV–3877, 2015 WL 5730605 at *15 (S.D.N.Y. Sept. 30, 2015); *Pittman v. City of New York*, 14-CV-4140, 2014 WL 7399308 (E.D.N.Y. Dec. 30, 2014); *Aderonmu v. Heavey*, 00 CIV. 9232, 2001 WL 77099 at *3 (S.D.N.Y. Jan. 26, 2001). This Court again recommends dismissal of the amended claim.

"The vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law." *Dunkelberger*, 2015 WL 5730605, at *15 (citing *Cabral v. City of New York*, 12-CV-4659, 2014 WL 4636433, at *11 (S.D.N.Y. Sept. 17, 2014)) ("[The defendant's] approach with his gun drawn does not constitute excessive force as a matter of law."); *Mittelman v. Cty. of Rockland*, 07-CV-6382, 2013 WL 1248623, at *13 (S.D.N.Y. Mar. 26, 2013) ("Likewise insufficient is [the][p]laintiff's assertion that the officers pointed guns at him. A threat of force does not constitute excessive force."); *Aderonmu*, 2001 WL 77099, at *3 (dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff "fail[ed] to allege that any physical force was used against him during his interrogation, or that any injuries resulted from [the] defendants' allegedly unconstitutional conduct").

***4** With respect to excessive force, Plaintiff's essential allegations have remained unchanged—immediately prior to

her being taken into custody, while she was still in her vehicle, a young male officer pointed his firearm at her and she was subsequently ordered her to exit her car. *See* Amend Compl. at 3-4, 28-30, ¶¶ 36-42. When compared to the original Complaint, the Amended Complaint contains some additional factual allegations related to this first cause of action, specifically, that the officer was in a "shooter's stance," that he appeared to be ready to shoot Podlach with his "finger ... on the trigger," and that the police force is "extremely young" and "inexperienced." *See* Amended Compl. at 49-50, ¶¶ 37-38. Podlach also asserts that police training and NYPD manuals classify this conduct as appropriate only when the officer intends to shoot to kill. *Id.* at 15. Nevertheless, these additional allegations do not allege that law enforcement used any actual physical force on Plaintiff as would save her claim from dismissal.

In support of her argument that the mere brandishing of a firearm by law enforcement can substantiate a claim of excessive force, Plaintiff directs the Court to *Robinson v. Solano*, 278 F.3d 1007 (9th Cir. 2002). *See* Pl. Opp. at 2-6. However, *Robinson* is factually distinguishable and contrary to precedent within the Second Circuit. *See Robinson*, 278 F.3d 1007. In *Robinson,* the plaintiff was unarmed and had not had any prior interactions with law enforcement preceding his arrest. *See id.* at 1010. Moreover, he was not in a vehicle and voluntarily approached the police after exiting his home to inquire about the incident that the officers were then investigating. *See id.* Further distinguishing *Robinson* from the instant matter, there, that plaintiff alleged that he was approximately six feet away from the police when they first drew their weapons, pointed them at his head, and ordered Robinson to put his hands up and that, after he complied with police directives, the officers repeated their command and brought their weapons closer, to within three feet of his head. *Id.* By contrast, here, when the police officer drew his weapon, he is alleged to have been approximately ten-feet away, and Podlach admits, that night prior to this encounter, she repeatedly refused to comply with police directives to stop and/or get out of her vehicle. *See* Amend. Compl. at ¶¶ 34-35, 37-41. Such differences alone render the use of and/or threat of force objectively more reasonable here than in *Robinson*. *Accord United States v. Santillian*, 13 CR. 138, 2013 WL 4017167, at *7 (S.D.N.Y. Aug. 7, 2013) (citing *Maryland v. Wilson*, 519 U.S. 408, 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) ("An officer making a traffic stop may order passengers to get out of the car pending completion of the stop.")); *United States v. Cummings*, 764 F.Supp.2d 480, 508 (E.D.N.Y. 2011) (holding that agents had the right to order the passenger co-defendant out of the car for safety reasons during a traffic stop even without any suspicion of wrongdoing on his part); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed. 2d 331 (1977) (holding that where police officers on routine patrol observed defendant driving an automobile with an expired license plate and lawfully stopped vehicle for purpose of issuing a traffic summons, order of one of officers that defendant get out of automobile was reasonable and thus permissible under Fourth Amendment). Additionally, Plaintiff's markedly different location, being in the driver's seat of an operable motor vehicle, puts her in possession of a potentially dangerous instrument as would justify an even greater display of force by law enforcement regardless of her motivation or mental state at the time. *Compare* ¶¶ 36-41 *with Costello v. Town of Warwick*, 273 Fed.Appx. 118 (2d Cir. 2008) (holding that police officer's decision to use *deadly* force against suspect was objectively reasonable when suspect was seated in the driver's seat, put vehicle into drive, stepped on the gas, and hit the police vehicle in front of it while suspect's car was surrounded by police officers). [2]

***5** The only other additional fact alleged in the Amended Complaint with respect to this excessive force claim concerns the assertion that due to the police officer drawing his weapon and pointing it at Plaintiff during her arrest, she lives in fear every day and has symptoms consistent with post-traumatic stress disorder and a deterioration of her health related to her thyroid condition. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶ 8. Though the Court notes that such an assertion may articulate an injury, because there is no actual excessive force alleged as a matter of law, these added details do not save Podlach's first cause of action. *See Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y. 2007) (noting that regardless of the level of injury pled the essential element of the cause of action is the factual assertion that the force that caused it was objectively unreasonable and excessive). Accordingly, the Court respectfully recommends that Defendants' motion to dismiss Plaintiff's first cause of action for excessive force be granted.

2. Seizure and Handcuffing

Next, the Court examines the allegations concerning Plaintiff's actual arrest. Preliminarily, the Court notes that "[n]ot every push or shove" constitutes a constitutional violation. *Robison v. Via*, 821 F.2d 913, 923 (2d Cir. 1987); *see Rodriguez v. Vill. of Ossining*, 918 F.Supp.2d 230, 238

(S.D.N.Y. 2013) (citing *Lemmo v. McKoy,* 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)) (holding police officer did not use excessive force in grabbing arrestee's arm to try to remove her from a vehicle to arrest her after she failed to comply with order to step out of the vehicle). Instead, "[t]he Fourth Amendment prohibits the use of unreasonable and, therefore, excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010). "A claim that excessive force was used in the course of a seizure is[, consequently,] subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir. 2000); *see Roundtree v. City of New York*, 778 F.Supp. 614, 622 (E.D.N.Y. 1991) (holding that arrestee failed to state a claim where arrestee alleged that he was pushed by an officer into one of the cars and experienced emotional pain and suffering). Accordingly, to plead excessive force, a plaintiff must allege facts that facially establish that the use of force at issue is "objectively sufficiently serious or harmful enough to be actionable." *Sachs v. Cantwell,* 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012) (citation and internal quotation marks omitted). "A *de minimis* use of force will rarely suffice to state a Constitutional claim," and consequently, even if an injury were to result from the force alleged to be excessive, when that injury is rightly also categorized as *de minimis* then the excessive force claim premised upon it should be dismissed. *Lemmo*, 2011 WL 843974, at *5 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

According to Plaintiff, when law enforcement took her into custody, the older male officer "grabbed" Podlach, "forcibly" turning her toward and "shov[ing] her into" her vehicle, "yanking" her arms down as he was attempting to handcuff her. *See* Amended Compl. ¶ 42. Even when assumed true and viewed collectively, these allegations simply do not rise to the level of excessive force in violation of Podlach's constitutional rights sufficient to sustain a section 1983 claim. Further, the only injuries that Podlach discusses in the Amended Complaint that could arguably rise above the *de minimis* threshold are her emotional distress and possible PTSD. *See* Amend. Compl. at 20-21, 30, ¶ 53; Pl. Opp. ¶¶ 3, 8-11. These injuries, however, are alleged to have resulted not from the actual use of physical force, but instead from the brandishing of a weapon that preceded it. *See id.* Moreover, Podlach acknowledges that prior to her arrest she refused to comply with law enforcement instructions to exit her vehicle and drove away from police directing her to stop. *See* Amend Compl. ¶¶ 34, 37-39, 40. Finally, Plaintiff alleges only emotional pain, "crying uncontrollably," as a result of the police officer's conduct while handcuffing her. *Id.* ¶ 42. The only specific physical injury Plaintiff mentions is that she had scars or scratches on her back, but according to her own pleadings these were the result, not of her arrest, but of her doing push-ups and sit-ups all night in her cell to calm herself down. *Id.* at 23.

***6** Despite her level of injury, Plaintiff still argues that the totality of the circumstances compels the Court to question the reasonableness of the police officers' conduct and thus deny Defendants' motion to dismiss. *See* Amend. Compl. at 18-23, 31, 45. However, in so do doing Podlach does not deny that she pled guilty to disorderly conduct, Section 240.20(7) of the New York State Penal Law. *See* Amend. Compl. at 30, 48; Certificate of Disposition, DE [10-3]; Pl. Opp. ¶ 2 ("The seminal material fact is that I pled guilty to a 'violation' ").[3] Though Plaintiff is correct in that she was not convicted of a crime, her plea to disorderly conduct nevertheless acknowledges that "[s]he was engaged in some unlawful activity for which the police could properly take [her] into custody." *Sealey v. Fishkin*, 96-CV-6303, 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998). When the Amended Complaint is read in conjunction with the Certificate of Disposition, the propriety of taking Plaintiff into custody and the limited physical force used to do so render her claim of excessive force related to her arrest inherently defective.[4]

Accordingly, because Podlach has failed to plausibly show that under any set of facts that she has pled she could be entitled to relief, the Court respectfully recommends that Defendants' motion to dismiss be granted and Plaintiff's excessive force cause of action be dismissed.

### C. Denial of Medical Care

Although Plaintiff's next cause of action is entitled a "Denial of Medical Care," the only denial articulated regards law enforcement's refusal to provide a meal during Podlach's initial overnight detention, which she maintains was medically necessary. *See* Amend. Compl. at 31-34 ("I explained clearly way [sic.] I needed food ... how my adrenal organ would be affected ... I also told him that this was what I required for not being moved to a hospital."). Even presuming all the facts and circumstances asserted regarding

Podlach's confinement, because such a limited deprivation does not rise to the level of a constitutional violation, the Court recommends that this cause of action be dismissed.

***7** Section 1983 claims premised upon inadequate conditions of confinement for pre-trial detainees are measured by "whether the conditions amount to 'punishment' without due process in violation of the Fourteenth Amendment." *Hendrix v. City of N.Y.*, 12 CV 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec. 20, 2013) (quoting *Lareau v. Manson*, 651 F.2d 96, 102 (2d Cir. 1981)). Either a plaintiff must allege "express intent to punish" or that defendants' "deliberate indifference" caused conditions to deteriorate below a "minimal civilized measure of life's necessities" as would create "an excessive risk to the detainee's health or safety." *Benjamin v. Fraser,* 343 F.3d 35, 50 (2d Cir. 2003); *see also Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009) (noting that claims for deliberate indifference to the health or safety of a detainee are analyzed the same under the Eighth and Fourteenth Amendments); *Solomon v. Nassau Cnty.,* 759 F.Supp.2d 251, 257–58 (E.D.N.Y. 2011); *Martin v. Cnty. of Nassau,* 692 F.Supp.2d 282, 295 (E.D.N.Y. 2010).

Plaintiff attempts to put forth an allegation of express intent to punish in quoting the matron's response to her request for food in support of her cause of action for denial of medical care. *See* Amend. Compl. ¶ 49. Podlach alleges that when she pled with the matron for a meal, the matron responded, "You wouldn't be here if you hadn't done something wrong, you should have thought of that." *Id.* However, this statement, though arguably unsympathetic, does not establish that law enforcement's motivation in denying Plaintiff's request was to punish her in a manner sufficient to support a cause of action. *See Perez v. Ponte*, 236 F.Supp.3d 590, 600–01 (E.D.N.Y. 2017) (Report and Recommendation), *adopted by,* 16-CV-645, 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (declining to find that an express intent to punish motivated the housing of a pre-trial detainee in isolation despite supervisory guard's statement, "[I] heard you [were] giving my budd[ies] in [N]assau a hard time[.] [Y]ou act like an asshole you [are going to] get treated like one"). *See* Amend. Compl. ¶ 49. Accordingly, the Court finds that, even were the statement assumed to be true, it does not demonstrate the requisite express intent necessary to establish Plaintiff's claim.

Therefore, the Court next considers whether the duration of the alleged deprivation of food itself "rises to the level of a constitutional violation." *See Hendrix*, 2013 WL 6835168, at *8-9 (citing *Simmons v. Kelly,* 06 Civ. 6183, 2009 WL 857410, at *7 (S.D.N.Y. Mar. 31, 2009) (denying motion to dismiss where plaintiff alleged deprivation of food and water for thirty hours during pre-arraignment detention); *Hodge v. Ruperto,* 739 F.Supp. 873, 878 (S.D.N.Y. 1990) (holding a deprivation lasting two and a half days to be a constitutional violation); *Webster v. City of New York,* 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004) (holding no constitutional violation when deprivation lasted from 1:30 am until day-time arraignment)). Here, Plaintiff alleges that she was held in custody without food from approximately 1:00 a.m. to approximately 10:00 a.m. that same day. *See* Amend. Compl. at 23, ¶ 49. Podlach claims in her Amended Complaint that she explained to law enforcement that she had a thyroid condition and had not eaten for the twelve hours prior to her arrest. *See id.* Although Plaintiff details the possible injuries inadequate nutrition can cause to someone with her thyroid condition, Hashimotos Thyroiditis, and contends that she has in her possession reports from treating physicians substantiating this risk, she fails to allege that any actual proximate serious injury occurred as a result of law enforcement's refusal to provide her with food during her overnight confinement. *See id.* at 31-33. Podlach does, however, allege a general decline in her health as a result of her arrest, which is broadly related to her thyroid condition and PTSD. *See id.* at 20, 23, 32 (explaining how in the morning due to the lack of food, the uncomfortable accommodations, and the harsh lighting she "felt very ill" and her "adrenal glands were messed up"). Nevertheless, such a generalized deterioration in health does not support a section 1983 deprivation of medical treatment claim sufficient to survive a Rule 12(b)(6) motion to dismiss. *See Mortimer Excell v. Fischer*, 9:08-CV-945, 2009 WL 3111711, at *4 (N.D.N.Y. Sept. 24, 2009) (holding plaintiff's claims that he suffered from heart and chest pains for a period of five days and that he was denied refills for medication used to treat stomach pain to be conclusory allegations); *Mena v. City of N.Y.*, 13-CV-2430, 2014 WL 4652570, at *6 (S.D.N.Y. Sept. 18, 2014) (dismissing as conclusory plaintiff's allegations regarding his mental health because they consisted of "his self-characterization that he was a mental health patient" and that he was "suffering from depression") (citing *Selah v. N.Y.S. DOCS Comm'r.*, 04–cv–3273, 2006 WL 2051402, at *5 (S.D.N.Y. July 25, 2006) ("[The plaintiff's] conclusory allegation that he suffers from some kind of mental illnesses ... is insufficient to rise to the level of a constitutional violation for failure to provide medical care.... [T]here is no allegation, as required, of pain, discomfort or risk to health, nor is there ... support for the claim of mental illness in the form of medical

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

evidence, such as a physician's diagnosis.") (citations and internal quotation marks omitted)).

***8** In recommending dismissal of Plaintiff's cause of action related to medical care and feeding, the Court notes that Plaintiff was fed at 10:00 a.m. prior to her arraignment hearing. *See* Amend. Compl. at 23. Though Podlach disagrees with the policy that delayed her feeding, the courts of this circuit have found that the government's purpose in not providing food to every detainee upon arrival at a police station is legitimate and non-punitive "particularly [for] those detainees who arrive at a police station in the early morning hours." *Webster v. City of N.Y.*, 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004). Additionally, with respect to deprivations that are shorter in length and that are not accompanied by evidence of punitive intent, the failure to allege actual injury renders such allegations inherently insufficient. *Id.* Thus, Courts of the Second Circuit have consistently held that an overnight deprivation of food and water does not rise to the level of a constitutional violation as a matter of law. *Hendrix,* 2013 WL 6835168, at *8-9 (dismissing claim based upon detainee plaintiff being deprived of food from midnight until his arraignment the following afternoon); *see also Dzwonczyk v. Syracuse City Police Dep't,* 710 F.Supp.2d 248, 269 (N.D.N.Y. 2008) (dismissing claims based on deprivation lasting from the detainee's arrest at 5:35 p.m. until the following morning); *see Felmine v. City of New York*, 09-CV-3768, 2011 WL 4543268, at *22 (E.D.N.Y. Sept. 29, 2011) (granting summary judgment on claims based on deprivation for "several hours" after detainee was arrested around midnight). Accordingly, the Court respectfully recommends that Podlach's claims that her constitutional rights were violated by law enforcement's failure to provide food during her overnight detention be dismissed.

### D. Denial of Counsel Claim Under the Sixth And Fourteenth Amendments

The Court also respectfully recommends Plaintiff's next claim, that Defendants violated her right to counsel while she was in custody, be dismissed.

A detainee does not have an inherent right to counsel prior to the initiation of adversarial judicial proceedings. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (holding that a criminal defendant's right to counsel is only triggered by way of formal charge, preliminary hearing, indictment, information, or arraignment). State law determines when adversarial judicial proceedings have commenced, and, under New York law, the filing of an accusatory instrument at an arraignment commences a criminal action. *Douglas v. People of the State of N.Y.,* 12 CV 3839, 2015 WL 9901710, at *8 (E.D.N.Y. Nov. 3, 2015) (Report and Recommendation*), adopted by*, 12 CV 3839, 2016 WL 270079 (E.D.N.Y. Jan. 21, 2016) (citing *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 465 (E.D.N.Y. 2010); N.Y. Crim. Proc. Law. § 100.05). In the specific context of pre-arraignment detention, the Second Circuit has expressly held that the Sixth Amendment right does not attach to questioning, even questioning by the police. *Sullivan v. City of N.Y.*, 14-CV-1334, 2015 WL 5025296, at *6 (S.D.N.Y. Aug. 25, 2015) (citing *Wims v. New York City Police Dep't*, 10–CV–6128, 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (dismissing Sixth Amendment Section 1983 claim where "plaintiff's complaint alleges only a lack of representation during his initial interrogation before arraignment")). Though the right to have an attorney present prior to and during questioning implicates an individual's right against self-incrimination under the Fifth Amendment and may result in suppression of evidence at trial, that right does not substantiate a cognizable section 1983 claim as a matter of law. *Nesbitt v. Cty. of Nassau*, 05 CV 5513, 2006 WL 3511377, at *2 (E.D.N.Y. Dec. 6, 2006) (citing *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998))

The Amended Complaint alleges that officers questioned Podlach at the start of her arrest processing regarding her driving history and the medications that she was taking for her thyroid condition. *See* Amend. Compl. ¶ 47. She was also "actively questioned by the superior officer about a toll [she] did not pay on the LIE and ... asked if she had difficulty with authority." Amend. Compl. ¶ 61. Plaintiff further claims that she felt forced to answer the questions posed to her because she was intimidated and isolated, with her boyfriend initially being denied access to the police station. *Id.* Accordingly, as all of Plaintiff's claims regarding lack of counsel occurred prior to her arraignment, the Court respectfully recommends that Defendants' Motion to Dismiss the Fourth Cause of Action for violations of the Sixth or Fourteenth Amendment be granted.

### E. First Amendment Retaliation and Conspiracy

***9** Next the Court examines Plaintiff's causes of action related to the First Amendment. The District Court adopted

this Court's recommendation that Podlach's First Amendment claims in her original Complaint be dismissed on three independent grounds: (1) her guilty plea conclusively established that her arrest was based upon probable cause, (2) she failed to allege that police-officer conduct had any chilling effect on her First Amendment rights, and (3) that the intracorporate conspiracy doctrine barred a conspiracy claim against the officers of the Southampton Police Department. *See* Report and Recommendation at 21-25; 2/25/2016 Dismissal Order. The Court renews its recommendation as the Amended Complaint fails to remedy these substantive defects in Plaintiff's pleadings.

1. Retaliation

To adequately plead a First Amendment retaliation claim under section 1983, "a plaintiff must allege that: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated by or substantially caused by plaintiff's exercise of that right; and (3) the defendant's actions effectively chilled the plaintiff's exercise of his rights." *Whitfield v. Imperatrice,* 477 Fed.Appx. 806, 808 (2d Cir. 2012) (citing *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998)). A plaintiff "must show ... that his First Amendment rights were 'actually chilled.' " *Bartels v. Inc. Vill. of Lloyd Harbor,* 751 F.Supp.2d 387, 401 (E.D.N.Y. 2010) (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001)). "Certain courts in the Second Circuit have held, however, that a plaintiff 'need not show a chilling effect' to prevail on a First Amendment retaliatory prosecution claim if he can 'demonstrate that the prosecution was not supported by probable cause.' " *Harris v. City of N.Y.*, 09-CV-3474, 2013 WL 4858333, at *6 (E.D.N.Y. Sept. 10, 2013) (quoting *Bradley v. City of New York,* 04 Civ. 8411, 2007 U.S. Dist. LEXIS 7811, at *21-22, 2007 WL 232945, at *8 (S.D.N.Y. Jan. 25, 2007)); *see also* Chi Chao *Yuan v. Rivera,* 48 F.Supp.2d 335, 351 n. 6 (S.D.N.Y. 1999) (stating that a plaintiff need only show actual chilling if alleging a restraint on future speech but not if probable cause for prosecution is in dispute).

Thus, the Court first turns to whether Plaintiff has alleged facts that if true are capable of calling into question the probable cause surrounding her arrest. A conviction, however, on any, even lesser included, charges conclusively establishes probable cause to arrest existed sufficient to defeat a section 1983 claim. *Corsini v. Brodsky*, 13CV2587, 2015 WL 3456781, at *8 (S.D.N.Y. May 27, 2015) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995); *Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir. 1986)); *see Croft v. Greenhope Servs. for Women, Inc.*, 13 Civ. 2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) ("If following the arrest, the plaintiff was convicted of the charges against him, that conviction normally would be conclusive evidence of probable cause.") (internal quotation omitted); *supra* at n.4. As stated above, even though it is a violation and not a crime under New York law, a conviction for disorderly conduct, NYPL § 240.20, acknowledges "unlawful activity for which the police could properly take [a subject] into custody." *Sealey*, 1998 WL 1021470, at *4; *supra* at 14-15.

In the Amended Complaint, Plaintiff admits that she pled guilty to violating the disorderly conduct statute and, moreover, acknowledges that she was represented by counsel during that proceeding. *See* Amend. Compl. at 30 ("I was found to be not in violation of anything other than disturbing the peace ..."), 47-48. In an attempt to plead facts as would undermine the probable cause that such a conviction establishes, Podlach asserts immediately after her admission that "in the course of 2015 years after the case was over" she determined that it was "impossible to be founded [guilty] by either the DA or the officer who lied to me that using a curse word was against local law ... a crime." Amend. Compl. at 30. Later in the Amended Complaint, she further alleges that the DA told her attorney that he knew that the charges against her were "bullshit" and asserts that she pled guilty to avoid the expense of trial and under the false impression that disorderly conduct was a real offense. *Id.* at 47-48.

***10** In reviewing Podlach's claim, the Court notes preliminarily that, although Podlach did plead guilty to disorderly conduct, she did not plead guilty to swearing in public. According to the Certificate of Disposition, Plaintiff pled guilty to NYPL § 240.20(7) in satisfaction of ten other Vehicle and Traffic and Penal Law charges. *See* Certificate of Disposition. NYPL § 240.20(7) reads as follows:

> "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e creates a hazardous or physically offensive condition by any act which serves no legitimate purpose."

*Id.* Nevertheless, Plaintiff is correct that disorderly conduct is a violation and not a crime. *Id.* However, her conclusory statements that this charge does not exist and that a conviction under this statute is constitutionally impermissible or impossible are patently false. *See, e.g., Sealey,* 1998 WL

1021470, at *4. Thus, Podlach has failed to plead a set of facts as would call into question the existence of the probable cause surrounding her arrest sufficient as to permit her First Amendment section 1983 claim to proceed.

Accordingly, as the Amended Complaint fails effectively to challenge the propriety of Podlach's arrest, the Court turns to whether the law enforcement conduct discussed above is alleged to have had an actual effect on her freedom of speech as protected under the First Amendment. As this Court explained in its prior Report and Recommendation, a Section 1983 claim premised upon intimidation and threats curtailing freedom of speech must set forth a particularized and specific chilling effect. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002)) ("[T]here is an injury requirement to state [a First Amendment 1983] claim."). The injury must be "actual" and "non-speculative." *Id.; Prince v. Cty. of Nassau*, 837 F.Supp.2d 71, 96 (E.D.N.Y. 2011) ("[A] plaintiff must show that his First Amendment rights were actually chilled.") (internal quotation marks omitted). Specific instances must be put forth where the allegedly injured party "desired to exercise her First Amendment rights but was chilled by" a defendant's alleged conduct. *See Mangano v. Cambariere*, 04 Civ. 4980, 2007 WL 2846418, at *2 (S.D.N.Y. Sept. 27, 2007) (noting, in context of summary judgment, that specific examples of when the plaintiff wanted to exercise her First Amendment Rights but chose not to are required). "[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F.Supp.2d 115, 133 (W.D.N.Y. 2010) (quoting *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972))) (internal quotation marks omitted). Subsequent acts by a plaintiff that seek redress of the underlying grievances weigh against finding that a plaintiff's First Amendment rights were objectively chilled. *MacPherson v. Town of Southampton*, 738 F.Supp.2d 353, 369 (E.D.N.Y. 2010) (citing *Rosendale v. Brusie*, 07-CV-8149CS, 2009 WL 778418, at *9 (S.D.N.Y. Mar. 25, 2009), *aff'd*, 374 Fed.Appx. 195 (2d Cir. 2010) (finding insufficient allegations of First Amendment retaliation when Complaint alleged that plaintiff continued to speak out against defendants' failure to enforce zoning regulations, brought a state court action, and commenced a federal action)).

***11** In the Amended Complaint, Plaintiff asserts only that her "speech was silence [*sic.*] so much so as to absolutely never ask a police officer for directions ever again, to address a police officer voluntarily ever again, to trust one, or risk my life to ask one a question." Amend. Compl. at 34. She goes on to state that she will never "express emotion toward an officer or in any place where an officer can even hear me." *Id.* Additionally, after alluding to her memory of her arrest, she concludes by commenting "to say this experience could leave anyone unaltered with regard to her speech is laughable and offensive." *Id.* Podlach's claimed injury of theoretically being prevented from speaking with police officers in the future is wholly speculative and conclusory, failing to allege a single instance of when she needed, wanted, or even had a subsequent opportunity to speak with a member of law enforcement and chose not to do so. *See* Amend. Compl. at 34. Plaintiff also fails to cite to any specific time that she wanted to curse at or even criticize a police officer and felt restrained as a result of the circumstances and conduct surrounding her arrest. *Id.* Further, in her concluding remarks, Plaintiff states that were the Courts to deny her relief, that she would not only appeal that decision but seek redress of her grievances against the police in the media undermining any claim that she feels inhibited about speaking out. *Id.* at 46. As Podlach's Amended Complaint has not put forth a set of facts that if proven true would substantiate that her rights under the First Amendment were actually chilled, she has failed to plead a cognizable First Amendment violation. Accordingly, the Court recommends that her claim be dismissed and Defendants' motion granted.

2. Conspiracy

As in the original Complaint, Plaintiff again asserts a conspiracy claim, alleging that Defendants' conduct "was the product of a conspiracy designed to punish plaintiff for exercising her First Amendment right to express herself orally." Amend. Compl. ¶ 59. Even assuming that Plaintiff stated a claim for First Amendment retaliation, she fails to state a cause of action for conspiracy.

*a. Intracorporate Conspiracy Doctrine*

First, Podlach's theory of liability must be dismissed under the intracorporate conspiracy doctrine, which holds that "the officers, agents, and employees of a single corporate entity, each acting within the scope of [his or] her employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F.Supp.2d 426, 441-42 (S.D.N.Y. 2007). The intracorporate conspiracy doctrine applies to the conduct of

both corporations and municipal entities. *Mendoza v. Cty. of Nassau*, 11-CV-2487, 2012 WL 4490539, at *8 (E.D.N.Y. Sept. 27, 2012). An exception to the intracorporate conspiracy doctrine exists where a plaintiff "adequately alleges that each defendant possessed an independent, personal conspiratorial purpose, wholly separate and apart from the entity." *Broich v. Vill. of Southampton*, 650 F.Supp.2d 234, 247 (E.D.N.Y. 2009) (internal quotation omitted).

Podlach alleges throughout her Amended Complaint that the officers of the Southampton Police Department worked together to arrest her on August 31, 2013, and that they were collectively and individually aware of why Officer Jones arrested her—namely disturbing the peace for cursing in public. *See* Amend. Compl. ¶¶ 46-48. However, such activity, even if proven true, falls squarely within scope of each individual officer's employment and cannot be said to be separate and apart from the Police Department itself—a municipal corporate entity. Additionally, Podlach failed to allege that any of the officers possessed any conspiratorial purpose other than arresting her for disturbing the peace to which she pled guilty. *See id.* Plaintiff claims that Officer Jones told her after her arrest, "You should have waited for me." Amend. Compl. ¶ 48. Presuming this statement occurred, the Court does not accept as reasonable Podlach's conclusion that it "made ... clear ... that she had followed [Podlach] because she was personally upset that [Plaintiff] had not waited for her when [she] first asked her for directions ... and then arrested [Podlach] after making up a law that didn't exist as an act of retaliation," as would express a personal conspiratorial purpose. *Id.* Accordingly, Defendants are legally incapable of conspiring together, and the claim of conspiracy should be dismissed.

*b. Section 1985(3)*

Second, as was also found in the prior Report and Recommendation, Plaintiff's claim is still improperly pled as arising under 42 U.S.C. § 1985(3). Under that statute, a plaintiff must allege: (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. *Turkmen v. Hasty,* 789 F.3d 218, 262 (2d Cir. 2015). To prevail on a claim under 42 U.S.C. § 1985(3), "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).

***12** Here, Plaintiff does not allege that Defendants acted with any racial, class-based, or otherwise discriminatory motivation, but rather, that Defendants sought to "punish [her] for exercising her First Amendment right to express herself orally." Amended Compl. ¶ 59. Accordingly, the Court again recommends that Defendants' motion to dismiss Plaintiff's claim for conspiracy arising under 42 U.S.C. § 1985(3) be granted.

**F. <u>Supplemental Jurisdiction Over State-Law Claims</u>**

Having recommended that each of Plaintiff's federal claims again be dismissed, the Court also renews its recommendation that the District Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

Supplemental jurisdiction over Plaintiff's state-law claims is governed by statute, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a claim where, as here, all claims over which it had original jurisdiction have been dismissed. 28 U.S.C. § 1367(c). When such circumstances arise prior to the commencement of trial, Second Circuit precedent consistently recognizes that, "the balance of factors to be considered," which include "judicial economy, convenience, fairness and comity," "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003).

Defendants' filed their Rule 12(b)(6) motion to dismiss the Amended Complaint in lieu of an Answer and while a stay of discovery remained in effect. *See* DE [18], [33]. Thus, this litigation is still in its initial stages and no discovery has taken place. Accordingly, the Court respectfully recommends that the Defendants' motion to dismiss be granted and the District Court decline to exercise supplemental jurisdiction over Podlach's state-law causes of action. *See Quiroz v. U.S. Bank Nat'l Ass'n*, 10-CV-2485, 2011 WL 2471733, at *8

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(E.D.N.Y. May 16, 2011) (Report and Recommendation), *adopted by*, 2011 WL 3471497 (E.D.N.Y. Aug. 5, 2011) (recommending that the district court decline to exercise supplemental jurisdiction over negligence claim once federal claims were dismissed between non-diverse parties). [5]

### G. Leave to Amend

***13** As the defects inherent in Plaintiff's original pleadings were not addressed in the Amended Complaint, the Court respectfully recommends that Podlach not be given *sua sponte* another opportunity to amend her complaint because such efforts would be futile. While leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). However, the court must be mindful of the unique context of a *pro se* complaint and "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.,* 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005); *see also Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). Nevertheless, "a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.' " *Reynolds v. City of Mount Vernon*, 14-CV-1481, 2015 WL 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)).

Despite the appropriate leniency afforded Plaintiff in light of her *pro-se* status, the Court finds that the deficiencies in Podlach's pleadings are substantive and persist despite clear guidance from this Court and the District Court. Instead of countenancing that guidance and properly amending her complaint, Plaintiff spends significant portions of the Amended Complaint providing extraneous background information, including newspaper articles with examples of her artwork, and generalized social commentary regarding police violence. *See, e.g.,* Amend. Compl. at 42-55. Additionally, in her opposition Plaintiff has not requested permission to file a second amended complaint, nor has Podlach "given any indication that [s]he is in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, 12-CV-8061, 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014). Accordingly, as the facts present in the pleadings "give[ ] no indication that a valid claim may be stated," the Court respectfully recommends that Plaintiff not be given further leave to amend. *See Flaherty v. All Hampton Limousine, Inc.*, 02-CV-4801, 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008).

## V. CONCLUSION

Accordingly, based on the foregoing, the Court respectfully recommends that the District Court grant Defendants' motion to dismiss the Amended Complaint for failure to state a claim in its entirety and with prejudice.

## VI. OBJECTIONS

A copy of this Report and Recommendation is being served on Defendants by electronic filing on the date below. Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff and promptly file proof of service by ECF. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

### All Citations

Not Reported in Fed. Supp., 2017 WL 4350433

## Footnotes

1 The Amended Complaint contains both numbered and unnumbered paragraphs. Where available, the Court will use paragraph numbers in its citations; otherwise, the Court will cite to the relevant page number.

2 Plaintiff imbeds in the Amended Complaint a string cite to case law that she argues supports her claim that the mere display of a weapon by an officer can substantiate excessive force. *See* Amend. Compl. at 25. Upon review, the Court declines to follow these cases as they are from other Circuits and factually distinguishable from the present matter. *See* *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016) (denying summary judgment in case where officer kept his semi-automatic rifle pointed at the head of a compliant, prostate detainee while other officers searched a house and the gun accidentally discharged killing detainee; holding "[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny."); *Binay v. Bettendorf*, 601 F.3d 640, 644 (6th Cir. 2010) (noting that officers continued to interrogate plaintiffs at gunpoint while they were handcuffed and compliant during execution of search warrant even after it was determined that no drugs were on the premises); *Curiel v. Cty. of Contra Costa*, 362 Fed.Appx. 824 (9th Cir. 2010) (finding that genuine issue of material fact existed as to whether deputies' use of force in entering house and seizing family members during murder investigation was excessive, when deputies' entered unannounced, with guns drawn and pointed at children, and they explicitly threatened deadly force with vulgar profanity); *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) (finding police officer's use of submachine gun to detain plaintiffs at search site for an alleged altered vehicle identification number was objectively unreasonable where there was no indication of any threat, none of the plaintiffs resisted or attempted to flee, and scene consisted of peaceable individuals, including pacifist Amish, going about their business).

3 As Plaintiff repeatedly references the circumstances and implications of the resolution of the underlying criminal case in arguing against the motion to dismiss, the Court is permitted to and does take judicial notice of the Certificate of Disposition proffered by Defendants detailing Podlach's original charges and eventual plea. *See* *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) (acknowledging that "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."); *see also* *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("There are circumstances under which it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss").

4 In her introductory remarks, Podlach explicitly states that she was wrongfully arrested and imprisoned and alludes to such a claim throughout her the Amended Complaint. *See, e.g.,* Amend. Compl. at 2, 28, 47-48. Podlach, however, never specifies a claim under state law or section 1983 regarding the lawfulness of her arrest itself. *See id.* Whether Plaintiff intended to assert such a claim, even when reading the *pro se* complaint liberally, the Court cannot find a viable cause of action for false or unlawful arrest as would survive a motion to dismiss. "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and [ ] it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006). On the question of probable cause, " 'a valid judgment of conviction, a defense to the tort [of false arrest], requires dismissal of a § 1983 action on motion for summary judgment.' " *Barnes v. Coughlin*, 14-CV-6364 2016 WL 3577603, at *4 (W.D.N.Y. June 27, 2016) (citing *Camarano v. City of New York*, 646 F.Supp. 246, 249 (S.D.N.Y. 1986)). As discussed, Plaintiff acknowledges that she pled guilty to disorderly conduct, one of the charges upon which she was arrested. *See supra* at 14-15. Accordingly, any nascent cause of action for unlawful or wrongful arrest would be dismissed were it explicitly pled.

5 The District Court previously declined to exercise supplemental jurisdiction over the state-law claims put forth by Plaintiff after determining that she had failed to state a federal claim. *See* DE [25]. Though the Court renews its recommendation that the District Court decline to exercise supplemental jurisdiction here

again, this Court also notes that Plaintiff has not put forth any additional factual allegations in the Amended Complaint with respect to those state-law claims that address the fatal deficiencies discussed in detail in the previous Report and Recommendation. *Compare* Report and Recommendation at 28-32 *with* Amend. Compl. at 35-41. The District Court acknowledged those legal conclusions but did not specifically adopt them as it declined to exercise supplemental jurisdiction over the underlying claims. *See* DE [25]. Accordingly, were the District Court not to adopt the present recommendations to dismiss the federal claims or, in its discretion, to determine that an exercise of supplemental jurisdiction over the state-law claims was now warranted, the Court incorporates by reference the argument and analysis contained in its prior Report and Recommendation and, in the alternative, independently again recommends dismissal of the state-law claims in their entirety. *See* Report and Recommendation at 28-32.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 992885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Benjamin Samuel RICH, formerly known as Samuel Guillaume, Plaintiff,
v.
State of NEW YORK, New York City; New York City Police Department; New York County; New York County District Attorney's Office; Detective Michael Miller, Vincent Corrando, John Passementi, Cyrus Vance, Jr., Shipla Kalra, David Nasar, and Does 1–100, Inclusive., Defendants.

21 Civ. 3835 (AT)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Benjamin Samuel Rich, Staten Island, NY, Pro Se.

Gee Won Cha, Julinda A. Dawkins, New York State Office of the Attorney General, New York, NY, for Defendant State of New York.

Andrew B. Spears, New York City Law Department, New York, NY, for Defendants City New York, Michael Miller, Vincent Corrando, John Passementi.

Patricia Jean Bailey, New York County District Attorney's Office, New York, NY, for Defendants Cyrus Vance, Jr., David Nasar.

## ORDER

ANALISA TORRES, District Judge:

***1** This action arises from a 2016 arrest and prosecution of Plaintiff *pro se*, Benjamin Samuel Rich, in New York County. He brings claims against the State of New York (the "State"); former New York County District Attorney ("DA") Cyrus R. Vance, Jr. and two Assistant District Attorneys ("ADAs"), Shilpa Kalra and David Nasar, (collectively, the "DA Defendants"); and the City of New York (the "City"), the New York City Police Department (the "NYPD"), and NYPD officers Michael Miller, Vincent Corrando, and John Passementi (collectively, the "City Defendants"), pursuant to, *inter alia*, 42 U.S.C. §§ 1983, 1985, and 1986, the New York State Constitution, and New York common law. *See generally* Compl., ECF No. 1. Before the Court are three motions to dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, brought by the State, ECF No. 20, the DA Defendants, ECF No. 22, and the City Defendants, ECF No. 32.

For the reasons stated below, the State's motion to dismiss is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

## BACKGROUND [1]

On January 6, 2016, Plaintiff was at the Highline Ballroom ("the Highline"), a nightclub in Manhattan, as an invited guest of Wasief Quahtan, a Highline employee. Compl. ¶ 24. Quahtan and the club owner began arguing over "Quahtan['s] [having brought] Plaintiff to the party." *Id.* ¶ 25. Security staff, and an individual named Avery Jackson, asked Plaintiff to leave. *Id.* ¶ 26. Plaintiff alleges that he was "forcibly escorted" from the club, and that Jackson became "belligerent and aggressive" towards him. *Id.* ¶ 27. Shortly thereafter, a shooting occurred outside the Highline. *Id.* ¶ 28.

Plaintiff believes that Jackson "ran down the street and jumped into a black sedan ... at the time the shots were fired." *Id.* ¶ 37. He also states that there were "numerous witnesses" to the shooting, including a "female 911 caller," who lived "next door" to the Highline. *Id.* ¶ 36. In that 911 call, the witness said that she had seen a "man jump into a black sedan speeding down the street" after shots were fired. *Id.* Based on this call, Plaintiff believes "it was more likely that it was [ ] Jackson who fired the shots before jumping into the black sedan to chase Plaintiff down." *Id.* ¶ 37.

***2** The shooting was investigated by Detective Michael Miller, who interviewed Jackson. *Id.* ¶¶ 29–30. Jackson told

Miller that he saw Plaintiff go to a car, "pull out a gun, and shoot in the direction of the Highline," and that Jackson "ran back into the club" when shots were fired. *Id.* ¶¶ 30, 37. But, Plaintiff alleges that many of Jackson's representations to Miller contradicted his initial statements to the NYPD officers who first responded to the shooting, as well as other eyewitness accounts. *See, e.g.*, ¶¶ 30–32. For instance, Plaintiff alleges that Jackson told the responding officers that Plaintiff was "escorted from the club because he was intoxicated," and that Plaintiff then "went to his car, [a Rolls Royce] removed a firearm ... and fired several shots." *Id.* ¶¶ 31, 46. But, Jackson told Miller that Plaintiff was "forcibly ejected from the club" after an altercation with its manager, that Plaintiff was "belligerent," and threatened that he had a gun. *Id.* ¶ 32. Plaintiff also contends that Jackson's statements were demonstrably false, because surveillance videos showed that Jackson "was the aggressor towards Plaintiff," and that Plaintiff was "calm, peaceful, and cooperative" when escorted from the club. *Id.* ¶¶ 32, 41.

Plaintiff alleges that Miller failed to conduct a thorough and complete investigation of the shooting, because he did not interview several witnesses, including the 911 caller. *Id.* ¶¶ 36–37, 39. Plaintiff also suggests that Miller obtained—but disregarded—surveillance video from the inside and the outside of the club that would have corroborated Plaintiff's version of events. *See id.* ¶¶ 40–43. Plaintiff also complains that Officer Vincent Corrando, Miller's supervisor, "approved all [of the] reports written" in the investigation and "should have notice[d] or known of all the inconsistencies and contradictory statements" in Miller's reports. *Id.* ¶ 95. And, Plaintiff alleges that Officer John Passementi "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." *Id.* ¶ 96.

On January 9, 2016, Miller obtained a search warrant for Plaintiff's car, based on what Plaintiff contends were "false, misleading and/or embellished information" in the underlying affidavits. *Id.* ¶ 46. The next day, Jackson picked Plaintiff's mugshot out of a photo lineup. *Id.* ¶ 92. Plaintiff appears to argue that this lineup was unduly suggestive, because his "mugshot had a lighter background than the other photographs." *Id.* ¶ 92. The same day, Miller obtained a warrant for Plaintiff's arrest for attempted murder, assault, and weapons possession, and in February obtained additional search warrants for Plaintiff's cell phone and laptop, allegedly based, again, on false and misleading statements provided by Miller and Jackson. *Id.* ¶¶ 45, 47. According to Plaintiff, no "physical evidence [ ] tie[d] him to any part of the shooting," *id.* ¶ 81, and the police did not recover a gun or find gunshot residue in Plaintiff's car, *id.* ¶ 91.

On January 22, 2016, a grand jury indicted Plaintiff for second-degree attempted murder, first-degree assault, and two counts of criminal possession of a weapon. *See id.* ¶¶ 45, 51. On January 27, 2016, Plaintiff was arrested. *Id.* ¶ 51. He was incarcerated until February 18, 2016, when he was released on bail. *Id.* ¶ 52.

In November 2016, Plaintiff was taken back into custody on suspicion of witness tampering, after Jackson allegedly made a "false[ ]" report to the DA's Office that Plaintiff had tried to contact him. *Id.* ¶¶ 53, 103. Plaintiff remained in jail until his trial, which began in June 2017. *Id.* ¶¶ 54, 64; *see also* Trial Tr. at 1, ECF No. 22-3. [2]

On March 26, 2016, ADAs Shilpa Kalra and David Nasar provided surveillance videos from the Highline to Plaintiff's counsel. Compl. ¶ 64. Plaintiff alleges, however, that the relevant video showed only "one (1) camera angle [out] of 14 camera angles." *Id.* He alleges that prosecutors did not provide videos from the thirteen additional camera angles until a week after trial commenced, even though these videos were collected from the Highline eighteen months earlier. Compl. ¶ 64. The trial court accordingly granted counsel's request to review the additional videos before conducting Jackson's cross-examination. Trial Tr. at 3. On direct examination, Jackson testified that he did not participate in escorting Plaintiff out of the club. *Id.* at 47–48.

***3** On June 12, 2017, prior to Jackson's cross-examination, Plaintiff's counsel reported to the trial court that Jackson could be identified in the additional videos based on his clothing. *Id.* at 135. Nasar acknowledged that if Jackson was indeed visible in the videos, he was "doing a bunch of things contrary to what he testified about." *Id.*; *see also id.* at 136. The trial court then determined that Jackson should be questioned, under oath, outside the jury's presence, about his clothing on the night in question, and whether he could identify himself on the videos, among other matters. *See id.* at 146–50, 152–54. Jackson was brought in, and warned about perjury. *See id.* at 154–56. Jackson identified himself on the videos wearing a jacket and a light-colored shirt. *See id.* at 156–59. The court then adjourned the proceedings. *See id.* at 159. When the court resumed, Jackson, through counsel, invoked his Fifth Amendment right against self-incrimination, *id.* at 176, and the court declared a mistrial, *id.* at 186–88.

Plaintiff's counsel then moved to dismiss the indictment against Plaintiff on two grounds: first, that it was based on false testimony, and second, because of prosecutorial misconduct. Compl. ¶ 100. On October 17, 2017, Kalra consented to dismissal of the indictment on the first ground, but opposed the assertion of prosecutorial misconduct. Dismissal Tr. at 12–13, 15–16. The court dismissed the indictment, but the presiding judge stated he did not "see any prosecutorial misconduct." *Id.* at 16.

On March 12, 2021, over three years after the indictment was dismissed, Plaintiff commenced this action. Compl. Defendants move separately to dismiss the claims against them. ECF Nos. 20, 22, 32. The Court considers each motion in turn.

## DISCUSSION

I. Legal Standard

A. Rule 12(b)(1)

An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court lacks subject matter jurisdiction—that is, the statutory or constitutional power—to adjudicate it. *See* Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal. *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

On a Rule 12(b)(1) motion, the Court must accept all material factual allegations as true. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). It may not, however, "draw inferences ... favorable to [the] plaintiff[ ]" on such a motion. *Id.* And, the Court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction. *See id.*

B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Additionally, because Plaintiff proceeds *pro se*, the Court is obligated to construe his submissions "liberally and interpret[ ] [them] to raise the strongest arguments they suggest." *Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted). And, on a motion to dismiss, the Court may appropriately consider a *pro se* plaintiff's opposition papers to "supplement or clarify" the allegations in their complaint. *Sommersett v. City of N.Y.*, No. 09 Civ. 5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) (citation omitted).

II. Duplicative and Improper Claims

***4** Count 7 of the complaint asserts a claim under 18 U.S.C. § 245 for the deprivation of rights under the color of law. Compl. ¶¶ 148–51. But, no private right of action exists under this federal criminal statute, and accordingly, Plaintiff cannot raise a cognizable claim under it. *See Corrado v. State of N.Y. Univ. Stony Brook Police*, No. 15 Civ. 7443, 2016 WL 4179946, at *3 (E.D.N.Y. Aug. 5, 2016). Count 7 is, accordingly, DISMISSED with prejudice.

Further, the Court finds that Count 9 of the complaint—fraudulent misrepresentation under § 1983, Compl. ¶¶ 157–63—is duplicative of Count 4—deprivation of a fair trial under § 1983, *id.* ¶¶ 133–37—because both seek redress for violations of Plaintiff's liberty interests arising from the alleged "fabrication of evidence by a government officer." *See Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). Count 9 is, accordingly, DISMISSED with prejudice.

Finally, three of Plaintiff's claims—Counts 4, 5, and 6—include both federal constitutional claims and analogous state constitutional claims. Compl. ¶¶ 133–47. The New York State Constitution "provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016). But, where alternative remedies are available under the federal civil rights statutes, including § 1983, courts must

dismiss the plaintiff's state constitutional claims. *Id.* Because § 1983 provides a remedy for all of Plaintiff's alleged federal constitutional violations, any analogous state constitutional claims are duplicative. Accordingly, the state constitutional claims pleaded in Counts 4, 5, and 6 are DISMISSED with prejudice.

III. The State's Motion

The State moves to dismiss the complaint under Rule 12(b)(1), on the ground that the Eleventh Amendment bars Plaintiff's claims against it by virtue of sovereign immunity. State Mem. at 3, ECF No. 21. The Court agrees.

The Eleventh Amendment bars federal courts from exercising jurisdiction over claims against states. U.S. CONST. AMEND. XI. This extends to a state sued by its own citizens, *see* *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000), and state agencies, *see* *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987). There are only limited exceptions to this rule, none of which are applicable here.

First, a state may waive its Eleventh Amendment defense. *See Coll. Sav. Bank v. Fla. Prepaid Postsec. Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the State has not explicitly waived its immunity, or consented to be sued. *See* State Mem. at 3. And, by filing a motion to dismiss, rather than an answer to the complaint, the State cannot be said to have taken actions inconsistent with an assertion of immunity. *Cf.* *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (finding waiver of immunity where state removed action to federal court, then asserted immunity).

Second, Congress may abrogate the states' immunity from suit through statute. *Kimel*, 528 U.S. at 80. But, Congress has not done so for claims brought under § 1983, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), § 1985, *see* *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013), or § 1986, *Medina v. Cuomo*, No. 15 Civ. 1283, 2015 WL 13744627, at *6–7 (N.D.N.Y. Nov. 9, 2015). In the "absence of [the State's] consent," accordingly, such claims are "proscribed by the Eleventh Amendment." *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also* *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

***5** Finally, the Eleventh Amendment does not bar a "suit against a state official when that suit seeks prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *see also* *Ex parte Young*, 209 U.S. 123 (1908). But here, Plaintiff seeks only money damages, and retrospective declaratory and equitable relief. Compl. § IX. And, Eleventh Amendment immunity shields states from claims for money damages, *Liner v. Hochul*, No. 21 Civ. 11116, 2022 WL 826342, at *1 (S.D.N.Y. Mar. 17, 2022), and "declaratory relief dealing solely with past violations," *Medina*, 2015 WL 13744627, at *7. Although Plaintiff demands "affirmative relief necessary to eradicate the effects of Defendants' unlawful practices," *see* Compl. § IX(B), he does not allege any present violations of his rights, *see id. See* *Medina*, 2015 WL 13744627, at *7 (noting that "declaratory relief where there is no present violation, is also barred under the Eleventh Amendment"). Accordingly, this exception does not preclude the State's immunity defense in this matter.

Where a defendant is found to have sovereign immunity from suit, the Court is deprived of subject-matter jurisdiction under Rule 12(b)(1). *McGinty v. New York*, 251 F.3d 84, 89, 101 (2d Cir. 2001). Accordingly, because the State is immune from liability on all of Plaintiff's claims under the Eleventh Amendment, its motion to dismiss is GRANTED. And, because amendment would be futile, Plaintiff's claims against the State are DISMISSED with prejudice to renewal. [3]

IV. The DA Defendants' Motion

Plaintiff raises claims against the DA Defendants "in their individual capacities" [4] arising *inter alia* under § 1983, § 1985, and § 1986, [5] based on three main factual assertions. *See generally Compl.* First, Plaintiff alleges that Kalra and Nasar wrongfully chose to prosecute him, despite the lack of physical evidence tying him to the shooting. Compl. ¶ 81. Second, Plaintiff asserts that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of his trial, *see id.* ¶¶ 75–76, 78. Third, Plaintiff alleges that the "[p]rosecuting [a]ttorneys" "coached" Jackson to give false testimony to the grand jury that indicted him. *Id.* ¶¶ 50–51.

A. Absolute Immunity

***6** The DA Defendants argue that Plaintiff's claims are barred by absolute and qualified prosecutorial immunity. DA Defs. Mem. at 10–12, ECF No. 22-1. To the extent Plaintiff's claims are predicated on his allegations that Kalra and Nasar wrongfully chose to prosecute him and withheld allegedly exculpatory evidence, the Court agrees.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

1. Federal Claims

Although § 1983 has no immunities on its face, the Supreme Court has held that, when Congress initially enacted the statute, it did not intend to abrogate existing immunities established at common law. *See Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). Thus, both absolute and qualified immunity are applicable defenses to § 1983 claims. *See Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). Prosecutors are entitled to "absolute immunity" from liability when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. But, prosecutors are entitled only to "qualified immunity" when they perform "investigative functions" normally undertaken by a police officer. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Under the doctrine of qualified immunity, an official is immune from liability "only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995).

Courts employ a "functional approach" to determine the availability of absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations omitted). And, although the party claiming absolute immunity bears the burden of establishing its applicability, *see Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), if the court finds that that the conduct at issue is covered by absolute immunity, then the actor is shielded from liability for damages no matter "how[ ] erroneous the act ... and how[ ] injurious ... its consequences." *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) (citation omitted); *see also Anilao v. Spota*, No. 19 Civ. 3949, 2022 WL 697663, at *4 (2d Cir. Mar. 9, 2022).

Plaintiff first alleges that Kalra and Nasar improperly chose to prosecute him, despite a lack of physical evidence tying him to the crime. Compl. ¶ 81. But, prosecutors are immune from suit for decisions regarding "whether and when to prosecute," *Imbler*, 424 U.S. at 430–31 n.32–33, even where they may prosecute an innocent individual, *Schmueli*, 424 F.3d at 237–39. Kalra and Nasar are, therefore, entitled to absolute immunity to the extent Plaintiff's claims are based on their decision to prosecute him. [6]

Second, Plaintiff alleges that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of trial, Compl. ¶¶ 75–76, 78. But again, prosecutors are entitled to absolute immunity for all decisions taken "in their prosecutorial capacity, including decisions regarding which evidence should be disclosed to a criminal defendant." *Newson v. City of N.Y.*, No. 16 Civ. 6773, 2019 WL 3997466, at *3 (E.D.N.Y. Aug. 23, 2019). This is true even where information was deliberately withheld, *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 640 (E.D.N.Y. 2017), or where such withholding violated the defendant's constitutional rights, *see Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009). Accordingly, Kalra and Nasar have absolute immunity to the extent any of Plaintiff's claims are predicated on a violation under this factual allegation.

***7** Finally, Plaintiff alleges that the "Prosecuting Attorneys" coached Jackson to give false testimony to the grand jury, which then formed the basis for his indictment. Compl. ¶¶ 50–51. Prosecutors generally only have qualified immunity for actions taken before there is probable cause to arrest a defendant, because they are performing an investigative function, rather than acting as advocates. *See Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273. And, although "knowingly presenting evidence" to a grand jury is considered the "core of a prosecutor's role as an advocate," *Bernard*, 356 F.3d at 503, the Second Circuit has distinguished between a prosecutor's knowing presentation of false evidence to the grand jury—which is still entitled to absolute immunity—from a prosecutor's deliberate fabrication of evidence, *Hill*, 45 F.3d at 662–63 (finding that where prosecutor deliberately manufactured evidence to establish probable cause for plaintiff's arrest, his conduct was investigatory, regardless of whether, when the evidence was manufactured, the prosecutor intended to present it to the grand jury). In *Hill*, the Second Circuit also established that "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of qualified immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Id.* at 663.

As in *Hill*, Plaintiff alleges that the prosecutors deliberately participated in the fabrication of false evidence by coaching a material witness to give perjured testimony to the grand jury, so that the jury would return an indictment. Compl. ¶¶ 50–51. Allegations that the prosecution falsified evidence are distinct from allegations that the prosecution merely presented evidence they knew to be false. *Compare Hill*,

45 F.3d at 662–63, *with* *Urrego v. United States*, No. 00 Civ. 1203, 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (prosecutors receive absolute immunity for claims predicated on "false presentation of evidence to a grand jury"). And, considering the Court's obligation to liberally construe Plaintiff's pleadings and afford every reasonable inference in his favor at this stage, the Court concludes the DA Defendants have not established that they were acting as "advocates," rather than "investigators," when they engaged in the challenged conduct. *Hill*, 45 F.3d at 660 (officials asserting absolute immunity bear the burden of establishing it for the action in question). And, accepting the facts in the complaint as true, the DA Defendants would not be entitled to even qualified immunity, because it is objectively unreasonable for them to have knowingly coached a witness to give false testimony before a grand jury. *See* *Cipolla v. Cty. of Rensselaer*, 129 F. Supp. 2d 436, 456 (N.D.N.Y. 2001) (not "objectively reasonable" to believe presenting or soliciting perjured testimony did not violate plaintiff's clearly established rights). Accordingly, to the extent that Counts 3, 4, 5, 6, and 8 are predicated on the claim that the DA Defendants coached Jackson to give false testimony, they are not entitled to either absolute or qualified immunity.

2. State Claims

Plaintiff raises state-law claims against the DA Defendants in Counts 10 and 14 of the complaint. Compl. ¶¶ 164–67, 182–85. As with federal law, under New York law, a district attorney prosecuting crime is performing a quasi-judicial function, and, as such, is entitled to absolute immunity. *Arteaga v. State*, 72 N.Y.2d 212, 217 n.1 (N.Y. 1988). But, unlike federal law, prosecutors are absolutely immune for official acts in both the prosecution and investigation of criminal charges. *See* *Moore v. Dormin*, 173 Misc. 2d 836, 843, (N.Y. Sup. Ct. 1997), *aff'd as modified*, 252 A.D.2d 421 (N.Y. App. Div. 1998). A prosecutor does not receive absolute immunity, however, "when knowingly acting in violation of law." *Id.* As with Plaintiff's federal claims, to the extent his state law claims against the DA Defendants are predicated on his allegations that they improperly targeted him for prosecution or deliberately withheld exculpatory evidence, the DA Defendants are entitled to absolute immunity. But, construing Plaintiff's third allegation liberally, he essentially claims that the prosecutors knowingly acted in violation of the law by suborning perjury. The Court cannot conclude, therefore, that the DA Defendants are entitled to absolute immunity as a matter of state law to the extent Counts 10 and 14 rest on this allegation. [7]

B. Time Bar

***8** The DA Defendants argue that Plaintiff's claims are untimely. DA Defs. Mem. at 6–8. With the exception of Counts 3 (§ 1983 malicious prosecution) and 4 (§ 1983 deprivation of a fair trial), the Court agrees.

1. Federal Claims

Claims arising under §§ 1983 and 1985, when brought in this district, are governed by New York's three-year statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214; *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citation omitted); *Hernandez-Avila v. Averill,* 725 F.2d 25, 27 n.3 (2d Cir. 1984). But, claims under § 1986 have a one-year statute of limitations, *see* 42 U.S.C. § 1986. Federal courts are also obligated to apply New York's tolling rules. *Bd. of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic. 9 N.Y.C.R.R. § 8.202.8. Subsequent orders extended the tolling period until November 3, 2020. Exec. Order 202.67 (Oct. 4, 2020). Contrary to the DA Defendants' assertion, *see* DA Defs. Mem. at 7–8, other courts in this district have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims. *See, e.g.*, *Lewis v. Westchester Cnty.*, No. 20 Civ. 9017, 2021 WL 3932626, at *2 n.3 (S.D.N.Y. Sept. 2, 2021). [8] The Court concludes, therefore, that Executive Order 202.8 tolls the statute of limitations for Plaintiff's §§ 1983 and 1985 claims, which apply New York's three-year limitations period —but not Plaintiff's § 1986 claims, because the applicable statute of limitations for that claim is found in the federal statute itself.

Section 1983 claims based on malicious prosecution or deprivation of a fair trial accrue when the underlying criminal action against the plaintiff is "favorably" terminated, rather than at the time of arrest. *Sharp v. Cnty. of Putnam*, No. 18 Civ. 780, 2019 WL 2250412, at *4 (S.D.N. Y May 24, 2019); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016). The dismissal of an indictment constitutes

the termination of a proceeding. *Sharp*, 2019 WL 2250412, at *4–5. Applying these principles, Plaintiff's § 1983 claims for malicious prosecution (Count 3) and denial of a fair trial (Count 4) accrued on October 17, 2017, the date the trial court dismissed the indictment against him. Dismissal Tr. at 5. And, although the statute of limitations would have expired on October 17, 2020, New York's COVID-19 tolling rule extended the limitations period until June 2, 2021.[9] Because Plaintiff commenced this suit on March 12, 2021, Counts 3 and 4 are timely.

***9** By contrast, a § 1983 abuse-of-process claim accrues when the criminal process is "set in motion—typically at arrest—against the plaintiff." *Hadid v. City of N.Y.*, No. 15 Civ. 19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015), *aff'd* 730 F. App'x 68 (2d Cir. 2018). Because Plaintiff was arrested on January 27, 2016, the relevant statute of limitations for Count 8, § 1983 abuse of process, expired on January 27, 2019, and COVID-19 tolling provisions are, therefore, inapplicable. Accordingly, this claim is DISMISSED with prejudice as untimely.

Section 1985(3) conspiracy claims accrue "at the time of the events that caused the injury." *Panetta v. Cassel*, 20 Civ. 2255, 2020 WL 2521533, at *5 (S.D.N.Y. May 18, 2020). The existence of a conspiracy "does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether the act is labelled a tort or a violation of [federal civil rights statutes]." *Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980) (citation omitted). As discussed, the single allegation that escapes absolute immunity—and therefore is the only remaining basis for Plaintiff's claims against the DA Defendants—is that those defendants suborned perjury in the grand jury proceedings by coaching Jackson to give false testimony, resulting in Plaintiff's indictment and arrest. Plaintiff's § 1985(3) claim—Count 5 of the complaint—accrued no later than January 27, 2016, the date of his arrest—which again, applying a three-year statute of limitations untouched by COVID-19 tolling provisions, renders it untimely. Count 5 is, accordingly, DISMISSED with prejudice.

Similarly, Count 6, Plaintiff's § 1986 conspiracy claim, accrued when Plaintiff knew, or had reason to know of the harm or injury. *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). Plaintiff knew of the injury by his arrest date. Applying § 1986's one-year statute of limitations, any § 1986 claim Plaintiff brought after January 27, 2017, is untimely.[10] Accordingly, Count 6 is DISMISSED with prejudice.

2. State Claims

Counts 10 and 14 of the complaint—both state common-law claims—are also time-barred. "Under New York law, a plaintiff asserting tort claims against the City or its employees," as well as against municipal officials like district attorneys, "must file a notice of claim within [90] days after the incident giving rise to the claim and commence the action within a year and [90] days from the date of the incident." *Brown v. City of N.Y.*, No. 18 Civ. 3287, 2020 WL 1819880, at *7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1)); *see also Gonzalez v. City of N.Y.*, No. 94 Civ. 7377, 1996 WL 227824, *2 (S.D.N.Y. May 3, 1996). Plaintiff asserts that he filed the requisite notice of claim with the City on January 16, 2018—720 days after his arrest, and 91 days after the dismissal of the indictment. Compl. ¶ 16. Plaintiff did not commence this action until March 12, 2021. *See* Compl. Therefore, Plaintiff neither timely filed a notice of claim within 90 days, nor did he commence this lawsuit within a year and 90 days after the date the indictment was dismissed—the last date that could possibly serve as the trigger for the statute of limitations. Failure to comply with the mandatory notice of claim requirements is a basis for dismissal of a plaintiff's claims. *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). The Court, accordingly, concludes that Counts 10 and 14 are also time-barred, and therefore, these claims are DISMISSED with prejudice.

C. Personal Involvement

***10** Liability under § 1983 must be premised on a defendant's direct, personal involvement in the alleged violations. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). A defendant cannot be held vicariously liable under § 1983 for employing or supervising an employee that violated the plaintiff's rights—rather, a plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

As to Vance, Plaintiff only alleges that he served as the DA of New York County. Compl. ¶ 11. Vance may not be held liable for merely employing or supervising Kalra and Nasar. *See Iqbal*, 556 U.S. at 676. And, Plaintiff neither pleads that Vance was personally involved in investigating the shooting

or prosecuting him, nor is there any evidence in the record to support such a finding. Accordingly, Plaintiff's claims against Vance are DISMISSED with prejudice, because given the lack of evidence of Vance's personal involvement, the Court finds that granting leave to amend would be futile. *Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011).

Plaintiff similarly fails to specify Kalra and Nasar's personal involvement in his claimed constitutional violations, stating only that the "Prosecuting Attorneys" coached Jackson to provide testimony. Compl. ¶ 50. But, given Plaintiff's position as a *pro se* litigant, the Court recognizes that there may be additional information made available to Plaintiff through discovery that would enable Plaintiff to assert claims directly against Kalra and Nasar, such as if, for example, either of them prepared Jackson to testify. By **April 15, 2022**, accordingly, the DA Defendants shall, through counsel, inform Plaintiff and the Court whether Kalra or Nasar prepared Jackson to testify before the grand jury with respect to any potential criminal charges against Plaintiff, and/or conducted an examination of Jackson before the grand jury. No later than **May 16, 2022**, Plaintiff shall file an amended complaint, alleging with specificity Kalra and Nasar's direct, personal involvement in either "coaching" Jackson to testify falsely before the grand jury, or deliberately eliciting false testimony from Jackson during the grand jury proceedings. In addition, because, as detailed *infra* at 25–26, the Court finds that Plaintiff's malicious prosecution claim is deficient because he failed to allege that the underlying criminal proceedings terminated in his favor, an argument raised by the City Defendants but not the DA Defendants, any amended malicious prosecution claim that Plaintiff wishes to assert against Kalra and Nasar should also address this issue. Failure to do so shall result in dismissal with prejudice of Plaintiff's remaining claims against Kalra and Nasar.

V. City's Motion to Dismiss

Plaintiff brings claims against the City Defendants, on the grounds that (1) Miller failed to conduct a thorough and complete investigation of the shooting, by not interviewing several witnesses, including the 911 caller, Compl. ¶¶ 36–37, 39; (2) in his investigation, Miller obtained—but disregarded—surveillance video from both the inside and outside of Highline Ballroom, *id.* ¶¶ 40–43; (3) that Miller "used his own added facts and embellished statements" in his investigative reports to target Plaintiff as the sole suspect in the shooting, *id.* ¶ 44, *see also* ¶ 39; (4) that Corrando, as Miller's supervisor, approved his investigative reports but failed to notice the inconsistencies and contradictions therein, *id.* ¶ 95; and (5) that Passamenti "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff," *id.* ¶ 96. The Court addresses each remaining [11] cause of action.

A. Time Bar

1. Section 1983 Claims

***11** Plaintiff brings claims under § 1983 for unlawful search and seizure (Count 1); false arrest (Count 2); malicious prosecution (Count 3); deprivation of a fair trial (Count 4); and abuse of process (Count 8). As noted, § 1983 claims are subject to a three-year statute of limitations in this district. *See supra* at 15. And, for the reasons discussed with respect to the DA Defendants, the Court concludes that Counts 3 and 4 were timely pleaded. *See supra* at 16–17.

A § 1983 unlawful search and seizure claim, however, accrues on the date the allegedly unlawful search occurred. *McClanahan v. Kelly*, No. 12 Civ. 5326, 2014 WL 1317612, at *4 (S.D.N.Y. Mar. 31, 2014). Plaintiff alleges that his property was searched on January 9, February 12, and February 15, 2016. Compl. ¶¶ 46–47. The applicable statute of limitations, therefore, expired no later than February 15, 2019, nearly two years before Plaintiff brought suit. Plaintiff's claims are, therefore, untimely, and Count 1 is DISMISSED with prejudice as time-barred.

Section 1983 false arrest claims and abuse-of-process claims accrue from the date of Plaintiff's arrest. *See Rivera v. City of N.Y.*, No. 16 Civ. 9709, 2019 WL 252019, at *4 (S.D.N.Y. Jan. 17, 2019) (false arrest); *Anderson v. Cnty. of Putnam*, No. 14 Civ. 7162, 2016 WL 297737, at *3 (S.D.N.Y. Jan. 22, 2016) (abuse-of-process). Plaintiff was arrested on January 27, 2016, and therefore, any such claims should have been brought no later than January 27, 2019. Counts 2 and 8 are, accordingly, DISMISSED with prejudice as untimely.

2. Sections 1985(3) and 1986 Claims

Liberally construing the complaint, in Count 5, Plaintiff sets forth a conspiracy cause of action under § 1985(3), alleging that the City Defendants engaged in a conspiracy to have Plaintiff wrongfully convicted, *see* Compl. ¶ 97. This claim appears predicated on the NYPD investigation into the January 6, 2016 shooting, and Miller's alleged embellishment

of information, and focus on Plaintiff as the sole suspect. *Id.* ¶¶ 36–37, 39, 46, 90. Plaintiff also raises a failure-to-intervene claim under § 1986 (Count 6), seemingly arising from Corrando's alleged failure to notice the inconsistencies and contradictory statements allegedly included in Miller's police reports. *Id.* ¶ 95.

Section 1985(3) claims accrue "at the time of the events that caused the injury," and are subject to a three-year statute of limitations, *Panetta*, 2020 WL 2521533, at *5. Section 1986 claims based on a failure to intervene accrue when the defendant fails to intervene, *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018), and must be brought within one year, *see* 42 U.S.C. § 1986. Plaintiff's claims each began accruing no later than January 27, 2016, the date of Plaintiff's arrest, because Plaintiff does not suggest that any investigation took place after that date. The applicable limitations period extends no later than January 27, 2019, for Plaintiff's § 1985(3) claim, and January 27, 2017 for Plaintiff's § 1986 claim, two and four years, respectively, before the complaint was filed. Counts 5 and 6 are, therefore, DISMISSED with prejudice as time-barred.

3. State Claims

To the extent Plaintiff's state common-law claims, asserting various types of negligence, arise from the NYPD investigation into the shooting on January 6, 2016; the searches of Plaintiff's property on January 9, February 12, and February 15, 2016; and Plaintiff's arrest on January 27, 2016, Plaintiff was required to file a notice of claim within 90 days of those events, *see* N.Y. Gen. Mun. L. § 50-e. As noted, Plaintiff did not file a notice of claim with the City until January 16, 2018—one year and eleven months after the latest of those dates. Compl. ¶ 16. Accordingly, each of Plaintiff's negligence claims (Counts 10–14) are DISMISSED with prejudice. [12]

B. Claim Against the City [13]

***12** The Court reads Plaintiff's complaint as claiming, under *Monell v. Department of Social Services*, 436 U.S. 658, that the City is liable for the allegedly unlawful conduct of the named NYPD officers. *See* Compl. ¶ 179. The City Defendants argue that Plaintiff does not include sufficient factual allegations to support a municipal liability claim. City Defs. Mem. at 20–22, ECF No. 34. The Court agrees.

To bring a municipal liability claim under § 1983, the plaintiff must "prove the existence of a municipal policy or custom," then demonstrate a causal connection between the policy and the alleged constitutional deprivation. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). Plaintiff pleads neither, offering only conclusory allegations that the City Defendants "engaged in a pattern and practice to commit the aforementioned unlawful acts," Compl. ¶ 179, and that a policy is "inferred" because the City Defendants "took no steps to reprimand or discharge the officers involved," ECF No. 39 at 27. These allegations cannot, without more, state a claim for municipal liability. *E.g.*, *Fleming v. City of New York*, No. 18 Civ. 4866, 2020 WL 5522871, at *6 (S.D.N.Y. July 23, 2020). Because Plaintiff offers no facts which suggest that the deficiencies in his *Monell* claim may be cured by amendment, any such claim is DISMISSED with prejudice. *Strong v. City of Syracuse*, No. 16 Civ. 1054, 2020 WL 137250, at *3–4 (N.D.N.Y. Jan. 13, 2020) (dismissing *Monell* claim, with prejudice, given "[p]laintiff's conclusory allegations are insufficient to plausibly infer a custom or policy to support municipal liability").

C. Passamenti's Personal Involvement

Plaintiff's remaining claims are Counts 3 (malicious prosecution) and 4 (denial of a fair trial). As to Defendant Passamenti, Plaintiff alleges that Passamenti authorized DNA tests, which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." Compl. ¶ 96. Plaintiff does not allege that Passamenti was involved in falsification of evidence, that he attempted to hide the results of the relevant DNA tests, or that he was otherwise responsible for, or even aware of, the alleged "embellishment" of statements in the NYPD's investigative reports. Plaintiff has not, therefore, sufficiently alleged Passamenti's direct, personal involvement in any constitutional violations under § 1983. *Tangreti*, 983 F.3d at 618. And, because the record does not establish that Plaintiff could cure this pleading defect by amendment, Plaintiff's claims against Passamenti are DISMISSED with prejudice.

D. Malicious Prosecution

A claim for malicious prosecution under § 1983—Count 3 of the complaint—requires the plaintiff to show that the criminal proceedings against him were terminated "in his favor," typically by an acquittal or another form of dismissal of the charges on the merits. *Janetka v. Dabe*, 892 F.2d 187, 189–90 (1989). The City Defendants argue that Plaintiff has not made such a showing. City Defs. Mem. at 10, 14–17. The

Court agrees. Plaintiff asserts—citing no authority in support—that the dismissal of the indictment was a "termination in his favor" because dismissals that "include constitutional privilege assertions are considered favorable terminations." ECF No. 39 at 7, 10 (quotation marks omitted). It is not clear what Plaintiff means by this. And, from the Court's review of the state court transcript, it appears that, in dismissing the indictment, neither the prosecution, nor the court, made any statements indicating a belief in Plaintiff's innocence. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) (looking to the "reasons ... stated on the record for dismissing the charges" in determining whether the termination of the criminal case was in plaintiff's favor). Indeed, Kalra expressly declined to concede that Plaintiff was innocent, instead reaffirming her belief that Plaintiff "was the shooter." Dismissal Tr. at 15. The presiding judge similarly stated on the record that dismissal of the indictment was warranted even though he did not "see any prosecutorial misconduct." *Id.* at 16. The dismissal of the indictment, therefore, left open the question of Plaintiff's guilt or innocence, and Plaintiff cannot, accordingly, assert on that basis alone, that the proceedings were terminated in his favor.

***13** The Court notes, however, that because four years have passed since the dismissal of the indictment, Plaintiff may be able to plead additional facts from that time that support this relevant element of his claim. There is no information before the Court as to whether, for example, Plaintiff was ever informed by the prosecutors that he had been cleared of wrongdoing, whether Jackson or anyone else was later prosecuted for the shooting, or whether the state court made any further statements regarding the merits of the charges against Plaintiff. Count 3 is, accordingly, DISMISSED without prejudice, to provide Plaintiff with an opportunity to plead additional facts to support this claim.

E. Denial of Fair Trial

To state a claim under § 1983 for denial of a fair trial based on the fabrication of evidence by a police officer—Count 4 of the complaint—a plaintiff must allege that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted). The plaintiff need not show a favorable termination indicative of innocence to state such a claim. *Smalls v. Collins*, 10 F. 4th 117, 142–43 (2d Cir. 2021). The City Defendants argue that Plaintiff has failed to show a deprivation of his liberty interests because there was probable cause for his prosecution, in the form of corroborative ballistics evidence. City Defs. Mem. at 16 (citing Dismissal Tr. at 15); City Defs. Reply at 6–7, ECF No. 46.

Probable cause is not a complete defense to a fair trial claim. *Torres v. City of N.Y.*, No. 16 Civ. 6719, 2017 WL 4325822, at *5 (E.D.N.Y. Sept. 27, 2017) (noting that where "independent probable cause exists for the prosecution," a plaintiff must "show that the misconduct caused some deprivation above and beyond the fact of the prosecution itself." (citation omitted)). Plaintiff plausibly alleges that Miller fabricated and "embellished" Jackson's statements in his investigative report; that Miller provided these reports to prosecutors to secure Plaintiff's indictment and arrest; and that Corrando, as Miller's supervisor, reviewed and approved these reports without identifying any "embellishments" or obvious factual contradictions. *See* Compl. ¶¶ 44–49, 95. On a motion to dismiss, the Court cannot take as true the City Defendants' factual assertion that, regardless of any alleged fabrications in Miller's reports, the prosecution had independent ballistics evidence to satisfy the probable cause standard. *Compare* City Defs. Reply at 6–7, *with* ECF No. 39 at 9–12. It cannot, therefore, find as a matter of law, that the City Defendants had probable cause for Plaintiff's indictment and prosecution. *See Bullard v. City of N.Y.*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003). The Court concludes, therefore, that Plaintiff has sufficiently alleged a § 1983 denial of fair trial claim against Miller and Corrando. The City Defendants' motion to dismiss Count 4 of the complaint is, accordingly, DENIED.

## CONCLUSION

For the reasons stated above, the State's motion to dismiss, ECF No. 20, is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss, ECF No. 22, is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. By **April 15, 2022,** the DA Defendants shall make the disclosures directed in this order. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

***14** By **May 16, 2022**, Plaintiff shall file an amended complaint as to Counts 3 and 4, with the additional factual allegations detailed in this order. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 20, 22, and 32, and mail a copy of this order to Plaintiff *pro se.* The Court shall separately provide Plaintiff with a copy of all unpublished cases cited herein.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 992885

## Footnotes

1 Unless otherwise stated, the following facts are taken from the complaint and assumed, for purposes of this motion, to be true. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

2 The relevant state court trial transcripts were submitted by the DA Defendants in their motion to dismiss. *See* Trial Tr.; Dismissal Tr., ECF No. 22-4. The Court may take judicial notice of these transcripts as a matter of public record. *See Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005).

3 Because the Court concludes that it lacks jurisdiction over Plaintiff's claims against the State under Rule 12(b)(1), it need not reach the State's alternative ground for dismissal, that Plaintiff's § 1983 and § 1985 claims must be dismissed because the State is not a suable "person" within the meaning of those statutes. State Mem. at 3–4.

4 Plaintiff makes this clarification for the first time in his opposition papers. ECF No. 28 at 14. The Court notes that because, as discussed, the Eleventh Amendment bars suits against states, *see supra* at 8–10, when a defendant is sued in his official capacity, the court treats the suit as one against the "entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Serves*, 436 U.S. 658, 690 n.55 (1978)). And, where a "district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 8 (2d Cir. 2017). Accordingly, any claims Plaintiff may raise against the DA Defendants in their "official capacity" would be precluded by immunity under the Eleventh Amendment. *See id.*

5 Although Plaintiff asserts that he pleads each of his claims against "all Defendants," even a liberal read of the complaint makes clear that certain of Plaintiff's claims cannot implicate the DA Defendants' conduct, including counts 1 (unreasonable search and seizure); 2 (false arrest/imprisonment); 11 (personal injury); 12 (property damage) and 13 (negligent hiring, training, supervision, and discipline of officers). Compl. ¶¶ 117–27, 168–81. As the Court has already dismissed Counts 7 and 9, *see supra* at 7–8, it only considers Counts 3 (malicious prosecution); 4 (deprivation of fair trial); 5 (conspiracy); 6 (failure to intervene); 8 (abuse of process); 10 (negligent misrepresentation); and 14 (negligent infliction of emotional distress) against the DA Defendants.

6 Because the Court finds that the DA Defendants are entitled to absolute immunity on any claims arising from the withholding of exculpatory evidence, the Court does not reach their alternative argument that Plaintiff fails to state a claim for an alleged *Brady* violation, *see* DA Defs. Mem. at 12–15.

7 As noted, the parallel state-law constitutional claims in Counts 4, 5, and 6 are dismissed with prejudice. *See supra* at 8.

8 The DA Defendants' reliance on *Johnson v. Fargione* is unavailing. In that case, the court found that the plaintiff's claims, which had expired weeks before the issuance of Executive Order 202.8, could not "be said to have been tolled" by that Executive Order, as the time for filing had already passed and the plaintiff had offered no excuse for the delay. 20 Civ. 764, 2021 WL 1406683, at *3 (N.D.N.Y. Feb. 17, 2021), *report and recommendation adopted* 2021 WL 1404554 (Apr. 14, 2021). Although *Johnson* is instructive with respect to how claims that may have expired *before* the issuance of Executive Order 202.8 (*i.e.*, before March 20, 2020) should be treated, it does not address the applicability of the Executive Order to federal claims that, like Plaintiff's, had not yet expired by that date.

9 Executive Order 202.8 tolled applicable limitations periods from March 20, 2020 to November 3, 2020. The order amounted to a "pause" in the limitations period—that is, during the duration of the toll, the clock to file [did] not run," but "[o]nce the toll end[ed,] the clock resume[d] from where it was when the toll began, and the plaintiff ha[d] the rest of his limitations period to file his complaint," *Johnston v. City of Syracuse*, No. 20 Civ. 1497, 2021 WL 3930703, at *6 (N.D.N.Y. Sept. 2, 2021). Because, as of March 20, 2020, when the clock was "paused," Plaintiff had 211 days remaining before the expiration of the limitations period on October 17, 2020, the Court calculates 211 days after November 3, 2020, as the end of the relevant limitations period when tolled—which is June 2, 2021.

10 Even assuming, *arguendo*, that Plaintiff would not have had reason to know of the harm or injury that was the basis of his Section 1986 claim until the date the indictment was dismissed (October 17, 2017), the claim would still be time-barred, because this would only extend the limitations period to October 17, 2018—nearly three years before the commencement of this action.

11 As noted, the Court dismissed Count 7 for relying on a statute that does not provide a private right of action, *see supra* at 7; Count 9 for being duplicative of Count 4, *see id.* at 8, and all the state constitutional claims Plaintiff asserts analogously to his federal constitutional claims, *see id.*

12 As discussed *supra* at 18–19, even if the Court construes Plaintiff's notice of claim as timely based on the dismissal of Plaintiff's criminal case on October 17, 2017, Plaintiff still failed to commence this action within one year and 90 days, as required by statute. This provides an alternative ground for dismissal.

13 Plaintiff also names the NYPD as a defendant. *See* Compl. But, the NYPD is a non-suable agency of the City, and thus, to the extent any of Plaintiff's claims are brought against it, they fail as a matter of law. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Any such claims are, accordingly, DISMISSED with prejudice.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1745713
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Brad ROBERTS, BY AND THROUGH his next friend Abbe ROBERTS, and Stacey Roberts, Plaintiffs,
v.
LIFEMD ATLANTIC PATIENT MEDICAL CARE, P.C., Defendant.

24 Civ. 8162 (LGS)
|
Signed June 16, 2026

**Attorneys and Law Firms**

David Graff, Matthew Silverstein, Graff Silverstein LLP, Armonk, NY, Daniel Stephen Shimko, Shimko Law PC, Brooklyn, NY, for Plaintiffs.

Catherine J. Kohn, Kasowitz LLP, New York, NY, for Defendant.

**OPINION & ORDER**

LORNA G. SCHOFIELD, District Judge:

***1** This Opinion & Order addresses partial motions to dismiss certain counterclaims and intervenor claims in this action. Movants are Counterclaim and Intervenor-Claim Defendants Brad Roberts ("Brad") and Stacey Roberts ("Stacey"). For ease of reference, they are referred to collectively as "Plaintiffs." LifeMD Atlantic Patient Medical Care, P.C.,[1] referred to herein as "Defendant," asserts declaratory judgment and breach of contract claims against Plaintiffs (the "Counterclaims") in connection with Plaintiffs' employment separation agreements (the "Agreements") with LifeMD, Inc. ("LifeMD"). Intervenor Plaintiff LifeMD asserts the same claims against Plaintiffs, as well as claims for fraud, conversion and unjust enrichment against both Plaintiffs and a claim for aiding and abetting fraud against Brad (the "Intervenor Claims"). Plaintiffs move to dismiss in part the Counterclaims and the Intervenor Claims under Rule 12(b)(6).[2] For the following reasons, Plaintiffs' motions are granted in part and denied in part.

## I. BACKGROUND

Familiarity with the underlying facts and procedural history is assumed. *See generally* *Roberts v. Puopolo M.D., P.C.*, No. 24 Civ. 8162, 2025 WL 2773007 (S.D.N.Y. Sep. 25, 2025) (denying Defendant's motion for summary judgment as to Plaintiffs' claims). The following facts are taken from the Counterclaims and the Intervenor Claims and are assumed to be true only for the purpose of this Opinion & Order. *See* *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 97 (2d Cir. 2024).

LifeMD operates a direct-to-consumer platform that provides in-home healthcare services to patients. LifeMD does not directly engage in the practice of medicine, but rather contracts with an affiliated network of physician-owned professional corporations ("P.C.s") and professional associations to provide patients with access to licensed medical professionals.

Defendant is a P.C. in LifeMD's affiliated network. Non-party Dr. Anthony Puopolo, a licensed medical professional, was at all relevant times the President of Defendant.

Plaintiffs, who are husband and wife, began working for LifeMD in late 2020. Brad served as LifeMD's Chief Operating Officer ("COO"). Stacey, during her tenure at LifeMD, became Director of Patient Care.

Around early 2024, LifeMD discovered that Brad had (1) used his company-issued credit card for numerous personal expenditures and (2) routinely submitted reimbursement requests to LifeMD for personal expenditures, all without LifeMD's authorization and in violation of his employment agreement. For example, between late 2022 and early 2024, Brad charged his company-issued credit card at least $20,713.98 in personal expenses, and between January 1, 2023, and February 23, 2024, Brad submitted approximately $200,000 in reimbursement requests, much of which consisted of personal purchases. Brad improperly charged LifeMD for, among other things, golf apparel and instruction, luxury retail purchases, payments to his children's tutors and private investigator services. LifeMD is unaware of the full extent of Brad's misappropriation of company funds.

***2** Stacey likewise misappropriated LifeMD's funds: Between late 2022 and early 2024, she charged her company-issued credit card at least $13,400.31 in personal expenses, and between January 1, 2023, and February 23, 2024, she submitted at least $15,206.78 in reimbursement requests, much of which consisted of personal purchases. In his

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

capacity as COO, Brad approved at least some of Stacey's charges. Neither Brad nor Stacey has reimbursed LifeMD for these personal expenses.

On February 25, 2024, after LifeMD discovered that Brad was misappropriating company funds, LifeMD sought to terminate Brad's employment. In February and March 2024, the parties extensively negotiated Brad's Agreement.

On March 9, 2024, Brad and Stacey executed the Agreements in connection with their respective separations from LifeMD. The Agreements are substantively similar to each other except for the amount of compensation that Brad and Stacey received. The Agreements state that Plaintiffs release "any and all claims" against the "Company Parties," which is defined to include LifeMD and Defendant. The Agreements also include non-disparagement provisions under which Plaintiffs agree to "refrain from making any disparaging statements about the Company Parties ... to anyone inside or outside [LifeMD]." Defendant is a third-party beneficiary under the Agreements.

On March 14, 2024, Brad's counsel sent LifeMD an email stating, "[W]e may have a serious problem with the settlement." On April 24, 2024, Brad's counsel sent LifeMD a letter (1) alleging that Brad's Agreement was obtained "as a result of coercion, duress and overreaching" and therefore was unenforceable and (2) seeking to renegotiate the Agreement. On September 24, 2024, Brad, his counsel and LifeMD participated in a mediation, but no resolution was reached.

On October 28, 2024, Plaintiffs commenced this action. The Complaint alleges that, from November 2022 through November 2023, Dr. Puopolo prescribed Brad "multiple overlapping and conflicting doses" of GLP-1 weight-loss medication and non-FDA-approved synthetic peptides aimed at accelerating weight loss. The Complaint further alleges that Dr. Puopolo's prescriptions "did not follow the manufacturer prescribing and titration guidelines," that Brad was inadequately monitored and that Brad was not "advised of the risks and benefits associated with any of the drugs that he was prescribed." The Complaint asserts claims for medical malpractice, lack of informed consent, negligent hiring and supervision and loss of consortium. Multiple media outlets have since republished the Complaint's allegations, allegedly at Plaintiffs' behest, including the blog Showbiz411 on March 10, 2025, and the *Daily Mail* on March 21, 2025.

Before any discovery, Defendant moved for summary judgment, arguing that the broad releases in the Agreements bar all claims. In opposing the motion, Plaintiffs conceded that Defendant is a third-party beneficiary to the Agreements but argued that the Agreements were voidable and unenforceable because (1) Brad lacked the capacity to enter into his Agreement due to cognitive impairments and (2) the Agreements were "illegally structured" to evade medical malpractice reporting requirements. The motion was denied due to questions of fact regarding the enforceability of the Agreements.

## II. STANDARD

"A motion to dismiss a counterclaim, third-party claim, and cross-claim is evaluated under the same standard as a motion to dismiss a complaint." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 282 (S.D.N.Y. 2023). [3] To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Emilee Carpenter*, 107 F.4th at 99. It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ] ... claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 139 (2d Cir. 2024). Under Rule 12(b)(6), a court "accept[s] as true all nonconclusory factual allegations in the complaint and draw[s] all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). A court "need not consider conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

***3** New York law governs state law issues in this dispute because the parties' submissions assume that New York law applies. *See Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 n.5 (2d Cir. 2023) ("[I]mplied consent is sufficient to establish the applicable choice of law.").

## III. DISCUSSION

### A. Declaratory Judgment Claims

Both the Counterclaims and the Intervenor Claims seek a declaratory judgment that the Agreements are valid and enforceable. Plaintiffs' motion to dismiss these claims is granted.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Among the factors courts consider in determining whether to exercise jurisdiction under the Declaratory Judgment Act are "(1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the issues involved; [and] (2) whether such a judgment would finalize the controversy and offer relief from uncertainty." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023). Courts have "broad discretion to weigh th[ose] factors," and no one factor is dispositive. *Id.* at 100.

"[C]ourts reject declaratory judgment claims when other claims in the suit will resolve the same issues, because, under such circumstances, a declaratory judgment will not serve any useful purpose." *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 383 (S.D.N.Y. 2023) (dismissing declaratory judgment claim as duplicative of breach of contract claim). "Accordingly, when a declaratory judgment claim seeks a declaration of the same rights as will be determined under a [claimant]'s action for breach of contract, it is duplicative and may be dismissed." *CVS Albany, LLC v. 1688 Rojav Realty, LLC*, No. 24 Civ. 7145, 2025 WL 2614077, at *3 (S.D.N.Y. Sep. 10, 2025) (same and collecting cases).

The declaratory judgment claims are dismissed because they are duplicative of Defendant's and LifeMD's breach of contract claims. The declaratory judgment claims seek a determination that the Agreements are valid and enforceable, an issue that necessarily will be resolved in adjudicating the breach of contract claims.

Defendant argues that the declaratory judgment and breach of contract claims are not duplicative because the breach of contract claims are "backward-looking, addressing Plaintiffs' past conduct," while the declaratory judgment claims "are forward-looking and seek resolution of an ongoing, live controversy concerning Defendant's present and future rights under the Agreements." This argument is unavailing because the allegations in the Counterclaims and the Intervenor Claims concern only past conduct. *See* *Scharf v. Jombihis Corp.*, No. 25 Civ. 8044, 2026 WL 752971, at *10 (S.D.N.Y. Mar. 17, 2026) ("[T]here is no basis for declaratory relief where only past acts -- such as a breach of contract for which damages are sought -- are involved.").

Defendant further argues that the declaratory judgment and breach of contract claims are not duplicative because they are based on different facts. Specifically, Defendant contends that the breach of contract claims are based on Plaintiffs[ ]breach[ ] [of] the release and non-disparagement provisions of the Agreements when they brought this action and disparaged Defendant," while the declaratory judgment claims "are based on Plaintiffs' assertions -- raised for the first time on summary judgment -- that the Agreements as a whole are unenforceable and voidable." That is a distinction without a difference. Even if the claims were prompted by different developments in the litigation, both sets of claims ultimately require resolution of the same issue -- whether the Agreements are valid and enforceable.

***4** LifeMD makes an additional, independent argument that LifeMD as a party to the Agreements has broader rights than Defendant, a mere third-party beneficiary. LifeMD points to "provisions governing the parties' ongoing obligations, including restrictions on Plaintiffs' use of [LifeMD]'s proprietary and confidential information, assignments of intellectual property rights to [LifeMD], and cooperation obligations" and argues that LifeMD requires clarification of those ongoing rights and obligations. But the Intervenor Claims do not allege any dispute regarding these additional provisions of the Agreements. Rather, LifeMD's declaratory judgment claims seek the same relief as Defendant's -- a declaration that the Agreements are enforceable, i.e., a declaration of the same rights that will be determined under the parties' breach of contract claims.

Plaintiffs' motion to dismiss the declaratory judgment claims is granted.

**B. Breach of Contract Claims**

Both the Counterclaims and the Intervenor Claims assert that Plaintiffs breached the Agreements in two ways -- (1) "by initiating the instant action and asserting claims [they] expressly and voluntarily released," in violation of the Agreements' release provisions, and (2) "by disparaging Defendant in the Complaint and subsequent amendments thereto" and by causing the allegations to be republished, in violation of the Agreements' non-disparagement provisions. Plaintiffs' motion to dismiss the breach of contract claims based on the second theory is granted.

Under New York law, statements made in the course of, and pertinent to, litigation are entitled to an "absolute privilege"

from defamation claims. *Gottwald v. Sebert*, 220 N.E.3d 621, 628-29 (N.Y. 2023). Protected statements include those in pleadings and other court filings. *See Kelly v. Albarino*, 485 F.3d 664, 665-66 (2d Cir. 2007) (under New York law, accusations in affidavit filed in opposition to motion were protected by the litigation privilege); *Deaton v. Napoli*, No. 17 Civ. 4592, 2019 WL 4736722, at *6 (E.D.N.Y. Sep. 27, 2019) (same where statements were in complaint). The public policy underlying this privilege -- and the reason it is an absolute rather than a qualified privilege -- is to allow participants in litigation to "write or speak with that free and open mind which the administration of justice demands." *Youmans v. Smith*, 47 N.E. 265, 268 (N.Y. 1897); *accord Sherman v. Graves*, No. 24 Civ. 8494, 2025 WL 1558476, at *3 (S.D.N.Y. June 2, 2025) (New York law). This principle prioritizes the administration of justice over individual reputational interests. *See Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442-43 (N.Y. 2007); *Martirano v. Frost*, 255 N.E.2d 693, 694-95 (N.Y. 1969).

Here, the Court applies a similar principle: that public policy prioritizes speech in the administration of justice over private contractual arrangements. This principle bars the claims for breach of the Agreements' non-disparagement provisions, which rely solely on statements Plaintiffs made in the course of this litigation. *See Arts4All, Ltd. v. Hancock*, 773 N.Y.S.2d 348, 351 (1st Dep't 2004) (claim for breach of a non-disparagement clause was "properly dismissed because of the absolute witness privilege"). To conclude otherwise would convert a non-disparagement clause into a de facto release without the notice and clear expectations that a fully negotiated release provision would provide.

Defendant's reliance on *TRB Acquisitions LLC v. Yedid*, 239 N.Y.S.3d 117 (1st Dep't 2025), is unavailing. In that case, the defendant had threatened to provide damaging testimony to plaintiff's opponent in a separate action to which the defendant was not a party. *Id.* at 118. On those facts, the First Department concluded that the litigation privilege did not shield the defendant from claims for breach of a non-disparagement provision. *Id.* at 119. The First Department explained that "[t]he litigation privilege does not apply because this action relates to claims of breach of contract, and defendant was not a party to the litigation wherein he threatened to provide ... information in violation of his contractual obligations." *Id.* In contrast, the Counterclaims and Intervenor Claims challenge statements Plaintiffs made in this action. The public policy rationale underlying the litigation privilege -- namely, to encourage litigants to speak freely during their own judicial proceedings -- applies here in a way it did not in *TRB Acquisitions*.

***5** The Counterclaims and Intervenor Claims also allege "[o]n information and belief" that the challenged statements were republished by media outlets "by Plaintiffs or on their behalf." These allegations do not change the result because of the "fair report" privilege under Section 74 of the New York Civil Rights Law. Section 74 states that "[a] civil action cannot be maintained against any person ... for the publication of a fair and true report of any judicial proceeding." "The purpose of the statute in part is to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest." *Beary v. W. Publ'g Co.*, 763 F.2d 66, 68 (2d Cir. 1985). Section 74 is construed liberally and protects "substantially accurate" reports of judicial proceedings. *See Alf v. Buffalo News, Inc.*, 995 N.E.2d 168, 169 (N.Y. 2013). "A statement comes within the privilege and is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021). The statute's protections extend to "statements published not only by the media, but also by parties or their counsel." *Wexler v. Allegion (UK) Ltd.*, 374 F. Supp. 3d 302, 311 (S.D.N.Y. 2019); *see, e.g.*, *Gottwald*, 220 N.E.3d at 629-30 (considering litigant's distribution of embargoed complaint and other statements to media outlets).

At least two courts in this District have held that statements privileged under Section 74 do not create liability for breach of a non-disparagement provision. *See Wexler*, 374 F. Supp. 3d at 314; *Rosen v. Sapir*, No. 20 Civ. 5844, 2021 WL 4523713, at *11 (S.D.N.Y. Sep. 30, 2021). The court in *Wexler* analogized to *Arts4All*, in which the First Department held that the absolute litigation privilege discussed above bars claims for breach of a non-disparagement clause. *See* 374 F. Supp. 3d at 314. The court in *Wexler* reasoned that the same result should follow under Section 74 because the fair report privilege -- like the litigation privilege -- is an absolute and not a qualified privilege, signifying the protection of a greater public interest. *See id.* Like the court in *Rosen, see* 2021 WL 4523713, at *11, this Court agrees with *Wexler* that the public interest underlying Section 74 outweighs the private reputational interests underlying a non-disparagement agreement, such that statements within the scope of Section 74 are privileged from breach of contract claims.

At issue here are "republications" of Plaintiffs' allegations in this action, which Plaintiffs allegedly placed with media outlets. These republications fall comfortably within the definition of a "fair and true" report of this action for purposes of Section 74. The March 10, 2025, Showbiz411 article largely quotes or cites the initial Complaint. The article also includes a screenshot of a portion of an affidavit Plaintiffs submitted in opposition to Defendant's motion for summary judgment. [4] The March 21, 2025, *Daily Mail* article briefly summarizes the allegations in the initial Complaint and devotes most of the discussion to quoting or citing affidavits submitted by Plaintiffs, expressly attributing the statements to the affiants. [5] These articles are "substantially accurate" reports of this action. *See, e.g.*, *Kinsey*, 991 F.3d at 179-80 (Section 74 privilege applied where article quoted declarations filed in case and included images of the declarations); *Wexler*, 374 F. Supp. 3d at 312 (same where press release contained "rhetorical hyperbole" but "repeatedly reference[d] the lawsuit"); *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 330 (S.D.N.Y. 2021) (same where social media post "clearly dr[ew] from multiple court records"). Even assuming Plaintiffs caused their allegations to be republished, this conduct is protected under Section 74 and cannot be the basis for liability under the Agreements' non-disparagement provisions.

**C. LifeMD's Claims in the Alternative**

***6** Only LifeMD asserts claims against Plaintiffs for fraud, conversion and unjust enrichment. These claims are asserted in the alternative, only in the event the Agreements are found to be unenforceable.

**1. Fraud**

Plaintiffs' motion to dismiss the fraud claims is granted. Under New York law, fraud consists of five elements: "(1) a misrepresentation or a material omission of fact, (2) which is either untrue and known to be untrue or recklessly made, (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance of the other party on the misrepresentation or material omission, and (5) injury." *Golobe v. Mielnicki*, 268 N.E.3d 982, 987-88 (N.Y. 2025). Additionally, Rule 9(b) requires that a party alleging fraud in federal court "state with particularity the circumstances constituting fraud." To satisfy Rule 9(b), a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 87 (2d Cir. 2023). In other words, the complaint must "describe the who, what, when, where, and how of the fraud." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 544 (2d Cir. 2024).

LifeMD's fraud claims are dismissed because they fail to meet Rule 9(b)'s heightened pleading standard. The Intervenor Claims allege that Plaintiffs "represented that [their personal] expenses were legitimate business expenses and/or failed to disclose the material fact that such expenses were personal rather than business-related," and that LifeMD "reasonably and justifiably relied on [these] misrepresentations and omissions" in paying the charges on Plaintiffs' company-issued credit cards and reimbursing Plaintiffs' expense requests. However, the Intervenor Claims do not identify specific statements or omissions by Plaintiffs, and do not allege for each one where, when and by whom each statement or omission was made. The allegations include only a rough estimate of the amount of funds allegedly misappropriated by Plaintiffs, categories of improper expenditures and a general time frame for the fraud. That is not enough to satisfy Rule 9(b). *See, e.g.*, *Buss ChemTech AG v. PCS Phosphate Co.*, No. 25 Civ. 3710, 2026 WL 35380, at *6 (S.D.N.Y. Jan. 6, 2026) (fraud claims dismissed for failure to satisfy Rule 9(b) where allegations "describe[d] the alleged misrepresentations only in broad terms, without pleading the particular statements with sufficient specificity," and "d[id] not identify the specific speakers or specify the time and place of the alleged misrepresentations").

LifeMD cites *United States ex rel. Chorches v. American Medical Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017), for the proposition that "the adequacy of particularized allegations under Rule 9(b) is case- and context-specific." But the Second Circuit's broader point in *Chorches* was that "[d]espite the generally rigid requirement of Rule 9(b), allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Id.* at 81-82. *Chorches* also involved the unique situation of a *qui tam* action, where the relator, suing on behalf of the government, lacked access to the defendant's billing submissions and thus alleged that the relevant facts were uniquely within the defendant's knowledge. *Id.* Here, by contrast, the Intervenor Claims do not allege that any of the relevant information -- the who, what, when, where or how of the fraud -- is uniquely within Plaintiffs' knowledge.

***7** Because LifeMD does not adequately plead fraud, LifeMD's claim against Brad for aiding and abetting fraud necessarily fails as well. *See Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (noting that "[t]o establish liability for aiding and abetting fraud under New York law, the plaintiffs must show ... the existence of a fraud"); *accord 1650 Broadway Assocs., Inc. v. Sturm*, 210 N.Y.S.3d 19, 22 (1st Dep't 2024).

Plaintiffs' motion to dismiss the fraud claims is granted.

### 2. Conversion

Plaintiffs' motion to dismiss the conversion claims is granted. Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006); *accord N.Y. Packaging II, LLC v. Merchs. Distribs., Inc.*, 249 N.Y.S.3d 591, 593 (2d Dep't 2026). "[I]t is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Advanced Knowledge Tech, LLC v. Fleitas*, No. 21 Civ. 992, 2021 WL 6126966, at *6 (S.D.N.Y. Dec. 28, 2021) (New York law). "To state a claim for conversion of money, the money must be specifically identifiable and segregated, and described or identified in the same manner as a specific chattel." *Id.*

LifeMD's conversion claims are dismissed because they do not allege a specific, identifiable fund. The Intervenor Claims allege that Plaintiffs intentionally and without authority used LifeMD's funds for personal expenditures that lacked any legitimate business purpose, and that Plaintiffs have refused to repay the funds. However, the allegations broadly reference "Company funds" and approximate figures, including expenditures by Brad of "at least $20,713.98" and "at least approximately $200,000" and expenditures by Stacey of "at least $13,400.31" and "at least $15,206.78." The allegations do not identify the type of specific, identifiable fund required to plead conversion of money. *See, e.g.*, *Heckl v. Walsh*, 996 N.Y.S.2d 413, 416 (4th Dep't 2014) (dismissing conversion claim because allegations that defendants "have taken approximately $4 million of [plaintiff]'s cash and/or personal property" did not identify a "specific, identifiable fund"); *PowerFlex Solar, LLC v. Solar PV Pros, LLC*, 217 N.Y.S.3d 694, 700 (3d Dep't 2024) (same where plaintiff alleged that a roughly $1.16 million deposit paid to defendants had been converted but "failed to allege that the money was somehow segregated upon its transfer[s] to" defendants and thus "failed to specifically identify the funds at issue").

Plaintiffs' motion to dismiss the conversion claims is granted.

### 3. Unjust Enrichment

The Intervenor Claims assert that Plaintiffs were unjustly enriched in two ways -- (1) by retaining the consideration LifeMD paid Plaintiffs under the Agreements while "repudiating the obligations that [LifeMD]'s consideration was intended to secure" and (2) by misappropriating LifeMD's funds for improper personal expenditures. The second theory arises from the same alleged improper expenditures underlying LifeMD's conversion claims. Plaintiffs seek to dismiss only the portion of the claims that "relate to the allegedly 'converted property' and/or improper expenditures." Plaintiffs' motion is denied.

***8** Under New York law, "[t]o recover under a theory of unjust enrichment, a litigant must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Columbia Mem'l Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022). "[E]quity does not allow a defendant ... to keep misappropriated funds." *Allen v. Zizzi Constr. Corp.*, 211 N.Y.S.3d 67, 68 (1st Dep't 2024).

The Intervenor Claims allege that Plaintiffs were enriched at LifeMD's expense when they used company funds for personal expenses without the company's authorization. The Intervenor Claims further allege that equity and good conscience require Plaintiffs to return the misappropriated funds. These allegations are sufficient to plead a claim for unjust enrichment. *See, e.g.*, *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 88 (E.D.N.Y.) (allegations that defendant diverted company funds and customer deposits for personal use sufficiently stated unjust enrichment claim under New York law), *reconsideration granted on other grounds*, 2025 WL 2178194 (E.D.N.Y. Aug. 1), *appeal on other grounds docketed*, No. 25-2189 (2d Cir. Sep. 11, 2025).

Plaintiffs argue that the Intervenor Claims fail to allege unjust enrichment because the at-issue expenses were approved by LifeMD. Plaintiffs argue that they sought

and received authority to use the funds by "providing [LifeMD] unadulterated documentation for the precise item[s] [Plaintiffs] sought reimbursement for." This argument is unavailing because the Intervenor Claims allege that LifeMD did not authorize the at-issue expenses, and at the motion to dismiss stage, these allegations must be accepted as true. *See K.W. ex rel. K.A. v. City of New York*, No. 24-3042, 2026 WL 1391967, at *6 (2d Cir. May 19, 2026) ("In considering a Rule 12(b)(6) motion to dismiss, the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.").

Plaintiffs' motion to dismiss the unjust enrichment claims relating to the alleged improper expenditures is denied.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiffs' partial motion to dismiss the Counterclaims is **GRANTED**. Plaintiffs' partial motion to dismiss the Intervenor Claims is **GRANTED** as to the declaratory judgment, breach of contract, fraud and conversion claims and **DENIED** as to the unjust enrichment claims.

For clarity, the following claims survive:

- Defendant's breach of contract claims relating to the Agreements' release provisions;

- LifeMD's breach of contract claims relating to the Agreements' release provisions and

- LifeMD's unjust enrichment claims, asserted in the alternative.

If Defendant and/or LifeMD has additional facts that it believes would cure the deficiencies identified in this Opinion & Order, by **July 7, 2026**, Defendant and/or LifeMD may file a letter not to exceed three single-spaced pages seeking leave to replead and explaining how the proposed amendments cure the deficiencies. Any letter shall be accompanied by proposed Second Amended Counterclaims or a proposed Amended Intervenor Complaint marked to show changes from the initial filing. Plaintiffs shall respond, with the same page limitation, by one week after the filing of any letter by Defendant and/or LifeMD.

***9** The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 63 and 117.

**All Citations**

Slip Copy, 2026 WL 1745713

## Footnotes

1 Puopolo M.D., P.C. was the original Defendant in this action. On February 2, 2026, LifeMD Atlantic Patient Medical Care, P.C. was substituted as Defendant.

2 Unless otherwise indicated, all references to "Rules" are to the Federal Rules of Civil Procedure.

3 Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

4 *See* Roger Friedman, *Former Weight Loss Spokesman Suing Doctor He Says Over-Prescribed Ozempic Type Drugs, Caused Him Severe Injuries*, Showbiz411 (Mar. 10, 2025), https://www.showbiz411.com/2025/03/10/former-weight-loss-spokesman-suing-doctor-he-says-over-prescribed-ozempic-type-drugs-caused-him-severe-injuries [https://perma.cc/HVM8-YTGG]. The Counterclaims and Intervenor Claims reference and include links to the at-issue articles. On a motion to dismiss, a court may consider documents incorporated by reference in the complaint. *Santos v. Kimmel*, 154 F.4th 30, 33 (2d Cir. 2025).

5 *See* Sadie Whitelocks, *I Lost 150 Pounds on Ozempic. I'm Also Losing My Mind, Memory, Sight, Speech and Hearing ... I Can Barely Walk or Eat*, Daily Mail (Mar. 21, 2025), https://www.dailymail.com/health/article-14507341/ozempic-dieter-suing-doctor-treating-weight-loss-drug.html.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1965631
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Timothy ROBINSON, Petitioner,
v.
Michael SPOSATO, Sheriff of
Nassau County, Respondent.

No. CV–11–0191 (SJF).
|
May 29, 2012.

**Attorneys and Law Firms**

Timothy Robinson, East Meadow, NY, pro se.

Paul M. Tarr, Office Of The Attorney General, New York, NY, Jason Richards, Mineola, NY, for Respondent.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

***1** On January 7, 2011, petitioner Timothy Robinson ("Petitioner") filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254 challenging his pretrial detention at the Nassau County Correctional Center ("NCCC") following his arrest on September 30, 2010 on larceny charges. The Nassau County District Attorney's Office ("Respondent"), on behalf of Michael Sposato, Sheriff of Nassau County, now moves to dismiss the petition. Petitioner has not opposed the motion. For the reasons set forth herein, respondent's motion is granted and the proceeding is dismissed.

I. BACKGROUND

In his petition, petitioner alleges that on August 31, 2010, he was arrested when he reported to his parole officer [1] "for a 155.3(1) that apparently [sic] happend [sic] on the 28th day of May 2010." [2] (Pet. at 1). According to petitioner, he was arraigned the following morning. (*Id.*) Petitioner further alleges that on September 9, 2010, he was released on his own recognizance pursuant to New York Criminal Procedure Law Section 180 .80 "because no witnesses showed up, and the [prosecutor] had no solid sufficient evidence." (Pet. at 1–2). Plaintiff alleges that on September 30, 2010, he was rearrested by his parole officer based upon the August 31, 2010 arrest. According to plaintiff, following that arrest, he was held in custody for over ninety (90) days in violation of New York Penal Law Section 190.80 and his due process rights under the Fourteenth Amendment to the United States Constitution. [3] (Pet. at 2).

On January 7, 2011, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254, alleging, *inter alia,* that his pretrial detention in excess of ninety (90) days violated his Fourteenth Amendment due process rights. Respondent now moves to dismiss the petition on the basis that petitioner has failed to exhaust available remedies in state court and that this Court must abstain from interfering in pending state court criminal proceedings. Petitioner has not opposed, or otherwise responded to, respondent's motion.

II. DISCUSSION

A. Exhaustion

Although petitioner seeks relief under both Sections 2241 and 2254 of Title 28 of the United States Code, relief is only available to him under Section 2241. Section 2254(a), provides, in relevant part, that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody *pursuant to the judgment of a State court* only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." (Emphasis added). Since petitioner, a pretrial detainee at the time he commenced this proceeding, was not "in custody pursuant to the judgment of a State court" at the time he filed his petition, he cannot seek habeas corpus relief under Section 2254. *See, e.g. Crawford v.* New York, No. 08–CV–1287, 2009 WL 396308, at * 1 (N.D.N.Y. Jan. 17, 2009) ("[S]ection 2254 would not apply to individuals held in pretrial custody because their custody would not result from a 'judgment' as required by that statute * * *.")

***2** Section 2241(c)(3) allows any prisoner to seek a writ of habeas corpus if "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." Thus, "section 2241 applies to all individuals held in state custody while § 2254 applies only to those whose custody results from a final judgment." *Crawford,* 2009 WL 396308, at * 1. Accordingly, Section 2241 is available to state pre-trial detainees challenging their custody as being in violation of

the Constitution or federal law. *See, e.g. Marte v. Berkman,* No. 11 Civ. 6082, 2011 WL 4946708, at * 5 (S.D.N.Y. Oct.18, 2011), *aff'd on other grounds sub nom Marte v. Vance,* No. 11–4486–cv, 2012 WL 1632606 (2d Cir. May 10, 2012); *Yellowbear v. Wyoming Attorney General,* 525 F.3d 921, 924 (10th Cir.2008) ("Section 2241 is a vehicle for challenging pretrial detention * * *.")

Although not a statutory requirement, Section 2241 has been interpreted as requiring a petitioner to exhaust available state court or administrative remedies prior to seeking any relief thereunder in federal court. *See Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632–34 (2d Cir.2001); *see also United States ex rel. Scranton v. State of New York,* 532 F.2d 292, 294 (2d Cir.1976) ("While 28 U.S.C., Section 2241 does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief, decisional law has superimposed such a requirement in order to accommodate principles of federalism."); *Allen v. Maribal,* No. 11–CV–2638, 2011 WL 3162675, at * 1 (E.D.N.Y. July 25, 2011) (accord). A petitioner who has not exhausted available state court or administrative remedies may only seek a writ of habeas corpus under Section 2241 if: (1) he establishes cause for his failure to exhaust and prejudice as a result of the alleged violation of federal law, *see id.,* or (2) he demonstrates that the failure to consider his claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). With respect to state prisoners seeking federal habeas corpus relief, the exhaustion requirement and "cause and prejudice" standard balance the interest "in guarding against convictions that violate fundamental fairness" against the "equally weighty principles of federalism, comity, and finality." *Carmona,* 243 F.3d at 633 (quotations and citation omitted).

Since petitioner has not alleged that he sought any relief from his pretrial detention in state court prior to commencing this proceeding, he has not exhausted available state court remedies. *See, e.g. Allen,* 2011 WL 3162675, at * 2 ("Because the state proceedings are pending before the trial court, petitioner's claims have yet to be presented to the highest state court, and petitioner therefore has not exhausted his available state remedies."); *cf. Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 490, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) (finding that the petitioner had exhausted available state remedies with respect to his speedy trial defense, notwithstanding the fact that he had not yet gone to trial in the state court criminal proceeding, since he had made repeated demands for trial to the state courts, thereby "offering those courts an opportunity to consider on the merits his constitutional claim of the * * * denial of a speedy trial.") Nor has petitioner asserted any cause for his failure to exhaust his state court remedies, any prejudice resulting to him from the alleged violation of his due process rights or that this Court's failure to consider his claims will result in a fundamental miscarriage of justice, particularly in light of his subsequent conviction upon his plea of guilty to the charge of petit larceny. Accordingly, the petition is denied and the proceeding is dismissed in its entirety for petitioner's failure to exhaust available state court remedies.

B. Abstention

***3** Even if petitioner could show cause for his failure to exhaust and prejudice resulting to him from the alleged violation of federal law, the petition is denied pursuant to *Younger v. Harris,* 401 U.S. 37, 54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny.

Pursuant to the Supreme Court's decision in *Younger,* absent unusual circumstances, a federal court must abstain from intervening in ongoing state criminal proceedings when adequate state relief is available. 401 U.S. at 54, 91 S.Ct. 746, 27 L.Ed.2d 669; *see also Davis v. Lansing,* 851 F.2d 72, 76 (2d Cir.1988) ("[I]nterference in pending [state court criminal] proceedings is inappropriate unless state law clearly bars the interposition of ... federal constitutional claims." (quotations, alterations and citations omitted)); *York v. Ward,* 538 F.Supp. 315, 317 (E.D.N.Y.1982) ("[F]ederal court interference with state court proceedings has long been discouraged by public policy that is reflected quite plainly in * * * judicial pronouncements.") "No more is required to invoke *Younger* abstention than the *opportunity* to present federal claims in the state proceeding." *Davis,* 851 F.2d at 76 (emphasis in original) (quoting *Juidice v. Vail,* 430 U.S. 327, 337, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977)). *"Younger* abstention is appropriate when: 1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of constitutional claims in the state court." *Hansel v. Town Court for Town of Springfield, N.Y.,* 56 F.3d 391, 393 (2d Cir.1995). "So long as a plaintiff is not barred on procedural or technical grounds from raising alleged constitutional infirmities [in state court], it cannot be said that state court review of constitutional claims is inadequate for *Younger* purposes." *Id.* at 394. As with the exhaustion principle, the interests of federalism and comity also stand behind the *Younger* abstention policy. *See Davis,* 851 F.2d at 76.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

"Although [*Younger* ] dealt with a federal injunction of a pending state criminal prosecution and was based upon a proper respect for state functions, that is, comity, the same policy and legal considerations have been applied to federal habeas corpus relief from a state criminal trial." *York,* 538 F.Supp. at 317 (citing, *inter alia, U.S. ex rel. Scranton,* 532 F.2d 292). Section 2241 "cannot be used to 'permit the derailment of a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court.' " *Allen,* 2011 WL 3162675, at * 1 (quoting *Braden,* 410 U.S. at 493, 93 S.Ct. 1123, 35 L.Ed.2d 443). Accordingly, courts should refrain from derailing "a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court." *Allen,* 2011 WL 3162675, at * 1.

At the time he commenced this proceeding, the criminal proceeding against petitioner was still pending in state court and there is ample opportunity for review of petitioner's constitutional claim in state court, i.e., by way of direct appeal from, or other collateral attack of, his judgment of conviction in state court. Moreover, "[t]here is no question that the ongoing prosecution [of petitioner] implicates important state interests: *Younger* itself settled the importance of the state's interest in criminal proceedings." *Davis,* 851 F.2d at 76; *see also Hansel,* 56 F.3d at 393 ("[I]t is axiomatic that a state's interest in the administration of criminal justice within its borders is an important one.") Since petitioner has not demonstrated any "extraordinary" or "unusual" circumstances that would militate against *Younger* abstention, *see Davis,* 851 F.2d at 76, respondent's motion is granted, the petition is denied and the proceeding is dismissed in its entirety without prejudice.

III. CONCLUSION

***4** Respondent's motion to dismiss is granted, the petition is denied and the proceeding is dismissed in its entirety without prejudice. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, *see, e.g. Finkelstein v. Spitzer,* 455 F.3d 131, 133 (2d Cir.2006) (denying a certificate of appealability because petitioner was no longer in custody in connection with his challenged convictions at the time he filed his habeas corpus petition), a certificate of appealability will not issue. 28 U.S.C. § 2253; *see also Miller–El v. Cockrell* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Luciadore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000); *Kellogg v. Strack,* 269 F.3d 100, 102 (2d Cir.2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See,* 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1965631

## Footnotes

1 According to respondent, petitioner was on parole for convictions of attempted burglary in the second degree in violation of New York Penal Law Sections 110.00 and 140.25 and attempted criminal possession of a forged instrument in violation of New York Penal Law Sections 110.00 and 170.25.

2 There is no Section 155.3 of the New York Penal Law. However, a Superior Court Information charged petitioner with one (1) count of grand larceny in the fourth degree in violation of New York Penal Law § 155.30(1), a class E felony, and one (1) count of petit larceny in violation of New York Penal Law § 155.25, a class A misdemeanor. On March 22, 2011, the prosecutor dismissed the charge of grand larceny in the fourth degree and petitioner pled guilty in the Supreme Court of the State of New York, County of Nassau to one (1) count of petit larceny in violation of New York Penal Law § 155.25, punishable by a maximum sentence of imprisonment of one (1) year. During his plea allocution: (1) petitioner testified that on May 28, 2010, he purchased items at a store in Glen Head, New York using a Visa card belonging to an account that he knew had been closed, (P. at 15); (2) petitioner waived his right to appeal his conviction, (P. at 11); and (3) the

trial court agreed to sentence petitioner to a term of imprisonment of eleven (11) months in the NCCC, to run concurrently with the sentence imposed upon petitioner for his conviction of a violation of probation, (P. at 13).

3 According to respondent, petitioner was ultimately sentenced, upon his plea of guilty to the charge of petit larceny in violation of New York Penal Law § 155.25, on June 2, 2011. Respondent further contends that petitioner has completed the term of imprisonment imposed pursuant to the June 2, 2011 sentence, although he remains in custody pursuant to the sentence imposed for his conviction of a violation of probation.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3392869
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven SERRANO, Michael Serrano, and Samuel Garcia, Plaintiffs,
v.
CITY OF NEW YORK, et al., Defendants.

16 Civ. 8105 (AKH)
|
Signed 07/11/2018
|
Filed 07/12/2018

**Attorneys and Law Firms**

David Bruce Rankin, Keith Michael Szczepanski, Beldock Levine & Hoffman LLP, New York, NY, for Plaintiffs.

Kavin Suresh Thadani, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

ALVIN K. HELLERSTEIN, United States District Judge

***1** This case concerns the allegedly unlawful arrest and subsequent prosecution of three individuals outside a Bronx apartment building. Plaintiffs Steven Serrano, Michael Serrano, and Samuel Garcia (collectively, "Plaintiffs") filed this action on October 17, 2016. Broadly stated, plaintiffs allege that they were falsely arrested as part of an undercover drug operation conducted by Defendants City of New York ("City"), Anthony DiSimone ("DiSimone"), Thomas McHale ("McHale"), Undercover Cop 0244 ("UC244"), and Undercover Cop 0114 ("UC114") (collectively "Defendants"). After amending the complaint on September 8, 2017, and withdrawing certain claims thereafter, [1] plaintiffs allege claims for false arrest, malicious prosecution, unreasonable search and seizure, assault and battery, and *respondeat superior.* Plaintiff Steven Serrano separately maintains a claim for excessive force. Pre-trial proceedings, including depositions, followed. Defendants now move for summary judgment on all claims, principally on the theory that the officers are entitled to qualified immunity and there was at least arguable probable cause to arrest, search, and prosecute plaintiffs. For the reasons that follow, the motion is granted in part and denied in part. The motion is granted as to all claims asserted by plaintiff Steven Serrano, and he shall be dismissed from the case. As to all claims raised by plaintiffs Samuel Garcia and Michael Serrano, the motion is denied.

**Background**

Much of the background leading to plaintiffs' arrests is undisputed. But significant disputes of fact remain, and these contested facts make summary judgment inappropriate as to many of the claims asserted.

At approximately 2:00 p.m. on January 22, 2015, New York City police officers were conducting a "buy and bust" narcotics operation in the vicinity of 984 Bronx Park South in the Bronx, New York. [2] Posing as a drug buyer during the operation, UC114 solicited "JD White," a nonparty to this case, seeking to purchase heroin. After agreeing to the sale, JD White left UC114 and approached "JD Red," another nonparty to this case who was also standing near 984 Bronx Park South, and asked him to supply the heroin.

***2** The parties agree that while this transaction was developing, plaintiffs Steven Serrano and Samuel Garcia were standing just outside the apartment building at 984 Bronx Park South, where Steven and his brother Michael Serrano were living at the time. But the parties sharply dispute plaintiffs' role in what followed. Plaintiffs contend that as Steven left his apartment that afternoon, he ran into Samuel, a former acquaintance, and struck up a conversation that lasted approximately thirty minutes. As some point during this time, plaintiffs claim that Michael Serrano arrived home, spoke with Steven and Samuel briefly, and went upstairs to the family's apartment. Plaintiffs claim that while Steven and Samuel were talking, Steven noticed two of the undercover officers, a male and a female, behaving strangely. His suspicions aroused, plaintiffs claim that Steven commented to Samuel—and only to Samuel—that he believed, based on his experience living in the neighborhood, that these two individuals were undercover cops. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 42:6–43:11. Both Steven and Samuel stated in their depositions that Steven made this remark, which was overheard by UC244, two or three times. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 44:7–9 (stating that he made the statement "maybe twice");

Declaration of Szczepanski, ECF 44, Ex. 3, at 33:14 (stating that Steven made the statement "three times, maybe"). Samuel apparently acknowledged the statement, but testified in his deposition that he neither agreed nor disagreed. *See* Declaration of Szczepanski, ECF 44, Ex. 1, 42:12–24; Declaration of Szczepanski, ECF 44, Ex. 2, at 33:2–24, 37:23–38:2. Plaintiffs contend that Michael Serrano, Steven's brother, was not present when these statements were made, and defendants do not suggest otherwise. *See* Def. Response Rule 56.1 Statement, ECF 45, at ¶ 11.

Although the police reports are contradictory, defendants now take the position that Steven made this remark not only to Samuel, but also to JD Red in an effort to warn him that the police were present.[3] In effect, defendants claim that Steven and the other plaintiffs were acting as lookouts for drug dealers in the area. The parties dispute how close Steven and Samuel were standing to JD Red when the statements were made, but Steven testified at his deposition that they were approximately ten feet from JD Red at the time. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 35:8.

Meanwhile, JD White returned to UC114 and informed him that the dealers would not complete the transaction because of police presence in the area. JD White then led UC114 to a laundromat around the corner from plaintiffs' apartment. Once out of view, JD White sold UC114 three glassines of heroin. UC114 then left the area, met up with UC244, and together they notified a field team that the transaction was complete.

Having received the notification, the arrest team, which included officers DiSimone and McHale, swarmed the scene and arrested a number of individuals, including JD Red and JD White. Believing that plaintiffs were acting as lookouts in the drug transaction, and based on a positive identification from UC244, Steven, Samuel, and Michael were also arrested. During the course of his arrest, Steven admitted to having a marijuana cigarette on his person, and officers recovered the cigarette during a pat-down search. Based on this information, all three plaintiffs were arrested and charged with Criminal Sale of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Seventh Degree. Although UC244 apparently identified all three plaintiffs, Steven and Michael testified in their respective depositions that Michael was not present when Steven remarked that certain individuals in the area were undercover cops. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 45:23–46:3; Declaration of Szczepanski, ECF 44, Ex. 2, at 34:15–35:15. Plaintiffs also contend that Michael was inside the apartment building when the arrests began and was arrested only after he returned outside when the uniformed police officers arrived on the scene. *See* PI. Rule 56.1 Statement, ECF 44, at ¶¶ 11, 22–23. Defendants have not advanced any evidence to the contrary, *see* Def. Response Rule 56.1 Statement, ECF 45, at ¶¶ 11, 22–23, arguing instead that plaintiffs' version of events still supports the officers' actions.

***3** During his arrest, Steven asked the officers to use two sets of handcuffs on him, as they had done with Michael.[4] The officers declined to do so, cuffed Steven with a single set of handcuffs, and placed plaintiffs in the back of an NYPD van. For approximately thirty minutes after his arrest, Steven complained that his handcuffs were too tight and requested that they be loosened. Although officers loosened the handcuffs after multiple requests, plaintiffs claim that Steven suffered physical pain in the interim and had minor abrasions on his wrists. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 73:7–76:16. It is uncontested that Steven did not seek medical attention for his alleged injuries, either during or after his release from custody, nor did he experience any lasting medical issues.

After a number of court appearances, the charges against Samuel Garcia and Michael Serrano were dismissed on motion by the Bronx County District Attorney's Office. *See* Declaration of Kavin Thadani, ECF 41, Ex. M, at 2:11–15 ("Although People's motion was that there was probable cause to arrest this defendant, on further review, it is the People's position that we would be unable to meet our higher burden of proof at trial and as such are requesting dismissal at this time."). On the same day, the charges against Steven Serrano were dismissed on speedy trial grounds. *See* Declaration of Kavin Thadani, ECF 41, Ex. O, at 2:10–11.

## Discussion

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment,

a Court must "view the evidence in the light most favorable to the party opposing summary judgment, ... draw all reasonable inferences in favor of that party, and ... eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

In § 1983 claims of this kind, the Second Circuit has cautioned that because "[t]he issue of probable cause" is "predominantly factual in nature," it is "properly presented to the jury." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994); *see also Farrell v. City of New York*, No. 15 CIV. 8401 (PAE), 2018 WL 944400, at *10 (S.D.N.Y. Feb. 15, 2018). However, defendants also argue that the officers are entitled to qualified immunity, which is a question of law for the Court. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (describing qualified immunity as a legal question that "ordinarily should be decided by the court long before trial"). The Supreme Court has explained that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) ).[5] Although an officer's entitlement to qualified immunity is a question of law for the Court, the Second Circuit has explained that even when the motion is "based on qualified immunity," "resolution of genuine factual issues is inappropriate." *McClellan v. Smith*, 439 F.3d 137, 149 (2d Cir. 2006); *see also Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) ("A defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury.").

### A. False Arrest

***4** Defendants argue that summary judgment is appropriate on plaintiffs' false arrest claims because the officers had probable cause to support their arrests. Alternatively, defendants argue that the officers are entitled to qualified immunity because they had arguable probable cause. Analyzing each of plaintiff's claims individually, I find that, in light of the facts and circumstances known to the officers at the time of the arrests, the officers are entitled to qualified immunity only with respect to plaintiff Steven Serrano's false arrest claim. But as to plaintiffs Samuel Garcia and Michael Serrano, material disputes of fact make summary judgment inappropriate, and defendants' motion is denied as to those claims.

A § 1983 claim for false arrest that allegedly occurred in New York is "substantially the same as a claim for false arrest under New York law." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).[6] "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.' " *Savino v. City of New York*, 331 F. 3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ).

It is well settled that "the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). The probable cause standard is derived from the Fourth Amendment, which protects individuals from unreasonable searches and seizures, "including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ); *see also Jaegly*, 439 F.3d at 152; *Hatcher v. City of New York*, No. 15-CV-7500 (VSB), 2018 WL 1583036, at *4 (S.D.N.Y. Mar. 27, 2018).

"Even if probable cause for the actual arrest charge did not exist, the existence of probable cause to arrest for any offense precludes a false arrest claim." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 373 (S.D.N.Y. 2015); *see also Jaegly*, 439 F.3d at 154 ("[W]e conclude here that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."). Put differently, the actual charges invoked against plaintiffs—Criminal Sale of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Seventh Degree—are irrelevant. The focus of this inquiry is "on the validity of the arrest, ... not on the validity of each charge," *Jaegly*, 439 F.3d at 154, and a claim of false arrest fails if probable cause existed to support any offense, regardless of the charge actually invoked by the arresting officer.

***5** Defendants also claim that even if the officers lacked probable cause to arrest plaintiffs, the officers are nonetheless entitled to qualified immunity. It is well settled that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *Wesby*, 138 S. Ct. at 589 (quoting *Reichle*, 566 U.S. at 664).[7] When a claim of false arrest is made, "[a]n officer is entitled to qualified immunity ... if he had *arguable* probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (emphasis added); *see also Collins v. City of New York*, 295 F. Supp. 3d 350, 364 (S.D.N.Y. 2018) (applying the arguable probable cause standard); *Hatcher*, 2018 WL 1583036, at *4 (same). "Arguable probable cause exists when 'it was objectively reasonable for the officer to believe that probable cause existed, or ... officers of reasonable competence could disagree on whether the probable cause test was met.' " *Kass*, 864 F.3d at 206 (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016) ).

In sum, the doctrine of qualified immunity protects an officer "unless 'no officer of reasonable competence could have made the same choice in similar circumstances,' " *id.* (quoting *Myers*, 819 F.3d at 633), and is intended to "protectQ ... all but the plainly incompetent or those who knowingly violate the law," *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335,341 (1986) ).

1. Plaintiff Steven Serrano

Defendants first seek summary judgment with respect to plaintiff Steven Serrano's false arrest claim. Because I find that the officers had at least arguable probable cause to support the arrest, the motion is granted.

The officers arrested Steven Serrano based on the following sequence of events: During the course of a "buy and bust" drug operation, UC244 heard Steven remark, at least once, that certain individuals on the street were undercover cops. Plaintiffs admit that Steven made such a statement multiple times in a conversational tone and in an area directly adjacent to drug activity. Then, apparently in response to Steven's statements, JD White informed UC114 that his dealers would not complete the transaction because of police presence in the area. JD White then led UC114 to a laundromat around the corner to avoid detection by undercover officers and made the sale. Under these facts and circumstances, the officers had at least arguable probable cause to arrest Steven Serrano as a lookout to enable a Criminal Sale of a Controlled Substance in the Third Degree, the crime for which he was charged,[8] and for Criminal Facilitation in the Fourth Degree. His conduct could reasonably be interpreted as "conduct which provides [a third person] with means or opportunity for the commission" of a felony. N.Y. Penal Law § 115.00(1).[9]

***6** To avoid summary judgment, plaintiffs argue that Steven Serrano made these statements to Samuel Garcia, not JD Red, and that Steven had no knowledge that drug activity was afoot. *See* Pl. Rule 56.1 Statement, ECF 44, at ¶¶ 11–14; *see also* Pl. Memorandum of Law in Opposition, ECF 44, at 10 (arguing that plaintiffs "did not interact with 'JD Red' or 'JD White' nor did they know that a drug sale was taking place near their apartment"). But this argument misapprehends the focus of the inquiry, which centers on the facts and circumstances known to the officers at the time of the arrest. *Swartz*, 704 F.3d at 111. And even viewing the evidence in the light most favorable to plaintiffs—that is, assuming that Steven was speaking only to Samuel—the officers still had at least arguable probable cause to believe that Steven was involved in drug activity. Steven Serrano's repeated statements that undercover officers were present were made in a conversational tone and in the immediate vicinity of a drug transaction. Officers heard these statements, and plaintiffs admit that they were made. And tellingly, after these statements were made, JD White told UC114 that the heroin deal had to be moved around the corner because "the cops [were] out" and his dealers would not complete the transaction otherwise. *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 2. Taken together and viewed from the perspective of the officers at the time, these facts and circumstances were sufficient to create arguable probable cause to support the arrest.

Moreover, Steven Serrano's false arrest claim must be dismissed for a separate reason: during the officers' pat-down search, plaintiff admitted that he had a marijuana cigarette on his person. This gave officers probable cause to arrest him for possession of marijuana under § 221.05 of the New York Penal Law.[10] To avoid this conclusion, plaintiff argues that because the officers lacked probable cause to arrest Steven in the first place, the search incident to the arrest was also unlawful and any evidence obtained therefrom cannot shield the officers from liability. *See* Pl. Memorandum of Law in Opposition, ECF 44, at 12. In effect, plaintiff is advancing a version of the fruit of the poisonous tree doctrine, "an evidentiary rule that operates in the context of

criminal procedure" to exclude unlawfully obtained evidence recovered as a consequence of unlawful official conduct. *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999). This argument is foreclosed by the Second Circuit's decision in *Townes*. There, the Second Circuit explained that "[t]he fruit of the poisonous tree doctrine is calculated 'to deter future unlawful police conduct' and protect liberty by creating an incentive—avoidance of the suppression of illegally seized evidence—for state actors to respect the constitutional rights of suspects." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974) ). The need for such an incentive structure is less forceful in the civil context, and the Second Circuit has accordingly held that "[t]he fruit of the poisonous tree doctrine ... is inapplicable to civil § 1983 actions." *Id.*

Under *Townes*, the fruit of the poisonous tree doctrine cannot be used to "link the unreasonable search and seizure" to what came next—the discovery of the marijuana cigarette on plaintiff's person—which unquestionably gave officers probable cause to arrest plaintiff Steven Serrano. *Id.* at 145–46; *Jenkins v. City of New York*, 478 F.3d 76, 91 n.16 (2d Cir. 2007); *see also Hatcher*, 2018 WL 1583036, at *3 (S.D.N.Y. Mar. 27, 2018) ("For federal false arrest claims, even in circumstances where a preceding search is illegal, police officers may use evidence obtained in that illegal search to establish probable cause for an arrest."); *Hayes v. Perotta*, 751 F. Supp. 2d 597, 602 (S.D.N.Y. 2010); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 431 (E.D.N.Y. 2012). Therefore, even if the officers lacked arguable probable cause for the initial search, plaintiff Steven Serrano's false arrest claim must be dismissed. [11]

***7** Accordingly, because the officers had at least arguable probable cause to arrest plaintiff Steven Serrano, and because probable cause is a complete defense to a claim of false arrest, plaintiff's claim under § 1983 and state law for false arrest must fail.

2. Plaintiff's Samuel Garcia and Michael Serrano

Applying the same framework described above to Samuel Garcia, I cannot say at this stage that the officers had arguable probable cause to support an arrest. As an initial matter, the discovery of a marijuana cigarette at the scene cannot support the arrests of Samuel Garcia or Michael Serrano. The officers found the marijuana cigarette during a pat-down search of Steven Serrano, and defendants do not claim that the officers ever observed Garcia (or Michael Serrano, for that matter) in possession of a controlled substance. [12]

It is also clear, and defendants do not suggest otherwise, that neither Garcia nor Michael Serrano had constructive possession over the marijuana cigarette in Steven Serrano's pocket at the time of the arrests. *See People v. Manini*, 79 N.Y.2d 561, 572–73 (1992) ("In New York, the rule has long been that to support a charge that a defendant was in constructive possession of tangible property, the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized."); *United States v. Paulino*, 445 F.3d 211, 222 (2d Cir. 2006) ("Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." (internal quotation marks omitted) (quoting *United States v. Gordils*, 982 F.2d 64, 71 (2d Cir. 1992) ) ); *see also* N.Y. Penal Law § 10.00(8) (defining possession). As such, Samuel Garcia and Michael Serrano's arrests cannot be premised on criminal possession of marijuana.

Moreover, as to Samuel Garcia, there are genuine disputes of fact concerning his involvement in the drug transaction at issue in this case. It is apparently undisputed that only Steven Serrano, and not Garcia, commented aloud on the presence of undercover officers outside of 984 Bronx Park South. In his deposition, Garcia stated that he perhaps acknowledged Steven Serrano's statements concerning police activity, but was uninterested because it had "nothing to do with [him]." Declaration of Szczepanski, ECF 44, Ex. 2, at 33:8. Defendants have not seriously advanced a contrary version of events, arguing instead that Garcia's mere presence next to Steven Serrano at the time the statement was made is sufficient to support the arrest. *See* Def. Memorandum of Law, ECF 43, at 10–11. This argument proves too much. Based on the evidence presented, the Court is left with only a vague impression of Samuel Garcia's conduct prior to his arrest, and what little information is presented suggests that his involvement in the drug transaction was minimal or nonexistent. Even granting defendants the widest possible berth of qualified immunity, the doctrine cannot be used to justify the arrest of a mere bystander to criminal activity. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). Viewing the evidence in the light most favorable to plaintiffs, as I am required to do, that is precisely what Samuel Garcia appears to have been.

***8** The evidence suggests that Michael Serrano's connection to the drug transaction was even more attenuated. According to plaintiffs' version of the events, which is supported by all three plaintiffs' deposition testimony, Michael was not present when Steven stated aloud that undercover cops were in the area, nor was he outside when the arrests began. Michael testified that he was inside the family apartment when the arrests began and returned outside only after hearing his brother yelling. *See* Declaration of Szczepanski, ECF 44, Ex. 2, at 33:2–24, 37:23–38:2. Defendants have not advanced a alternative version of events, *see* Def. Response Rule 56.1 Statement, ECF 45, at ¶¶ 11, 22–23, and in any event, any conflicting evidence in the record merely creates a genuine dispute of fact for trial.

Under these circumstances, and given the disputed facts presented by the parties, I cannot say that the officers had probable cause, or even arguable probable cause, to support the arrests of Samuel Garcia and Michael Serrano. As such, defendants' motion for summary judgment on these claims is denied.

**B. Unreasonable Search and Seizure**

Plaintiffs also raise claims for unreasonable search and seizure under § 1983 and state law. Under § 1983, a plaintiff may recover money damages for unreasonable searches and seizures that violate the Fourth Amendment. In analyzing such a claim, "courts look to the reasonableness of the search when determining whether a search violated a plaintiff's constitutional rights." *Hatcher*, 2018 WL 1583036, at *7 (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968) ). However, officers are generally permitted to conduct reasonable searches incident to a lawful arrest. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009). Therefore, to the extent that there was probable cause to support plaintiffs' arrests, any reasonable searches incident to their arrests were also lawful, *see Guerrero v. City of New York*, No. 12 CIV. 2916, 2013 WL 673872, at *4 n.3 (S.D.N.Y. Feb. 25, 2013) ("In addition, to the extent that Guerrero is basing his § 1983 claim on an allegedly unreasonable search, ... this claim fails as well, because a search incident to a lawful arrest is per se reasonable."); *Moore v. Hearle*, 639 F. Supp. 2d 352, 356 (S.D.N.Y. 2009) ("Generally, officers are justified in conducting searches incident to a lawful arrest in order to ensure the safety of officers as well as to prevent the destruction of evidence."); *Walker v. City of New York*, No. 15 CV 500 (NG) (ST), 2017 WL 2799159, at *6 (E.D.N.Y. June 27, 2017) ("Because there was probable cause for plaintiff's arrest, the search of his person was lawful.").

As such, plaintiffs' unreasonable search and seizure claims turn entirely on the probable cause analysis conducted above. Because I have already found that the officers had at least arguable probable cause to support the arrest of plaintiff Steven Serrano, the officers are also entitled to qualified immunity as to his unreasonable search and seizure claim. [13] *See Walker*, 2017 WL 2799159, at *6. Defendants' motion for summary judgment is therefore granted as to Steven Serrano. But because I have found that summary judgment is inappropriate on the question of arguable probable cause to arrest plaintiffs Samuel Garcia and Michael Serrano, *see supra* section A.2, their claims for unreasonable search and seizure also must survive. Accordingly, defendants' motion for summary judgment as to Samuel Garcia and Michael Serrano is denied.

**C. Malicious Prosecution**

***9** Plaintiffs also raise claims for malicious prosecution under § 1983 and state law. The elements of malicious prosecution under New York law are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ). Additionally, "[i]n order to allege a cause of action for malicious prosecution under § 1983, [plaintiffs] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Hatcher*, 2018 WL 1583036, at *5 (applying these elements); *Lynch v. City of New York*, No. 16 CIV. 7355 (LAP), 2018 WL 1750078, at *7 (S.D.N.Y. Mar. 27, 2018) (same).

As with claims for false arrest under § 1983, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ). However, "[t]he Second Circuit has clarified that 'probable cause' in the malicious prosecution context means 'probable cause to believe that [the prosecution] could succeed.' " *Garcia v. Cty. of Westchester*, No. 11-CV-7258 (KMK), 2017 WL 6375791,

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

at *23 (S.D.N.Y. Dec. 12, 2017) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) ). This is so because "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) Courts must therefore take care not to "conflate probable cause to arrest with probable cause to believe that [a plaintiff] could be successfully prosecuted," for "[o]nly the latter kind of probable cause is at issue with respect to the malicious prosecution claim." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). This distinction is not relevant to this case, however. First, plaintiffs have not attempted to differentiate between the two standards, instead relying solely on the theory that the officers lack probable cause to support their arrests. *See* Pl. Memorandum of Law in Opposition, ECF 44, at 12. Second, this distinction is meant to capture the notion that although probable cause might exist at the time of arrest, "evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Cox v. County of Suffolk*, 780 F. Supp. 103, 108 (E.D.N.Y. 1991) ). In such a case, the Second Circuit has explained that "[i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Id.*; *see also Garcia*, 2017 WL 6375791, at *23 ("If, however, 'probable cause existed at the time of the arrest and the plaintiff offers no additional facts to show that it dissipated post-arrest, then the claim for malicious prosecution cannot be maintained.' " (quoting *Jimenez v. City of New York*, No. 15-CV-3257, 2016 WL 1092617, at * 4 (E.D.N.Y. Mar. 21, 2016) ) ). Plaintiffs have not advanced any such theory, nor is there any reason to believe this distinction is relevant to the facts of this case.

As to plaintiff Steven Serrano, I find that the totality of the facts and circumstances described above also support a finding of arguable probable cause to support his prosecution. Based on Steven Serrano's statements, the context in which they were made, and the fact that the drug transaction was relocated apparently in response, the officers had probable cause to believe that the prosecution against him could succeed. *Boyd*, 336 F.3d at 76. Accordingly, the officers are entitled to qualified immunity as to plaintiff Steven Serrano's malicious prosecution claims, and the motion for summary judgment is granted as to him. But as to plaintiffs Samuel Garcia and Michael Serrano, I already have held that summary judgment is inappropriate on the question of arguable probable cause to support their arrests. *See supra* section A.2. Because "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury*, 721 F.3d at 95, the officers necessarily lacked sufficient probable cause to support the prosecutions of Samuel Garcia and Michael Serrano.

***10** Defendants also argue that plaintiffs have not put forth evidence to "prove the fourth element of [a malicious prosecution] claim—that the prosecution was motivated by malice." *Lowth*, 82 F.3d at 573. To show malice, plaintiffs must demonstrate that "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Dufort v. City of New York*, 874 F.3d 338, 353 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978) ). I find that plaintiffs have sufficiently established malice to survive summary judgment. First, in most cases, "[a] lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78; *see also Dufort*, 874 F.3d at 353 ("Malice may be inferred ... from the absence of probable cause."). Moreover, plaintiffs' theory is that their prosecutions were motivated to induce cooperation in an unrelated investigation into a nearby shooting, which "also supports the inference that the prosecution against him was improperly motivated." *Dufort*, 874 F.3d at 354 (holding that the plaintiff had demonstrated a material dispute of fact when the trial attorney "was told by detectives that they were treating [the plaintiff] as a suspect solely in order to induce him to testify against other participants"). Because the record also presents genuine issues of fact on the question of malice, the motion for summary judgment is denied as to plaintiffs Samuel Garcia and Michael Serrano.

**D. Excessive Force**

Plaintiff Steven Serrano also brings a claim for excessive force, principally arguing that the handcuffs placed on his wrists were too tight and his pleas to loosen the cuffs went unanswered.[14] "A claim of excessive use of force during an arrest is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Case v. City of New York*, 233 F. Supp. 3d 372, 385 (S.D.N.Y. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989) ). "As in other Fourth Amendment contexts, ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

The Second Circuit has "recognized that excessively tight handcuffing that causes injury can constitute excessive force in violation of the Fourth Amendment." *Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." *Case*, 233 F. Supp. 3d at 385 (internal quotation marks omitted) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) ); *see also Lloyd v. City of New York*, 246 F. Supp. 3d 704, 724 (S.D.N.Y. 2017). Courts have placed particular emphasis on the injury requirement, *see Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013), and "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort," *Lynch*, 567 F. Supp. 2d at 468. Although an alleged injury need not be "severe or permanent," *Vogeler v. Colbath*, No. 04 CIV. 6071(LMS), 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005), it must be more than merely "de minimis," *Usavage*, 932 F. Supp. 2d at 592.

Here, even viewing the facts in the light most favorable to plaintiff, defendants are entitled to summary judgment. The record shows that after Steven Serrano complained that his handcuffs were too tight (and initially requested that he be double-cuffed), the officers loosened his handcuffs. The officers did not, as plaintiff claims, ignore his pleas that the handcuffs were too tight. *Case*, 233 F. Supp. 3d at 385. Moreover, plaintiff has not established an injury that rises above a de minimis level. There is no dispute that Steven Serrano never requested medical treatment while in custody, nor did he seek medical treatment following his release. *See Usavage*, 932 F. Supp. 2d at 592 (noting that "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage"). As a general rule, "[c]ourts in this Circuit have ... found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." *Lloyd*, 246 F. Supp. 3d at 724 (internal quotation marks omitted) (quoting *Omor v. City of New York*, No. 13-cv-2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015) ). The law is clear that the evidence raised here is insufficient to support an excessive force claim. Accordingly, the motion for summary judgment as to Steven Serrano's excessive force claim is granted.

**E. Assault and Battery**

***11** Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (internal quotation marks omitted) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) ); *see also Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006); *Rucks v. City of New York*, 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015). Although all three plaintiffs assert claims under New York state law for assault and battery, the claims rest on different theories.

1. Steven Serrano

Plaintiff Steven Serrano's assault and battery claim rests on two grounds: (1) unlawful physical contact incident to an allegedly unlawful arrest, and (2) assault and battery related to the tightness of the handcuffs. On the first of these grounds, the existence of probable cause to support plaintiff's arrest fatally undermines his claim. The law is clear that "where there has been a lawful arrest, intentional contact with the arrested person does not constitute assault and battery, provided such force is reasonable." *Leibovitz v. City of New York*, No. 14 Civ 3297 (RA) (JCF), 2016 WL 3671232, at *8 (S.D.N.Y. Mar. 17, 2016) (internal quotation marks omitted) (quoting *Cunningham v. United States*, 472 F. Supp. 2d 366, 381 (E.D.N.Y. 2007) ); *see also Lloyd*, 246 F. Supp. 3d at 729. Accordingly, because the officers had probable cause to arrest plaintiff, Steven Serrano cannot maintain an assault and battery claim under New York law.

As to plaintiffs handcuffing theory, assault and battery claims of this kind "are evaluated like excessive force claims." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 295 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Brown v. City of New York*, No. 11–CV–1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013) ). This is so because "except for § 1983's requirement that the tort be committed under color of state law, the essential elements of the two claims" are "substantially identical." *POSR V. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991); *Lloyd*, 246 F. Supp. 3d at 729; *Tompkins v. City of New York*, 50 F. Supp. 3d 426, 440 (S.D.N.Y. 2014) ("New York courts analyze assault and battery claims against police officers using the same standard applicable to excessive force

claims under Section 1983."). Because plaintiff has failed to establish a claim for excessive force under § 1983, defendants' motion for summary judgment as to Steven Serrano's assault and battery claims is also granted.

2. Michael Serrano

Plaintiff Michael Serrano has not alleged that officers used excessive force during the course of his arrest. [15] Instead, plaintiff relies on the first ground discussed above—i.e., that because his underlying arrest was unlawful, any contact associated with it was also unlawful. *See Rucks*, 96 F. Supp. 3d at 152–53 ("[I]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest."); *Goonewardena v. Spinelli*, No. 15-CV-5239 (MKB) (ST), 2017 WL 4280549, at *11 (E.D.N.Y. Sept. 26, 2017) ("New York law holds that any force used during the course of an unlawful arrest gives rise to assault and battery claims against the arresting officers.").

***12** Because the issue of arguable probable cause to arrest Michael Serrano raises a disputed issue of material fact, plaintiffs assault and battery claim also must be put to a jury. *See Goonewardena*, 2017 WL 4280549, at *11 ("Accordingly, because Plaintiff has established a false arrest claim against [defendant police officers], under New York law, Plaintiff has established assault and battery claims against [the defendants]."); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 530–31 (S.D.N.Y. 2013) ("If an arrest is unlawful, an arresting police officer commits a battery when he or she touches the arrestee, including during the application of handcuffs."); *cf. Lloyd*, 246 F. Supp. 3d at 729 ("But because Plaintiff's excessive force claims based upon the pushing and handcuffing incidents must be decided by a jury, so too must her state law assault and battery claims."). Accordingly, the motion for summary judgment is denied.

**F. Municipal Liability**

Finally, defendants argue that they are entitled to summary judgment as to all claims against the City brought under a theory of *respondeat superior*.

Unlike claims brought under § 1983, "New York law permits plaintiffs to hold municipalities vicariously liable for torts committed by employees while acting within the scope of their employment." *Tompkins*, 50 F. Supp. 3d at 440; *see also Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012). However, there can be no vicarious liability in the absence of individual liability on the part of a City's employees. *See Hatcher*, 2018 WL 1583036, at *10 (explaining that where "there are no viable tort claims against the individual Defendants, there is no basis for City liability under a *respondeat superior* theory"); *Jenkins v. City of New York*, No. 10 CIV. 4535 AJN, 2013 WL 870258, at *14 (S.D.N.Y. Mar. 6, 2013).

Therefore, to the extent that plaintiffs retain state law claims against individual officers the City may be held vicariously liable under a theory of *respondeat superior*. *Mesa v. City of New York*, No. 09 CIV. 10464 JPO, 2013 WL 31002, at *34 (S.D.N.Y. Jan. 3, 2013) ("Accordingly, where Plaintiffs' state law claims survive, so too do their *respondeat superior* claims against the City."). Because all of plaintiff Steven Serrano's state law claims have been dismissed, all pendant state law claims against the City also are dismissed. *See Hatcher*, 2018 WL 1583036, at *10. But as to plaintiff Michael Serrano, the City may be held liable for his remaining state law claims for false arrest, malicious prosecution, unreasonable search and seizure, and assault and battery. *See Bleiwas v. City of New York*, No. 15 CIV. 10046 (ER), 2017 WL 3524679, at *4 (S.D.N.Y. Aug. 15, 2017) ("Additionally, because the Court finds that Plaintiff has sufficiently alleged a state false arrest claim, the City may be held liable pursuant to a theory of *respondeat superior*."); *Ramos v. City of New York*, No. 15 CIV. 6085 (ER), 2017 WL 3267736, at *12 (S.D.N.Y. July 31, 2017) ("Here, the Court has found that Plaintiffs have a viable malicious prosecution claim against Detective Marrero as it relates to the charge of the sale of a controlled substance. Therefore, to the extent Plaintiffs seek to impose liability on the City for the remaining malicious prosecution claim, they are allowed to proceed."); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010) ("The remaining state law claim of assault and battery against the City of White Plains is alive due to the potential for vicarious liability for actions of its police officers as its employees."). Accordingly, defendants' motion for summary judgment is granted as to all state law claims brought by Steven Serrano, but denied as to all remaining state law claims brought by Michael Serrano.

**Conclusion**

***13** For the reasons stated herein, the motion for summary judgment is granted in part and denied in part. The motion is granted as to all claims asserted by plaintiff Steven Serrano, and his complaint against defendants is dismissed. As to

all claims raised by plaintiffs Samuel Garcia and Michael Serrano, the motion is denied. Plaintiffs Samuel Garcia and Michael Serrano shall retain claims for false arrest, unreasonable search and seizure, and malicious prosecution. Michael Serrano shall also retain his state law claim for assault and battery, as well as all pendant state law claims against the City under *respondeat superior*.

The clerk is instructed to terminate the motion (ECF 40). The oral argument, currently scheduled for July 26, 2018, is cancelled. Plaintiffs shall amend their complaint to reflect that the claims of Steven Serrano have been dismissed, and restate, without change, the claims by Samuel Garcia and Michael Serrano. The parties shall appear for a status conference on August 17, 2018, to determine what discovery remains, and if none remains, to set a trial date.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3392869

## Footnotes

1 Plaintiffs have withdrawn all claims for negligent hiring, training, and supervision under federal and New York state law. Similarly, plaintiffs have withdrawn their failure to intervene claims and all claims brought under the Fourteenth Amendment. Plaintiff Samuel Garcia also has withdrawn all his state law claims. By not responding to defendants' collective knowledge arguments, plaintiffs have also abandoned their false arrest and malicious prosecution claims against defendants McHale and DiSimone. *See* *Plahutnik v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012) ("[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned."); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument."). Accordingly, these claims are dismissed with prejudice.

2 It appears that officers were investigating a shooting at a nearby housing complex and were conducting the "buy and bust" operation in an attempt to leverage potential cooperating witnesses. *See* PL Rule 56.1 Statement, ECF 44, at ¶¶ 7–8.

3 The record is somewhat inconsistent on this point. UC244's contemporaneous report stated that Steven "then signal [sic] JD Red, don't do anything 'he's a cop.' " *See* Declaration of Kavin Thadani, ECF 41, Ex. C. However, the Criminal Complaint drafted by Officer DiSimone stated that "defendant MICHAEL SERRANO and defendant GARCIA both pointed at informant #2 and stated in sum and substance, 'THAT GUY IS A COP.' " *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 2. In any event, plaintiffs' current position renders this inconsistency irrelevant. Plaintiffs now claim that although Steven was speaking only to Samuel, he did state, in sum and substance, that he believed certain individuals in the vicinity were undercover cops. For the reasons explained below, even viewing the evidence in the light most favorable to plaintiff, this statement gave the officers arguable probable cause to arrest plaintiff Steven Serrano.

4 Steven testified at his deposition that Michael was double-cuffed because of an accident. Declaration of Szczepanski, ECF 44, Ex. 1, at 74:19.

5 In the context of a false arrest claim, qualified immunity protects officers provided that they had at least arguable probable cause to support the arrest. *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017). This issue is discussed in greater detail below.

6 Although the parties do not address the issue, the amended complaint also raises a separate claim for false imprisonment. *See* Amended Complaint, ECF 27, at ¶ 64(d). But "[u]nder New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim

under § 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013); *see also Hatcher*, 2018 WL 1583036, at *3. As such, plaintiffs' false imprisonment claims are coterminous with their false arrest claims and can be analyzed together. *See, e.g., Hatcher*, 2018 WL 1583036, at *3.

7 In order for a right to be "clearly established ... at the time of the officer's conduct," the law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ). Moreover, "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "It is not enough that the rule is suggested by then-existing precedent;" the "legal principle" must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590.

8 N.Y. Penal Law § 220.39(a) provides that "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells ... a narcotic drag."

9 In full, N.Y. Penal Law § 115.00(1) provides that "[a] person is guilty of criminal facilitation in the fourth degree when, believing it probable that he is rendering aid ... to a person who intends to commit a crime, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit a felony."

10 N.Y. Penal Law § 221.05 provides that "[a] person is guilty of unlawful possession of marihuana when he knowingly and unlawfully possesses marihuana."

11 Although the parties do not raise this issue, "[t]here is some dispute ... as to whether this principle applies when the underlying claim is a state, rather than federal, false arrest claim." *Hatcher*, 2018 WL 1583036, at *3 (collecting cases from New York state courts). But courts in this district have recognized that despite "some ambiguity as to whether New York courts apply the same reasoning as *Townes*, qualified immunity protects an officer" in circumstances of this kind. *Id.* at *4; *see also Cabral v. City of New York*, 662 Fed.Appx. 11,13 (2d Cir. 2016) (holding that "[w]hatever ambiguity may exist as to [the New York Court of Appeals'] adoption of *Townes*'s reasoning," the officer was entitled to "qualified immunity with regard to the state claim"). Accordingly, the officers are also entitled to qualified immunity on the same theory for plaintiff Steven Serrano's state law claims for false arrest.

12 Defendants separately argue that "it is undisputed that plaintiff Samuel Garcia was smoking marijuana outside of 984 Bronx Park South a short time before his arrest." Def. Memorandum of Law, ECF 43, at 10. But this revelation came out in plaintiffs' depositions. It is uncontested that the officers never observed Garcia smoking marijuana before his arrest; indeed, the criminal complaint alleges *possession* of marijuana. *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 1; *see also Swartz*, 704 F.3d at 111 (focusing on the officer's knowledge at the time of the arrest).

13 Unlike his false arrest claim, the discovery of the marijuana cigarette cannot support the officers' search of plaintiff Steven Serrano, for the cigarette was found only once the search began *See Townes*, 176 F.3d at 148 ("Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."); *Matthews*, 889 F. Supp. 2d at 431 (finding that "plaintiffs must allege damages attributable to the claims for unreasonable search and seizure to recover under Section 1983" and could not recover damages for false arrest). Regardless, because I find that Steven Serrano's initial arrest was supported by arguable probable cause independent of his marijuana possession, plaintiff cannot maintain an unreasonable search and seizure claim. *See Walker*, 2017 WL 2799159, at *6.

14 Plaintiffs Samuel Garcia and Michael Serrano do not allege claims for excessive force.

15 As noted above, *see supra* Note 1, all of plaintiff Samuel Garcia's state law claims have been dismissed.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1558476
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph SHERMAN, Plaintiff,
v.
Thalia GRAVES and Gloria Allred, Defendants.

24 Civ. 8494 (AT)
|
Signed June 2, 2025

**Attorneys and Law Firms**

Darnell D. Crosland, Croslandlawgroup, LLC, Stamford, CT, for Plaintiff.

Heather Clare Gregorio, Mariann Meier Wang, Cuti Hecker Wang, LLP, New York, NY, for Defendants.

## ORDER

ANALISA TORRES, District Judge:

***1** Plaintiff, Joseph Sherman, brings this action against Defendants, Thalia Graves and Gloria Allred, alleging claims of defamation, negligent and intentional infliction of emotional distress, negligence, vexatious litigation, abuse of process, and malicious prosecution, all in connection with Graves' earlier action against Sherman. *See generally* Am. Compl., ECF No. 12. Defendants move to dismiss the complaint and sanction Sherman and his counsel. MTD Mem., ECF No. 24; Sanctions Mem., ECF No. 26. For the reasons stated below, the motion to dismiss is GRANTED, and the motion for sanctions is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On September 24, 2024, Graves, represented by Allred and other counsel, filed an action in this District against Sherman and Sean Combs (the "First Action") alleging that, in 2001, Sherman and Combs raped Graves, recorded the assault on video, and disseminated the video. [1] *See generally* Compl., *Graves v. Combs*, No. 24 Civ. 7201 (S.D.N.Y. Sept. 24, 2024), ECF No. 1. In the First Action, Graves brings claims for gender-motivated violence under the Victims of Gender-Motivated Violence Protection Law, N.Y.C. Admin. Code § 10-1101 *et seq.*; unlawful dissemination of an intimate image under New York Civil Rights Law § 52-b; and unlawful disclosure of an intimate image under New York City Administrative Code § 10-180. *See* Am. Compl., *Graves v. Combs*, No. 24 Civ. 7201 (S.D.N.Y. Jan. 17, 2025), ECF No. 47 ¶¶ 60–88. The First Action is pending.

Less than two months after Graves filed the First Action, Sherman brought this action, alleging that Graves and her attorneys falsely and maliciously filed the First Action against him. *See generally* ECF No. 1. On December 6, 2024, Sherman amended his complaint, alleging (1) defamation, (2) negligent infliction of emotional distress, (3) intentional infliction of emotional distress, (4) negligence, (5) vexatious litigation, (6) abuse of process, and (7) malicious prosecution. Am. Compl. ¶¶ 31–70.

Before the Court are Defendants' motions to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and to sanction Sherman and his counsel, Darnell Crosland, under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power. *See generally* MTD Mem.; Sanctions Mem.; *see also* MTD Opp., ECF No. 35; Sanctions Opp., ECF No. 36; MTD Reply, ECF No. 37; Sanctions Reply, ECF No. 38.

## LEGAL STANDARD

### I. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a plaintiff need not provide "detailed factual allegations," he must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* In conducting its analysis, a court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the nonmovant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### II. Rule 11, § 1927, and the Court's Inherent Power

***2** Rule 11 "authorizes a court, after notice and a reasonable opportunity to respond, to impose appropriate sanctions upon a party, its attorney, or both, for violating [their] obligations to the court as set forth" by the Rule. *Forbes v. NAMS Int'l, Inc.*, No. 07 Civ. 39, 2007 WL 1814656, at *5 (N.D.N.Y. June 21, 2007); Fed. R. Civ. P. 11(c). Under Rule 11, attorneys have a duty to "undertake reasonable inquiry to ensure that papers filed are well-grounded in fact, legally tenable, and not interposed for any improper purpose." *Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D. 363, 368 (E.D.N.Y. 2013) (citation omitted); Fed. R. Civ. P. 11(b)(1)–(4) (noting, *inter alia*, that "[b]y presenting to the court a pleading," an attorney certifies that, after "an inquiry reasonable under the circumstances," the pleading "is not being presented for any improper purpose," the "claims, defenses, and other legal contentions are warranted by existing law," the "factual contentions have evidentiary support," and "the denials of factual contentions are warranted on the evidence").

The "standard for triggering [sanctions] under Rule 11 is objective unreasonableness." *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000). "An action is objectively unreasonable such that Rule 11 sanctions are appropriate where an attorney or party declines to withdraw a claim upon an express request by his or her adversary after learning that the claim was groundless." *Cameau v. Nat'l Recovery Agency, Inc.*, No. 15 Civ. 2861, 2018 WL 4853050, at *2 (E.D.N.Y. Sept. 28, 2018) (alteration adopted) (citation omitted); *see also O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990) ("[C]ontinuing to press an obviously meritless lawsuit does tend to indicate bad faith and further supports the imposition of a [R]ule 11 sanction."). If a court determines that sanctions are appropriate, such sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.*

Under § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To "impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999).

## DISCUSSION

I. Motion to Dismiss

A. Defamation

Sherman's first claim is for defamation. He alleges that Graves' statements "in [her complaint], through media, and [in] her direct communications with [Sherman] and others falsely and maliciously claim that ... Sherman[ ] committed heinous crimes, including, but not limited to, rape and sexual assault, thereby damaging [Sherman's] reputation." Am. Compl. ¶ 32.

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) (citation omitted). To state a claim for defamation under New York law, a plaintiff must show "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Harding v. Dorilton Cap. Advisors LLC*, 635 F. Supp. 3d 286, 306 (S.D.N.Y. 2022) (citation omitted). A defamation claim "is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated." *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) (citation omitted).

***3** New York law recognizes an "absolute privilege" that "prohibits defamation claims arising out of statements made in litigation if, by any view or under any circumstances, [the statements] may be considered pertinent to the litigation." *Lue v. JPMorgan Chase & Co.*, No. 19 Civ. 9784, 2021 WL 1108558, at *4 (S.D.N.Y. Mar. 23, 2021) (citation omitted). "The test of pertinency is extremely broad, and the privilege embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Id.* (citation omitted). This absolute privilege "protect[s] the public interest in encouraging participants in litigation to speak with [the] free and open mind which the administration of justice demands." *Id.* at *5 (citation omitted).

Sherman fails to state a defamation claim. First, any allegedly defamatory statements made by Graves in her complaint are absolutely privileged. *See Evans v. Waldo*, No. 04 Civ. 566, 2006 WL 2689819, at *3 (E.D.N.Y. Sept. 18, 2006). Sherman identifies no statements made by Graves that are unrelated or irrelevant to the First Action. The statements he does identify —Graves' allegations that Sherman and Combs raped her and recorded the assault on video, and that Sherman was Combs' bodyguard at the time of the incident—are "relevant [and] pertinent" to Graves' sexual assault claims and are, therefore, absolutely privileged from a defamation claim. *Lue*, 2021 WL 1108558, at *4 (citation omitted); Am. Compl. ¶¶ 14–24; *see Evans*, 2006 WL 2689819, at *3 ("[A]ny alleged defamatory statements relate directly to plaintiff's sexual harassment complaint and, thus, are absolutely privileged.").

Second, Sherman's assertions concerning Defendants' alleged media statements are also insufficient to state a claim for defamation. Citing Graves' complaint, Sherman alleges that Defendants "sued and went on a media tour touting, claiming, publishing, stating and telling the whole world (*without any proof*)," that Sherman raped Graves in 2001. Am. Compl. ¶ 1. Sherman further alleges that the statements "Defendants put forth in the media, *e.g.*, on CNN, against [him] are utterly and entirely false." *Id.* ¶ 18. His complaint, however, does not identify the "purported [media] communication[s]," "when [they were] made," or "to [whom they were] communicated." *Thai*, 726 F. Supp. 2d at 329 (citation omitted). Accordingly, Sherman's allegations as to Defendants' purported media statements fail to state a defamation claim. *See Mehrhoff v. William Floyd Union Free Sch. Dist.*, No. 04 Civ. 3850, 2007 WL 4591741, at *5 (E.D.N.Y. Dec. 28, 2007) (dismissing defamation claim when complaint "d[id] not provide the substance of the alleged defamatory comments, nor d[id] it mention when [they were] made or to whom [they were] communicated").

Third, Sherman's allegations as to Graves' "direct communications" with him also fail to state a defamation claim. Am. Compl. ¶ 32. Sherman alleges that, on or about November 29, 2023, Graves messaged him via Instagram, stating, "If you will be my witness against [Combs], then my attorneys will leave you out of any proceedings ... [and] I will make sure that the state does not pick up charges or rape charges against you." *Id.* ¶ 25; *see generally* ECF No. 1-1. Graves' alleged message to Sherman is irrelevant to the Court's inquiry, however, because to state a defamation claim, a plaintiff must identify a statement that was "published to a third party." *Harding*, 635 F. Supp. 3d at 306 (citation omitted).

Sherman's defamation claim is, therefore, dismissed.

B. Negligence and Negligent Infliction of Emotional Distress

Next, Sherman brings claims for negligence and negligent infliction of emotional distress, alleging that Defendants owed him a duty to "verify" Graves' allegations and that they breached that duty by recklessly filing the First Action. *See* Am. Compl. ¶¶ 37–44, 51–55.

***4** "Any claim sounding in negligence under New York law, including negligent infliction of emotional distress, must be based in the breach of a legally cognizable duty of care." *Chai v. NYU*, No. 23 Civ. 9192, 2024 WL 4042468, at *12 (S.D.N.Y. Sept. 4, 2024). The duty must be "specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996); *see Allstate Ins. Co. ex rel. Lothridge v. Gonyo*, No. 07 Civ. 1011, 2009 WL 962698, at *4 (N.D.N.Y. Apr. 8, 2009) (stating that, "[i]n order to prevail on a theory of negligence, a plaintiff must show that the defendant owed a duty of care specifically to him"); *Shumate v. McNiff*, No. 88 Civ. 6820, 1990 WL 6549, at *8 (S.D.N.Y. Jan. 23, 1990) ("In order to properly allege a negligence claim, plaintiffs must sufficiently identify a duty owed by defendants to plaintiffs.").

Sherman's complaint alleges only that Defendants owed him a duty to "verify the truth" before filing the First Action. Am. Compl. ¶¶ 39, 52. Such conclusory assertion aside, Sherman fails to allege any facts from which to plausibly infer the existence of a duty owed to him by Graves and Allred. *See Gonyo*, 2009 WL 962698, at *4; *see also Baldeo v. Airbnb, Inc.*, No. 20 Civ. 7771, 2023 WL 7689652, at *8 (S.D.N.Y. Sept. 29, 2023) (recommending dismissal of negligence claim where plaintiffs failed to allege the existence of a duty owed specifically to them), *rep. & rec. adopted*, 2024 WL 1367189 (S.D.N.Y. Mar. 30, 2024); *SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 554 (S.D.N.Y. 2022) (same). Sherman's negligence and negligent infliction of emotional distress claims are, therefore, dismissed.

C. Intentional Infliction of Emotional Distress

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Sherman asserts a cause of action for intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 45–50. Under New York law, such a claim requires a showing of "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1238 (S.D.N.Y. 1994) (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). "Commencement of litigation, even if alleged to be for the purpose of harassment and intimidation, is insufficient to support such a claim." *Chord Assocs., LLC v. Protech 2003-D, LLC*, No. 07 Civ. 5138, 2011 WL 13302692, at *10 (E.D.N.Y. Mar. 30, 2011) (citation omitted). "Even aggressive litigation intended to 'malign, harass[,] and intimidate [a] plaintiff' does not constitute 'outrageous' conduct." *Id.* (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)).

Sherman alleges that "Defendants engaged in extreme and outrageous conduct by falsely accusing [him] of rape and other heinous crimes." Am. Compl. ¶ 47. Because Defendants' commencement of the First Action "is insufficient to support" Sherman's claim for intentional infliction of emotional distress, the claim is dismissed. *Chord Assocs.*, 2011 WL 13302692, at *10 (citation omitted).

D. Vexatious Litigation

Sherman's next claim is for vexatious litigation. He alleges that Defendants initiated the First Action "with malicious intent, knowing the allegations were baseless and without probable cause," and that "Defendants engaged in this litigation with the intent to harass and coerce [Sherman] into providing favorable testimony against a third party, Sean Combs." Am. Compl. ¶¶ 57–58. This vexatious litigation claim fails because, as Sherman concedes, "no such claim exists under New York law." *Chord Assocs., LLC v. Protech 2003-D, LLC*, No. 07 Civ. 5138, 2010 WL 3780380, at *1 (E.D.N.Y. Sept. 21, 2010); MTD Opp. at 6–7. The claim, therefore, is dismissed.

E. Abuse of Process

***5** Next, Sherman brings a cause of action for abuse of process. Am. Compl. ¶¶ 61–65. To prevail on such a claim under New York law, "the claimant must establish that the defendant (1) used a regularly issued process, either civil or criminal, (2) had an intent to do harm without excuse or justification, and (3) used the process in a perverted manner to obtain a collateral objective." *Asia TV USA, Ltd. v. Total Cable USA LLC*, No. 16 Civ. 6873, 2018 WL 1626165, at *4 (S.D.N.Y. Mar. 29, 2018) (quoting *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984)).

Sherman alleges that Defendants filed the First Action "to exert pressure on [him] to cooperate in litigation against a third party," and that "use of process in this manner constitutes an abuse of process." Am. Compl. ¶¶ 62–63. The institution of a civil action, however "is not legally considered process capable of being abused." *Asia TV*, 2018 WL 1626165, at *4 (quoting *Curiano*, 469 N.E.2d at 1326). And, "[a] malicious motive in bringing an action is not on its own the basis for an abuse of process claim." *Id.* Sherman's abuse of process claim is, therefore, dismissed.

F. Malicious Prosecution

Finally, Sherman asserts a cause of action for malicious prosecution, alleging that "Defendants initiated and pursued [the First Action] against [him] without probable cause, [and] with full knowledge that the allegations were baseless." Am. Compl. ¶ 67.

"To establish a malicious prosecution claim under New York law, a plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). Sherman's malicious prosecution claim fails because, as he concedes, the First Action is pending and has thus not terminated in his favor. MTD Opp. at 5; *see Smith v. City of New York*, No. 14 Civ. 4982, 2015 WL 4008642, at *3 (E.D.N.Y. June 30, 2015) (dismissing malicious prosecution claim as premature). This claim is, therefore, dismissed.

For the foregoing reasons, Sherman's complaint is dismissed.

II. Motion for Sanctions

Graves moves for sanctions against Sherman and his counsel, Crosland, pursuant to Federal Rule of Civil Procedure 11(b)(2), 28 U.S.C. § 1927, and the Court's inherent power. Sanctions Mem. at 1. She argues that sanctions are warranted because "any reasonable lawyer would know that the claims

asserted in the [c]omplaint are all fundamentally flawed, or at the very least would discover those flaws after [a] reasonable inquiry." *Id.* at 15; *see also* Fed. R. Civ. P. 11(b)(2) ("By presenting to the court a pleading, ... an attorney ... certifies that ... the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."). The Court agrees.

Sherman does not dispute that, on November 13, 2024, Graves' counsel served Crosland with a letter (the "Rule 11 Letter") pursuant to Rule 11's safe harbor provision, which requires the subject of a sanctions motion to be served with the motion at least twenty-one days before the motion is presented to the court. *See* Fed. R. Civ. P. 11(c)(2); Sanctions Mem. at 7; Rule 11 Letter, ECF No. 4-1. The Rule 11 Letter explains why each of Sherman's seven claims are without merit. *See generally* Rule 11 Letter. For example, it states that the defamation claim is meritless "because Defendants are protected by an absolute litigation privilege;" that the intentional infliction of emotional distress claim is "fundamentally and facially defective" because commencement of litigation is insufficient to state such a claim; that the malicious prosecution claim fails because the First Action is ongoing; and that no cause of action for vexatious litigation exists under New York law. Rule 11 Letter at 16–20.

***6** Crosland did not respond to the Rule 11 letter. Sanctions Mem. at 7. Instead, he pressed forward: On December 6, 2024, Sherman filed an amended complaint that dismissed other defendants from this action but left his claims intact. *See generally* Am. Compl. On January 13, 2025, more than twenty-one days after serving the Rule 11 letter on Crosland, Defendants moved for sanctions. Sanctions Mem.

Crosland has violated Rule 11. The complaint asserts at least five patently frivolous claims. As discussed above, the defamation claim is barred by an absolute privilege, the intentional infliction of emotional distress and abuse of process claims are premised upon conduct that does not support such claims, the vexatious litigation claim is not recognized under New York law, and the malicious prosecution claim is plainly premature. Because these claims are "unambiguously foreclose[d]" by existing caselaw, *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 460 (S.D.N.Y. 2023), it would have been "patently obvious to any attorney who had familiarized himself with the law" that the claims had "absolutely no chance of success," *Sibanda v. Elison*, No. 23 Civ. 5752, 2024 WL 3835220, at *5 (S.D.N.Y. Aug. 14, 2024) (cleaned up) (citations omitted). And, despite being advised that the claims "w[ere] groundless," Crosland "decline[d] to withdraw" them. *Cameau*, 2018 WL 4853050, at *2 (citation omitted).

Accordingly, Crosland's propoundment of a complaint, "which contains frivolous claims that [the Court] summarily dismissed and no claims of such merit as to make [this] suit as a whole nonabusive," *Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 226 (2d Cir. 2002), warrants the imposition of sanctions in the form of reasonable costs and attorneys' fees against Crosland pursuant to Rule 11(b)(2).[2] By **June 30, 2025**, Defendants shall submit proof of the costs and attorneys' fees they have incurred in opposing this action, including but not limited to receipts, invoices, and contemporaneous time records.[3]

## CONCLUSION

***7** For the foregoing reasons, Defendants' motion to dismiss is GRANTED.[4] Defendants' motion for sanctions pursuant to Rule 11(b)(2) is GRANTED to the extent Defendants seek, against Crosland, reasonable costs and attorneys' fees incurred in their defense of this action and DENIED in all other respects.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1558476

## Footnotes

1 Graves also named several organizational defendants but has since dismissed her claims against them. ECF No. 48 in *Graves v. Combs*, 24 Civ. 7201.

2 Because responsibility for the violation of Rule 11(b)(2) "is more properly placed solely on [Sherman's] attorney[ ]," Defendants' request for sanctions against Sherman is denied. *Gurary v. Winehouse*, 235 F.3d 792, 798 (2d Cir. 2000) (citation omitted).

3 Because the Court imposes sanctions against Crosland under Rule 11, it does not reach the merits of sanctions under 28 U.S.C. § 1927 or the Court's inherent power.

4 Sherman requests leave to amend his complaint. MTD Opp. at 7. "When a plaintiff does 'not advise the district court how the complaint's defects would be cured,' " it is "not an abuse of discretion" to deny leave to amend. *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 38 n.4 (2d Cir. 2018) (quoting *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006)). Here, Sherman "request[s] leave to amend in a cursory manner without any explanation for how [he] would be able to cure the complaint's defects." *Id.*; *see* MTD Opp. at 7. His request is especially improper because he had ample opportunity to file a second amended complaint. Indeed, he could have sought leave to amend within twenty-one days of receiving the Rule 11 letter, *see* Fed. R. Civ. P. 11(c)(2), or after the first exchange of pre-motion letters under this Court's Individual Practices in Civil Cases, *see* Rule III(B)(ii). Sherman's request for leave to amend is, therefore, denied.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 5007423
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Quincy THORPE, Plaintiff,
v.
DELTA AIR LINES, INC., Defendant.

24-CV-01089 (HG)
|
Signed December 6, 2024

**Attorneys and Law Firms**

Natraj S. Bhushan, Natraj Bhushan, Turturro Law, P.C., Staten Island, NY, Eric Howard, The Howard Law Firm P.C., New York, NY, for Plaintiff.

Ira Gregg Rosenstein, Carolyn Corcoran, John Paul Guyette, Morgan Lewis & Bockius LLP, New York, NY, for Defendant.

**MEMORANDUM & ORDER**

HECTOR GONZALEZ, United States District Judge:

***1** In September 2019, during his time as an employee of Defendant Delta Air Lines, Plaintiff Quincy Thorpe was arrested by the FBI. *See* ECF No. 11 ¶ 16 (Am. Compl., "AC"). A grand jury sitting in this District indicted Plaintiff and his then-co-defendant for conspiracy to steal cargo and for the substantive offense of stealing cargo at John F. Kennedy International Airport ("JFK"). *See United States v. Thorpe*, No. 19-cr-00492, ECF No. 7 (E.D.N.Y. Oct. 24, 2019) (Criminal Indictment, "Indictment"). I presided over Plaintiff's criminal trial at which a jury acquitted him of those charges. *See id.*, ECF No. 88 (Judgment of Acquittal). Now, Plaintiff has filed a civil suit against his former employer, Delta, for violation of the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* AC ¶¶ 31–37. Plaintiff also brings state law claims for breach of contract, malicious prosecution, and abuse of process. *Id.* ¶¶ 26–30, 38–48. Delta has moved to dismiss, *see* ECF No. 16-1 (Motion to Dismiss, "Mot."); ECF No. 18 ("Reply"), which Plaintiff opposes, *see* ECF No. 17 (Opposition, "Opp."). For the reasons explained below, Delta's motion is granted in full.

**BACKGROUND**

The Court draws the following facts from the AC. The Court "recite[s] the substance of the allegations as if they represent[ ] true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). [1]

Plaintiff started working at Delta's JFK location in 1997. AC ¶ 6. As a ground services employee, his tasks included loading and unloading bags from planes. *Id.* ¶ 7. On September 24, 2019, Delta was transporting bags of cash from JFK. *Id.* ¶¶ 17–18 & n.2 [2]; *see also* Opp. at 6. [3] But one bag did not make it to its Miami destination and the $258,000 in it was missing. AC ¶ 17 & n.2. On that same day, Plaintiff injured his shoulder after lifting a heavy electrical wheelchair at JFK. *Id.* ¶ 9.

***2** When Plaintiff reported to work the next day, September 25, his shoulder injury left him in such pain that he could not complete his shift. *Id.* ¶ 11. He informed a Delta supervisor, who directed Plaintiff to complete worker's compensation forms. *Id.* He was then "excused, approved for medical leave[,] and went home early ... out on disability." *Id.* Later that day, Plaintiff visited a doctor, who recommended that Plaintiff be placed on medical leave. *Id.* ¶ 12. Delta authorized that leave. *Id.* As of September 25, Plaintiff was already "receiving short-term disability benefit [sic] and worker's compensation benefits." *Id.* ¶ 13. But the FBI arrested him on the next day, September 26, on charges related to stealing the missing bag. *Id.* ¶¶ 16, 17 & n.2, 39, 46; *see also* Opp. at 6. Plaintiff alleges that Delta provided "false and misleading information ... to the FBI and/or U.S. Attorney's Office for [this District] with the objective of making him the scapegoat for [this] high-profile 'heist.' " AC ¶ 17 (footnote omitted); *see also id.* ¶ 21.

On October 22, 2019, Delta's agent sent Plaintiff a letter confirming that he would not need to report for work through December 27, 2019, and further stated "that this disability time counted towards [twelve] weeks of time under the [FMLA]." *Id.* ¶ 14 (emphasis omitted). Two days later, on October 24, 2019, the grand jury indicted Plaintiff. *See* Indictment at 1. On December 26, 2019, Delta's agent sent Plaintiff "another letter confirming his approval to be off work" through January 24, 2020, and providing an "unknown" estimated return-to-work date. AC ¶ 15. The second letter also confirmed Plaintiff's eligibility for other

disability and related benefits from Delta. *Id.* However, Delta fired Plaintiff on January 8, 2020. *Id.* ¶ 35.

Plaintiff initiated this action in Kings County Supreme Court on January 10, 2024. *See* ECF No. 1-2 at 3–4 (Summons with Notice). Delta removed the case to this Court on February 12, 2024, properly invoking this Court's diversity jurisdiction. *See* ECF No. 1 ¶¶ 6–8 (Notice of Removal). I directed Plaintiff to file his complaint because he had commenced this action in state court by serving a summons with notice only, as permitted under New York law. *See* Feb. 14, 2024, Text Order. Plaintiff filed his first complaint on February 28, 2024. *See* ECF No. 5. Delta then filed a pre-motion conference letter in anticipation of filing a motion to dismiss, *see* ECF No. 7, which Plaintiff opposed, *see* ECF No. 8. In his response, Plaintiff also sought leave to amend the complaint, *see id.* at 3, and the Court informed him that he could amend as of right under Rule 15(a)(1). *See* Mar. 26, 2024, Text Order. On April 9, 2024, Plaintiff filed the AC. *See* ECF No. 11. On May 9, 2024, Delta moved to dismiss the AC, *see* ECF No. 16, which Plaintiff opposed on June 10, 2024, *see* ECF No. 17. Delta filed its Reply on June 24, 2024. *See* ECF No. 18.

## LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Johnson v. Mount Sinai Hosp. Grp.*, No. 23-466, 2024 WL 3289475, at *1 (2d Cir. July 3, 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In addition to requiring sufficient factual matter to state a plausible claim for relief, pursuant to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must provide a short, plain statement of claim against the defendant so that it has adequate notice of the claims against it. *Id.* at 677–78 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). A pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* To satisfy this standard, the complaint must, at a minimum "disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000).

## DISCUSSION

***3** The Court begins its analysis with Plaintiff's sole federal claim under the FMLA and proceeds to the state law claims.

### I. FMLA

Plaintiff alleges that Delta acted unlawfully when it fired him while he was on FMLA leave. AC ¶ 36. Although not articulated in the AC, Plaintiff states in his Opposition that he is asserting both an FMLA interference and FMLA retaliation claim. Opp. at 11–12. Delta now argues that the FMLA claim must be dismissed because it is (1) barred by the statute of limitations and (2) implausible. I agree with both points.

#### *A. Statute of Limitations*

Delta argues that Plaintiff's claim is time-barred. *See* Mot. at 12–13. Under the FMLA, "an action may be brought ... not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). Delta says that Plaintiff's last alleged relevant event was his firing on January 8, 2020, meaning that this claim, which was brought for the first time in the AC on April 9, 2024, is untimely. *See* Mot. at 13.

Plaintiff does not dispute that the statute of limitations began to run with his firing. Nor does he dispute that the relevant date for measuring the timeliness of the FMLA claim is the filing of the AC, as only state law claims appeared in the initial complaint. *See* ECF No. 5 ¶¶ 23–38.[4] Instead, he asserts that the statute of limitations for the FMLA claim is three years in this case. Opp. at 12. Undoubtedly, in an FMLA case "brought for a willful violation," an extended three-year statute of limitations is triggered. 29 U.S.C. § 2617(c)(2). However, Plaintiff's argument is puzzling here because even assuming that this lengthier bar applies, the claim would remain untimely, as Plaintiff was fired on January 8, 2020, but did not even initiate this case until 2024.

***4** In any event, I need not assume as much because the three-year bar does not apply here. As the Supreme Court has made clear, there is a "significant distinction between ordinary violations and willful violations," *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988), and as Delta rightly observes, Plaintiff points to no facts, in the AC or elsewhere, indicative of willfulness, *see* Reply at 6. All he says is that "Delta knew and/or recklessly disregarded whether its conduct violated the FMLA because it terminated ... Plaintiff while on extended leave that was afforded to [him]." Opp. at 12. The Court does not accept that legal conclusion as true. *See Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 53–54 (2d Cir. 2017) (concluding that the plaintiff failed to plausibly allege a willful FMLA violation where "[n]either the complaint nor her briefing explain[ed] why any alleged violation ... would have been 'willful' "). The mere fact that Delta terminated Plaintiff while he was on leave did not in and of itself constitute willful conduct. *See Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("The law is clear that an employee may be terminated while on medical leave, as long as the taking of the FMLA leave was not the cause for the termination."). On the contrary, by the time Delta fired Plaintiff, he had been arrested and indicted by a federal grand jury for crimes directly related to his role at Delta. On those facts, Plaintiff does not plausibly allege that Delta either knew it was violating the FMLA or recklessly disregarded its obligations thereunder by firing him, *see Porter v. N.Y. Univ. Sch. of L.*, 392 F.3d 530, 531–32 (2d Cir. 2004), especially after it had already granted him months of leave, since the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *See Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 137 (2d Cir. 2018) (finding no willfulness under the FMLA where the plaintiff, who had been fired while on leave, *inter alia*, "admitted it was possible she was tardy or absent on various days" unrelated to that leave). Accordingly, the three-year statute of limitations does not apply.

Plaintiff also argues that the FMLA claim is timely because "per Governor Cuomo's Executive's [sic] Order, causes of action that arose under New York law that accrued before the tolled period—between March 2020 and November 2020—do not count toward[ ] the statute of limitations period." Opp. at 12. Oddly, Plaintiff does not cite to the relevant law, but he is referring to Executive Order 202.8, which together with several additional executive orders, created a 228-day tolling period from March 20, 2020, to November 3, 2020. *See generally Doe v. State Univ. of N.Y. Purchase Coll.*, 617 F. Supp. 3d 195, 207 (S.D.N.Y. 2022). Unfortunately for Plaintiff, his own description of the executive orders—as applicable to "causes of action that arose under New York law"—demonstrates why they are not relevant here. As mentioned, the FMLA provides its own statute of limitations.[5] And "courts ... have consistently held that the [New York] Executive Orders do not purport to toll, nor could they, the time periods established by federal law." *See Brain v. Execu-Search Grp., LLC*, No. 22-cv-8219, 2024 WL 838085, at *6 (S.D.N.Y. Feb. 28, 2024) (collecting cases). Therefore, no tolling is applicable. Again, it is worth noting that such tolling would also have been inconsequential here. Even in Plaintiff's best scenario in which the three-year period applied *and* he could fully toll 228 days, the pleading of the FMLA claim (or even the initiation of this case) would still have come after the expiration of the limitations period, which started to run on January 8, 2020. The Court therefore dismisses the FMLA claim with prejudice.

*B. Plausibility*

Notwithstanding the expired statute of limitations, the Court would also dismiss an FMLA interference or retaliation claim on the merits. "[T]o prevail on a claim of interference with h[is] FMLA rights, a plaintiff must establish: 1) that [ ]he is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [ ]he was entitled to take leave under the FMLA; 4) that [ ]he gave notice to the defendant of h[is] intention to take leave; and 5) that [ ]he was denied benefits to which [ ]he was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Delta attacks this claim on various bases[6], *see* Mot. at 14–15, but the most relevant here is that Plaintiff fails to plausibly plead that the leave had anything to do with his firing, which implicates the fifth element of the claim. *See id.* That argument is persuasive. Plaintiff responds that his "FMLA-protected leave was active at the time of his suspension and ensuing termination," *see* Opp. at 12, but even if true, that misapprehends the law.[7] Again, "[t]he FMLA is not a shield to protect employees from legitimate disciplinary action by their employers." *Mejia*, 751 F. App'x at 137. Thus, as already discussed, "[t]he fact that plaintiff was notified of h[is] termination during h[is] leave," standing alone, "does not constitute interference." *Geromanos*, 322 F. Supp. 2d at 428. Indeed, "it is well-settled that an employer is not liable for interfering with an employee's leave when the employee would have been terminated regardless of leave." *Marshall*,

2024 WL 665200, at *7. Accordingly, the Court must reject Plaintiff's strict liability construction of the FMLA, and absent any other indication[8] that Delta "attempted to discourage or otherwise restrain [Plaintiff] from exercising h[is] rights under the FMLA," *Passante v. Cambium Learning Grp.*, No. 23-cv-4060, 2024 WL 4171026, at *15 (E.D.N.Y. Sept. 12, 2024), his interference claim is dismissed.

***5** It remains unclear how Plaintiff is attempting to assert a retaliation theory on the pled facts. *See* Opp. at 12 (discussing only the interference standard). However, to the extent Plaintiff's claim can be construed as an FMLA retaliation claim, it also fails. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 167 (2d Cir. 2017) (explaining that "terminations for exercising FMLA rights by, for example, taking legitimate FMLA leave" give rise to "FMLA retaliation claims"). "To establish a *prima facie* case of FMLA retaliation, Plaintiff must establish that: (1) [ ]he exercised rights protected under the FMLA; (2) [ ]he was qualified for h[is] position; (3) [ ]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent," *Henderson v. GEICO*, No. 22-cv-03513, 2024 WL 4694011, at *6 (E.D.N.Y. Nov. 6, 2024), under which "but-for" causation is not required, *see Woods*, 864 F.3d at 169. Rather, an employee must adequately plead that the FMLA leave was a "motivating factor" behind the retaliatory conduct. *Passante*, 2024 WL 4171026, at *14.

As mentioned, despite his invocation of a retaliation theory, Plaintiff does not address any of these elements. *See* Opp. at 11–12. And even though his burden in establishing a *prima facie* case is "minimal," *Henderson*, 2024 WL 4694011, at *14, he has failed to adequately plead it under the unique circumstances of this case. *See Geromanos*, 322 F. Supp. 2d at 433–34 (notwithstanding counsel's framing of a wrongful discharge claim as interference-based, analyzing it as a retaliation claim and dismissing it on causation grounds). As it concerns the fourth element of the claim, any theory that his FMLA leave was a motivating factor in his firing is implausible against the backdrop in which he had been arrested by the FBI and indicted by a federal grand jury for crimes directly related to his role at Delta. *See Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 575–76 (S.D.N.Y. 2023) (granting motion to dismiss FMLA retaliation claim due to lack of causation between taking FMLA leave and termination). Therefore, any retaliation claim is also dismissed.

## II. Breach of Contract

Delta moves to dismiss Plaintiff's breach of contract claim, contending that Plaintiff has failed to plead the existence of an enforceable contract. *See* Mot. at 11–12. To state a claim for a breach of contract, "a plaintiff usually must allege that: (1) a contract exists[;] ... (2) plaintiff performed in accordance with the contract[;] ... (3) defendant breached its contractual obligations[;] and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *accord Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). "Critically, a complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms." *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022). And "[c]onclusory allegations that a contract existed or that it was breached do not suffice." *Id.* Here, Plaintiff claims that "Delta wrongfully suspended [him] while he was out on approved medical leave and thereafter unlawfully terminated him in violation of Delta's policies and New York law" and that "[i]n doing so, upon information and belief, Delta breached the terms of these policies and deprived [him] of his annual salary/wages and accompanying benefits (e.g., retirement credits/ benefits [sic]) for the years 2019-2023." AC ¶¶ 28–29.

Delta is correct. The AC plainly fails to identify a contractual obligation, much less a breached provision thereof. The closest Plaintiff comes is by asserting the following: "Upon information and belief, given Plaintiff's senior employment status with the Delta [sic] at the, [sic] his approved medical leave status, and, [sic] the then existing [sic] work-related policies in effect between Delta and its ground employees, Plaintiff's employment could not be terminated 'at will.' " *Id.* ¶ 27. But that "vague" string of alleged facts does not plausibly suggest the existence of a binding employment agreement. *See Ebomwonyi*, 473 F. Supp. 3d at 348 (dismissing breach of contract claim where the plaintiff alleged a "promise[ ]" to be paid but failed to plead any terms of the alleged agreement). Plaintiff's treatment of Delta's serious argument is cursory at best: he merely pastes the three above-quoted paragraphs from the AC into his brief and, relying on generalized rules of pleading, says that suffices to plead the existence of a contract. *See* Opp. at 10. He errs badly on this point. For Plaintiff's claim to survive this motion, he must still "nudge h[is] claim across the line from conceivable to plausible" by "rais[ing] a reasonable expectation that discovery will reveal evidence of the wrongdoing alleged."

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 323 (2d Cir. 2021). The mere assertion that an employment agreement existed, supported only by unconnected facts about Plaintiff's employment and conjecture, does not get him across this threshold.

***6** Indeed, in the employment context, "New York courts continue to hold that an employee is presumed to be hired at-will, meaning that the employment can be terminated by either party, at any time, for any or no reason whatsoever, so long as the termination is not effected for a discriminatory reason." *Hunter v. Kaufman Enters., Inc.*, No. 09-cv-5540, 2011 WL 3555809, at *3 (E.D.N.Y. Aug. 8, 2011) (collecting cases). [9] That presumption may be rebutted, but only where "the employer made its employee aware of an express written policy limiting the right of discharge and the employee detrimentally relied on that policy." *Id.* Here, Plaintiff has not even tried to achieve the "difficult" task of pleading such an implied contract. *Id.* (quoting *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 922 (N.Y. 1987)); *see also Stinnett v. Delta Air Lines, Inc.*, No. 18-cv-2704, 2019 WL 1493224, at *11 (E.D.N.Y. Mar. 31, 2019) (dismissing with prejudice breach of contract claim against Delta due to the plaintiff's failure to "rebut the presumption of at-will employment"), *aff'd*, 803 F. App'x 505 (2d Cir. 2020).

To the extent the disparate facts referred to by Plaintiff may nevertheless be considered an effort to plead an implied contract, it is unavailing. First, although he mentions his "senior" status, he neither alleges nor argues that that took his employment out of the presumptively at-will domain. *See Harrison v. Indosuez*, 6 F. Supp. 2d 224, 231–32 (S.D.N.Y. 1998) ("While plaintiff may have believed that her agreement entitled her to a position until age 65, there is nothing contained in the agreement to indicate any term of definite duration."); *cf. Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 852 (2d Cir. 1985) (implied contract where employees "received repeated oral and written assurances from the employer that the Operations Manual," which expressly linked job reductions to seniority, "contained the terms and conditions of employment and was controlling"). The same is true of the existence of ordinary company policies (none of which are pled). As the New York Court of Appeals has explained: "Routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements .... It would subject employers who have developed written policies to liability for breach ... upon the mere allegation of reliance on a particular provision." *Lobosco v. N.Y. Tel. Co./NYNEX*, 751 N.E.2d 462, 465 (N.Y. 2001). Next, the fact that Plaintiff was on medical leave did not guarantee him perpetual employment, as receiving "the benefits of ... employment" does not "constitute a limitation on [D]efendant's right to discharge [Plaintiff] at will." *Sabatowski v. Fisher Price Toys*, 763 F. Supp. 705, 712 (W.D.N.Y. 1991). Finally, even if Delta somehow breached one of its own policies by firing Plaintiff, "a failure by an employer to follow its internal policies cannot form the basis of a breach of contract claim, unless, *inter alia*, mutual assent to enter into an implied-in-fact contract is shown." *Hunter*, 2011 WL 3555809, at *4. But as in *Hunter*, "Plaintiff has failed to identify what specific policies were mutually assented to by the Defendant ... [and] which were then not followed by the Defendant." *Id.* Accordingly, Plaintiff's breach of contract claim is dismissed with prejudice.

### III. Malicious Prosecution

"Under New York law, a malicious-prosecution claim requires a plaintiff to show (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *McCullough v. Graves*, No. 24-506, 2024 WL 4615821, at *3 (2d Cir. Oct. 30, 2024). "Because accusers must be allowed room for benign misjudgments, the New York Court of Appeals has held that the law places a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004). Delta argues that Plaintiff has failed to adequately plead the first and third elements of the cause of action. *See* Mot. at 15–16. I agree on both counts.

***7** As it relates to the first element, commencement, "New York law imposes a presumption that a prosecutor exercises his own independent judgment in deciding to prosecute a criminal defendant." *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 128 (S.D.N.Y. 2012). Thus, as a general matter

> a civilian defendant who merely furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed will not be held liable for malicious

> prosecution. The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition.

*Saunders v. Cavada*, No. 19-cv-3279, 2024 WL 4284655, at *4 (E.D.N.Y. Sept. 25, 2024); *accord Shioya v. Hanah Country Inn Mgmt. Corp.*, 172 N.Y.S.3d 761, 767 (N.Y. App. Div. 2022). Delta argues that Plaintiff fails to adequately plead the necessary affirmative inducement. *See* Mot. at 15–16.[10] Plaintiff's AC contains many allegations about Delta's intent and participation in his prosecution. *See, e.g.*, AC ¶ 39 ("Defendant and/or its agents deliberately and maliciously initiated and materially assisted in the criminal prosecution ... for the improper purpose and/or objective of creating a scapegoat for Defendant's embarrassing and well-publicized mishandling of the ... transport ...."); *id.* ¶ 40 ("Defendant failed to take reasonable steps to stop the prosecution of ... Plaintiff and, instead, maliciously and deliberately provided false and/or incomplete information ... to induce prosecution ...."). However, I agree with Delta that Plaintiff's claims are conclusory because of the absence of factual matter suggestive of anything more than mere assistance to law enforcement, which is insufficient to trigger liability. *See Delcine*, 2011 WL 666347, at *4. And to the extent he alleges that Delta was motivated to induce the prosecution to shift blame away from itself, without more, courts reject such claims as speculative. *See Gilman*, 868 F. Supp 2d at 128 ("Plaintiffs allege that Defendants 'encouraged,' 'convinced,' and 'colluded with' the Attorney General by 'offering up [the plaintiffs] as targets .... These conclusory allegations are not sufficient to state a plausible claim for relief under ...*Twombly* and *Iqbal*.").[11] This defect alone dooms the malicious prosecution claim.

Plaintiff also has a fundamental problem when it comes to the absence of probable cause, the third element of his claim. As the Second Circuit recently explained in *McCullough*, "[u]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." 2024 WL 4615821, at *3 (emphasis in original). And like in that case, it is "undisputed" here that Plaintiff was indicted by a grand jury "on the charges underlying this claim." *Id.* Because "[t]he existence of probable cause is an absolute defense to a cause of action for malicious prosecution," Plaintiff's claim should fail. *See Maron v. Cnty. of Albany*, 166 F. App'x 540, 541 (2d Cir. 2006).

***8** Nevertheless, in Opposition, Plaintiff makes the point that "a party may still rebut the presumption" of probable cause created by the Indictment. *See* Opp. at 14 (emphasis omitted). That is fair enough as an abstract matter, but he does not point to a single fact in the AC demonstrating the application of the principle. *See id.* at 14–15; *see also* Reply at 9. To be sure, Plaintiff says he was "an innocent man," AC ¶ 39, but that does not help him because he does not connect it to the probable cause inquiry, which asks whether the "facts and circumstances ... would lead a reasonably prudent person to believe the plaintiff guilty," *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021).[12] Plaintiff also references his ultimate acquittal, *see* AC ¶ 42, but that is similarly irrelevant, *see Warren v. Byrne*, 699 F.2d 95, 98 (2d Cir. 1983) ("Malicious prosecution is based upon a defendant's alleged lack of probable cause to believe the plaintiff guilty of the crime for which he was prosecuted; and '[f]avorable termination has no bearing whatever in and of itself on want of probable cause ....' ") (brackets retained) (quoting *Kezer v. Dwelle-Kaiser Co.*, 225 N.Y.S. 722, 729 (N.Y. App. Div. 1927)).

In addition, Plaintiff is insensitive to the particular context of this case, in which he was indicted by a grand jury. Thus, he is "required to rebut th[e] presumption by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." *Rothstein*, 373 F.3d at 283 (emphasis added). But like in *Rothstein*, "[h]is failure even to attempt to make that showing requires the dismissal of his claim." *Id.*; *accord Alvarez v. City of New York*, No. 22-cv-8689, 2024 WL 1140659, at *5 (S.D.N.Y. Mar. 15, 2024) (dismissing malicious prosecution claim based on the presumption of probable cause created by a grand jury indictment where the complaint, *inter alia*, "d[id] not address the grand jury proceeding at all"). In conclusion, Plaintiff fails to "rebut[ ] the presumption of probable cause that arises from the indictment." *McCullough*, 2024 WL 4615821, at *3. And his effort to do so by "mere conjecture and surmise that his indictment was procured as a result of conduct undertaken by [Delta] in bad faith" is unavailing. *Id.* (affirming grant of motion to dismiss a malicious prosecution claim). His malicious prosecution claim is therefore dismissed with prejudice.

**IV. Abuse of Process**

To state a claim for abuse of process under state law, "a plaintiff must allege that the defendant (1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Zappin v. Cooper*, No. 23-165, 2024 WL 3084015, at *2 (2d Cir. June 21, 2024). The third element, which forms the "crux" of this claim, *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05-cv-6278, 2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009), requires that "the defendants had an improper *purpose* in instigating the action," as opposed to merely "a malicious motive," *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003) (emphasis in original). [13] Delta's sole, narrowly focused argument [14] is that Plaintiff has failed to plausibly plead this element. *See* Mot. at 17. I agree.

***9** Here, Plaintiff alleges that Delta had the "the improper objective of creating a scapegoat for [its] embarrassing and well-publicized mishandling of the secure transport" and "failed to take reasonable steps to stop the prosecution ... and, instead, maliciously and deliberately provided false and/or incomplete information ... to induce the continued prosecution." AC ¶¶ 46–47. But even though he uses the word "objective," his allegations go to Delta's motive. On this point, Delta rightly points to *Savino*, in which the Second Circuit found that the plaintiff's allegation that an investigation of him "was solely motivated to seek vindication for the [City's] great political embarrassment and humiliation for allowing plaintiff to be the highest paid [city] employee" went just to the defendants' motive and thus fell short of creating liability. 331 F.3d at 77–78 (brackets in original). Similarly, the Second Circuit recently held that allegations, like those here, "suggest[ing] only that [the defendant] 'acted maliciously' in instigating the prosecution" were "insufficient" to state a claim. *Zappin*, 2024 WL 3084015, at *2. In Opposition, Plaintiff repeats the familiar mantra that his allegations "are presumed to be true (not speculation)," but here, too, asserting that does not immunize the claim from pleading requirements. *See* Mot. at 15. I therefore join a long line of courts that have found "that allegations," like those advanced here, "that defendants pursued a prosecution in order to 'cover up' their own misconduct or protect other bad actors do[ ] not satisfy the collateral objective requirement." *See LoPorto v. Cnty. of Rensselaer*, No. 15-cv-0866, 2018 WL 4565768, at *2, *15 (N.D.N.Y. Sept. 24, 2018) (collecting cases and rejecting this type of claim in which the plaintiff alleged that a defendant tried to "scapegoat" him); *see also Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (dismissing abuse of process claim for failure to plausibly plead a collateral objective where the plaintiff pled, *inter alia*, that the defendants were "covering up the fact that they did not want to treat her as a victim of domestic violence").

In any event, assuming *arguendo* that Plaintiff's "creating a scapegoat" motive is an actionable collateral objective, for the reasons already explained in the dismissal of the malicious prosecution claim, I would still agree with Delta that Plaintiff's assertion that this was in fact Delta's objective is too speculative to survive. *Cf. Gilman*, 868 F. Supp. 2d at 133 ("This speculation about what Defendants communicated to the Attorney General behind closed doors is insufficient to state a plausible claim for abuse of process just as it was insufficient to state a plausible claim for malicious prosecution."). The abuse of process claim is therefore dismissed with prejudice.

**V. Leave to Amend**

In the final sentence of his Opposition, Plaintiff seeks leave to amend: "Plaintiff requests and should be afforded leave to amend to the extent the [C]ourt determines any of his claims are deficiently ple[d]." Opp. at 16. As an initial matter, that request does not entitle Plaintiff to leave to amend. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011) (finding no abuse of discretion where the "plaintiffs requested leave to amend without specifying what additional facts, if any, they might assert in a new pleading"); *Singh v. Shikan*, No. 14-cv-5450, 2015 WL 4111344, at *1 (S.D.N.Y. June 25, 2015) (describing denial of leave to amend based on a "one[-]sentence, boilerplate request"). And although the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," in this instance, the Court declines to grant Plaintiff further opportunity to further amend the AC. *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (affirming denial of leave to amend). "A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(2d Cir. 2021). Amendment is futile where the issues with the causes of action are "substantive." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court finds that repleading any of the four causes of action would be futile. With respect to the FMLA cause of action, "[c]laims barred by an applicable statute of limitations are futile." *Jones v. City of New York*, 571 F. Supp. 3d 118, 126 (S.D.N.Y. 2021). Further, on the merits, I see no way for Plaintiff to try to cure the defect with the interference claim, since the basis of Plaintiff's claim—that any disciplinary action against him while he was on leave violated the FMLA—is legally unsound. *See Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940, 2024 WL 4023842, at *6 (2d Cir. Sept. 3, 2024) (leave to amend is futile where the plaintiff cannot "cure the legal defects in the claims"). Similarly, for his retaliation claim (assuming that is even a viable framing), Plaintiff will be unable to plead around the Indictment, and thus, also be unable to cure the fundamental causation problem with such a claim. Plus, given that Plaintiff did not even address the merits of a retaliation theory in his brief, he similarly identified "almost no facts" to support it, leaving me with "no reason to believe that giving Plaintiff another opportunity to amend would be anything other than futile." *See Williams v. Victoria's Secret*, No. 15-cv-4715, 2017 WL 1162908, at *11 (S.D.N.Y. Mar. 28, 2017).

***10** In the same way, leave to amend the state law claims for breach of contract, malicious prosecution, and abuse of process would be futile. Here, the Court considers it important that the bases for dismissal of these claims identified in this Order were all previously and precisely identified by Delta in its pre-motion letter, *see* ECF No. 7, after which Plaintiff amended. Of course, the mere fact of amendment after seeing the pre-motion letter does not mean that Plaintiff "forfeit[ed] the opportunity to replead." *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Nevertheless, this history informs (and ultimately helps to confirm) the Court's futility analysis given the simplicity and yet fundamental nature of the pleading defects that remain present in these three claims. *Cf. id.* at 191 (observing that in a "case combin[ing] a complex commercial reality with a long, multi-prong complaint[,] .... pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution; they may also be borderline, and hence subject to reasonable dispute").

For the breach of contract claim, Plaintiff has still not pled the existence of a contract, and despite his multifront effort to plead an implied contract, there remains no indication that he can overcome the "heavy burden ... to take his employment relationship out of the 'at-will' realm." *Hunter*, 2011 WL 3555809, at *4 (denying leave to amend). He faces a similar "heavy burden," *Rothstein*, 373 F.3d at 282, with his malicious prosecution claim, for which there are two independently fatal flaws as to the elements of initiation/continuation and the absence of probable cause. Particularly with respect to the latter element, despite demonstrating a clear understanding in Opposition of the difficult task of rebutting the presumption of probable cause created by the Indictment, Plaintiff neither identified nor even argued that there exist or may exist facts to support such a claim, instead asking the Court merely to "indulg[e] all available inferences of the absence of probable cause." Opp. at 15. But the Court can indulge inferences based only on facts, not legal assertions. And because the Indictment establishing probable cause will not disappear if he is given the opportunity to replead, Plaintiff appears to lack a viable path here, too. *See Lavrick v. Suffolk Cnty.*, No. 20-cv-609, 2021 WL 2856722, at *7 (E.D.N.Y. July 8, 2021) (denying leave to amend malicious prosecution claim after finding probable cause). I similarly see no basis for Plaintiff to properly plead the collateral objective needed for his abuse of process claim, especially given his failure to address this issue in Opposition and the AC's exclusive focus on Delta's motive. *See Zappin*, 2024 WL 3084015, at *3 (affirming denial of leave to amend abuse of process claim on futility grounds where the plaintiff "fail[ed] to adequately plead anything more than an improper motive"). Thus, leave to amend is denied.

## CONCLUSION

For the foregoing reasons, the AC is dismissed with prejudice and without leave to amend.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 5007423

**Footnotes**

1 Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

2 Footnote 2 of the AC cites to an online article. *See* Associated Press, *Delta Baggage Handler Accused of Stealing $250,000 in Cash at JFK International Airport*, USA Today, https://perma.cc/SS7J-XAZK (Sept. 27, 2019, 12:26 P.M.). In this posture, the Court may consider this article, which is "incorporated in [the AC] by reference." *D'Cunha v. Northwell Health Sys.*, No. 23-476, 2023 WL 7986441, at *2 (2d Cir. Nov. 17, 2023); *see* *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 503 n.11 (N.D.N.Y. 2020) (on a motion to dismiss, considering videos linked to in the complaint); *Frascatore v. Blake*, 344 F. Supp. 3d 481, 489 (S.D.N.Y. 2018) (considering newspaper article quoted and cited in complaint). In addition, the Court takes judicial notice of the Indictment, which Plaintiff also refers to, AC ¶ 1, and is a matter of public record. *See, e.g.*, *Johnson v. City of New York*, No. 23-cv-3018, 2024 WL 3520445, at *2 & nn.10–11 (S.D.N.Y. July 23, 2024) (doing the same). In this Order, citations to footnote 2 of the AC incorporate the linked article cited therein.

3 The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

4 Although unchallenged, the Court notes that Delta's analysis on the latter point is correct. Under Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." "In making this [relation-back] determination, 'the pertinent inquiry ... is whether the original complaint gave the defendant fair notice of the newly alleged claims.' " *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 192 (S.D.N.Y. 2011) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 815 (2d Cir. 2000)). Here, neither the summons with notice filed in state court (*see generally* *Lutzker v. Novo Nordisk Pharms., Inc.*, No. 07-cv-3272, 2008 WL 905040, at *4 (E.D.N.Y. Apr. 2, 2008)) nor the initial complaint gave Delta fair notice of an FMLA claim. Although the initial complaint, drafted by counsel in federal court, contained factual allegations about Plaintiff being out on leave, it did not suggest "discriminatory actions in response to plaintiff's absences and disability leave" or other conduct actionable under the FMLA. *Cf.* *Kamtaprassad v. Chase Manhattan Corp.*, No. 00-cv-8834, 2001 WL 1662071, at *5 (S.D.N.Y. Dec. 28, 2001). Rather, the thrust of the initial complaint, like the AC, was that Delta sought to frame Plaintiff as the "fall guy" or "scapegoat" for the missing cash. *See* ECF No. 5 ¶¶ 16, 22; AC ¶¶ 18, 25. Accordingly, the FMLA claim does not relate back to the initial complaint. *See* *Phillips v. LIRR*, No. 13-cv-7317, 2019 WL 1757176, at *8 (E.D.N.Y. Mar. 4, 2019) (finding that FMLA claim did not relate back where "[t]he FMLA was not mentioned in Plaintiff's prior filings," "[P]laintiff did not allege that he had taken a[n] FMLA leave or that he was discriminated against or retaliated against for doing so," and "the crux of Plaintiff's [prior] claims ... was that he was discriminated against on the basis of race"), *report and recommendation adopted*, 2019 WL 1758079 (E.D.N.Y. Mar. 25, 2019), *aff'd*, 832 F. App'x 99 (2d Cir. 2021). That being said, this point is ultimately academic. As discussed in this Section, even if the FMLA claim did relate back to the filing of the initial complaint on February 28, 2024 (or the commencement of the state court action on January 10, 2024), it would not change the Court's timeliness analysis.

5 This case is therefore also distinct from one in which the federal statute borrows its statute of limitations from state law. *See, e.g.*, *Doe*, 617 F. Supp. 3d at 207–08 (applying the executive orders to a federal Title IX claim, which borrows from state law).

6 Based on the AC, and drawing all inferences in Plaintiff's favor, the Court cannot resolve in this posture when Plaintiff's FMLA leave began to run and therefore, whether he had used up all his leave benefits under the FMLA at the point when he was fired and whether he was capable of returning to his job at the end of the

FMLA leave. *Compare* AC ¶ 13 (alleging that approved "medical leave" began on September 25, 2019), *with id.* ¶¶ 14, 34 (suggesting that "FMLA leave" began on October 22, 2019).

7 This type of claim appears to be cognizable as an FMLA interference (as opposed to retaliation) claim only because, construing the allegations in the light most favorable to him, Plaintiff alleges that he was still on FMLA leave at the time he was fired and with more leave available to him. *See* AC ¶¶ 15, 35–36. In that sense, "Plaintiff pleads actual interference with h[is] FMLA entitlements" because he was granted leave but terminated while allegedly entitled to more leave. *See Marshall v. Westchester Med. Ctr. Health Network*, No. 22-cv-7990, 2024 WL 665200, at *7 (S.D.N.Y. Feb. 16, 2024) (distinguishing this scenario from instances of "a retaliation theory in disguise" where "the plaintiff failed to allege she was entitled to any other benefits prior to her termination or that she intended to take leave after her termination"). I assume that Plaintiff was indeed on FMLA leave at the time of his termination for the purpose of the interference analysis.

8 In another part of the AC, Plaintiff also alleges that Delta "suspended" him while he was on leave. AC ¶ 28. He provides no additional factual support for that allegation, and in any case, even if I were to construe it as forming the basis of a potential interference claim (something Plaintiff does not do), it would still not constitute interference because, for the reasons already explained, the FMLA does not shield an employee from legitimate discipline any more than it shields him from legitimate termination, which is to say, not at all.

9 Delta observes that Plaintiff was, in fact, an at-will employee. *See* Mot. at 12 n.2. In resolving this motion, the Court disregards that argument, which goes beyond the pleadings. *See Lugo v. City of Troy*, 114 F.4th 80, 88 (2d Cir. 2024) (interpreting Fed. R. Civ. P. 12(d)).

10 Plaintiff barely engages with Delta's argument, merely falling back again on general pleading rules. *See* Opp. at 13–15. For the reasons already explained, *see supra* at 12, more is required. Indeed, his own authority, *Delince v. City of New York*, No. 10-cv-4323, 2011 WL 666347, at *5 (S.D.N.Y. Feb. 7, 2011), makes clear that his allegations must still satisfy *Twombly* and *Iqbal* to survive a motion to dismiss.

11 Similarly, notwithstanding the summary judgment posture in *Saunders*, the court there rejected as conclusory the plaintiff's allegation that the defendants "initiated plaintiff's prosecution in concert to avoid dealing with [a defendant's] 'manifest complicity' " in an illegal scheme. 2024 WL 4284655, at *4.

12 The same is true with respect to the following allegation tucked into a footnote in the AC: "Upon information and belief, Delta conducted their own internal investigation which concluded that [Plaintiff] was innocent of what he was being accused of. Yet, upon information and belief, they [Delta] withheld the findings of this investigation to achieve their ostensible objective of having Plaintiff be the public scapegoat for their own negligence." AC ¶ 20 n.3. That does not render his claim plausible. The Second Circuit has made clear that "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018). "Nevertheless, even where facts are peculiarly within the possession and control of the defendant, the plaintiff must allege some factual basis for the allegations made upon information and belief," and Plaintiff has not even tried to do so here. *See James v. Monroe Cnty.*, No. 20-cv-7094, 2022 WL 17155831, at *8 (N.D.N.Y. Nov. 22, 2022) (collecting cases).

13 "The collateral objectives typically associated with abuse of criminal process are extortion, blackmail or retribution; and those objectives are usually characterized by personal animus." *Richardson*, 2009 WL 804096, at *16.

14 For this reason, the Court does not address other potential defects with this claim. For example, it is not clear to the Court how Delta abused process, like the Indictment, after it was issued, a requirement of this cause of action. *See, e.g.*, *Gilman v. Marsh & McLennan Cos.*, 654 F. App'x 16, 16–17 (2d Cir. 2016) ("To the extent [the plaintiffs] allege any 'abuse,' it unquestionably came *before* the process in question (their respective indictments), not after." (emphasis in original)).

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2868136
Only the Westlaw citation is currently available.
**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**
United States Court of Appeals, Second Circuit.

Quincy THORPE, Plaintiff-Appellant,
v.
DELTA AIR LINES, INC., Defendant-Appellee.

No. 25-58
|
October 9, 2025

Appeal from a judgment of the United States District Court for the Eastern District of New York (Gonzalez, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Natraj S. Bhushan, Turturro Law, P.C., Staten Island, NY

FOR DEFENDANT-APPELLEE: Ira G. Rosenstein, (John P. Guyette, on the brief), Morgan, Lewis & Bockius LLP, New York, NY

PRESENT: MYRNA PÉREZ, SARAH A. L. MERRIAM, Circuit Judges. *

**SUMMARY ORDER**

***1** Quincy Thorpe appeals from a December 9, 2024 judgment of the United States District Court for the Eastern District of New York dismissing his action against Delta Air Lines, Inc. ("Delta") for failure to state a claim. Thorpe appeals solely the dismissal of his malicious prosecution claim. We assume the parties' familiarity with the underlying facts and the record of prior proceedings, to which we refer only as necessary to explain our decision to affirm.

**I. Background**

While working for Delta at the John F. Kennedy International Airport ("JFK"), Thorpe sustained a work-related shoulder injury. The following day, he informed Delta of the injury and was excused from work. Delta subsequently authorized Thorpe to be placed on medical leave.

On the same day as Thorpe's injury, a bag of approximately $258,205 in cash was stolen while being transported at JFK to a Delta aircraft. Two days later, the FBI arrested Thorpe, while he was out on medical leave, on charges related to the stolen cash. Thorpe was subsequently indicted by a grand jury but was acquitted of all charges after a jury trial.

The operative complaint alleges, upon information and belief, that Delta knowingly provided false and/or misleading information to law enforcement which was material to Thorpe's indictment. In relevant part, the District Court found that Thorpe had failed to plausibly allege a malicious prosecution claim under New York law. Thorpe timely appealed.

**II. Discussion**

We review a district court's dismissal for failure to state a claim *de novo*. *See* *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 80 (2d Cir. 2020). "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.' " *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). Because each element is essential to Thorpe's claim, if the Court determines that one element is lacking, it need not address the others. This case can be disposed of on the third element, because of the existence of probable cause. *See* *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ("[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York.").

Under New York law, where a plaintiff has been indicted by a grand jury, the indictment creates "a presumption of probable cause." *Id.* To ultimately prevail in such circumstances, a plaintiff must rebut that presumption by pointing to "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other ... conduct undertaken in bad faith." *Id.* (citation and internal quotation marks omitted). Of course, at the pleadings stage, plaintiffs need only plausibly allege facts that allow the Court to draw the reasonable inference that the grand jury indictment was secured through such means. *See Costabile*, 951 F.3d at 80–81.

***2** Thorpe argues the amended complaint plausibly alleges grounds for overcoming the presumption of probable cause. He alleges Delta knowingly provided false or misleading information to investigators regarding key facts, which he says proves the indictment was procured through fraud, perjury, suppression of evidence, or other conduct undertaken in bad faith. In turn, Delta argues that the amended complaint is silent as to the evidence used to secure the indictment in the grand jury, and that Thorpe's allegations are no more than conjecture.

The amended complaint does allege that the purportedly false or misleading information provided by Delta was "material in securing the indictment against Plaintiff." J. App'x at 10. Even assuming that is sufficient at the pleadings stage, the relevant allegations suffer from a more fundamental problem: they are made on information and belief. *See id.* Though allegations on information and belief may sometimes be enough to overcome the presumption, we have held that "[t]hose magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.' " *See Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Neither of those conditions is met here. First, Thorpe's failure to allege facts based on personal knowledge is inexcusable because Thorpe was present throughout an entire trial based on the indictment relevant here, and that trial was completed prior to the filing of his amended complaint. Thorpe is thus aware of the evidence that was used to unsuccessfully prosecute him, and he can draw upon that evidence to support allegations of bad faith conduct. Second, the amended complaint does not identify any facts capable of plausibly suggesting that the grand jury indictment was improperly secured.

Thus, Thorpe's allegations on information and belief are insufficient to overcome the presumption of probable cause, and as a result, he has failed to state a malicious prosecution claim.

We have considered Thorpe's remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the District Court is AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2868136

## Footnotes

* Judge Alison J. Nathan, who was originally assigned to the panel, is unable to participate in consideration of this matter. Pursuant to this Court's Internal Operating Procedures, the appeal has accordingly been heard and decided by the remaining two judges of the panel. *See* 2d Cir. IOP E(b).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146942
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Leon G. TSINBERG, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

20 Civ. 749 (PAE)
|
Signed 03/25/2021

**Attorneys and Law Firms**

Leon G. Tsinberg, Bronx, NY, Pro Se.

Pamela Ann Koplik, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

***1** Plaintiff Leon G. Tsinberg, a "non-admitted attorney" proceeding *pro se*, sues the City of New York (the "City") under 42 U.S.C. § 1983, alleging constitutional violations arising from the ticketing and towing of his 2009 Nissan Altima (the "Vehicle").

In 2018, while Tsinberg was temporarily living out of state, the Vehicle accumulated several parking tickets, mostly for displaying an expired registration. After Tsinberg failed to respond to those tickets, the City entered default judgments on them. Tsinberg later moved to reopen those judgments, but did not succeed. Then, in January 2019, the City immobilized and towed the Vehicle, which remains in storage accruing storage fees. Tsinberg alleges that these events violated, *inter alia*, his due process rights under the Fourteenth Amendment, his right to be free from excessive fines under the Eighth Amendment, his right to be free from unreasonable seizures under the Fourth Amendment, and his right against double jeopardy under the Fifth Amendment. The City has moved to dismiss all Tsinberg's claims.

Before the Court is the report and recommendation of the Honorable Sarah L. Cave, United States Magistrate Judge, recommending that the City's motion to dismiss be granted. *See* Dkt. 46 ("Report"). For the following reasons, the Court adopts that recommendation in full.

## I. Background

### A. Factual Background [1]

The Court adopts the Report's comprehensive account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

In New York City, the Parking Violations Bureau ("PVB") [2] issues and adjudicates summonses for violations of parking and traffic laws. *See* N.Y. Veh. & Traf. Law ("VTL") § 237(1)–(2), (9); N.Y.C. Admin. Code § 19-201 *et seq.* A person accused of a parking violation is first given a summons, *i.e.*, a parking ticket, containing information about the charged offense and how to contest or pay it. *See* VTL § 238(1); N.Y.C. Admin. Code § 19-204(a). State and City law require that, if the operator of the vehicle is not present at the time of service, notice of the violation must be affixed to the vehicle "in a conspicuous place." VTL § 238(2); N.Y.C. Admin. Code § 19-204(b). In that case, such notice "shall have the same force and effect and shall be subject to the same penalties for disregard thereof as" personal service on the violator. VTL § 238(2); N.Y.C. Admin. Code § 19-204(b).

***2** Once a parking summons issues, the recipient may plead guilty and pay the fine, or plead not guilty and receive a hearing date before an administrative law judge ("ALJ"). N.Y.C. Admin. Code §§ 19-202, 19-204, 19-206. A person may so plead by mail, by phone, in person at one of the Department of Finance's "Business Centers," or online, either through the City's website or a "Pay or Dispute" application. *See* *Schaer v. City of New York*, No. 09 Civ. 7441 (CM), 2011 WL 1239836, at *7 (S.D.N.Y. Mar. 25, 2011); Report at 3–4. If a party fails to plead or appear, the City may obtain a default judgment sustaining the charge in the summons, fixing the fine, and assessing fees and penalties. *See* N.Y.C. Rules & Regs. tit. 19 §§ 39-05, 39-07, 39-10(d). Once a default judgment is entered, a party may reopen it "only upon written application showing excusable neglect and a substantial defense to the charge." *Id.* § 39-10(i). After a party is found guilty of a parking violation, she may appeal to the PVB Appeals Board. *See* VTL § 242; N.Y.C. Rules & Regs. tit. 19 § 39-12(a), (b)(2). Finally, a party may challenge an adverse decision by the Appeals Board in New York State Supreme Court, by petitioning under Article 78 of the N.Y.

C.P.L.R. ("CPLR"). *See* VTL § 243; N.Y.C. Admin. Code § 19-209.

If the owner of a vehicle owes more than $350 in judgments, the City may tow and impound her vehicle to satisfy those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212; N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9). In that case, the owner may be held liable for towing and storage fees associated with the impoundment. *See* CPLR § 8013(c);[3] N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(iii)–(vii) (authorizing, among other things, $185 removal fee and $20-per-day storage fee).

Tsinberg spent most of 2018 temporarily living and working in Pennsylvania, where he ran a business out of the Philadelphia International Airport. FAC ¶ 1. During that time, he left the Vehicle parked in the Riverdale neighborhood of the Bronx, where it amassed 11 tickets, five of which are relevant here. *Id.* ¶¶ 1–2; Dkt. 22-3; Dkt. 26 ("Koplik Decl."), Ex. A.[4] The first of those five tickets was for displaying an expired inspection sticker; the other four were for displaying an expired registration sticker. *See* Dkt. 22-3; Koplik Decl., Exs. D–H. Each was issued on a different day between April and October 2018. After Tsinberg failed to respond to them, the City entered a default judgment on each about three months after issuance. *See* Koplik Decl., Exs. D–H; Report at 6–7. Each ticket was originally $65, or $325 total, but, after penalties associated with Tsinberg's failure to plead to or contest the tickets accrued, the total amount owed on the five tickets rose to over $600. FAC ¶ 34; Report at 6–7.

In January 2019, Tsinberg discovered the tickets and the default judgments against him. FAC ¶ 3. He then sought to vacate three of the default judgments by filing disputes through the City's "Pay or Dispute" application and submitting an image of his current, unexpired registration. *See* FAC ¶ 11; Koplik Decl., Exs. D–F. Each application was denied by an ALJ because his application did not show a legally sufficient reason for his failure to respond to the summons, and his proof of current registration did not refute that his car had displayed an expired registration when each summons was issued. *See* Koplik Decl., Exs. D–F.

On January 29, 2019, the City placed an immobilizing "boot" on the Vehicle. FAC ¶ 14. The City affixed a notice to the Vehicle, which provided a telephone number and five physical addresses at which Tsinberg could pay the outstanding judgments. Dkt. 22-4 ("Booting Notice"). The City also affixed an execution to the Vehicle, which stated that the state of New York, or one of its subdivisions, was the judgment creditor, "and/or the debt enforced is for child support, spousal support, maintenance or alimony." FAC ¶ 7; Dkt. 22-2 ("Execution"). The same day, Tsinberg filed an order to show cause ("OTSC") in New York State Supreme Court, seeking to commence an Article 78 proceeding and to obtain a temporary restraining order ("TRO") to prevent the towing of his Vehicle. FAC ¶¶ 5, 8; Dkt. 22-9. He tried to serve the City with the OTSC at two the addresses provided on the Booting Notice, but neither office would accept service. FAC ¶ 10.

***3** On January 30, 2019, the City towed the Vehicle. *Id.* ¶ 12. On February 15, 2019, the City placed an "indefinite sales hold" on the Vehicle—meaning that the Vehicle would not be auctioned to satisfy Tsinberg's unpaid judgments—given the pending Article 78 petition. *See id.* ¶¶ 22, 36; Koplik Decl., Ex. R. The Vehicle remains in City storage and has accrued thousands of dollars in storage fees. Reply at 7 n.5 (as of July 28, 2020, total outstanding judgments were $10,397.72). On June 25, 2019, the New York State Supreme Court dismissed Tsinberg's Article 78 petition because he had failed to serve or file any complaint or petition in the matter and to exhaust administrative appeals. Koplik Decl., Ex. Q.

### B. Procedural History

On January 28, 2020, Tsinberg filed a Complaint. Dkt. 2. On May 7, 2020, the City moved to dismiss. Dkts. 15–17. On June 18, 2020, Tsinberg filed the FAC. On August 3, 2020, the City moved to dismiss the FAC, Dkt. 25, and filed a memorandum of law in support, City Mem., and the declaration of Pamela A. Koplik, Esq., *see* Koplik Decl. On August 4, 2020, the Court referred that motion to Judge Cave for a report and recommendation. Dkt. 29. On August 18, 2020, Tsinberg opposed the City's motion. Dkt. 31 ("Pl. Opp'n"). On September 8, 2020, the City replied. *See* Reply.

While the motion to dismiss was pending, Tsinberg sought "preliminary discovery" from the City; the City moved to stay discovery pending a ruling on its motion to dismiss. *See* Dkt. 43 at 1. On November 19, 2020, Judge Cave granted the City's motion to stay, with an exception for the exchange of five narrow categories of information, largely relating to the circumstances surrounding the seizure and storage of the Vehicle. *Id.* at 2–3.

On January 22, 2021, Judge Cave issued the Report, which recommends the dismissal of the FAC with prejudice and without leave to amend. *See* Report at 1, 35. On February

15, 2021, Tsinberg filed objections to the Report. Dkt. 51 ("Objections"). On March 15, 2021, the City responded. Dkt. 54 ("Response").

## II. Legal Standard

### A. Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report and recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

***4** Where, as here, the plaintiff is *pro se*, his complaint must be construed "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). This mandate "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009). Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George*, 2012 WL 2512964, at *6 n.7.

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (citation omitted). Thus, even a *pro se* plaintiff "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). The Court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).

## III. Discussion

The Report recommends dismissal of Tsinberg's entire case for failure to state a claim. In many respects, Tsinberg's objections do not engage with any specific aspects of the thoughtful and well-reasoned Report, but reprise, through 35 "claims" spanning nearly 50 pages, general assertions about the sufficiency of the FAC's allegations and principles of constitutional law. Thus, as to much of the Report, review for clear error would be appropriate. *See Dickerson*, 2013 WL 3199094, at *1. Nevertheless, for the avoidance of doubt, in the interest of thoroughness, and given Tsinberg's *pro se* status, the Court will review the entire Report *de novo.*

The Court addresses Tsinberg's claims in the following order: (1) Fourteenth Amendment Due Process Clause claims; (2) Fifth Amendment Double Jeopardy Clause claim; (3) Eighth Amendment Excessive Fines Clause claim; (4) Fourth Amendment claim; (5) municipal liability claim; (6) Fair Debt Collection Practices Act claim; and (6) state-law claims. Finally, the Court addresses Tsinberg's request for leave to amend the FAC.

### A. Due Process Clause

#### 1. Procedural Due Process

Tsinberg claims that the City's ticketing and towing of his car violated his rights to procedural due process because he received insufficient notice of the tickets, because the dispute mechanism provided by the "Pay or Dispute" application was inadequate, and because his Article 78 proceeding failed to provide adequate post-deprivation remedies. *See* FAC ¶¶ 48–61; Pl. Opp'n ¶¶ 1–11, 18–20.

The Court agrees with the Report that Tsinberg has failed to allege a violation of his rights to procedural due process. Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

***5** "Courts in this Circuit have found that, as a general matter, the PVB/Article 78 review process for challenging parking summonses meets the requirements of procedural due process." *Nestle Waters N. Am., Inc. v. City of New York*, No. 15 Civ. 5189 (ALC), 2016 WL 3080722, at *8 (S.D.N.Y. May 25, 2016) (collecting cases), *aff'd*, 689 F. App'x 87 (2d Cir. 2017) (summary order); *see Schaer*, 2011 WL 1239836, at *9 ("The City's administrative parking violations system has been held to be constitutional.") (collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) (The City "provide[s] parking violators ... with more than sufficient process to satisfy the Constitution."). To plausibly allege a procedural due process violation, therefore, Tsinberg must allege some departure from that constitutionally "more than sufficient" process.

Tsinberg has failed to do so. First, he alleges that the City's service of parking summonses by affixing them to his car and mailing them to him was insufficient. That is because he alleges that he failed to receive *actual* notice of the tickets and, because he lived in Philadelphia at the time, the City should have either called or emailed him to give him such notice before the judgments against him were entered. *See* FAC ¶¶ 48–49; Objections at 17, 20–21. But the method of service the City employed here is prescribed by the statutes above, and courts have repeatedly held it to be constitutional. *See* VTL § 238(2); *e.g.*, *Nestle Waters*, 2016 WL 3080722, at *8. Nor was the City obliged to anticipate that Tsinberg might have been out of state for several months, and to depart from its statutorily prescribed method of service to accommodate that absence. Further, as the Report notes, Tsinberg did receive actual notice of the default judgments against him, as evidenced by his challenges thereto, and had both the chance to contest them before the City towed and impounded his Vehicle several weeks later, and to pay them while his Vehicle continued to accumulate storage costs. *See* Report at 19.

Second, Tsinberg alleges that the procedures through which he tried to vacate the default judgments against him were deficient because the "Pay or Dispute" application is flawed in unspecified ways. *See* FAC ¶¶ 48–51; Pl. Opp'n ¶ 10. To the extent that Tsinberg alleges that the City obtained judgments against him through "adjudication via app," that is wrong. As the Report notes, the default judgments were entered in the usual course, and Tsinberg merely tried to vacate them through the "Pay or Dispute" application. *See* Report at 18–19. As to the latter process, Tsinberg was never required to use that method of contesting the judgments—he remained free at all times to file his disputes by mail or in person. *See* City Reply at 3 n.1. His decision to do so, absent any allegation that other such options were unavailable, cannot support a plausible claim for any deprivation of procedural due process.

Third, Tsinberg alleges that, while Article 78 proceedings may, in some cases, provide adequate post-deprivation protections against arbitrary government action, here that was not so because the New York Supreme Court's dismissal of his Article 78 proceeding for failure to serve, failure to file a petition, and failure to exhaust administrative remedies was "merely on a Temporary Restraining Order," and not a "valid, final judgment on the merits." FAC ¶ 55. He also argues that, because the Booting Notice did not provide him with the proper address for service of an Article 78 petition on the City, he was denied procedural due process.

Pl. Opp'n ¶¶ 7–9; Objections at 6–7, 9–11, 15–17. As to the first point, Tsinberg's decision to seek a TRO rather than commence an Article 78 proceeding, as well as his failure to serve or file any attending petition or exhaust administrative remedies, resulted from his own decisions, not any procedural impediments erected by the City. *See* Koplik Decl., Ex. Q. Those decisions do not affect the availability of Article 78 proceedings as a sound, post-deprivation guard against erroneous deprivations. "The fact that [a plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect [the] due process analysis. Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity." *Nestle Waters*, 2016 WL 3080722, at *10 (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 740 F.3d 458, 467 n.9 (2d Cir. 2006)); *see Schaer*, 2011 WL 1239836, at *9 ("[T]he Second Circuit has 'held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy[.]' " (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 985 F.2d 90, 93 (2d Cir. 1996))). [5] As to the second, Tsinberg does not provide any authority for the notion that the City deprived him of due process by failing to provide, on the Booting Notice, the proper address for service of a TRO, rather than the proper address at which to pay his tickets.

***6** The Court thus agrees with the Report that the FAC fails to plausibly allege any procedural due process violation. [6]

### 2. Substantive Due Process

Although the FAC did not do so expressly, the Report also construed it to assert a substantive due process claim, but found such claim to be deficient. The Court agrees with that assessment. To violate Tsinberg's substantive due process rights, the City's actions "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' " *Schaer*, 2011 WL 1239836, at *6 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "Only conduct that 'shocks the conscience' qualif[ies] as even potentially violative of plaintiffs' substantive due process rights." *Id.* (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). Upon *de novo* review, the Court agrees with, and adopts in full, the Report's conclusion that the City's ticketing and towing of Tsinberg's car—all under established and oft-approved state and local law—does not approach this threshold. *See* Report at 23–24. [7] Tsinberg's claim for violation of his substantive due process rights is also dismissed.

### B. Double Jeopardy

Tsinberg next claims that the issuance of several tickets for the same alleged failure to display an unexpired registration sticker subjected him to double jeopardy, in violation of the Fifth Amendment. *See* FAC ¶ 45. The Report recommends dismissing this claim because the Double Jeopardy Clause applies only to criminal proceedings, and Tsinberg has failed to adequately allege that the parking sanctions imposed on him were "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." Report at 25–26 (quoting *Doe v. Pataki*, 120 F.3d 1263, 1274 (2d Cir. 1997)).

***7** Again, the Court agrees with that assessment. The Double Jeopardy Clause protects an individual's right not to be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. The Supreme Court has held that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and does not apply to civil penalties. *Hudson v. United States*, 522 U.S. 93, 99 (1997). To decide whether a sanction is criminal or criminal, courts apply a two-part test. First, courts consider whether the legislative intent behind the law was punitive: If the intent was " 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Doe*, 120 F.3d at 1273. Second, even where a law was not *designed* to be punitive, courts then must determine whether it is "so punitive either in purpose or effect" that the sanction at issue is "transform[ed] into a criminal penalty." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The Supreme Court "has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, but has identified several non-exclusive and non-dispositive factors that may guide it, *see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (identifying, *inter alia*, whether the sanction imposes an affirmative disability or restraint, has historically been considered punishment, and depends on a finding of scienter). At this second stage of the inquiry, the burden is on the party challenging a law to "show by 'the clearest proof' that the sanctions imposed 'are *so punitive in form and effect* as to render them criminal despite [the legislature's] intent to the contrary.' " *Doe*, 120 F.3d at 1274 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).

Here, Tsinberg addresses only the second inquiry, arguing that the collective amount of fines and fees, including storage fees, imposed on him provide "the clearest proof" that the parking sanctions at issue are in fact criminal. *See* Objections at 32–35. The Court disagrees. As the Report cogently explains, the City's parking procedures, including seeking recoupment of storage costs occasioned by the impoundment of delinquent vehicles, serve legitimate, important non-punitive interests. *See* Report at 24, 26 (collecting cases). And Tsinberg does not explain how the accumulation of fines and storage costs, resulting from his own failure to pay the original penalties, can convert otherwise civil sanctions into criminal ones. Indeed, as the Report notes, such a result would be surprising given the substantial New York state authority holding that parking and traffic sanctions are civil, not criminal. *See Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 400 (E.D.N.Y. 2017) (noting that "such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal" and collecting cases). The imposition of parking tickets, and resulting penalties for non-payment, thus is not a criminal punishment to which the Double Jeopardy Clause applies. The Court adopts the Report's recommendation and dismisses Tsinberg's double jeopardy claim.

**C. Excessive Fines**

Next, Tsinberg alleges that the magnitude of the civil penalties that have accrued on the parking tickets at issue are impermissible under the Eighth Amendment's prohibition on excessive fines. In support, he argues that, while the $65 fines originally imposed may not be excessive, the accumulation of "fines on fines," including tow, boot, and storage fees, is unconstitutional, and tantamount to "criminal usury." *See* FAC ¶¶ 32–44, 69; Pl. Opp'n ¶¶ 21–27; Objections at 36–40. The Report recommends dismissal of this claim because, even if the Excessive Fines Clause applies here, the fines are not disproportionately excessive. *See* Report at 26–30. The Court agrees with the Report's assessment.

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," *i.e.*, whether the forfeiture at issue "may be characterized, at least in part, as 'punitive.' " *Id.* at 109. Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* A fine is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

***8** Here, the parties and the Report focus only on the second question, assuming that the Excessive Fines Clause applies in the first instance. The Court therefore assumes without deciding that the Clause applies to the routine application of the City's parking and traffic laws in cases like Tsinberg's. [8] As to the second factor, the Second Circuit has set forth a four-factor test governing the inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 109 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Courts may also consider, along with those four factors, "whether the forfeiture would deprive the defendant of his livelihood." *Id.* at 111. In undertaking this analysis, the Supreme Court has admonished that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336; *see id.* (courts "should grant substantial deference" to the legislature (citation omitted)).

The Court agrees that Tsinberg has failed to plausibly allege that the fines at issue are "grossly disproportional" to Tsinberg's offenses. Tsinberg does not argue that the $65 parking fines were excessive. *See, e.g.*, FAC ¶ 36; Pl. Opp'n ¶ 11. [9] Instead, he contends that the fines he accrued for failing to address the five $65 tickets, and the resulting fees associated with booting, towing, and storing his Vehicle collectively became disproportionate. *See, e.g.*, Objections at 38–40. Whereas Tsinberg was ticketed $65 per original ticket, or $325 total, those penalties increased to about $640, or another $63 per ticket, after he failed to respond to or pay those tickets. *See* FAC ¶ 34; Koplik Decl., Exs. D–H; Dkt. 22-3. As to the first factor, Tsinberg's offense is the accumulation and failure to resolve several duly issued parking tickets, for which, as several ALJs held, he did not

provide any legitimate excuse. *See* Koplik Decl., Exs. D–F. Beyond the five tickets directly at issue here—which Tsinberg still has not paid—he also accrued at least six others in a similar period, for a variety of offenses. *See* Dkt. 22-3. Thus, while negligent or reckless parking violations themselves may not entail a great degree of moral culpability, *see George*, 779 F.3d at 123, Tsinberg's sustained refusal to lawfully address them, well after he undisputedly received notice of them, weighs in the City's favor. As a result, Tsinberg is squarely a member of the "class of persons for whom" such enhanced penalties were principally designed. *Viloski*, 814 F.3d at 109. Without the prospect of escalating fines, violators like Tsinberg would have little reason ever to pay their tickets to the City. The third factor, as to whether the maximum fine was imposed, does not fit well into the parking-ticket context, where there appears to be little discretion over the degree of any given penalty. *Cf. Viloski*, 814 F.3d at 109 (discussing imposition of sentence and fine within the context of the criminal Sentencing Guidelines and statutory maximum penalties). Thus, the Court gives it little weight in the analysis. Last, although when Tsinberg's experience is viewed in isolation, his non-payment of five $65 tickets may not have meaningfully harmed the City of New York, the City must process an "overwhelming volume of alleged parking violations." *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1067 (S.D.N.Y. 1995). Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, it would likely suffer substantial financial harms. The City also has a separate, if less tangible, interest in promoting compliance with its laws, which is undermined even by small-scale disregard like that here.

***9** Considering the above factors, Tsinberg has not plausibly alleged anything close to a gross disproportion between his offense and the penalties, totaling $315, for his failure to address his many parking tickets. That conclusion accords with the assessment of various other courts to have considered the issue. *See, e.g.*, *Shibeshi v. City of New York*, No. 11 Civ. 4449 (LAP), 2011 WL 13176091, at *2 (S.D.N.Y. Sept. 21, 2011) ("[Plaintiff's] fines totaling $515.16 for four tickets, plus additional fees, are not disproportional."), *aff'd*, 475 F. App'x 807 (2d Cir. 2012) (summary order); *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 808–09 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06 Civ. 1577 (LAB), 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008) (penalty's increase from $47 to $104 upon nonpayment not excessive). [10]

The same is true of Tsinberg's claim that the City's booting, towing, and impounding of his car, and that the resulting accrual of fees, were excessive. Courts have approved the towing and auctioning of vehicles to satisfy municipal judgments, as state law specifically authorizes. *See, e.g.*, *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 420 (E.D. Pa. 2019) (denying Eighth Amendment Excessive Fines claim under *Timbs* for towing and impoundment of vehicle for failure to pay parking tickets); *see also Rackley*, 186 F. Supp. 2d at 469–85 (same under Fourth Amendment and Due Process Clause). Although the value of the car was, at the time of its towing, substantially greater than the amount Tsinberg owed, he remained free at all times to recover the Vehicle by paying the City what he owes it. And even if the City auctions his car to satisfy the judgments at issue, Tsinberg would then have a right to receive any sale proceeds above the outstanding judgments and fees at the time of sale. *See* CPLR § 5234(a). Finally, as to the booting, towing, and storage fees associated with the Vehicle—including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City, *see* N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(vii)—Tsinberg fails to explain, except in conclusory terms, why those essentially compensatory fees are unconstitutional. *See, e.g.*, *Potter v. City of Lacey*, No. 20 Civ. 05925 (RJB), 2021 WL 915138, at *1 (W.D. Wash. Mar. 10, 2021) (impoundment fees not excessive because "they can reflect the costs associated with towing and storage"); *see* Objections at 38–40. Accordingly, the Court adopts in full the Report's recommendation that Tsinberg's Eighth Amendment claim, too, be dismissed for failure to state a claim.

### D. Fourth Amendment

Tsinberg also asserts a Fourth Amendment claim related to the towing of the Vehicle, arguing that such towing constituted an unreasonable seizure. *See* FAC ¶¶ 62–67. Specifically, he claims that the City booted and towed his Vehicle "through an automated system ... without an independent review of the underlying facts and circumstances ... by a judge." *Id.* ¶ 65. He also asserts that the inclusion of language regarding child support, spousal support, or alimony on the Execution makes the seizure even more unreasonable. *See id.*; Execution. The Report recommends dismissal of this claim, which the Court adopts.

***10** The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states

and, relevant here, municipalities such as New York City. *See City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It "applies in the civil context as well" as the criminal. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 57 (1992) (collecting cases).

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 61 (citation omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979).

Tsinberg has failed to plausibly allege that any seizure of his Vehicle was unreasonable. It is undisputed that the City seized Tsinberg's Vehicle based on valid judgments entered against him pursuant to state and local law, and that the seizure was authorized by statute given those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212 (allowing towing of vehicle for which outstanding judgments exceed $350); *see also* VTL § 237(5) (empowering PVB to "enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place provided for the entry of civil judgment within the state of New York"); FAC ¶ 34 (alleging that $640.59 in fines "caused NYC Admin. Code § 19-212 to trigger this seizure of the property"). Courts have held that the towing and impoundment of vehicles in similar circumstances is reasonable under the Fourth Amendment. *See, e.g.*, *Shibeshi*, 2011 WL 13176091, at *2 ("The City's warrantless seizure of a person's vehicle from a public street due to that person's failure to pay parking ticket fines has been held not to violate the Fourth Amendment in that it is a reasonable seizure, does not implicate core privacy concerns requiring a warrant and, of itself, demonstrates probable cause."); *Yu Juan Sheng v. City of New York*, No. 05 Civ. 1118 (RRM) (VVP), 2009 WL 6871132, at *8 (E.D.N.Y. June 26, 2009) (approving towing and impoundment resulting from default judgments on parking tickets), *report and recommendation adopted*, 2010 WL 3744428 (E.D.N.Y. Sept. 20, 2010); *Rackley*, 186 F. Supp. 2d at 478–79 (same even where City officials erroneously calculated amounts owed to City on multiple dates). Tsinberg does not offer any countervailing authority, or explain why the underlying tickets arising from the same expired registration makes the ultimate seizure, which undisputedly complied with N.Y.C. Admin. Code § 19-212, unreasonable. *See* FAC ¶ 65. [11] The Court therefore also adopts the Report's recommendation on this point and dismisses Tsinberg's Fourth Amendment claim.

**E. *Monell* Liability**

***11** Having dismissed each of Tsinberg's § 1983 claims, the Court holds, with the Report, that dismissal of Tsinberg's claim for municipal liability against the City is required as well. A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior.* Instead, to hold a municipality liable for its employees' unconstitutional actions, a plaintiff must establish a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Because *Monell* liability merely extends liability for an underlying constitutional violation to a municipality, without a predicate violation, the Court need not address whether the municipality itself can be liable for such violation. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020) (summary order) (dismissal of *Monell* claim appropriate where plaintiff had "not plausibly pled any underlying constitutional violation that survives a motion to dismiss"). Here, with the Court's having held that Tsinberg failed to state a claim for any underlying constitutional violation under § 1983, there is no basis to extend any such liability to the City based on an alleged custom, policy, or widespread usage of the City. Tsinberg's *Monell* claim is therefore dismissed.

**F. Fair Debt Collection Practices Act**

Tsinberg next asserts that the City's actions violated the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1962 *et seq.* He alleges that the Execution's reference to child support or alimony, as a potential ground for seizure of the Vehicle, was false and harassing under that statute. *See* FAC ¶¶ 62–63; Pl. Opp'n ¶¶ 28–29; Objections at 40. As the Report

correctly concluded, that claim fails for at least two reasons. First, the FDCPA does not apply to actions taken by municipal employees, and Tsinberg alleges only that the City of New York, through its employees, affixed the Execution notice to his Vehicle. *See* 15 U.S.C. § 1962a(6)(C) (excluding from definition of "debt collector" any "officer or employee of ... any state"), (8) (defining "state" to include "any political subdivision" thereof). Second, the FDCPA "does not extend to creditors seeking to collect on debts owed to themselves." *Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296 (PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July 13, 2012) (collecting cases). Here, the City's Execution was issued and posted in connection with its attempts to collect debts Tsinberg owed to the City, not to any other person. The Court thus adopts the Report in full in dismissing Tsinberg's claim for a violation of the FDCPA.

**G. State-Law Claims**

Finally, Tsinberg brings claims under state law for conversion, trespass to chattels, and defamation. FAC ¶¶ 68–71. The Report recommends that the Court decline to exercise supplemental jurisdiction over these claims given the Court's dismissal of Tsinberg's federal causes of action. The Court agrees. "District courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Having dismissed all federal claims over which the Court had original jurisdiction before meaningful discovery has taken place, and far before trial, the Court dismisses Tsinberg's state-law claims, too, without prejudice to his pursuit of those claims in state court.

**H. Leave to Replead**

***12** Last, the Report recommends that Tsinberg not be granted leave to file another amended complaint, and that his claims instead be dismissed with prejudice given the substantive deficiencies in his allegations and his earlier opportunity to amend his complaint after the City moved to dismiss it. Report at 34–35. Tsinberg, in his Objections (but not in his opposition), sought leave to file another amended complaint, after further discovery, to remedy any deficiencies in the FAC. *See* Objections at 48. He does not, however, identify any specific facts that, if pled, could salvage any of his claims. *See id.*

*Pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (citation omitted); *see Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). But a district court has discretion to deny leave if a revised claim still "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a *pro se* plaintiff's claim are "substantive," rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Thus, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Cuoco*, 222 F.3d at 112 (courts should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court agrees with the recommendation in the Report and will dismiss Tsinberg's claims without leave to amend, and with prejudice. Tsinberg already had one opportunity to amend his complaint, and did so after reviewing the City's arguments, in its first motion to dismiss, explaining why his pleading failed to state a claim. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its

complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Green v. Niles*, No. 11 Civ. 1349 (PAE), 2012 WL 987473, at *7 (S.D.N.Y. Mar. 23, 2012). Further, the Court agrees with the Report's assessment that the FAC's substantive deficiencies are such that a third attempt to state a viable claim would be futile. *See, e.g.*, *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N. Y July 13, 2020) (collecting cases denying plaintiffs a "third bite at the apple"), *aff'd*, 2020 WL 4547167 (2d Cir. Aug. 6, 2020).

## CONCLUSION

For the foregoing reasons, the Court adopts the Report in full, grants the City's motion to dismiss, and dismisses Tsinberg's claims without leave to amend. Tsinberg's federal claims are dismissed with prejudice, but his state-law claims are dismissed without prejudice to his ability to pursue them in state court.

***13** The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 1146942

## Footnotes

1 The Court mainly draws its account of the facts from the Amended Complaint and the documents attached to and discussed in it. Dkt. 22 ("FAC"); *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Given Tsinberg's *pro se* status, the Court also considers the allegations raised in Tsinberg's opposition to the motion to dismiss to the extent consistent with those in the FAC. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2 What was once called the PVB is now called the "Adjudications Division." *See* Dkt. 27 ("City Mem.") at 2. The Court, however, follows the parties and the Report in generally referring to the agency using its old name, the PVB.

3 In its opening brief, the City misidentified the statute authorizing the imposition of towing and storage fees as VTL § 1224. *See* Dkt. 33 ("Reply") at 7 n.5. It clarified in its reply brief that VTL § 1224 only applies to abandoned vehicles, and that CPLR § 8013(c) is the authorizing statute for the imposition of removal and storage fees in this case. *Id.*

4 Only the first five were subject to final judgments in January 2019, when Tsinberg's car was towed, although several would later become so, leading to $750 more in outstanding judgments. *See* Dkt. 22-3; Report at 7–8.

5 The Report construed Tsinberg's allegations about the adequacy of the Article 78 proceedings as a challenge to the result of that action, and so assessed this issue under the *Rooker-Feldman* doctrine. *See* Report at 19–20. But in the Court's view, Tsinberg's challenge to the procedural adequacy of the Article 78 proceeding, liberally construed, does not necessarily require review of the merits of that action. *See Hoblock v. Albany Cnty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (*Rooker-Feldman* bars federal court review of merits of state-court judgments). Thus, while the Court agrees with the Report's ultimate conclusion, it departs from the

Report insofar as it based its recommendation on the application of *Rooker-Feldman.* To the extent Tsinberg does seek review of the merits of the state-court decision at issue, the Court fully agrees with the thoughtful assessment of this issue in the Report.

6 In his Objections, Tsinberg argues, for the first time, that *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) requires a different result. But parties may not raise new legal arguments for the first time in their objections to a report and recommendation. *See, e.g.*, *Gonzalez v. Garvin*, No. 99 Civ. 11062 (SAS), 2002 WL 655164, at *2 (S.D.N.Y. Apr. 22, 2002) (dismissing objection "because it offers a new legal argument that was not presented in his original petition, nor in the accompanying Memorandum of Law"); *see also Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (rejecting arguments advanced for first time in objections to report because permitting such claims would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). The Court thus rejects this objection. In any event, as the City notes, *Krimstock* appears inapposite. *See* Response at 3 & n.1.

7 In his Objections, Tsinberg expands on his claim of a substantive due process violation, suggesting that the state has no legitimate interest in enforcing registration requirements and that he was singled out for disfavored treatment when the City placed his car on an "indefinite sales hold" as a result of his Article 78 petition, leading to significant storage fees. Objections at 17–19, 25–32. Again, these new theories are not cognizable in the Court's review of a report and recommendation. *See, e.g.*, *Gonzalez*, 2002 WL 655164, at *2. Even if they were, they do not come close to showing a substantive due process violation. In fact, it appears that it was Tsinberg, not the City, who requested that the Vehicle be placed on a sales hold, which request led to the accumulating storage fees. FAC ¶ 54; *see also* Koplik Decl., Ex. R (sales hold listing "requester" as "Leon G. Tsinberg").

8 *See Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198–99 (S.D.N.Y. 2019) ("fees and penalties" that "are multiples" of an unpaid tolls were plausibly alleged to be partially punitive); *Dubin*, 277 F. Supp. 3d at 400–02 (Excessive Fines Clause applied to "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on ticketed motorists who received a final disposition other than "not guilty," and recognizing that "administrative and other civil penalties satisfy the [first factor], even if they bear no direct relationship to a criminal prosecution"); *see also Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Excessive Fines Clause applies to "municipal fines," and specifically parking tickets and late penalties, under *Timbs v. Indiana*, 139 S. Ct. 682 (2019), which held that the Clause applies to the states). *But see id.* at 925–29 (Bennett, J., concurring) (disagreeing that Eighth Amendment Excessive Fines Clause "should routinely apply to parking meter violations," noting that the "potential for federal court litigation is endless" and risks "trivializ[ing] the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts"). Given the Supreme Court's recent holding that the Fourteenth Amendment incorporates the Excessive Fines Clause against state and municipal governments, *see Timbs*, 139 S. Ct. 682, courts in the coming years may be called on more often to assess its applicability to cases like this one, and the extent to which these protections police the bounds of municipal fines, fees, and other penalties. Without fuller presentation by the parties, the Court here has no occasion to opine on this threshold question.

9 Tsinberg, for the first time in his Objections, argues that the $65 exceeds a statutory cap of $50 for parking violations set by N.Y. Admin. Code § 19-203(b). *See* Objections at 37. As the City notes, the $65 amount results from a mandatory state surcharge required by VTL § 1809-a, which provides that "[t]he provisions of any other general or special law notwithstanding," any city with more than 100,000 persons, must levy "a mandatory surcharge in addition to any other sentence, fine or penalty otherwise permitted or required, in the amount of fifteen dollars." Response at 7. That provision states that such $15 surcharge "shall not be deemed a monetary penalty for the purposes of ... section 19-203 of the administrative code of the city of New York"—the provision that Tsinberg relies on for this point.

10 Although Tsinberg relies heavily on the Supreme Court's holding in *Timbs* in arguing to the contrary, that case merely held that the Excessive Fines Clause applies to the states. *See* 139 S. Ct. at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged"). It did not purport to alter the above analysis.

11 Tsinberg is also vague as to how the reference to child support or alimony on the Execution plays into the Fourth Amendment analysis. To the extent he argues that the language on the Execution falsely accuses him of owing child support or alimony, that characterization is wrong. A photograph of the Execution is attached to the FAC. It identifies outstanding child support or alimony as *among* the authorized bases for such an execution, but it does not state that each was the bases for executing on Tsinberg's car. It states: "The judgment creditor is the state of New York, or any of its agencies or municipal corporations *and/or* the debt enforced is for child support, spousal support, maintenance or alimony." Execution (emphasis added). The execution's recitation thus is consistent with the FAC's allegation that Tsinberg does not owe child support, alimony, or spousal support. FAC ¶ 7; *see* Report at 29 (noting that Execution merely recites legally available bases). Even construing the FAC liberally, it is not plausibly alleged that Tsinberg's vehicle was towed based on a misperception that he owed child support, spousal support, or alimony, as opposed to the substantial debts that Tsinberg admits he actually owed to the City for parking infractions.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through Barbara McGREGOR, as Administratrix of the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, Chief Judge.

## I. *Introduction*

***1** Plaintiff Kylie Ann Turczyn, deceased, by and through Barbara McGregor, as administratrix of the estate of Kylie Ann Turczyn, commenced this action against defendants City of Utica, City of Utica Police Dept., and Elizabeth Shanley alleging substantive due process claims pursuant to 42 U.S.C. § 1983 and separate state law causes of action. (Am.Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 19.) For the reasons that follow, the motion is granted in part and denied in part.

## II. *Background*

### A. *Facts* [1]

Shanley, an Oneida County domestic violence investigator, was at all relevant times assigned by the Police Department to accomplish the goals of reducing "occurrence[s] of domestic violence by increasing reporting and by identifying and tracking repeat victims and/or offenders," and "increas[ing] victims' access to supportive services by encouraging [them] to report their abuse, thereby increasing arrest rates for domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012, Thomas Anderson, Turczyn's former boyfriend and the father of her daughter, broke into Turczyn's home armed with a 9 mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking her life in view of their four-year-old daughter, G.T. (*Id.*) Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn made between five and ten complaints to Utica police officers, "including informing them of a specific threat by Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told Shanley "that Anderson was armed and had threatened to kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic violence between Turczyn and Anderson, neither Shanley, New York State Police, nor Utica Police took any steps to arrest Anderson, investigate Turczyn's complaints, or follow-up with Anderson "as is the policy and protocol of the domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of protection, which she attempted to do, but was told by an unknown person at the Oneida County Family Court to return the following day because the court was " 'too busy.' " (*Id.* ¶¶ 15–16.) The following day, Turczyn left a voice message for Shanley, explaining that she was unable to obtain an order of protection and that Anderson had a gun and planned to kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge, "Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly believed that Turczyn's issues with Anderson were outside of the purview of Utica Police and should, instead, be dealt with by New York State Police; however, "she did not inform any other police agency or take any action herself." (*Id.* ¶¶ 18, 19, 20.)

### B. *Procedural History*

Turczyn commenced this action by filing a complaint on October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved to dismiss, (Dkt. No. 10.) In response, Turczyn filed an amended complaint as of right, which is now the operative pleading. (*See generally* Am. Compl.) In her amended complaint, Turczyn alleges the following causes of action: (1) a denial of substantive due process rights under the Fifth and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4)

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

***2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

**A. *Preliminary Matters***

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at *6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

***3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at *3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B. *Rule 8***

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C. *Rule 12(b)(6)***

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

***4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

***5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

***6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at *10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at *13 (E.D.N.Y. Mar. 24, 2014).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

## Footnotes

1 The facts are presented in the light most favorable to plaintiff.

2 *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3 In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6727538
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Deshawn TYSON, Plaintiff,
v.
Patrick J. CLIFFORD, et al., Defendants.

CIVIL CASE NO. 3:18cv1600(JCH)
|
Signed 12/21/2018

**Attorneys and Law Firms**

Deshawn Tyson, Suffield, CT, pro se.

**INITIAL REVIEW ORDER**

Janet C. Hall, United States District Judge

***1** The plaintiff, Deshawn Tyson ("Tyson"), is confined at MacDougall-Walker Correctional Institution. He has filed a pro se civil rights action pursuant to section 1983 of title 42 of the United States Code against New Haven Superior Court Judge Patrick J. Clifford ("Judge Clifford") and Connecticut State's Attorney John P. Doyle, Jr. ("Attorney Doyle"). For the reasons set forth below, the Complaint is dismissed.

**I. STANDARD OF REVIEW**

Pursuant to section 1915A(b) of title 28 of the United States Code, the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." Id. This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only " 'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,' " does not meet the facial plausibility standard. Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007) ). Although courts still have an obligation to interpret "a pro se complaint liberally," the Complaint must still include sufficient factual allegations to meet the standard of facial plausibility. See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

**II. FACTS**

Tyson states that he has been "wrong[ly] incarcerated" in a facility within the State of Connecticut Department of Correction since March 10, 2016.[1] See Compl. (Doc. No. 1) at 22. The State of Connecticut Judicial Branch website reflects that New Haven police officers arrested Tyson on March 10, 2016, and that the State of Connecticut has charged him in a criminal case filed in the Connecticut Superior Court for the Judicial District of New Haven with one count of sexual assault in the first degree, in violation of Conn. Gen. Stat. § 53a-70(a)(1), and one count of unlawful restraint in the first degree, in violation of Conn. Gen. Stat. § 53a-95. See State v. Tyson, Case No. NNH-CR16-0165313-T (Conn. Super. Ct. Mar. 10, 2016).[2] The case detail indicates that Tyson is represented by counsel and that a jury trial is scheduled for December 16, 2020. See id.

***2** Tyson alleges that, on or about July 26, 2018, in the Connecticut Superior Court for the Judicial District of New Haven, Judge Clifford stated on the record that he had instructed Attorney Doyle to ignore or disregard any motions, memoranda, or affidavits filed by Tyson. See Compl. at 5 ¶ 1, 22. Judge Clifford has ruled against Tyson even when Attorney Doyle refused to oppose Tyson's motions. See id. at 17.

On or about August 22, 2018, Judge Clifford stated on the record that he had instructed Attorney Doyle to remain silent during a pretrial hearing and that Attorney Doyle agreed to do so. See id. at 5 ¶ 2. On or about September 12, 2018, Judge Clifford stated on the record that he had instructed Attorney Doyle to ignore or disregard Tyson's


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

"Conditional Acceptance/Negotiable instrument/grievance" document. See id. at 5 ¶ 3. On that same date, Judge Clifford informed Tyson that he would not consider any motions that Tyson might file. See id. at 5 ¶ 4. Tyson generally asserts that Judge Clifford and Attorney Doyle have misapplied statutes and laws and have failed to provide him with "Discovery/ Brady material." Id. at 6 ¶ 6, 17–18.

At one point during the criminal proceeding, Judge Clifford issued an order that Tyson could represent himself. See id. at 22. Judge Clifford subsequently attempted to appoint an attorney to represent Tyson even though the attorney had made threats against Tyson in the past. See id.

### III. DISCUSSION

Tyson alleges that the defendants violated his rights under the First, Fifth, Eighth, Ninth and Fourteenth Amendments as well as under sections 241 and 242 of title 18 of the United States Code. See id. at 17–18. Tyson seeks punitive, compensatory, nominal, and exemplary damages, as well as injunctive and declaratory relief. See id. at 6–7.

As a preliminary matter, the court notes that Tyson includes the following additional allegations in the Complaint. The "State of CT has declared me/plaintiff sovereign [f]rom itself, as establish[ed] by law, because I/plaintiff had/has no residency with the state and therefore plaintiff is not only a private man as opposed to a corporate fiction." See id. at 6 ¶ 7. Tyson asserts that he cannot be "named in any statutes" and has "a Reservation of Rights which was made known to all defendants." See id. at 6 ¶¶ 8–10. Tyson contends that, throughout his criminal case, "defendants [have] refuse[d] to adhere to the Supremacy Clause of the United States Supreme Court rulings." See id. at 6 ¶ 5. Tyson signs the Complaint as: "Secured Party, Sui Juris, one of the sovereign people, a private man on the land, non-combatant, an American by birth, and child of the living God, Grantor, Secured Party/Creditor and principal of which 'Rights' existed long antecedent to the Organization of the State and Trustee." Id. at 33. Attached to the Complaint is a document titled "Memorandum of Law with points and Authorities on 'sovereignty' of the people In Relationship to 'Government' of the several Compact De-facto State and the Federal Government." Id. at 25–32.

This language and the title of the attachment to the Complaint suggest that Tyson considers himself a "sovereign citizen." In United States v. Ulloa, 511 F. App'x. 105 (2d Cir. 2013), the Second Circuit described, "sovereign citizens," as "a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." Id. at 107 n.1.

***3** Adherents of such claims or defenses "believe that they are not subject to government authority and employ various tactics in an attempt to, among other things, avoid paying taxes, extinguish debts, and derail criminal proceedings." Gravatt v. United States, 100 Fed. Cl. 279, 282 (2011) (citations omitted). Federal courts across the country, however, have routinely refused to credit arguments based on a redemption, sovereign citizen, or other similar theory because the arguments are often frivolous, irrational and unintelligible. See United States v. Sterling, 738 F.3d 228, 233 n.1 (11th Cir. 2013) (noting that courts have summarily rejected sovereign citizens' legal theories as frivolous); United States v. Benabe, 654 F.3d 753, 767 (7th Cir. 2011) ("Regardless of an individual's claimed status of descent, be it as a sovereign citizen, a secured-party creditor, or a flesh-and-blood human being, that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented.") (internal quotation marks omitted); Charlotte v. Hanson, 433 F. App'x. 660, 661 (10th Cir. 2011) (rejecting the sovereign citizen theory as having no conceivable validity in American law) (citation omitted); United States v. Jagim, 978 F.2d 1032, 1036 (8th Cir. 1992) (holding that "sovereign citizen" argument was "completely without merit" and "patently frivolous"); Akbar v. Clarke, No. 1:15-CV-338(AJT/TCB), 2016 WL 4150456, at *7 (E.D. Va. Aug. 1, 2016) (noting that sovereign citizen claims are "wholly frivolous"); Berman v. Stephens, No. 4:14-CV-860-A, 2015 WL 3622694, at *2 (N.D. Tex. June 10, 2015) (finding that a prisoner's "reliance on the UCC or a so-called 'sovereign citizen' theory that he is exempt from prosecution and beyond the jurisdiction of the state or federal courts is frivolous") (collecting cases); Gaskins v. South Carolina, C/A No. 2:15-cv-2589 DCN, 2015 WL 6464440, at *4 (D.S.C. Oct. 26, 2015) (affirming recommended ruling dismissing as baseless prisoner's claim, premised upon "sovereign citizen" theory, that the state court lacked jurisdiction over her and that her state conviction was therefore void); Paul v. New York, No. 13-CV-5047 (SJF)(AKT), 2013 WL 5973138, at *3 (E.D.N.Y. Nov. 5, 2013) (dismissing complaint as factually and legally frivolous because "[t]he conspiracy and legal revisionist theories of sovereign citizens are not established law in this court or anywhere in this country's valid legal system") (internal quotation marks and citation omitted).

It is apparent that Tyson is claiming that, as a "sovereign citizen," he is not subject to the jurisdiction of the State of Connecticut or the Connecticut Superior Court and that any criminal charges against him must be dismissed. To the extent that he challenges the jurisdiction of the State of Connecticut, its courts, or Judge Clifford, or the authority of the State, through Attorney Doyle, to prosecute him for a criminal offense, based on a "sovereign citizen" theory, the court concludes that the claim lacks an arguable legal basis. Thus, that claim is dismissed. See 28 U.S.C. § 1915A(b)(1). To the extent that Tyson is challenging the conduct of the defendants on other grounds, the court addresses those claims below.

A. Requests for Injunctive and Declaratory Relief

Tyson seeks a declaration that the defendants violated his constitutional and federal protected rights and an injunction directing the defendants to cease and desist from making further contact with him or harassing him in violation of his rights. See Compl. at 7. He includes, an "Order to Show Cause for an Preliminary Injunction and a Temporary Restraining Order," as an attachment to the Complaint, which seeks a court order that the defendants be enjoined from various types of conduct in connection with his state criminal case. See id. at 19–20.

In Younger v. Harris, 401 U.S. 37 (1971), the Supreme Court held that a federal court, except in cases where an injunction is necessary to prevent immediate and irreparable injury to a defendant, should not enjoin a pending state court criminal proceeding. Id. at 45. The doctrine of federal abstention, as outlined in Younger, "is grounded in principles of comity and federalism and is premised on the belief that a state proceeding provides a sufficient forum for federal constitutional claims." Schlagler v. Phillips, 166 F.3d 439, 442 (2d Cir. 1999). It "is not a jurisdictional bar based on Article III requirements, but instead a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." Spargo v. New York State Comm'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003) (citations omitted).

In Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69 (2013), the Supreme Court clarified that courts should abstain under Younger only in three "exceptional circumstances": (1) pending state criminal proceedings; (2) civil enforcement proceedings that are "akin to criminal prosecutions;" and (3) civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts." See id. at 72. The court may address the applicability of the Younger abstention doctrine sua sponte. See Catlin v. Ambach, 820 F.2d 588, 591 (2d Cir. 1987) (citing Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976) ). The Younger doctrine is as applicable to suits for declaratory relief as it is to those for injunctive relief. See Samuels v. Mackell, 401 U.S. 66, 73 (1971) (holding Younger's policy would "be frustrated as much by a declaratory judgment as it would be by an injunction").

***4** It is clear from the Complaint and the State of Connecticut Judicial Branch website, that Tyson's state criminal proceeding stemming from his arrest on March 10, 2016 is ongoing. See State v. Tyson, Case No. NNH-CR16-0165313-T (Conn. Super. Ct. Nov. 30, 2018). If the court were to grant Tyson's request for a court order directing the defendants to dismiss the criminal charges against Tyson, or were to declare that the defendants had violated Tyson's federal constitutional rights in presiding over and prosecuting Tyson's state criminal case, such Orders would interfere with Tyson's pending state criminal proceeding.

There are two exceptions to the Younger abstention doctrine: bad faith and extraordinary circumstances. See Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 197–198 (2d Cir. 2002). Abstention may be inappropriate if "a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." Id. at 199 (internal quotation marks and citation omitted). This exception focuses on the subjective intent or motivation of the state prosecutor who initiates the proceeding. See id. ("A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception.") (citation omitted).

The Second Circuit has described the extraordinary circumstances necessary to invoke the second exception to abstention under Younger as circumstances that "render the state court incapable of fairly and fully adjudicating the federal issues before it" and "creat[e] an extraordinarily pressing need for immediate federal equitable relief." Id. at 201 (citation omitted). Application of the extraordinary circumstances exception requires "two predicates ... (1) that there be no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; and (2) that a finding be made that the litigant will suffer 'great

and immediate' harm if the federal court does not intervene." Id. (citation omitted) (emphasis in original).

Tyson has alleged no facts to suggest that the prosecutor initiated the criminal action against him in bad faith or with "no reasonable expectation of obtaining a favorable outcome." Id. at 199 (internal quotation marks and citation omitted). Nor has Tyson alleged the absence of a remedy available in state court to challenge any alleged constitutional violations associated with his criminal prosecution. Tyson is not precluded from challenging any subsequent conviction or sentence on appeal to the Connecticut Appellate and Supreme Courts, filing a habeas petition in the Connecticut Superior Court, and following that, a habeas petition in federal court. Furthermore, Tyson has not alleged that he will suffer imminent harm if this court does not intervene in the ongoing prosecution. See Davis v. Lansing, 851 F.2d 72, 77 (2d Cir. 1988) (holding the burden of defending criminal prosecution is insufficient, without more, to constitute irreparable harm); Saunders v. Flanagan, 62 F. Supp. 2d 629, 635 (D. Conn. 1999) ("That the plaintiff will be forced to defend against a charge of murder in state court does not constitute the extraordinary circumstances resulting in irreparable harm warranting this court to refuse to apply the doctrine of Younger abstention, and no other specific basis of 'extraordinary circumstances' is asserted.").

***5** Because there are no facts alleged to plausibly suggest that either of the narrow exceptions to the Younger abstention doctrine have been met, the court abstains from exercising jurisdiction over the requests for injunctive and declaratory relief seeking intervention in Tyson's ongoing state criminal case. The court therefore dismisses those requests. See 28 U.S.C. § 1915A(b)(1).

B. Request for Money Damages

Tyson seeks $ 1,000,000 in punitive damages from each defendant as well as damages for harassment, mental anguish, anxiety and annoyance, nominal damages and exemplary damages. See Compl. at 6. The court declines to stay this action pending resolution of the state criminal proceeding because Tyson's claims for damages lack arguable legal merit.

1. Judge Clifford

Judges are immune from suit, not just from the ultimate assessment of damages. See Mireles v. Waco, 502 U.S. 9, 11 (1991). This immunity applies even to claims that a judge acted in bad faith, erroneously, maliciously or "in excess of his authority." Id. at 13. "[O]nce a court determines that an official was functioning in a core judicial or prosecutorial capacity, absolute immunity applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." DiBlasio v. Novello, 344 F.3d 292, 297 (2d Cir. 2003) (citations and internal quotation marks omitted). There are two situations in which judicial immunity may be overcome. A judge is not immune from suit for actions taken outside his judicial capacity or for actions that are judicial in nature but taken in the absence of all jurisdiction. See Mireles, 502 U.S. at 11 (citations omitted).

Tyson alleges that, at times during the pendency of his state criminal case, Judge Clifford has instructed Attorney Doyle not to speak during a pretrial hearing, has either declined to rule on his motions or ruled against him on matters and motions, has disregarded his Acceptance/Negotiable Instrument/Grievance document, has misapplied statutes, and has refused to provide or disclose discovery/exculpatory material to him. See Compl. at 5, 17–18. Tyson complains that, at one point, Judge Clifford permitted him to proceed pro se, but would not rule on his motions. See id. at 22. Tyson suggests that more recently, Judge Clifford has attempted to appoint counsel for him, even though he did not ask for counsel. See id. Tyson claims that the attorney Judge Clifford attempted to appoint for him had threatened Tyson in the past. See id.

Appointing counsel for a party and determining whether to rule on motions, ruling on motions, including motions related to the disclosure of information or evidence, issuing orders regarding documents that have been filed in a case, directing speakers during proceedings, and interpreting and applying statutes constitute judicial acts within the jurisdiction of a state court judge. See Sadler v. Supreme Court of Connecticut, 167 F. App'x 257, 259 (2d Cir. 2006) ("Superior Court Judge White is immune from liability under § 1983 for damages and injunctive relief. Judge White performed a judicial action within his jurisdiction when he determined that Sadler's counsel ... should not be replaced.") (citation omitted); Ashmore v. Prus, No. 13-CV-2796 (JG), 2013 WL 3149458, at *3 (E.D.N.Y. June 19, 2013) ("Making evidentiary rulings is a paradigmatic judicial function."); Book v. Tobin, No. 3:04CV442 (JBA), 2005 WL 1981803, at *2 (D. Conn. Aug. 16, 2005) ("Quintessential judicial acts include presiding over trial proceedings, making evidentiary rulings, issuing jury instructions, and deciding motions, and remain protected

by judicial immunity even if the decisions are erroneous, untimely, and in excess of the judge's authority."). There are no allegations that Judge Clifford engaged in actions that were not judicial in nature or were taken in the absence of all jurisdiction. Thus, Judge Clifford is absolutely immune from suit to the extent that Tyson seeks money damages, and those claims against Judge Clifford are dismissed. See 28 U.S.C. § 1915A(b)(2).

2. Attorney Doyle

***6** Tyson alleges that Attorney Doyle is the State's Attorney prosecuting his criminal case in the Connecticut Superior Court for the Judicial District of New Haven. See Compl. at 3, 5. Tyson asserts that Attorney Doyle did not speak during a pretrial hearing, did not respond to motions that he filed in the case, ignored his Acceptance/Negotiable Instrument/ Grievance document, misapplied statutes, and refused to disclose discovery/exculpatory material to him. See id. at 5 ¶ 2, 17–18. Tyson contends that, by failing to respond to his motions, Attorney Doyle has consented to the relief sought in those motions, including a motion to dismiss the charges against him. See id. at 20.

A prosecutor is protected by absolute immunity from a section 1983 action "for virtually all acts, regardless of motivation, associated with his function as an advocate." Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994). In Imbler v. Pachtman, 424 U.S. 409 (1976), the Supreme Court held that a state prosecutor was absolutely immune from a civil suit to recover damages under section 1983 because the prosecutor's conduct "in initiating a prosecution and presenting the State's case" were "intimately associated with the judicial phase of the criminal process." Id. at 430–31. If a prosecutor acts in an investigative rather than an adversarial capacity, he or she is not entitled to absolute immunity. See Kalina v. Fletcher, 522 U.S. 118, 125–27 (1997) (holding that prosecutor was not protected by absolute immunity because she was acting as an investigator when she signed a sworn affidavit attesting to the facts supporting an arrest warrant).

Tyson's allegations against Attorney Doyle pertain to his role in prosecuting the criminal case against Tyson. Decisions involving whether to respond to a motion, to argue a matter in a pretrial hearing, or to disclose evidence to a defendant are all part of the preparation of a case for trial. See Shmueli v. City of New York, 424 F.3d 231, 236 (2d Cir. 2005) ("It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.' ") (quoting Imbler, 424 U.S. at 410, 431); Smith v. Garretto, 147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in initiating a prosecution and in presenting the State's case, whether at a trial, a preliminary hearing, or a bail hearing.") (internal citations and quotation marks omitted); Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995) (explaining that prosecutors are "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged") (citation omitted). Thus, Attorney Doyle is immune from this suit.

**ORDERS**

The court enters the following Orders:

**(1)** To the extent that Tyson challenges, based on a "sovereign citizen" theory, the jurisdiction of the State of Connecticut to prosecute him for a criminal offense, or the authority of any defendant to be involved in his prosecution, the court concludes that the claim lacks an arguable legal basis and is **DISMISSED**. See 28 U.S.C. § 1915A(b)(1). The claims against Judge Clifford and Attorney Doyle in their individual capacities for money damages are **DISMISSED** on the ground that they are entitled to absolute immunity. See 28 U.S.C. § 1915A(b)(2). The court concludes that it must abstain from exercising jurisdiction over the requests for injunctive and declaratory relief seeking the court's intervention in Tyson's ongoing state criminal case and **DISMISSES** those requests. See 28 U.S.C. § 1915A(b)(1).

***7** **(2)** The Clerk is directed to enter judgment for the defendants and close this case. Any appeal from the Ruling dismissing the Complaint would not be taken in good faith. See 28 U.S.C. § 1915(a)(3).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6727538

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## Footnotes

1 The State of Connecticut Department of Correction's website indicates, however, that Tyson is currently serving a nine-year sentence, imposed on January 25, 2017, for a violation of probation. Information regarding Tyson's current confinement may be found on the State of Connecticut Department of Correction's website under Inmate Search using his CT DOC Inmate Number 253494. See http://portal.ct.gov/DOC.

2 Information regarding this case may be found on the State of Connecticut's Judicial Branch website at: http://www.jud.ct.gov/jud2.htm under Superior Court Case Look-up; Criminal/Motor Vehicle; Pending Case – Search by Defendant – using plaintiff's last name and first initial of his first name - Tyson, D. (Last visited on December 19, 2018). The court notes that Tyson has filed another federal lawsuit against the victim of the alleged offenses for which he was arrested on March 10, 2016, as well as the police officers who arrested him. See Tyson v. Doe, et al., Case No. 3:17cv731(JCH). The court has stayed that action pending resolution of Tyson's state criminal case. See id. (Ruling on Mot. to Intervene or Stay Discovery, Doc. No. 133).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

101 F.3d 682
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See Federal Rule of Appellate Procedure 32.1 and this court's local Rule 32.1.1. for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,
v.
Ronald KORON, Defendant–Appellant.

No. 95–1657.
|
April 23, 1996.

**Attorneys and Law Firms**

APPEARING FOR APPELLANT: Gaspar M. Castillo, Jr., Castillo and Seigel, Albany, NY.

APPEARING FOR APPELLEE: William C. Pericak, Assistant United States Attorney for the Northern District of New York, Albany, NY.

**Synopsis**
N.D.N.Y.

AFFIRMED.

**Procedural Posture(s):** On Appeal.

PRESENT: MINER, McLAUGHLIN and LEVAL, Circuit Judges.

SUMMARY ORDER

***1** UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Northern District of New York, it is hereby

ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED.

This cause came to be heard on the transcript of record and was argued by counsel.

Defendant-appellant Ronald Koron appeals from a judgment entered in the United States District Court for the Northern District of New York (Scullin, J.) convicting him, upon a plea of guilty, of possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The district court sentenced Koron to a 14–month term of imprisonment, a three-year term of supervised release, and a $100 special assessment.

In February of 1994, New York State Police Officer Richard Gildersleeve learned that a confidential informant had reported that Koron was selling cocaine in the Cobleskill, New York area and that Koron was making regular trips to New York City to purchase cocaine. In March of 1994, Gildersleeve learned that another confidential informant (the "Informant") had been purchasing cocaine from Koron. The Informant told Gildersleeve that Koron was selling between four and eight ounces of cocaine each week; was transporting cocaine from New York City to his residence in his blue Chevrolet pick-up truck; was making the trips to New York City each Wednesday, usually leaving his home at about 3:00 a.m. and returning before noon; and was traveling to New York City on the New York State Thruway.

The state police decided to conduct surveillance of Koron on Wednesdays. On Wednesday, May 18, 1994, at approximately 3:00 a.m., Gildersleeve observed that Koron's truck was not parked at his residence. Gildersleeve then parked his car and waited for Koron's truck near the Thruway exit. At approximately 10:30 a.m., Gildersleeve spotted Koron's truck and began to follow it. After observing the driver fail to signal a right-hand turn, Gildersleeve radioed a New York State Police officer, and requested that an officer in a marked police car stop the truck. Officer Michael Teets responded and stopped Koron's truck.

After the passenger of the truck identified himself as Koron, Gildersleeve asked him to step out of the truck. As Koron was getting out, he removed a jacket from the seat of the truck and put it on. Gildersleeve "pat searched" Koron, and felt a "round, almost cylindrical object" in the front pocket of the jacket. Gildersleeve removed the object and discovered that it was a package that appeared to contain cocaine. Gildersleeve then discovered a second package in Koron's jacket. Thereafter, Gildersleeve arrested Koron and the driver of the truck. Later, it was determined that the packages contained cocaine.

On June 7, 1994, an indictment was filed against Koron charging him with possession of cocaine with the intent to distribute, and conspiracy to possess cocaine with the intent to distribute. On July 6, 1994, Koron moved in the district court to suppress the cocaine, arguing that the warrantless search was illegal. The district court denied the motion on January 6, 1995. On January 9, 1995, Koron pleaded guilty to the two counts of the indictment, but reserved his right to appeal the district court's denial of his motion to suppress.

***2** On appeal, Koron contends that Gildersleeve's warrantless search violated the Fourth Amendment, and therefore that the district court erred in denying his motion to suppress the cocaine. The government argues that the search was permissible pursuant to the "automobile exception." Under the automobile exception to the Fourth Amendment's warrant requirement, when a police officer believes that an automobile contains contraband or evidence of criminal activity, the officer may conduct a warrantless search of the automobile without violating the Fourth Amendment. *See Carroll v. United States,* 267 U.S. 132, 149 (1925).

Koron concedes that Gildersleeve possessed sufficient probable cause to believe that the truck contained cocaine. Koron, however, contends that the automobile exception does not apply because the cocaine was not discovered during a search of the truck, but instead, during a search of Koron's person. We disagree.

When Gildersleeve approached Koron's truck, the jacket containing the cocaine was visible on the front seat of the truck. Because the jacket was in the truck, Gildersleeve was entitled to search the pockets of the jacket pursuant to the automobile exception. The mere fact that, before Gildersleeve could search the jacket, Koron picked it up and put it on does not change the fact that the jacket was in the truck at the time the truck was stopped. Because Gildersleeve had probable cause to believe that the truck contained cocaine and because the jacket was found in the truck when the truck was stopped, Gildersleeve was entitled to search the jacket pursuant to the automobile exception.

In any event, even if we view the search as a search of Koron's person, the search is proper as incident to a lawful arrest. Under the "search incident to arrest" exception to the Fourth Amendment's warrant requirement, "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Illinois v. Lafayette,* 462 U.S. 640, 645 (1983). In order to make a warrantless arrest, "the police [must] have probable cause when the defendant is put under arrest to believe that an offense has been or is being committed." *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1077 (1988). Moreover, we have held that, as long as a police officer has probable cause to arrest a suspect prior to searching the suspect, the search will be valid, even if the officer initially had no intention of arresting the suspect. *United States v. Ricard,* 563 F.2d 45, 49 (2d Cir.1977), *cert. denied,* 435 U.S. 916 (1978).

We believe that Gildersleeve had sufficient probable cause to arrest Koron when he stopped the truck. Gildersleeve had received detailed information from two informants who had advised the police of the quantity of cocaine Koron was selling each week, the source of Koron's cocaine, and the method by which Koron acquired the cocaine. The informants provided the police with Koron's method of travel, specifying that he drove to New York City on the New York State Thruway in his blue Chevrolet pick-up truck each Wednesday morning, leaving at approximately 3:00 a.m. and returning before noon. Moreover, on Wednesday, May 18th, Gildersleeve observed that Koron's truck was not parked at his residence at 3:00 a.m., and the following morning, observed Koron's truck heading towards Koron's residence. From the totality of these circumstances, Gildersleeve had probable cause to arrest Koron for possession of cocaine and past cocaine sales. Indeed, as Koron concedes, Gildersleeve had probable cause to believe that the truck contained cocaine and that Koron was in possession of cocaine. Therefore, the warrantless search was a proper search incident to a lawful arrest.

***3** We have considered Koron's remaining contentions, and we find them all to be without merit.

**All Citations**

101 F.3d 682, 1996 WL 197234 (Table)

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

***1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

***2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also* *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

2. Analysis of Plaintiff's Claims

***3** Although a municipality is subject to suit pursuant to section 1983, *see* *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See* *Krug v. Cnty. of Rensselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also* *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also* *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

***4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

## Footnotes

1 Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2 The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3 Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4 The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5 If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT; Abraham Mamoun, Syracuse Police Dept.; William Kittle, Syracuse Police Dept.; Shawn Hauck, Syracuse Police Dept.; Altimonda, Syracuse Police Dept.; and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

***1** Currently before the Court, in this *pro se* civil rights action filed by Jeramie White ("Plaintiff") against the Syracuse Police Department and five of its employees ("Defendants"), is United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that (1) Plaintiff's Complaint be accepted for filing by the Court with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and (2) Plaintiff's remaining cause of action against the Syracuse Police Department be dismissed with leave to replead within thirty days of the issuance of an Order adopting the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not submit an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) [1]

Based upon a review of this matter, the Court can find no clear error in the Report-Recommendation: [2] Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein; Plaintiff's Complaint is accepted for filing with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's remaining cause of action against the Syracuse Police Department is dismissed with leave to replead within thirty days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 9) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and it is further

***2 ORDERED** that Plaintiff's remaining cause of action against the Syracuse Police Department is **DISMISSED with leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

## Footnotes

1 The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2 When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Jordan v. County of Chemung, W.D.N.Y., September 5, 2017

2014 WL 1293527
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Guynell WRIGHT, Plaintiff,
v.
CITY OF SYRACUSE; Jeffrey T. Wright; Andrew Nolan; Donald Thompson; Robert Calkin; John Doe(s); Jane Doe(s); John M. O'Connor, III; and Thomas Simone, Defendants.

No. 5:10–CV–0661 (GTS/TWD).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Bosman Law Firm, L.L.C., A.J. Bosman, Esq., Daniel W. Flynn, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Robert P. Stamey, James P. McGinty, Esq., Aimee M. Paquette, Esq., of Counsel, Syracuse, NY, for City of Syracuse Counsel for Defendants.

Hancock Estabrook LLP, John G. Powers, Esq., of Counsel, Syracuse, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this employment discrimination action filed by Guynell Wright ("Plaintiff") against the City of Syracuse, six of its employees and an unstated number of John and Jane Does ("Defendants") is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 95.) For the reasons set forth below, the motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, in his Third Amended Complaint, Plaintiff, an African–American man who was formerly employed by the City of Syracuse ("the City") as a laborer for the Department of Public Works ("the Department"), alleges that, throughout his employment with the City, he was treated differently than similarly situated white employees in the form of promotions, work assignments and discipline; he was retaliated against for his complaints of racial discrimination; and he was subject to continuous hostile work environment conditions. (Dkt. No. 45.)

Based on the factual allegations of Plaintiff's Third Amended Complaint, he asserts the following twenty-one claims: (1) a claim against all Defendants alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a claim against all Defendants alleging race discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296 ("NYHRL"); (3) a claim against all Defendants alleging hostile work environment in violation of Title VII; (4) a claim against all Defendants alleging hostile work environment in violation of NYHRL; (5) a claim against all Defendants alleging retaliation in violation of Title VII; (6) a claim against ll Defendants alleging retaliation in violation of NYHRL; (7) a claim against all Defendants alleging race discrimination in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("Section 1983"); (8) a claim against all Defendants alleging hostile work environment in violation of Plaintiff's right to equal protection under the Fourteenth Amendment pursuant to Section 1983; (9) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983; (10) a claim against the City alleging municipal liability on Plaintiff's Section 1983 claims against the individually named Defendants; (11) a claim alleging breach of contract against all Defendants; (12) a claim against all Defendants alleging race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"); (13) a claim against all Defendants alleging hostile work environment in violation of Section 1981; (14) a claim against all Defendants alleging retaliation in violation of Section 1981; (15) a claim against all Defendants alleging the deprivation of Plaintiff's property interest in his continued employment in violation of his right to due process under the Fourteenth Amendment pursuant to Section 1983; (16) a claim against all Defendants alleging the deprivation of Plaintiff's property and liberty interest in his good name and reputation in violation of his right to due process under the Fourteenth Amendment

pursuant to Section 1983; (17) a claim against all Defendants alleging the deprivations of Plaintiff's rights under Article I of the New York State Constitution; (18) a claim against all Defendants alleging retaliation in violation of Title VII based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (19) a claim against all Defendants alleging retaliation in violation of Section 296 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (20) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; and (21) a claim against all Defendants alleging retaliation in violation of Section 1981 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits. (*Id.*)

**B. Undisputed Material Facts**

***2** The following material facts [1] are gleaned from Defendants' Local Rule 7.1 Statement of Undisputed Material Facts, and Plaintiff's response thereto. (*See* Dkt. No. 100–7 [Defs.' Rule 7.1 Statement]; Dkt. No. 105 [Pl.'s Rule 7.1 Response Statement].) Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id.*

Plaintiff was employed as a "Laborer I" in the Department's Street Cleaning Bureau from at least June of 2006 until his termination in February of 2010. [2] Laborer I is a civil service classified job title that includes a written job description and written qualifications. The Laborer I position is covered within the American Federation of State, County and Municipal Employees ("AFSCME") Local 400 ("Local 400") bargaining unit, of which Plaintiff was a member.

The collective bargaining agreement ("CBA") for the relevant period between the City and Local 400 provides that the City shall furnish each employee member of Local 400 with a copy of the existing Work Rules and that any amendments or additions to the Work Rules shall be discussed with Local 400 and published to its members prior to becoming effective and that thereafter, any complaint shall be resolved through the grievance procedure. (*See* Dkt. No. 96–2, at 64 [Ex. B to Decl. of Donald Thompson, June 13, 2013].) Section 8.1.4 of the CBA also provides that, "[i]n the event that an employee receives a written reprimand and one (1) year elapses without any other disciplinary action being imposed on the employee, such reprimand shall be removed from the employee's personal file.

The Work Rules provide, in relevant part, at follows:

> VII. Employee Discipline
>
> The City shall not exercise its right to discharge or otherwise discipline an employee without just cause. Whenever reasonable, the City shall subscribe to the principles of progressive discipline. Set forth below are the guidelines used by the City in enforcing progressive discipline and determining the appropriate disciplinary penalty in any particular circumstance. These guidelines may be deviated from when, in the City's opinion, circumstances warrant.

| MINOR OFFENSES | | |
|---|---|---|
| FIRST, SECOND, THIRD | - | Write up |
| FORTH | - | Write up and one day suspension |
| FIFTH | - | Write up and three day suspension |
| SIXTH | - | Write up and five day suspension |
| SEVENTH | - | Write up and ten day suspension |
| EIGHTH | - | Write up and termination |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| MAJOR OFFENSES | | |
| FIRST | - | Write up and suspension or termination |
| SECOND | - | Write up and suspension or termination |
| THIRD | - | Write up and termination |

***3** Notwithstanding the provisions of Article 8.1.4 of the parties ['] collective bargaining agreement, the discipline imposed for those violations considered to be 'minor' shall be determined by reviewing the number of such violations for which an employee has been disciplined in the twelve (12) months preceding the current violation;

> However, upon committing a fourth (4th) 'minor' violation within the above stated twelve (12) month[ ] period, then that minor violation and each succeeding 'minor' violation shall be based on discipline[ ] received within the preceding eighteen (18) month period. The discipline imposed for each succeeding violation shall be in accordance with progressive discipline as outlined in the above guidelines;
>
> In all cases of 'major' violations which are subject to suspension and/or termination, the preceding eighteen (18) months disciplinary record (including 'minor' violations) shall be considered in determining the discipline to be imposed in accordance with those outlined in the above guidelines.

(Dkt. No. 107–1, at 9–10 [Ex. 1 to Flynn Aff. ].) The Work Rules expressly provide that "[i]nsubordination is a major ... violation." (*Id.,* at 7.) To be sure, the Work Rules provide that "[t]heft of any City property or services is prohibited[,]" the level of violation attached to such conduct is not specified. (*Id.*) However, Section 9.2.1 of the CBA refers to fighting, theft, substance abuse and insubordination as "serious violations." (*See* Dkt. No. 96–2, at 53.)

From July 2006 until he was terminated, Plaintiff was subject to a series of disciplinary actions by the City. First, in July 2006, Plaintiff was given a one-day suspension for insubordination. In February 2007, Plaintiff was given a 20–day suspension for fighting with another employee. [3] In July 2007, Plaintiff was given a 20–day suspension for theft of City property. In January 2009, Plaintiff was terminated for insubordination, but then was brought back to work through a "last chance" agreement between the City and Local 400. [4] Finally, on February 24, 2010, Plaintiff was terminated for theft of City Property. Plaintiff does not dispute the fact of these disciplinary actions, but disputes the bases for the actions and/or argues that the City applies their policies inconsistently, discretionarily and disparately.

Defendant, John M. O'Connor, III ("O'Connor") made the decision to terminate Plaintiff. O'Connor was appointed Commissioner of the Department in January 2010 and had no involvement in Plaintiff's discipline or any employment actions regarding Plaintiff prior to his termination in February 2010. Defendant, Jeffrey Wright ("Wright") was the Commissioner of the Department through December 2009 and had no involvement in the decision to terminate Plaintiff in February 2010. Defendant, Thomas Simone, III ("Simone") has been the First Deputy Commissioner of the Department since January 2010. He was not a decision maker regarding the determination to terminate Plaintiff in February 2010.

***4** Defendant, Donald Thompson ("Thompson") was the Director of Personnel during the relevant period. Thompson asserts by Declaration that he agreed that it was appropriate to terminate Plaintiff under the circumstances and concurred with O'Connor's decision in that regard. (*See* Dkt. No. 96 at ¶¶ 34–35 [Decl. of Donald Thompson, June 13, 2013].) At his deposition, O'Connor testified regarding his communication with Thompson prior to terminating Plaintiff, as follows: "I had [a] conversation with Don Thompson, who told me the level of progression [Plaintiff] was at and [sic] was instructed and encouraged that I should investigate, and most likely there would be termination here." (Dkt. No. 112, at 56 [Dep. of John M. O'Connor, III, at 152: 4–8, Jan. 4, 2013].) According to Plaintiff, O'Connor told him that Don (meaning Thompson) "said to fire you." (Dkt. No. 106 at 7–8 [Aff. of Guynell Wright at ¶ 41].)

During the relevant time period, Defendant, Robert Culkin ("Culkin") was the Acting Assistant Superintendent of the Department's Street Cleaning Bureau and Defendant, Andrew Nolan ("Nolan") was Acting Superintendent. Both Culkin and Nolan assert that they did not initiate the discipline leading up to Plaintiff's termination, did not participate in the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

pretermination hearing and played no role in the decision to terminate Plaintiff, nor were they consulted by O'Connor for their input regarding Plaintiff's discipline. (*See* Dkt. No. 98 at 8 [Decl. of Andrew Nolan at ¶ 49, June 13, 2013]; Dkt. No. 100 at 5 [Decl. of Robert Culkin at ¶ 32, June 13, 2013].) Plaintiff counters that he "personally observed [ ] O'Conn[o]r go to [ ] Nolan and [ ] C[u]lkin for advice on how to perform his duties as Commissioner." (Dkt. No. 106 at 8 [Wright Aff. ¶ 42].)

Prior to his termination in February 2010, Plaintiff was provided a copy of the notice of the disciplinary charges against him as well as the possibility that termination would be considered as a result. Plaintiff was afforded a disciplinary hearing at which he was given the chance to respond to the disciplinary charges against him and was permitted to have union representation present to advocate on his behalf. Simone was present at Plaintiff's disciplinary hearing. Although Simone has the authority to advise regarding discipline, his role at Plaintiff's hearing was as an observer and gatherer of information.

Also, Plaintiff exercised his procedural right to grieve his termination. That procedure ran its course according to the grievance procedure set forth in the CBA and terminated prior to the final step, when Local 400 voted not to take the grievance to arbitration.

Plaintiff ultimately filed complaints with the New York State Division of Human Rights ("DHR") on March 26, 2010 and April 28, 2010 challenging his February 2010 termination.[5] (*See* Dkt. No. 96–33 [Ex. GG to Thompson Decl.].) In those complaints, Plaintiff alleges that he was suspended and terminated based on his race and that he was retaliated against for his prior DHR complaints. Plaintiff alleges that white employees are treated differently than black employees in terms of employee discipline. (*See id.*) On June 3, 2010 and June 10, 2010, respectively, the DHR dismissed those complaints for administrative convenience. (*See* Dkt. No. 9'–13 [Ex. L to Decl. of Aimee Paquette, June 14, 2013]; Dkt. No. 96–34 [Ex. HH to Thompson Decl.].)

***5** After Plaintiff was terminated, he filed a claim for unemployment benefits with the Department of Labor ("DOL"). When the DOL inquired about the circumstances of Plaintiff's termination, the City responded that he had been terminated for cause. Plaintiff availed himself of the administrative appeal process to challenge the DOL's determination, which was ultimately overturned. Plaintiff received full payment of back benefits owed.

### C. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, the Defendants assert twelve arguments with regard to Plaintiff's claims against them. (Dkt. No. 100–8 [Defs.' Mem. of Law].)

First, argue the Defendants, Plaintiff's employment discrimination claims based on his termination may be dismissed for the following three reasons: (1) the discriminatory determination claim against Simone, Wright, Culkin, Thompson and Nolan should be dismissed because each was either not the decision maker or was not otherwise actionably involved in the decision to terminate Plaintiff; (2) the discriminatory determination claim against O'Connor and the City should be dismissed because (a) Plaintiff cannot make out a prima facie case that his termination was discriminatory, (b) Defendants have come forward with legitimate, nondiscriminatory reasons for Plaintiff's termination, and (c) Plaintiff has no evidence that Defendants' stated reasons for his termination are a pretext for discrimination; and (3) absent individual liability for discriminatory termination, no liability will lie against the City pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018 (1978). (*Id.* at 14–25.)

Second, argue the Defendants, Plaintiffs 18th, 19th, 20th and 21st causes of action alleging discrimination against the City for opposing his application for unemployment benefits may be dismissed for the following three reasons: (1) there is caselaw supporting the legal conclusion that an employer's opposition of a former employee's application for unemployment benefits is not adverse employment action; (2) where an employer opposes a former employee's unemployment application, but the employee is ultimately awarded those benefits, no adverse employment action occurs in any event; and (3) Plaintiff cannot prove discriminatory animus in the opposition of his unemployment application because he failed to seek any discovery or deposition from the City employee responsible for responding to DOL inquiries. (*Id.* at 26–27.)

Third, argue the Defendants, Plaintiff's hostile work environment claims may be dismissed as a matter of law for the following five reasons: (1) Plaintiff's Title VII and NYHRL claims of hostile work environment must be

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

dismissed for failure to exhaust his administrative remedies before the DHR; (2) Plaintiff's NYHRL claim must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) all of Plaintiff's hostile work environment claims must be dismissed because Plaintiff has failed to identify evidence that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his employment; (4) Plaintiff's hostile work environment claims against Simone, O'Connor, Wright and Thompson must be dismissed because there is a lack of evidence of their personal involvement or discriminatory purpose; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 27–36.)

***6** Fourth, argue the Defendants, there is no claim for discriminatory overtime in this action for the following six reasons: (1) the Third Amended Complaint does not include a claim for discriminatory overtime; (2) any claim for discriminatory overtime under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (3) any discriminatory overtime claim under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (4) Plaintiff cannot identify any evidence that he was denied overtime due to discrimination; (5) Plaintiff cannot identify any evidence that he was denied overtime because of his race or protected activity; and (6) any claim of discriminatory overtime against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory overtime assignments. (*Id.* at 36–43.)

Fifth, argue the Defendants, Plaintiff's discrimination and retaliation claims based on less desirable work assignments must be dismissed for the following five reasons: (1) Plaintiff's claimed discriminatory work assignments fail or do not constitute adverse employment action; (2) any claim of discriminatory work assignments against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory work assignments; (3) any claim for discriminatory work assignments under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (4) any discriminatory claim for discriminatory work assignments under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 43–48.)

Sixth, argue the Defendants, Plaintiff's discriminatory and retaliatory discipline claims must be dismissed for the following six reasons: (1) Plaintiff's claim for discriminatory and retaliatory discipline under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory and retaliatory discipline under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) some or all of Plaintiff's claims for discriminatory and retaliatory discipline are barred by the relevant statute of limitations; (4) Plaintiff cannot established that the challenged disciplinary actions were premised on discriminatory or retaliatory animus; (5) discriminatory discipline claim against Simone, O'Connor, Nolan, Culkin and Thompson must be dismissed because none of them was a decision maker or involved in the discipline of Plaintiff; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 48–57.)

***7** Seventh, argue the Defendants, Plaintiff's claims of discriminatory and retaliatory denial of promotion may be dismissed for the following six reasons: (1) Plaintiff's claims for discriminatory denial of promotion under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory denial of promotion under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) Plaintiff's claims for discriminatory denial of promotion under Title VII, NYHRL and Section 1983 must be dismissed because they are timebarred; (4) Plaintiff cannot establish that the claimed promotions for which he was passed over were filled based on discriminatory or retaliatory intent; (5) Plaintiff's claims for discriminatory denial of promotion against Simone, Nolan, Culkin, Thompson and O'Connor should be dismissed because none of them was a decision maker or involved in the alleged failure to promote Plaintiff to crew leader; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 57–67.)

Eighth, argue the Defendants, Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to file a claim against Local 400, which is a prerequisite to a breach

of contract claim based on a union's breach of its duty of fair representation. (*Id.* at 67–68.)

Ninth, argue the Defendants, Plaintiff's 15th and 16th causes of action, brought under Section 1983 for violation of his Fourteenth Amendment right to Due Process may be dismissed because (1) municipal employees hold no due process rights to promotions, overtime, discipline or work assignments; and (2) a municipal employee's liberty interest in keeping his employment is adequately served where there is a process available to challenge the employer's deprivation, such as a grievance procedure. (*Id.* at 68–70.)

Tenth, argue the Defendants, Plaintiff's 17th cause of action for violations of the New York State Constitution must be dismissed because no private right of action exists under the New York State Constitution where a claim based on the same allegations is asserted under Section 1983. (*Id.* at 70–71.)

Eleventh, argue the Defendants, Plaintiff's claim for punitive damages must be dismissed because no such claim may be maintained against the City as a matter of law and because Plaintiff has failed to identify any evidence to establish that the individual Defendants acted with evil motive or intent. (*Id.* at 71.)

Twelfth, argue the Defendants, Plaintiff's claims against John and Jane Doe defendants must be dismissed because Plaintiff failed to identify them through amendment of his pleading prior to the close of discovery. (*Id.*)

**2. Plaintiff's Opposition Memorandum of Law**

Generally, in his opposition memorandum of law, Plaintiff asserts eleven arguments: (1) because Plaintiff asserts claims under the NYHZL and the New York State Constitution, this Court should apply New York procedural law when deciding the pending motion for summary judgment; (2) Defendants' motion should be denied because there are triable issues of fact to support Plaintiff's claims that he was unlawfully discriminated against; (3) Defendants' arguments of failure to exhaust should be rejected because they rely only on the formal charges to the DHR rather than Plaintiff's intake form and handwritten submissions; (4) Plaintiff's hostile work environment claims should not be dismissed because there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation, ridicule and insult that the terms and conditions of his employment were altered for the worse; (5) the City Charter's Notice of Claim provision does not apply to Plaintiff's NYHRL claims; (6) Plaintiff's claims relating to his unemployment benefits should not be dismissed because the City's opposition of Plaintiff's unemployment applications should be deemed adverse employment action under *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006); (7) Plaintiff has viable due process claims because the CBA here only allows Local 400 to seek a post-termination hearing through arbitration; (8) Plaintiff's breach of contract claim should not be dismissed because it is a matter of fact for the jury to decide whether Local 400 breached its duty of fair representation; (9) Plaintiff's claims under the New York State Constitution should not be dismissed because the availability of a federal constitutional or statutory claim does not render a claim under the New York State Constitution subordinate; (10) Plaintiff's entitlement to punitive damages is not suitable for resolution at the summary judgment stage; and (11) Defendants lack standing to seek dismissal of the John and Jane Doe defendants. (*See* Dkt. No. 104 [Pl.'s Opp'n Memo. of Law].)

**3. Defendants' Reply Memorandum of Law**

***8** Generally, in their reply memorandum of law, the Defendants assert eleven arguments: (1) Plaintiff mischaracterizes his summary judgment burden; (2) Plaintiff fails to meet his burden with respect to his wrongful termination claim; (3) Plaintiff fails to oppose, and therefore concedes, Defendants' argument that no claim exists based on discriminatory overtime; (4) Plaintiff fails to meet his burden on his discriminatory promotion claim; (5) Plaintiff fails to meet his burden on his excessive discipline claim; (6) Plaintiff fails to meet his burden on his hostile work environment claim; (7) Plaintiff effectively concedes he has no discriminatory assignments claim; (8) post-employment contestation of unemployment benefits is not actionable; (9) Plaintiff is barred from asserting a contract claim against the City; (10) Plaintiff does not have a viable due process claim; and (11) Plaintiff has failed to establish sufficient evidence to support a *Monell* claim against the City. (Dkt. No. 124 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

**A. Motion for Summary Judgment**

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine

dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted; emphasis added). [6] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). [7]

### B. Legal Standard Governing Unopposed Motions

***9** In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

### C. Plaintiff's Claims

#### 1. Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals. *See Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012).

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See Morgan v. NYS Attorney Gen.'s Office,* No. 11–CV–9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 146 (2d Cir.2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))). Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency. *See id.* (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998)). A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402. When determining whether a claim is reasonably related to the claims filed with the EEOC, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (internal alteration and citation omitted). "[I]t is the substance of the charge and not its label that controls." *Mathirampuzha v. Potter,* 548 F.3d 70, 76–77 (2d Cir.2008) (quoting *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Mathirampuzha,* 548 F.3d at 76–77 (citing *Williams,* 458 F.3d at70).

##### a. Hostile Work Environment

***10** In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U .S. 57, 67, 106 S.Ct. 2399 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Further, the plaintiff must establish that the hostile or abusive treatment was because of his membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that his "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there [generally] must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation marks omitted).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ .,* No. 11–CV–3582, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)). Thus, "the 'mere utterance of an epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment claim." *Tolbert v. Smith,* 09–CV–6579, 2014 WL 906158, at *19 (W.D.N.Y. Mar. 7, 2014) (quoting *Hannon v. Wilson Greatbatch, Ltd.,* No. 00–CV–0203, 2002 WL 1012971, *7 (W.D.N.Y. Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

***11** In addition to showing that he was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to his employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at *4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d. Cir.2001)).

The actions of a plaintiff's coworkers will be imputed to the employer if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at * 10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, the actions of a plaintiff's supervisor are "automatically imputed to the employer unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at *4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257 (1998).

Where an employer "maintains a policy against [ ] harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

**b. Race Discrimination and Disparate Treatment**

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and its progeny. *See Mathirampuzha,* 548 F.3d at 78 citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013) (quoting *Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003).

***12** In order to establish a prima facie case of discrimination based on failure to promote under Title VII, a plaintiff ordinarily must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Yu v. New York City Housing Development Corp.,* 494 F. App'x 122, 124–125 C.A.2 (2d Cir.2012) (quoting *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quotation marks omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir,* 2013 WL 362973, at*1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010)).

" 'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' A change that is 'materially adverse' could consist of, inter alia, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Morgan,* 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

**c. Retaliation**

To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d

203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

***13** Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640; *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII are governed by the burden-shifting analysis announced in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at * 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23, ––––, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

> ***14** If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at * 19. *See also Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* ––– F.Supp.2d. ––––, ––––, 2013 WL 5338516, at *18 (S.D.N.Y.2013).

**2. NYHRL**

"Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.* 174 F.3d 261, 264, n. 1 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n. 4 (2d Cir.1995), abrogated on other grounds by *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226, n. 2 (2d Cir.2008). Accordingly, a

court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold,* 174 F.3d at 264, n. 1.

Under the NYHRL, however, a plaintiff may allege claims against an individual defendant as an aider or abettor of NYHRL violations. In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that [ ]he engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination." *Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citations omitted). *See also* N.Y. Exec. Law § 296.1(a) (McKinney 2012). Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself." *Jordan v. Cayuga Cnty.,* No. 01–CV1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 213 (N.D.N.Y.2002) (internal quotation and emphasis omitted)). *See DeJohn v. Wal–Mart Stores East, LP,* No. 09–CV–1315, 2012 WL 3679204, at * 16 (N.D.N.Y. Aug. 17, 2012). However, an individual cannot be held liable for aiding and abetting their own violations of the NYHRL. *See Reid v.. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012). Finally, an employee is not individually subject to suit as an aider or abettor under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Miotto v. Yonkers Public Schools,* 534 F.Supp.2d 422, 427 (S.D.N.Y.2008) (quoting *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)). *See also Tomka,* 66 F.3d at 1317.

### 3. 42 U.S.C. § 1983

***15** In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct.2018). Thus, isolated acts of municipal employees are typically not sufficient to establish municipal liability. However, acts done "pursuant to municipal policy, or [that] were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware" would justify liability of the municipality. *Jones,* 691 F.3d at 81. Further, "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

#### a. First Amendment Retaliation

***16** "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Caballus,* 547 U.S. 410, 417, 126 S.Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must show that (1) he engaged in "constitutionally protected speech" because

he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 2013 WL 208950, at *6 (quoting *Johnson v.. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684 (1983)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

**b. Equal Protection**

A plaintiff may establish a claim for the violation of her right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (quoting *Feingold,* 366 F.3d at159 & n. 20). Thus, claims for hostile work environment and disparate treatment may be brought under § 1983 as equal protection claims. *See Demoret,* 451 F.3d at 149. However, a claim of retaliation for complaining of race discrimination is not properly brought under the Equal Protection Clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996).

**c. Due Process**

***17** The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to prevail on a due process cause of action, a plaintiff must establish the deprivation of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite conscioushocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701 (1972); *Ciambriello v. County of Nassau,* 292 F.3d 307, 314 (2d Cir.2002).

Where a government employee has a constitutionally protected property interest in his employment, "some kind of hearing [is required] prior to [termination]." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (internal quotation marks and citation omitted).

> However, in general, something less than a full evidentiary hearing is sufficient prior to adverse action. Before being terminated, the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. As long as a full post-termination hearing

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> is provided for, the pre-termination hearing may be minimal.

*Arteta v. Cnty. of Orange,* 141 F. App'x. 3, 7 (2d Cir.2005) (citing *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487; *Locurto v. Safir,* 264 F.3d 154, 173–74 (2d Cir.2001)) (quotations omitted).

It is a well-established legal principle in the Second Circuit "that there is no [procedural] due process violation where ... pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008) (citing cases). *See also* *Coollick v. Hughes,* 699 F.3d 211, 217 (2d Cir.2012).

A government employee may have a cause of action for violation of his right to substantive due process where a government defamation occurs in the course of dismissal from employment resulting in a deprivation of a liberty interest, commonly referred to as a stigma plus claim. *See* *Lawson v. Rochester City Sch. Dist.,* 446 F. App'x. 327, 329 (2d Cir.2011) (citing *Patterson,* 370 F.3d at 330). In order to prevail on such a claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *See* *Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010). "An employee's liberty interest is not ordinarily implicated by statements in connection with his termination of employment if there has been no public disclosure of the reasons for the discharge." *Walsh v. Suffolk Cnty. Police Dep't,* 341 F. App'x 674, 675 (2d Cir.2009) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 (1976) ("Since the ... communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Moreover, a plaintiff cannot prevail on a substantive due process claim unless he shows that the defendants infringed a liberty interest in an arbitrary or irrational manner and in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). *See also* *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001).

#### 4. 42 U.S.C. § 1981

***18** Employment discrimination claims brought under Section 1981, like those brought under Section 1983, are subject to the same substantive standards as claims brought pursuant to Title VII and NYHRL. *See* *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014). Procedurally, employment discrimination claims brought pursuant to Sections 1981 and 1983 are also analyzed under the *McDonnell Douglas* framework. *See id.* [8] Finally, Section 1981 claims against a municipality, like Section 1983 claims, are subject to analysis under *Monell. See Lang. v.* *New York City Health & Hosps. Corp.,* No. 12–CV–5523, 2013 WL 4774751, at * 5 (S.D.N.Y. Sept. 5, 2013).

#### 5. New York State Constitution

Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. *See* *Canzoneri v. Incorporated Vill. of Rockville Ctr.,* 2013 WL 6330671, at *11 (E.D.N.Y. Dec. 5, 2013) (citing *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 247–48 (N.D.N.Y.2008)). *See also* *Clayton v. City of Poughkeepsie,* 2007 WL 2154196, at *7 (S.D.N.Y. June 21, 2007) (quoting *De Vito v. Barrant,* No. 03–CV–1927, 2005 WL 2033722, at *6–7 (E.D.N.Y. Aug. 23, 2005)); *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446–47 (S.D.N.Y.1999).

## II. ANALYSIS

### A. Whether A Discriminatory Overtime Claim Exists in This Action

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 36–43 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

Plaintiff fails to plead a claim for discriminatory overtime in his Third Amended Complaint. Moreover, Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met

the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The only evidence of Plaintiff being denied overtime occurred in January 2006, before the period that is relevant to the claims in this action. Moreover, the evidence reflects that Plaintiff grieved the issue, which was resolved in his favor. Accordingly, there is no evidence that Plaintiff endured a materially adverse change in the terms and conditions of his employment as it relates to overtime. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory denial of overtime is granted.

**B. Whether Plaintiff's Claims Under Article I of the New York State Constitution Must Be Dismissed**

***19** After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 70–71 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

First, Plaintiff's purported claim under the New York State Constitution is that Defendants deprived him of his rights under Article I, essentially claiming a violation of the entire Bill of Rights. Accordingly, Plaintiffs' New York Constitutional claim is overly broad and therefore, should be dismissed for failure to state a claim. In an abundance of caution, the Court interprets Plaintiff's Third Amended Complaint to allege claims under Article I, Sections 6 (due process), 8 (freedom of speech), and 11 (equal protection).

Second, and in any event, as indicated above in Point II.C.5. of this Decision and Order, where Plaintiff's state constitutional claims mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. Accordingly, for this reason alone, Defendants' motion for summary judgment on Plaintiff's 17th cause of action under the New York State Constitution is granted.

**C. Whether Plaintiff's Claims Against John Doe(s) and Jane Doe(s) Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 71 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' legally supported motion for summary judgment seeking dismissal of the John and Jane Doe defendants Plaintiff makes the bald and completely unsupported assertion that Defendants "have no standing" in that regard. (Dkt. No. 104 at 22 [Pl.'s Mem. of Law].) Plaintiff does not dispute that discovery in this action, which lasted in excess of two years, is complete, nor does he argue that further discovery would reveal the identity of these unnamed defendants. Accordingly, the completion of discovery and Plaintiff's failure to identify the John and Jane Doe defendants mandates their dismissal. *See Epps v. City of Schenectady,* No. 10–CV–1101, 2013 WL 717915, at *5 (N.D.N.Y. Feb. 27, 2013). Therefore, Defendants' motion for summary judgment is granted in this regard.

**D. Whether Plaintiff's Breach of Contract Claim Against Defendants Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 67–68 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' motion in this regard, Plaintiff cites inapposite caselaw and fails to address the point made by Defendants, which is that in order to pursue a breach of contract claim against the City under the undisputed facts of this case, Plaintiff must have also pursued a claim against Local 400 for breach of the duty of fair representation. *See Lore v. City of Syracuse,* 670 F.3d 127, 151 (2d Cir.2012). Plaintiff fails to identify any such claim against Local 400, nor has he alleged such a claim against Local 400 in this action. Accordingly, the caselaw Plaintiff cites, for the proposition that whether a union has breached its duty of fair representation is a fact question for a jury to decide, is irrelevant to the pending issue before the Court. (*See* Dkt. No. 104 at 20 [Pl.'s Mem. of Law citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1244–45 (8th Cir.1980) ].) Finally, it is worth noting that Plaintiff's misunderstanding of the law in this regard is dubious considering the supporting legal authority cited by Defendants, *Lore v. City of Syracuse,* is a case out of the Second Circuit Court of Appeals, a party to which was represented by Plaintiff's counsel in this action.

***20** Therefore, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is granted.

### E. Whether Plaintiff's Claims Alleging Discrimination and Retaliation Due to the City's Contestation of His Application for Unemployment Benefits Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 26–27 [Defs.' Mem. of Law]; Dkt. No. 124 at 14–15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff opposes Defendants' motion in this regard, arguing that the City's contestation of his application for unemployment benefits was an adverse action. However, Plaintiff concedes that his retaliation claims in this regard are asserted solely against the City, despite the allegations in the Third Amended Complaint.

Plaintiff acknowledges that courts disagree whether an employer's decision to contest unemployment benefits constitutes an adverse action, but cites only one case in support of his argument that opposing unemployment benefits is adverse action, ostensibly suggesting that this Court should decide the issue here accordingly. *See Brown v. JP Morgan Chase Bank,* No. 12–CV–544, 2013 U.S. Dist. LEXIS 95946, at *21–22 (E.D.N.Y. Apr. 10, 2013). [9]

Nonetheless, this Court finds instructive and persuasive the caselaw holding that an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim. *See Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.,* No. 10–CV–681, 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *U.S. v. N.Y. City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996)). *See also Belardo v. Con–Way Transp. Servs., Inc.,* No. 02–CV5406, 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y. Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim, failed to award severance pay, and informed the EEOC that the plaintiff resigned); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action).

Therefore, Defendants' motion for summary judgment regarding Plaintiff's retaliation claims as it relates to the City's contestation of his unemployment benefits is granted.

### F. Whether Plaintiff's Hostile Work Environment Claims Must Be Dismissed

***21** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 31–34 [Defs.' Mem. of Law]; Dkt. No. 124 at 12–14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Defendants point to Plaintiff's deposition testimony to demonstrate the lack of evidence supporting Plaintiff's hostile work environment claim. Specifically, Plaintiff testified that he felt his employment environment was hostile because nobody on his crew liked him nor would they communicate with him, despite the fact that they never made any racial comments to him. (*See* Dkt. No. 108 at 264–264 [Dep. of Guynell Wright, Jan. 18, 2013].) Plaintiff further testified that he felt like he was walking on egg shells at work because he feared being disciplined for things that other people were not disciplined for, and that despite being a victim when a white employee lifted his leg up behind Plaintiff's head and when another employee patted his butt, Plaintiff was still disciplined. [10] (*Id.,* at 267–268.) Defendants argue that these instances do not rise to the level of severity or pervasiveness to establish hostile work environment and that Plaintiff has not established that the alleged hostile or abusive treatment was because of his race.

Plaintiff, in opposition, fails to identify any evidence in the record to create a question of fact on the issues of severity or pervasiveness or the issue of whether the alleged hostile treatment was because of his race. Instead, Plaintiff argues, in conclusory fashion, that "there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation,

ridicule and insult that the terms and conditions of his employment were altered for the worse." (Dkt. No. 104 at 12 [Pl.'s Mem. of Law].) Accordingly, Plaintiff has not met his burden to identify any fact question for a jury to decide regarding his hostile work environment claim and summary judgment may be granted on this basis alone. However, in an abundance of caution, the Court has reviewed the record to identify any other evidence that could possibly support Plaintiff's hostile work environment claim.

In his affirmation, Plaintiff states that when Nolan was crew leader an employee called Plaintiff the N word in Nolan's presence, but Nolan asked Plaintiff to shake the other employee's hand to resolve the conflict, without disciplining the other employee. (*See* Dkt. No. 106 at 10, ¶ 56 [Pl.'s Aff.].) Plaintiff further asserts that, "[u]pon information and belief, Department of Personnel employee Terri Macri has made statements to other DPW employees that she does not approve of mixed race babies." (*Id.,* ¶ 60.) Other evidence includes Plaintiff's assertion that Nolan said that "no black man was ever going to make anything on my watch" in 2007. (*Id.,* at 8, ¶ 46.)

***22** To be sure, even assuming the admissibility of Plaintiff's double hearsay statements attributable to Terri Macri, their relevance is dubious considering they were made outside the presence of Plaintiff. *See, e.g., Greaves v. St. Luke's–Roosevelt Hosp. Ctr.,* 03–CV–7424, 2005 U.S. Dist. LEXIS 4082, at *33 (S.D.N.Y. March 17, 2005) (rejecting plaintiff's claim of hostile work environment because, "[w]ith the exception of a single hearsay remark, made outside his presence, Greaves fails to point to any discriminatory insult or abuse"); *cf. Benjamin v. Metro. Transp. Auth.,* 07–CV–3561, 2012 WL 3188764, at *12 (S.D.N.Y. Aug. 2, 2012) ("While some of Benjamin's fellow Plaintiffs also make allegations about a hostile work environment, the record does not indicate that Benjamin was aware of any comments made to other Plaintiffs, let alone was present to hear them and have them impact his own work environment."). Moreover, Plaintiff's assertion regarding another employee calling him the N-word in Nolan's presence is also of questionable relevance because, while Plaintiff fails to state with specificity when the statement was made, he asserts that it was made when Nolan was a crew leader, which would have been prior to the relevant time period at issue in this action. (*See* Dkt. No. 117, at 6 [Dep. of Andrew Nolan, Jan. 8, 2013].)

Nonetheless, even assuming the truth, relevance and admissibility of all of the aforementioned evidence, Plaintiff still cannot identify a question of fact regarding his hostile work environment claims. As indicated in Point II.C. 1.a. of this Decision and Order, occasional offensive racial comments are not sufficiently severe or pervasive in order to establish a hostile work environment claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

### G. Whether Plaintiff's Due Process Claims Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 68–70 [Defs.' Mem. of Law]; Dkt. No. 124 at 15–16 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

First, the Court notes that the Third Amended Complaint contains an allegation that "Plaintiff maintained a property and liberty interest in his good name and reputation" which was deprived by Defendants. (Dkt. No. 45 ¶¶ 103–104 [Pl.'s Third Am. Compl.].) In his papers in opposition to Defendants' motion for summary judgment on his due process claim, Plaintiff makes no mention of a liberty interest in his reputation, nor does the record contain any evidence of an offensive statement that was made public. Accordingly, to the extent any substantive due process claim was intended by Plaintiff, it is dismissed from this action.

Second, to the extent Plaintiff alleges a procedural due process claim based on any employment action other than termination, those claims are dismissed. Courts in this Circuit hold that an employee does not have a constitutionally protected interest to be free from employment actions other than termination. *See Barnes v, Pilgrim Psychiatric Ctr.,* 860 F.Supp.2d 194, 204 (E.D.N.Y.2012) (citing cases).

***23** Finally, regarding Plaintiff's termination, it is clear that the grievance procedure set forth in the CBA provided Plaintiff the appropriate pre-deprivation hearing as required by the Due Process Clause. *See Adams,* 517 F.3d at 128. Regarding post-deprivation procedures, Plaintiff argues that the CBA "replaces N.Y. Civil Service Law § 75 and any other procedures to challenge the termination of employment." (Dkt. No. 104 at 17 [Pl.'s Mem. of Law].) To be sure, the CBA provides, in relevant part, that the grievance procedure outlined therein "shall apply in lieu of Section 75 and 76 of the Civil Service Law for any employee who

would be covered by those sections." (Dkt. No. 96–2 at 52 [Ex. B to Thompson Decl.].) However, there is nothing in the CBA or otherwise that prevents Plaintiff from seeking a post-deprivation hearing. "[T]he availability of an Article 78 proceeding after the fact provides all the process that is due." *Kruggel v. Town of Arietta,* No. 11–CV–1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (quoting *Sebast v. Mahan,* 754 F.Supp.2d 423, 431–32 (N.D.N.Y.2010)).

For these reasons, Defendants' motion for summary judgment regarding Plaintiff's due process claims is granted.

**H. Whether Plaintiff's Claims Based on Discriminatory Assignments Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 43–45 [Defs.' Mem. of Law]; Dkt. No. 124 at 14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable. *See Henry v. NYC Health & Hosp. Corp.,* No. 13–CV–6909, 2014 WL 957074, at *5 (S.D.N.Y. Mar. 10, 2014). Here, Plaintiff complains that "he and other Black employees have been given less desirable assignments" such as those requiring work outdoors in the hazardous weather. (*See* Dkt. No. 42 at ¶ 28 [Pl.'s Third Am. Compl.].) At his deposition, however, Plaintiff conceded that it was part of his job to go out in the cold and shovel snow. (*See* Dkt. No. 108 at 116 [Pl.'s Dep.].) There is no evidence that such job assignments were accompanied by a loss in job title or pay. Accordingly, the alleged discriminatory job assignments cannot form the basis of a discrimination or retaliation claim since they were not materially adverse. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory reassignment of job duties is granted.

**I. Whether Plaintiff's Claims Based on Discriminatory Denial of Promotion Must Be Dismissed**

***24** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 57–67 [Defs.' Mem. of Law]; Dkt. No. 124 at 6–9 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

In support of his discriminatory failure to promote claim, Plaintiff alleges that he asked Defendants Nolan and Wright for promotions and that, when asked why he did not promote black employees, Nolan responded, "A black man will never make anything on my watch." (*See* Dkt. No. 42 at ¶¶ 26–27 [Pl.'s Third Am. Compl.].)

The following facts are undisputed. The opportunities for a pay grade promotion just above Plaintiff's job title, Laborer I, include Laborer II, Motor Equipment Operator ("MEO") I and MEO II, all of which are within Plaintiff's bargaining unit. Each of these positions require a Commercial Driver's License ("CDL"), which Plaintiff never sought. Plaintiff also never applied for any of these pay grade promotions. The title of "Crew Leader" is a position within the Street Cleaning Bureau, which falls under a separate CBA between the AFSCME 1773 and the City. (*See* Dkt. No. 96–7 [Ex. G to Thompson Decl.].) Under that CBA, all Crew Leader vacancies must be advertised and filled by qualified Local 1773 members before being offered to members of other bargaining units, such as Local 400.

Although the City has no record of Plaintiff ever having applied for a Crew Leader position, Plaintiff asserts that between 2006 and 2010, whenever a bid was posted for a Crew Leader position, he submitted an application, but was never promoted to Crew Leader. However, at his deposition, when asked what positions he put in a bid for between 2006 and 2010, Plaintiff replied that he "put in a bid for a crew leader" and later that he bid for "a couple of" and "more than one bid" for Crew Leader. (Dkt. No. 108 at 96, 99.)[11]

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Plaintiff went on to explain that there was one Crew Leader position in Sanitation, and another in Street Cleaning. Plaintiff said that Sanitation position went to Efren Maldonado, who had previously worked in Street Cleaning and Sanitation, and the other position went to Thomas Rubado, who came from the Aviation Department. Finally, when asked what reason he has to believe he did not get those jobs because of his race, Plaintiff testified that he believes he didn't get those positions because "they didn't like me." (*Id.* at 105.)

According to Jeffrey Wright, who was Commissioner through the end of 2009, the only Crew Leader positions that he appointed in the Street Cleaning Bureau during his tenure were filled by existing Local 1773 members, Thomas Rubado and Richard Shepherd. Since both were qualified, the position would not have been opened to other bargaining units. The only non Local 1773 member who filled a Crew Leader position during Wright's tenure was Efran Maldonado, a minority who was an MEO at the time of his promotion. Also, that position opened in the Department of Sanitation in 2006 and had entirely different job responsibilities than that of the Street Cleaning Bureau. (*See* Dkt. No. 97 at ¶¶ 48–49 [Decl. of Jeffrey Wright, June 13, 2013].)

***25** Nolan, Superintendent, asserts that he was not involved in formal hiring decisions, which are made by the Commissioner. (*See* Dkt. No. 98 at ¶ 13 [Decl. of Andrew Nolan, June 13, 2013].) Plaintiff disputes this, citing Nolan's promotion of Ray Garcia to the vacant position of "acting crew leader" in 2007. It was at that time that, Plaintiff asserts, Nolan made the comment that "no black man was ever going to make anything on my watch." (Dkt. No. 106 at ¶¶ 44–46 [Pl.'s Aff.].)

Jeffrey Wright, who was Commissioner through 2009, affirms that, in the day-to-day operation of the Street Cleaning Bureau, it becomes necessary to name an acting Crew Leader if the actual Crew Leader is out sick or on vacation. These positions are temporary and are made by the Superintendent, not the Commissioner. (*See* Dkt. No. 97 at ¶ 51 [Jeffrey Wright Decl.].) Wright further affirmed that "at some point in 2007," Plaintiff came to Wright and told him that he should be considered for promotion to Crew Leader; not for a specific opening, but more generally in the future. Then Commissioner Wright explained to Plaintiff that he needed to make himself more competitive, "including obtaining his CDL and applying for some of the intermediate positions such as Laborer II and MEO." (*Id.,* at ¶ 50.) Wright explained that, "[i]n other words, since a Crew Leader must supervise laborers and heavy equipment and motor vehicle operators and be familiar with the operation of all of the equipment in the Bureau, it helps to have experience actually performing those jobs and operating that equipment." (*Id.*)

At his deposition, Plaintiff explains that he was told by Bobby Reed, a supervisor, that "next week you are going to be the acting crew leader" but then when that week arrived, Ray Garcia was the acting crew leader. (Dkt. No. 108 at 106–107 [Pl.s' Dep.].) Plaintiff agreed "that an acting crew leader is someone who is working out of title for a short period of time while somebody is either on medical leave or vacation." (*Id.* at 107:9–14.) Plaintiff also explained that during this short period of time, the acting crew leader is paid at the Crew Leader rate. Plaintiff testified that he felt that Nolan gave Ray Garcia the acting crew leader position because of racial animosity toward Plaintiff due to Nolan's comment that a black man wasn't going to make anything on his watch. (*Id.* at 108.) Plaintiff clarified that Nolan made this comment after he made Ray Garcia acting crew leader. (*Id.*)

In his opposition to Defendants' motion, Plaintiff cites one factual question that he argues warrants a denial of summary judgment. Specifically, Plaintiff argues that there is a question of fact regarding whether Nolan made the statement that no black man will ever make anything on his watch. Moreover, Plaintiff contends that even where Nolan was not the decision maker, under a Cat's Paw theory of liability, his racial animus may be imputed to the decision maker.

***26** As indicated in Point II.C. 1.b. of this Decision and Order, Plaintiff bears the burden at trial to show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See* *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013). In order to establish a prima facie case of discrimination based on failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

Plaintiff cannot establish a prima facie case of discriminatory failure to promote for several reasons. First, there is evidence that Plaintiff was not qualified to be a Crew Leader, given

his lack of experience and failure to obtain a CDL, which Plaintiff does not dispute. Next, as it relates to Plaintiff's claim that Defendants failed to promote him, instead promoting Mr. Rubado and Mr. Maldonado, to vacant Crew Leader positions, there is absolutely no evidence of racial animus underlying the decision to promote Mr. Rubado and Mr. Maldonado. In fact, Plaintiff testified that he was not promoted to either of these positions because "they didn't like me" but then later also testified that Mr. Rubado and Mr. Maldonado were in a position to get those jobs. (Dkt. No. 108 at 105, 106.) Moreover, even if Plaintiff could establish a prima facie case of discrimination on this basis, Defendants have identified legitimate, non-discriminatory reasons, which Plaintiff does not dispute, for promoting Mr. Rubado and Mr. Maldonado rather than Plaintiff: those gentlemen were qualified for the position and were members of Local 1773, which, pursuant to the CBA, required that the City promote them before opening the position up to members of other bargaining units, such as Local 400. Given the lack of evidence regarding racial animus attached to those promotions, Defendants are entitled to summary judgment in that regard.

Regarding Nolan's assignment of Ray Garcia to a temporary, acting crew leader position instead of Plaintiff, the Court notes that it is questionable whether such an assignment may be considered a promotion. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004) (concluding that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion). Nonetheless, Plaintiff does not identify any evidence suggesting that he was qualified for the acting crew leader position, while Mr. Garcia, who was an MEO II, three positions ahead of Plaintiff, was clearly qualified. Because Plaintiff cannot show that the acting crew leader position was given to someone less qualified than him, he cannot establish a prima facie case of discrimination based on failure to promote.

***27** For these reasons, Defendants' motion for summary judgment on Plaintiff's claims based on failure to promote is granted.

### J. Whether Plaintiff's Claims Based on Discriminatory Discipline Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 48–577 [Defs.' Mem. of Law]; Dkt. No. 124 at 9–12 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to discipline. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to the disciplinary actions taken against Plaintiff. It is undisputed that the only Defendant who was the decision maker regarding the disciplinary actions against Plaintiff was Commissioner Wright.[12] Moreover, other than a bald and unsupported assertion by Plaintiff in his response to Defendants' Local Rule 7.1 statement, there is no evidence that Nolan had anything to do with the Commissioner's decision to discipline Plaintiff. Finally, there is absolutely no evidence of racial animus or bias on behalf of Commissioner Wright against Plaintiff.

Moreover, for the reasons stated in Defendants' memoranda, Plaintiff has failed to adduce any evidence that similarly situated white employees were treated more favorably than Plaintiff in terms of discipline. (*See* Dkt. No. 100–8 at 51–55 [Defs.' Mem. of Law].)

For these reasons, Defendants' motion for summary judgment on Plaintiff's claims regarding discriminatory and/or retaliatory discipline is granted.

### K. Whether Plaintiff's Claims Based on Discriminatory Termination Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 14–25 [Defs.' Mem. of Law]; Dkt. No. 124 at 2–6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to his termination. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to Plaintiff's termination. The evidence reflects that Defendant O'Connor, who was Commissioner at the time, made the decision to terminate Plaintiff. Even assuming that Defendants Thompson and Simone advised or encouraged O'Connor to terminate Plaintiff, there is no evidence of racial animus or

bias on behalf of O'Connor, Thompson [13] or Simone against Plaintiff.

The only person that Plaintiff has identified as having racial animus is Nolan. Nolan affirms that he did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. Nolan further affirms that O'Connor did not ask for his input regarding the termination. (*See* Dkt. No. 98 at ¶ 49 [Nolan Decl.].) O'Connor affirms that he was the sole decision maker in the determination to terminate Plaintiff. (*See* Dkt. No. 99 at ¶ 36 [Decl. of John M. O'Connor, III, June 13, 2013].). In making the decision to terminate Plaintiff, O'Connor states that he relied upon

> ***28** (a) the Police Report and the statements Guynell Wright made to the police that he knew he was violating DPW policy; (b) the fact that Guynell Wright was in the last stage of disciplinary progression; (c) the fact that Guynell Wright had been previously received significant discipline in 2007 for near identical conduct; and (d) a review of Guynell Wright's prior "thick" disciplinary file which reflected numerous prior major and minor violations and demonstrated a pattern of misconduct over time.

(*Id.* at ¶ 37.) In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies the assertion that Nolan did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. (*See* Dkt. No. 105 at ¶ 47 [Pl.'s Rule 7.1 Response Statement].) In support of his purported denial, Plaintiff cites his affirmation that he personally observed O'Connor go to Nolan and Culkin for advice on how to perform his duties as Commissioner. (*See* Dkt. No. 106 at ¶ 42 [Pl.'s Aff.].) Plaintiff has failed to identify any evidence of Nolan's participation in his termination, either directly or by communication or encouragement of a decision maker.

For these reasons, Defendants' motion for summary judgment as it relates to Plaintiff's claims for discriminatory and/or retaliatory termination is granted.

Finally, the Court notes that Plaintiff has identified no evidence of a causal connection between his DHR complaints and the alleged adverse actions. There is no direct evidence of retaliatory motive on behalf of any decision maker. Moreover, there is no temporal proximity between Plaintiff's complaints and the adverse actions. For example, Plaintiff complained to DHR in March 2008, but the next adverse action did not occur until January 2009. Also, Plaintiff was terminated an entire year after his February 2009 DHR complaint. For these reasons, in addition to those asserted by Defendants in their memoranda of law, Plaintiffs' retaliation claims are dismissed.

Because the Court dismisses Plaintiff's claims for the absence of a question of material fact as to the substantive elements of those claims, the Court need not address the remainder of Defendants' arguments for dismissal, such as failure to exhaust and failure to file a notice of claim.

**ACCORDINGLY,** it is

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 95) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's claims are dismissed with prejudice. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1293527

## Footnotes

1 Conclusions of law in a Local Rule 7.1 Statement, even where unopposed, are not deemed admitted. *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M .J.), *adopted in its entirety by,* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

2 Plaintiff asserts that he began working for the City on October 3, 1988 as a "Laborer I" for the Department's Sanitation Bureau. (*See* Dkt. No. 108, at 44–45 [Dep. of Guynell Wright, Jan. 18, 2013].) However, events which occurred prior to June of 2006 are irrelevant to the resolution of the pending motion since the longest statute of limitations applicable to any of the claims in this action is four years. *See James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 317–318 (E.D.N.Y.2012) (finding that four-year statute of limitations set forth in 28 U.S.C. § 1658(a) applies to employment discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981); *Asanjarani v. City of New York,* No. 09–CV–7493, 2011 WL 4343687, at * 10 (Aug. 18, 2011) (statute of limitations for employment discrimination claims brought pursuant to Section 1983 is three years); *Ruggerio v. Dynamic Elec. Sys. Inc.,* No. 12–CV–100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)(f)) (claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a rightto-sue letter by the administrative body); *Sloth v. Constellation Brands, Inc.,* 883 F.Supp.2d 359, 373 (W.D.N.Y.2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)) (under Section 296, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter).

3 Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on March 3, 2008, in which he argued that his 20–day suspension by the City for fighting was disparate treatment based on race. On August 18, 2008, DHR dismissed the complaint based on a lack of probable cause. (*See* Dkt. Nos. 96–29 and 96–30 [Exs. CC and DD to Thompson Decl.].)

4 Plaintiff ostensibly filed a complaint with DHR on February 18, 2009, charging the City with race discrimination due to his termination. The DHR later dismissed the complaint citing a lack of evidence of unlawful discrimination. (*See* Dkt. No. 96–31 [Ex. EE to Thompson Decl.].)

5 Plaintiff's complaints were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

6 As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348 (1986) (citations omitted).

7 Plaintiff's counsel argues that here, this Court must apply the "universal" rule in the courts of the State of New York that allows a non-moving party to successfully oppose summary judgment with evidence that would be inadmissable at trial because some of Plaintiff's claims arise under New York law. (*See* Dkt. No. 104 at 1–2 [Pl.'s Mem. of Law].) Without commenting on the veracity of Plaintiff's counsel's interpretation of New York law in this regard, the Court notes that it is by now very well-settled law that "[t]he issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive, under the distinction created by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938) and its progeny, and accordingly is subject to federal rather than state law ." *Tingling v. Great Atl. & Pac. Tea Co.,* 02–CV–4196, 2003 WL 22973452, *2 (S.D.N.Y. Dec. 17, 2003), citing *Erie R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817 (1938) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) (applying federal law on defendant's burden at summary judgment stage to diversity action).

8 "The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4, n. 10 (E.D.N.Y. Mar. 17, 2014) (citing *Patterson,* 375 F.3d at 225–227).

9 Although, as Defendants point out, this decision is a Report and Recommendation that was later vacated, the case was thereafter reassigned to another District Judge who adopted the Report and recommendation in full. See *See Brown v. JP Morgan Chase Bank,* No. 12–CV544, 2013 U.S. Dist. LEXIS 109700 (E.D.N.Y. Aug. 5, 2013).

10 Regarding these incidents of discipline, the Court notes Plaintiff's affirmation that in 1997, another black employee slapped his bottom in the restroom, which resulted in two separate physical altercations between Plaintiff and this other employee: one in the restroom and another later in the day when Plaintiff was on his way home from work. Plaintiff asserts that both he and the other employee were disciplined as a result. (*See* Dkt. No. 106 at 2, ¶ 8 [Pl.'s Aff.].) Plaintiff further asserts that in February 2007, Stanley Gardynski, a white employee, made humping motions with his groin at Plaintiff's head. Plaintiff admits that afterward, when Gardynski was provoking him again, Plaintiff hit him. Both Plaintiff and Gardynski were disciplined as a result. (*Id.* at 3, ¶ 13.)

11 Plaintiff also put in a bid for a gardener position in the Parks and Recreation Department.

12 In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies that Nolan was not the decision maker regarding the discipline he received between 2006 and 2009. (*See* Dkt. No. 105 at ¶ 68 [Pl.'s Rule 7.1 Response Statement] .) In support of this purported denial, Plaintiff asserts that Commissioner Wright relied on Defendants Nolan and Culkin to make the final determination regarding discipline. However, Plaintiff cites a portion of his deposition testimony that does not support this assertion. Accordingly, this fact is deemed admitted.

13 At his deposition, Plaintiff testified that he did not believe that O'Connor or Thompson decided to terminate him because he is black. (*See* Dkt. No. 108 at 222 [Pl.'s Dep.].) Plaintiff testified that he thought Thompson retaliated against him for making complaints of discrimination because Thompson "never helped me out" when Plaintiff would go to him with problems. (*Id.* at 222–223.) Finally, at his deposition, Plaintiff testified that the only involvement Simone had was being present at meetings and that "[h]e didn't do anything, really." (*Id.* at 247.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3084015
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Anthony ZAPPIN, Plaintiff-Appellant,
v.
Matthew F. COOPER, Lauren Liebhauser, Defendants-Appellees,
Kevin M. Doyle, Hannah Yu, Jane Doe, Defendants.

No. 23-165
|
June 21, 2024

Appeal from a judgment of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the April 6, 2022 judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Anthony Zappin, pro se, North Myrtle Beach, SC.

For Defendant-Appellee Matthew F. Cooper: Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, Andrea W. Trento, Assistant Solicitor General, for Letitia James, Attorney General of the State of New York, New York, NY.

For Defendant-Appellee Lauren Liebhauser: Steven C. Wu, Chief, Appeals Division, Molly Morgan, Assistant District Attorney, for Alvin L. Bragg, Jr., District Attorney of New York County, New York, NY.

PRESENT: DENNIS JACOBS, PIERRE N. LEVAL, RICHARD J. SULLIVAN, Circuit Judges.

## SUMMARY ORDER

Appellant Anthony Zappin, a disbarred attorney proceeding *pro se*, appeals from a judgment of the district court dismissing his claims under 42 U.S.C. § 1983 against the New York Supreme Court justice who presided over his divorce proceeding, various employees of the New York County District Attorney's Office ("DANY"), and a staff attorney for the Attorney Grievance Committee for the New York State Supreme Court, Appellate Division, First Department ("AGC"). We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

The suit giving rise to this appeal is one of more than a dozen state and federal actions that Zappin has filed in relation to his divorce proceeding, his subsequent disbarment, and – as particularly relevant here – his arrest and prosecution by New York authorities. Zappin alleges that Justice Matthew Cooper and Lauren Liebhauser, then an investigator with DANY, conspired to initiate a baseless false-reporting prosecution against Zappin in retaliation for the various complaints and legal actions he had filed against Justice Cooper. By Zappin's telling, he reported Justice Cooper to the police in November 2016 after Justice Cooper approached and spit on him. A short time later – at Justice Cooper's urging and based on Liebhauser's false statements – police arrested Zappin and charged him with filing a false report. Although Zappin eventually pleaded guilty to the lesser offense of non-criminal disorderly conduct, he then filed this action, asserting claims under section 1983 for abuse of process, First Amendment retaliation, and conspiracy against Justice Cooper and Liebhauser, as well as conspiracy claims against DANY prosecutor Hannah Yu, her unidentified supervisor Jane Doe, and AGC staff attorney Kevin Doyle.

After the district court *sua sponte* dismissed Zappin's claims against Yu, Doe, and Doyle, Zappin filed an amended complaint asserting claims only against Liebhauser and Justice Cooper, which each moved to dismiss. While those motions were pending, Zappin sought leave to file a second amended complaint against Liebhauser and Justice Cooper, asserting an additional section 1983 claim for conspiracy to use bail as punishment and various state law claims premised on the same set of alleged facts. In July 2021, the district court granted the defendants' motions to dismiss, holding (among other things) that Zappin's guilty plea to a lesser charge established probable cause barring his substantive claims. The district court later denied Zappin's motion for leave to file a second amended complaint and further enjoined Zappin from filing, without leave of the court, any future actions in the Southern District of New York concerning his divorce proceeding and related matters. Zappin sought reconsideration of this ruling, which was denied.

On appeal, Zappin argues that the district court erred in dismissing his abuse-of-process claim and denying him leave to assert new claims for conspiracy under section 1983 and

*prima facie* tort under state law. He also contends that the district court improperly denied him discovery, dismissed his claims against Doyle, Yu and Doe, and issued a filing injunction against him. We address each of these arguments in turn.

### I. Dismissal of the Abuse-Of-Process Claim

***2** Of the four claims alleged in his first amended complaint, Zappin challenges only the district court's dismissal of, and denial of leave to re-plead, his abuse-of-process claim. We review *de novo* the district court's grant of a motion to dismiss and denial of leave to amend for failure of the proposed amendment to state a claim. *See* *Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015).

"[S]ection 1983 liability may lie for malicious abuse of criminal process," since "[i]n the criminal context, malicious abuse of process is by definition a denial of procedural due process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (internal quotation marks omitted). "[W]e turn to state law to find the elements of the malicious abuse of process claim" brought under section 1983. *Id.* Under New York law, a plaintiff must allege that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act[,] (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (internal quotation marks omitted).

In dismissing Zappin's abuse-of-process claim and denying him leave to amend, the district court concluded that Zappin's guilty plea to disorderly conduct established probable cause for his arrest and prosecution for falsely filing a police report. On appeal, Zappin does not dispute that his guilty plea establishes probable cause; he instead asserts that the district court erred in holding that probable cause negates his abuse-of-process claim as a matter of law. We have previously observed that "[t]here has been considerable confusion within our Circuit regarding whether probable cause is a complete defense to a claim of abuse of process under New York law." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 (2d Cir. 2015). But whatever confusion may exist on this point, we need not resolve it today, since we are able to affirm the dismissal of the abuse-of-process claim on other grounds. *See* *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (explaining that we "may affirm on any basis supported by the record").

Put simply, Zappin fails to plausibly state any facts, beyond his conclusory allegations, that Cooper and Liebhauser pursued his prosecution for any improper purposes. *See* *Savino*, 331 F.3d at 77 (explaining that a plaintiff must allege that defendants "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution"). Instead, Zappin repeatedly asserts that Justice Cooper engineered the criminal prosecution to retaliate against Zappin for the numerous complaints and legal actions he had filed against Justice Cooper. But allegations that Justice Cooper "[was] seeking to retaliate against [Zappin] by pursuing his arrest and prosecution," without more, are insufficient, *Savino*, 331 F.3d at 77, and suggest only that he "acted maliciously" in instigating the prosecution, which is also insufficient, *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984). Nor does the complaint plausibly allege that Justice Cooper misused the prosecution and related order of protection after their issuance to further any improper objectives. [1] *See id.* ("[T]he gist of the action for abuse of process ... is the improper use of process after it is issued." (internal quotation marks omitted)); *see also* *Hauser v. Bartow*, 273 N.Y. 370, 373 (1937) ("The action is not for the wrongful bringing of an action or prosecution, but for the improper use, or rather abuse, of process in connection therewith." (internal quotation marks omitted)). Moreover, although Zappin repeatedly lumps Justice Cooper and Liebhauser together, his specific allegations – in both his amended complaint and his proposed second amended complaint – refer only to Justice Cooper's improper (and legally insufficient) motive to retaliate against him.

***3** Given his failure to adequately plead anything more than an improper motive on the part of Justice Cooper, Zappin's abuse-of-process claim against Justice Cooper and Liebhauser necessarily fails. We therefore affirm the district court's decision to dismiss, and to deny the request for leave to re-plead, that claim. *See* *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 309 (2d Cir. 2022) (affirming denial of leave where amendment would be futile).

### II. Denial of Leave to Amend to Add New Claims

Zappin also contends that the district court improperly denied him leave to further amend his complaint to assert new claims alleging conspiracy to use bail as punishment under section 1983 and *prima facie* tort under New York law. We review denials of leave to amend for abuse of discretion. *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). Although leave to amend should be given freely "when justice so requires," Fed. R. Civ. P. 15(a)(2), a "district court has broad discretion

in determining whether" to deny such leave, *id.*, and may do so "for good reason, including futility, bad faith, undue delay, *or* undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (emphasis added) (internal quotation marks omitted).

We find no abuse of discretion in the district court's denial of leave to amend. While Zappin contends that the amendment would not be futile, he does not address the district court's additional grounds for denying leave to amend: his request was brought in bad faith, was unduly delayed, and would cause undue prejudice to the defendants. Accordingly, he has forfeited any challenge to the district court's ruling as to those grounds. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered [forfeited] and normally will not be addressed on appeal."); *see Cohen v. Am. Airlines, Inc.*, 13 F.4th 240, 247 (2d Cir. 2021) (concluding plaintiff forfeited challenge to denial of leave by failing to address district court's ruling that amendment was sought in bad faith).

In any event, the district court properly considered the "extensive evidence" of Zappin's continuous and vexatious efforts to bring actions against Justice Cooper and other New York state officials when it denied Zappin leave to amend. Zappin App'x at 268; *see also id.* at 175–95. At least as far back as 2017, Zappin has pleaded claims in federal court based on the same underlying facts — the November 2016 incident — against the same set of defendants. Notwithstanding this lengthy history, Zappin waited thirteen months after the filing of his initial complaint in this case, and two months after the defendants' motions to dismiss his first amended complaint had been fully briefed, before seeking leave to amend his complaint a second time to assert new theories of liability based on these same underlying facts. *See, e.g.*, *United States v. Cardroom Int'l, LLC*, 726 F. App'x 98, 100 (2d Cir. 2018) (finding no abuse of discretion to deny party leave to amend "to assert a totally new theory over a year" after its initial filing, where "the facts underlying its new theory were clearly available to it when it filed its initial claim"). We therefore see no abuse of discretion in the district court's decision to deny Zappin leave to file yet another complaint. *See Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001) (explaining that district courts may deny leave "in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive").

### III. Denial of Discovery

***4** Zappin next argues that the district court abused its discretion in denying his requests for discovery pending resolution of defendants' motions to dismiss. But the law is clear that discovery is not warranted where, as here, a plaintiff has "failed adequately to state a claim." *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 567 (2d Cir. 2016); *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (concluding that a plaintiff's "speculation" that discovery would reveal facts to support the complaint's claims "underscores, rather than cures, the deficiency in the [c]omplaint"). As explained above, Zappin has not plausibly alleged an abuse-of-process claim, and he does not otherwise challenge the district court's dismissal of his first amended complaint. The district court therefore did not err in refusing his requests to conduct discovery.

### IV. Dismissal of Claims Against Doyle, Yu, and Doe

Zappin also contends that the district court erred in dismissing *sua sponte* his conspiracy claims against Doyle, Yu, and Doe in his original complaint. Again, we disagree.

First, because Zappin sought leave to proceed *in forma pauperis*, the district court properly reviewed the complaint *sua sponte* for any claims that were frivolous, failed to state a claim, or sought monetary relief from a defendant with immunity. 28 U.S.C. § 1915(e)(2)(B); *see Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363–64 (2d Cir. 2000). Second, the district court did not err in concluding that *res judicata* barred Zappin's claims against Doyle – claims he had, or could have, asserted in a prior suit against Doyle that was adjudicated on the merits (and which we affirmed on appeal). *See Zappin v. Doyle*, 756 F. App'x 110, 112 (2d Cir. 2019) (affirming Rule 41(b) dismissal with prejudice); *see also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000).

Finally, Zappin contends that Yu and Doe were not entitled to prosecutorial immunity. But Yu and Doe's alleged conduct here – making statements at Zappin's arraignment, arguing for bail, and requesting a temporary order of protection – was "intimately associated with the judicial phase of the criminal process" and thus entitled to absolute immunity. *See Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). And even if some of their alleged acts could be said to be "investigative" such that absolute immunity does not apply, *id.* at 166, the original complaint offered only conclusory and vague allegations about any agreement Yu and Doe had among themselves or others to deprive Zappin of his

constitutional rights. Accordingly, Zappin again failed to state a claim for relief. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002); *see also Coulter*, 753 F.3d at 366.

**V. Issuance of the Filing Injunction**

Although Zappin also challenges the district court's entry of a filing injunction against him, he forfeited that aspect of his appeal by offering no argument other than an incorporation by reference of arguments raised in the district court. *See Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 n.1 (2d Cir. 2013) ("Appellants do not preserve questions for appellate review by merely incorporating an argument made to the district court by reference in their brief." (internal quotation marks omitted)).

But even if we were to consider those arguments on the merits, we cannot say that the district court abused its discretion when it enjoined Zappin from "instituting further vexatious, harassing[,] or repetitive proceedings arising out of" his divorce proceedings and related disciplinary and criminal matters. *See Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 25 (2d Cir. 1986); *see also Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 713 (2d Cir. 2019) (reviewing a filing injunction for abuse of discretion). As the record demonstrates: (1) Zappin was on notice of Justice Cooper's motion for a filing injunction and had the opportunity to, and in fact did, respond to that motion, *see Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998); (2) the district court considered the five factors set out in *Safir* and reasonably concluded that each supported the imposition of an injunction, *see* Zappin App'x at 186–95; and (3) the injunction is appropriately tailored to prevent Zappin only from filing future, related actions without the district court's permission, *id.* at 195.

***5** We have considered Zappin's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 3084015

## Footnotes

1 We need not credit Zappin's allegations that are plainly contradicted by materials incorporated into the complaint or appropriately judicially noticed, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), or his entirely speculative allegations of misconduct, *see Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory.").

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.